IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

OFFICE OF THE ATTORNEY GENERAL,
THE STATE OF FLORIDA,
Department of Legal Affairs,

and

OFFICE OF FINANCIAL REGULATION,
THE STATE OF FLORIDA,
Division of Consumer Finance,

      Plaintiffs,

      v.                            CASE No. _____

OCWEN FINANCIAL CORPORATION,
a Florida corporation, OCWEN MORTGAGE
SERVICING, INC., a U.S. Virgin Islands
corporation, and OCWEN LOAN
SERVICING, LLC, a Delaware limited
liability company,

      Defendants.
_____/

## **COMPLAINT**

Plaintiffs, the Office of the Attorney General, State of Florida, Department of Legal Affairs

(the "Florida Attorney General"), and the Office of Financial Regulation, State of Florida, Division

of Consumer Finance (the "Florida Office of Financial Regulation") (collectively, the "Plaintiffs"),

by and through their undersigned attorneys, sue defendants, Ocwen Financial Corporation, a

Florida corporation ("Ocwen Financial"), Ocwen Mortgage Servicing, Inc., a U.S. Virgin Islands

corporation ("Ocwen Mortgage Servicing"), and Ocwen Loan Servicing, LLC, a Delaware limited

liability company ("Ocwen Loan Servicing") (Ocwen Financial, Ocwen Mortgage Servicing, and

Ocwen Loan Servicing are collectively referred to herein as the "Ocwen Defendants" or "Ocwen"),

and respectfully allege as follows:

## INTRODUCTION

1.      This is a civil action filed by the Florida Attorney General and the Florida Office of Financial Regulation against the Ocwen Defendants for misconduct occurring after February 2014 relating to their servicing of single family residential mortgages.  The parent company Ocwen Financial is based in West Palm Beach, Florida.

2.      Despite multiple lawsuits and regulatory actions by various state attorneys general, state regulators, and federal agencies, the Ocwen Defendants continue to violate federal and state laws and industry standards.  As a result, Floridians, along with borrowers throughout the United States, have suffered financial injury, and in some instances, have lost or been placed in imminent risk of losing their homes.

3.      The deficiencies in the Ocwen Defendants' system of record are widespread and often require manual fixes and result in significant errors such as illegal foreclosures, mishandling loan modifications, misapplied mortgage payments, failure to make insurance payments from borrowers' escrow accounts, and overcharging borrowers' accounts for default fees.  The Ocwen Defendants willfully disregarded advice from regulators and retained third party auditing firms to update its technology.

4.      In addition, the Ocwen Defendants have not adequately responded to customer complaints and requests for loss mitigation.  The Ocwen Defendants have also engaged unlicensed vendors to assist in servicing functions and failed to implement adequate control over vendors.

5.      The Ocwen Defendants knew or should have known that their servicing errors were widespread and that the technology used in their systems and by their vendors was compromised and functioning below industry standard.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action because it presents a federal question, 28 U.S.C. § 1331 and is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a), 12 U.S.C. § 2605.  This action is also brought by the Florida Attorney General pursuant to its authority under 12 U.S.C. §§ 5536, 5552 and 2614.  This action is brought by the Florida Office of Financial Regulation pursuant to its authority under 12 U.S.C. §§ 5536 and 5552.

7.      In addition, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the subject matter of the state law claims asserted by Plaintiffs because those claims are so related to the claims brought under Federal consumer financial law that they form part of the same case or controversy, and because those claims arise out of the same transactions or occurrences as the claims brought by Plaintiffs pursuant to 12 U.S.C. §§ 5536 and 5552.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f) because the Ocwen Defendants are located in or do business in this district and a substantial part of the events or omissions and course of conduct giving rise to the claims set forth in this Complaint occurred in this district.

## PLAINTIFFS

9.      This action is brought by the Plaintiffs to seek injunctive and other statutory relief to enforce Section 6 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, and the regulations promulgated thereunder at Regulation X, 12 C.F.R. part 1024 ("Regulation X").  RESPA is a Federal consumer financial law.  12 U.S.C. § 5481(14).  Violations of RESPA represent violations of the Consumer Financial Protection Act ("CFPA").  12 U.S.C. § 5564.  Each Plaintiff is an enforcing authority of the CFPA.  12 U.S.C. § 5552.  Plaintiffs are authorized to

bring this action and to enforce the CFPA, which prohibits the violation of Federal consumer financial law by any covered person or service provider. *See* 12 U.S.C. § 5536(a)(1)(A).

10.     This action is also brought by the Florida Attorney General pursuant to the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ("FDUTPA"). The Florida Attorney General is an enforcing authority of FDUTPA. *See* Fla. Stat. § 501.203(2) (2016). The Florida Attorney General has conducted an investigation of the matters alleged herein, and the head of the enforcing authority, Attorney General Pamela Jo Bondi, has determined that this enforcement action serves the public interest. The FDUTPA statutory violations alleged herein affect more than one judicial circuit of the state of Florida. As an enforcing authority under FDUTPA, the Florida Attorney General is authorized to pursue this action to enjoin FDUTPA violations and to obtain legal, equitable, or other appropriate relief, including restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, and other relief as may be appropriate pursuant to Sections 501.207, 501.2075, and 501.2077, Florida Statutes.

11.     This action is further brought by the Florida Office of Financial Regulation pursuant to Chapter 494 of the Florida Statutes. The Office of Financial Regulation is established by Section 20.121(3)(a)2, Florida Statutes, to regulate various financial businesses in the state. Chapter 494, Part III, of the Florida Statutes regulates various businesses and occupations involved in the financing of real estate, specifically including mortgage lenders. According to Section 494.0011, Florida Statutes, the Florida Office of Financial Regulation is charged with administering and enforcing the provisions of Chapter 494, Florida Statutes, and pursuant to Section 494.0012, Florida Statutes, conducting examinations and investigations to determine whether any provision of Chapter 494, Florida Statutes, has been violated.

**DEFENDANTS**

12.     Defendant Ocwen Financial is a publicly traded Florida corporation with its principal place of business in West Palm Beach, Florida.  Ocwen Financial provides residential mortgage servicing services and engages in specialty servicing and other mortgage-related services.  At all times relevant to this Complaint, Ocwen Financial transacts or has transacted business in this district, throughout the State of Florida and the United States.

13.     Defendant Ocwen Mortgage Servicing is a United States Virgin Islands corporation.  Ocwen Mortgage Servicing's principal place of business is in the United States Virgin Islands.  At all times relevant to this Complaint, Ocwen Mortgage Servicing transacts or has transacted business in this district, throughout the state of Florida and the United States. Ocwen Mortgage Servicing is a direct subsidiary of Ocwen Financial.

14.     Defendant Ocwen Loan Servicing is a Delaware limited liability company and wholly-owned second-tier subsidiary servicing company of Ocwen Financial.  Ocwen Loan Servicing's principal place of business is in West Palm Beach, Florida.  At all times relevant to this Complaint, Ocwen Loan Servicing transacts or has transacted business in this district and throughout the state of Florida and United States.  Ocwen Loan Servicing is a direct subsidiary of Ocwen Mortgage Servicing.  Ocwen Loan Servicing is licensed as a mortgage lender pursuant to Chapter 494, Florida Statutes, and holds license No. MLD765 from the Florida Office of Financial Regulation.

15.     Ocwen Financial, through its subsidiaries, originates and services loans. The Ocwen Defendants engage in servicing activities related to the loans by, among other things, processing borrower payments, administering loss mitigation processes, and managing

foreclosures. The Ocwen Defendants also acquire and collect upon borrowers' mortgage debts that are in default.

16. Ocwen Financial, the parent and publicly traded company, wholly owns all of the common stock of its primary operating subsidiary, Ocwen Mortgage Servicing. Ocwen Mortgage Servicing wholly owns the stock of another of Ocwen Financial's primary operating subsidiaries, Ocwen Loan Servicing. All three entities share and have shared key executives, including Ronald Faris, Timothy Hayes, Michael Bourque, and John Patrick Cox. Each of the three entities, through Ocwen Financial, file a consolidated financial statement with Ocwen Financial's public disclosures.

17. Ocwen Financial directs, operates, and participates in mortgage servicing activities, including the daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations, for Ocwen's loans. Ocwen Financial enters into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. Ocwen Financial has contracted for such products and services, including a system of record and related technology services, for and on behalf of Ocwen's affiliates, which include Ocwen Mortgage Servicing and Ocwen Loan Servicing.

18. Ocwen Mortgage Servicing is also engaged in servicing loans for borrowers. Upon information and belief, Ocwen Mortgage Servicing is licensed by numerous state regulators to service loans and collect mortgage debts. It has entered into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. Ocwen Mortgage Servicing has also contracted for such products and services, including a system of record and related technology services used by Ocwen Loan Servicing and Ocwen Financial.

19.     Upon information and belief, Ocwen Loan Servicing is licensed by numerous state regulators to service loans and collect borrowers' mortgage debts.

20.     Under Ocwen Financial's and Ocwen Mortgage Servicing's direction, authority, and control, Ocwen Loan Servicing has also engaged in the marketing and processing and transmitting of payments for credit monitoring products, financial advisory products, and other products that are added on to Ocwen borrowers' accounts.

21.     At all times relevant to this Complaint, each of the Ocwen Defendants has been a "covered person," as defined by 12 U.S.C. 5481(6)(A).  Each entity offers or provides a consumer financial product or service for use by consumers primarily for personal, family, or household purposes, or that is delivered, offered, or provided in connection with such a product or service by servicing mortgage loans and collecting on consumers' mortgage debts, among other services. 12 U.S.C. § 5481(15)(A)(i), (iv), (vii) and (x).

22.     As set forth in Paragraph 16, at all times relevant to this Complaint, Ocwen Financial has been "related person" because, it has been the direct and indirect shareholder of all Ocwen Mortgage Servicing and Ocwen Loan Servicing stock, and is thus a "controlling shareholder" and "shareholder…or other person…who materially participates in the conduct of the affairs" of Ocwen Mortgage Servicing and Ocwen Loan Servicing, which are covered persons. 12 U.S.C. § 5481(25)(C)(i) and (ii). Ocwen Financial is thus "deemed to [be] a covered person for all purposes of any provision of Federal consumer financial law. 12 U.S.C. § 5481(25)(B).  At all times relevant to this Complaint, Ocwen Mortgage Servicing has been a "related person" because, as described in Paragraph 16, it owns all of Ocwen Loan Servicing's stock and is thus a "controlling shareholder" and a "shareholder…or other person…who materially participates in the conduct of the affairs" of Ocwen Loan Servicing, which is a covered person.  12 U.S.C. §

5481(25)(C)(i) and (ii).  At all times relevant to this Complaint, Ocwen Mortgage Servicing is thus "deemed to [be] a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

23.  At all times relevant to this Complaint, Ocwen Financial has been a service provider, as defined in 12 U.S.C. § 5481(26)(A), to Ocwen Loan Servicing because, as described above, Ocwen Financial has provided material services to Ocwen Loan Servicing.  Ocwen Financial has also controlled and participated in the design, operation, and maintenance of Ocwen Loan Servicing's mortgage servicing activities.  12 U.S.C. § 5481(26)(A)(i).

24.  At all times relevant to this Complaint, Ocwen Financial has been a "control person" of Ocwen Mortgage Servicing, as that term as that term is defined by § 494.001(6), Florida Statutes.  At all times relevant to this Complaint, Ocwen Mortgage Servicing has been a "control person" of Ocwen Loan Servicing, as that term as that term is defined by § 494.001(6), Florida Statutes.

25.  At all times relevant to this Complaint, Ocwen Loan Servicing, Ocwen Mortgage Servicing, and Ocwen Financial have operated as a "common enterprise."  Ocwen Loan Servicing, Ocwen Mortgage Servicing, and Ocwen Financial have conducted the business practices described below through interconnected companies that have common business functions, employees, and office locations. Ocwen Financial and Ocwen Mortgage Servicing control (either formally or informally) and operate Ocwen Loan Servicing's mortgage servicing activities.  Ocwen Financial also contracts for critical mortgage servicing operations for and on behalf of Ocwen Mortgage Servicing and Ocwen Loan Servicing. Ocwen Financial, Ocwen Mortgage Servicing, and Ocwen Loan Servicing also file consolidated financial statements and share employees and offices. Accordingly, an act by one entity constitutes an act by each entity comprising the "common

enterprise" and Ocwen Financial, Ocwen Mortgage Servicing, and Ocwen Loan Servicing are each jointly and severally liable for the acts and practices alleged below.

26.     As described in Paragraphs 16-25, at all times relevant to this Complaint, Ocwen Financial and Ocwen Mortgage Servicing have directed and controlled Ocwen Loan Servicing's mortgage servicing activities, and authorize Ocwen Loan Servicing to service Ocwen's loans. Employees of Ocwen Financial and Ocwen Mortgage Servicing have knowledge of and control, or have the ability to control, the activities of Ocwen Loan Servicing, as discussed herein. Therefore, Ocwen Financial and Ocwen Mortgage Servicing, as Ocwen Loan Servicing's principals, are liable for the actions of their agent, Ocwen Loan Servicing.

27.     The Ocwen Defendants are engaged in trade or commerce in the state of Florida and are subject to the consumer protection laws of the state of Florida in the conduct of their mortgage servicing and related activities, loss mitigation and foreclosure activities. The consumer protection laws of the state of Florida include laws prohibiting unfair or deceptive acts or practices.

## I.     BACKGROUND

### A.     The Mortgage Servicing Industry

28.     The single-family mortgage servicing industry consists of financial services entities and other firms that service mortgages for residential properties designed to house one- to four-family dwellings.

29.     A servicer is responsible for mortgage administration activities, known as servicing activities, which generally include collecting payments from borrowers, applying payments made in an agreed-upon order to borrowers' indebtedness, pursuing collections from delinquent mortgagors, and pursuing either loss mitigation or foreclosure, as appropriate, when borrowers become delinquent on mortgage payments.

30.     Servicers utilize software, known as a system of record, to input and maintain loan and homeowner information.  Accurate and functioning systems of record are extremely important to a servicer's ability to comply with state and federal law.

31.     Individual loans are typically escrowed, which means that the servicer collects a budgeted escrow payment on an installment basis over the course of the year.  The servicer, rather than the homeowner, is entrusted with making monetary disbursements to taxing authorities, hazard insurance providers, and other entities.  Installment payments for escrowed loans are comprised of principal, interest, and escrow payments.  Servicers are required to perform an accurate annual escrow analysis to determine the installment payment amount.  Following the escrow analysis, the servicer must provide an escrow statement to the homeowner.  Borrowers are completely reliant on the servicer to timely disburse funds to the appropriate entities out of the loan's escrow account.

32.     In the event a homeowner fails to provide a servicer with documentation that their home is insured, a servicer may force-place insurance on the home.  Force-placed insurance premiums are frequently two-to-three times or more the price of an insurance policy purchased by the homeowner.  Generally, a servicer enters into an agreement with a force-placed insurance vendor that exclusively provides force-placed insurance policies to the servicer.

33.     A servicer who does not own a mortgage loan may become the servicer by acquiring "mortgage servicing rights" or by entering into a contract with a master servicer to act on its behalf as subservicer.  Such transfers can occur at various stages of repayment of the mortgage, including where the borrower is delinquent in payments and may seek loss mitigation assistance from the servicer to avoid foreclosure on the loan.

### B.    Background Information on Ocwen

34.    Ocwen services and subservices home mortgage loans secured by residential properties owned by individual citizens of the State of Florida and of the United States and is currently the second largest non-bank mortgage servicer in the United States.  Ocwen's current servicing portfolio includes approximately 125,000 loans secured by property located in the State of Florida.  As of December 2016, Florida loans account for 9.14% of Ocwen's total portfolio of single-family residential mortgage loans.

35.    Borrowers do not choose their mortgage servicer and have no control over whether and how Ocwen services their loans.

36.    Following the onset of the mortgage crisis, Ocwen experienced rapid growth. Beginning in late 2012, Ocwen began making large acquisitions of mortgage servicing rights and over a nine-month period from December 2012 through August 2013, Ocwen acquired the servicing rights to over 2.6 million loans with over $347 billion in unpaid principal balance (UPB) from Homeward, Residential Capital, LLC (ResCap) and Ally Bank.  By the end of 2014 Ocwen's portfolio had nearly doubled in size and the aggregate unpaid principal balance of the loans in its portfolio grew from nearly $204 billion at year end 2012 to over $398 billion by year end 2014.

37.    Ocwen's rapid growth led to an increase in the complexity of its operations as Ocwen attempted to assimilate new loans into its portfolio.  Since 2014, state regulators have noted Ocwen's lack of proper risk management and found numerous operational deficiencies, including, for example, Ocwen's failure to timely date borrower correspondence, failure to timely pay borrower escrow items, and failure to ensure the accuracy of escrow accounts.

38.     Ocwen specializes in "default servicing" where Ocwen's portfolio of loans consists of many loans where the borrowers are more at risk of default and often encounter hardships or difficulties in making payments.

39.     In addition to collecting payments and disbursing escrows, Ocwen regularly reviews mortgage loans for potential loss mitigation or loss mitigation options, including loan modifications, and manages the foreclosure process.

40.     While Ocwen Loan Servicing is the flagship mortgage loan servicer within the Ocwen family, as set forth above, each of the Ocwen Defendants perform mortgage servicing and/or debt collection activities. Additional Ocwen affiliates who perform mortgage servicing and/or debt collection on behalf of Ocwen include the following:

     a.  Ocwen Financial Solutions Private Limited ("OFSPL"): OFSPL is an India entity that is licensed to conduct mortgage loan servicing and debt collection agency activities in a significant number of jurisdictions; and

     b.  Homeward Residential Corporation India Private Limited ("HRCIPL"): HRCIPL is an India entity that is licensed to conduct debt collection agency activities in several jurisdictions.

41.     Ocwen relies on Altisource Portfolio Solutions ("Altisource"), an affiliated vendor, to provide technology services and perform other servicing functions.

42.     In 2009, Ocwen Financial spun off its internal technology department into Altisource. As a result of this spin-off, Altisource owns and maintains the REALServicing platform, and Ocwen has contracted with Altisource for technology services. Altisource derives a majority of its revenue from the services it provides to Ocwen.

43.     Prior to 2015, William Erbey served as Chairman to both Ocwen and Altisource. Mr. Erbey was forced to resign in January 2015 under the terms of a Consent Order Ocwen entered with New York Department of Financial Services ("NY DFS").  NY DFS described the conflicts of interest between Ocwen and Altisource as wide spread.

### C.     Ocwen's Inadequate System of Record: REALServicing

44.     Fundamental functions of a mortgage servicer include processing and applying borrower payments, communicating accurate payment information to borrowers, managing escrow accounts, and maintaining accurate loan balance information.

45.     Servicers use systems of record to service loans and automate servicing functions.

46.     Ocwen manages its large portfolio by relying on Altisource.  Altisource provides fundamental mortgage-servicing technology functions to Ocwen including information technology solutions for the application of payments and the preservation of loan payment and loan balance information.  Altisource uses REALServicing as the system of record.  REALServicing and its related applications consist of a patchwork of legacy systems, some of which were inherited from companies acquired by Ocwen over the years.

47.     REALServicing suffers from fundamental architecture and design flaws, including lack of properly managed data, lack of automation, and lack of capacity.

48.     REALServicing is unable to adequately handle the volume and complexity of Ocwen's post-2012 portfolio.  REALServicing has not been properly maintained, the system functionality has deteriorated, and the platform often malfunctions.  The system now requires Ocwen personnel or its vendors to input data using ill-defined codes and manual data entry to fix failures of the automated systems, resulting in serious data integrity challenges.

49.     These flaws have adversely impacted the accuracy of information Ocwen uses to service loans.

50.     Ocwen knows that REALServicing is not an adequate system of record and is far below the industry standard, is unreliable, and cannot be trusted to accurately maintain homeowner's loan and payment information.  Nonetheless, Ocwen still maintains REALServicing as its system of record.

51.     Ocwen management was frequently advised of the operational deficiencies and compliance failures of servicing functions, including continuing compliance concerns.  Ocwen management has been advised by employees that compliance concerns stemming from REAL Servicing encompassed several departments in servicing, including escrow.  Despite knowledge of widespread problems, Ocwen was resistant to making consumer redress and failed to implement appropriate controls and take adequate actions to ensure compliance with consumer protection laws.

52.     Upon information and belief, no other mortgage servicer uses REALServicing.

53.     As a result of the patchwork of systems, duplicative and confusing comment codes, overall lack of uniformity within REALServicing, and Ocwen's reliance upon outdated and unreliable technology, borrowers have suffered serious harm.  As set forth more fully below, Ocwen has improperly applied borrowers' mortgage payments, mishandled loan modification payments, failed to make timely payment of insurance premiums from escrow accounts, mailed insurance payments to wrong addresses, overcharged delinquent borrowers for property inspections and maintenance, and mailed time-sensitive correspondence to borrowers with erroneous dates.  These errors have resulted in overcharges that has in some instances forced consumers into default and even foreclosure.

### D.    Ocwen's History with Regulators

54.    Since 2014, Ocwen has entered into several settlements with various regulators and state attorneys general to attempt to resolve ongoing servicing misconduct and regulatory deficiencies in Ocwen's servicing operations.

55.    In February of 2014, Ocwen Financial and Ocwen Loan Servicing entered a Consent Judgment with the Florida Attorney General and 48 other states, the District of Columbia and the CFPB[1] to address and resolve servicing misconduct including misapplying borrower payments; failing to maintain accurate account statements; charging unauthorized fees for default-related services; improperly imposing force-placed insurance; failing to provide accurate and timely information to borrowers relating to loss mitigation services and eligibility for loan modifications; among other misconduct.

56.    In December of 2014, the New York Department of Financial Services ("NY DFS") restricted Ocwen's ability to acquire mortgage servicing rights ("MSR(s)") on additional New York loans and the California Division of Business Oversight ("CA DBO") placed a similar MSR ban in January of 2015. These bans were put in place due to misconduct identified by those regulators and a perception that Ocwen could not be trusted to accurately service mortgage loans. The ban imposed by CA DBO was lifted on February 17, 2017. The NY DFS ban is still in place.

57.    The Florida Office of Financial Regulation engaged in a limited examination in 2015, along with the states of Maryland, Massachusetts, Mississippi, Montana, and Washington, in response to concerns raised by consumer complaints about, among other things, Ocwen's handling of consumer escrow accounts and failure to make insurance payments from escrow

---

[1] The prior Consent Judgment resulted in a Settlement providing approximately $125 million in direct payments to foreclosed borrowers.  A related Consent Order was entered between Ocwen Financial and Ocwen Loan Servicing on the one hand and the Florida Office of Financial Regulation, among other state regulators, on the other hand.

accounts.  The examination reviewed a sampling of borrower loans from January 1, 2013 through February 28, 2015.

58.     During this multi-state examination of Ocwen, the Florida Office of Regulation identified compliance violations of both federal and state law under Section 494.00255(1)(m), Florida Statutes.

59.     Additionally, several state regulators fined Ocwen for its use of unlicensed business entities in the Philippines and India to service its mortgage portfolio.  Ocwen maintains an affiliate named Ocwen Business Solutions, Inc. ("OBS") in the Philippines.  OBS engaged in unlicensed mortgage servicing activity during the time-period of August 26, 2013 to September 13, 2015.  In 2016, Ocwen entered a Consent Order with the Florida Office of Financial Regulation to settle concerns regarding Ocwen's unlicensed business activity from the Philippines.  Upon information and belief, Ocwen continues to presently conduct unlicensed business from India.

60.     In January 2017, the United States Inspector General for the Troubled Asset Relief Program released a report stating that Ocwen has one of the worst track records in foreclosure mitigation. The report includes a finding that in a sampling of loans tested, Ocwen had wrongfully terminated borrowers from HAMP loan modifications in 2016.  The report cited Ocwen for improperly holding borrower payments in expense accounts, improperly reversing and reapplying payments, and mishandling rolling delinquencies.

61.     Since 2014, the Florida Attorney General has engaged Ocwen on numerous occasions to discuss grave concerns regarding the serious and troubling issues arising from regulatory exams, various settlements, and consumer complaints.  Nonetheless, Ocwen's mortgage servicing misconduct has continued.

## II.   THE OCWEN DEFENDANTS HAVE ENGAGED IN MORTGAGE SERVICING MISCONDUCT

### A.   Ocwen Often Services the Most Vulnerable Borrowers

62.    At all times material hereto, Ocwen has serviced and subserviced home mortgage loans secured by residential properties owned by individual citizens of the State of Florida and of the United States. Ocwen's portfolio of loans consists of many loans where the borrowers are more at risk of default and often encounter hardships or difficulties in making payments.

63.    Because of the nature of Ocwen's portfolio of distressed loans, Ocwen's personnel frequently interact with borrowers who are delinquent, at risk of delinquency, have complaints or inquiries about their mortgages, have filed for bankruptcy, or require immediate loss mitigation assistance.

64.    Borrowers in imminent danger of losing their homes require immediate attention and accurate information from a servicer.  Ocwen is often unable to fulfill this basic need and incapable of effectively executing its fundamental servicing functions.

65.    Borrowers continue to suffer through frustrating loss mitigation processes, errors in payment applications, poor record keeping, and a basic inability to effectively address consumer concerns.

66.    Since 2014, the Attorney General and Florida Office of Financial Regulation have collectively received over 1,000 complaints raising serious concerns regarding Ocwen's servicing practices.  More than half of the complaints are from Florida borrowers.  The complaints primarily identify mortgage-servicing-related issues at Ocwen that are similar, if not identical, to the conduct that was occurring prior to the Consent Judgment, including, but not limited to: (1) loss mitigation practices; (2) payment processing issues; (3) escrow account issues including force-placed insurance; and (4) customer service.

67.     Borrowers often complain that Ocwen employees are unable to address borrowers' concerns, even after repeated calls. Ocwen employees cannot access the required system to address borrower concerns and therefore often lack knowledge regarding the borrower's loan.  Borrowers are frustrated because they are unable to reach a live person to discuss their concerns and unable to have their call escalated or transferred.

### B.  The Ocwen Defendants Have Illegally Foreclosed on Borrowers and Engaged in Other Unlawful Foreclosure and Loss Mitigation Practices

68.     Ocwen has failed to maintain accurate or complete foreclosure-related information, which is necessary to provide its borrowers with mandatory foreclosure protections.  In part, this has been caused by Ocwen's errors in boarding loans acquired from other servicers into REALServicing, Ocwen's error-prone manual processes, and REALServicing's deficiencies.  All of which has caused or is likely to have caused borrowers substantial harm from wrongfully initiated foreclosure proceedings and wrongful foreclosure sales.

69.     RESPA and Regulation X provide borrowers with numerous protections when they apply for loan modifications or other loss mitigation options.  These protections are triggered when a borrower submits an oral or written application for loss mitigation options.

70.     Under Regulation X, if a servicer receives a loss mitigation application 45 days or more before a foreclosure sale, it must provide the borrower an acknowledgement letter within five days that states whether the application is "complete," and, if it is not, what additional documents and information the borrower must submit to complete the application ("Acknowledgment Letter").  A loss mitigation application is complete under Regulation X when the servicer has received all of the information it requires from a borrower to evaluate the borrower's application for all available loss mitigation options ("Complete Application"). An application is facially complete under Regulation X if a borrower provides the information and

documentation that the servicer requests in the Acknowledgment Letter or if no additional information is requested in the Acknowledgment Letter ("Facially Complete Application").

71.    Regulation X also requires that, if a servicer receives a Complete Application more than 37 days before a foreclosure sale, it must evaluate the borrower for all available loss mitigation options and provide the borrower with a written notice within 30 days indicating, among other things, whether it will offer the borrower any loss mitigation options ("Evaluation Notice").

72.    Regulation X also includes requirements relating to a servicer's access to and ability to exchange information with its service providers. Regulation X generally requires a servicer to, among other things, implement policies and procedures reasonably designed to ensure that the servicer is providing appropriate servicer personnel with access to accurate and current documents and information reflecting actions performed by its service providers.

73.    Regulation X also generally prohibits servicers from, among other things, commencing foreclosure filing ("First Filing"), obtaining a foreclosure judgment, or conducting a foreclosure sale if: (1) the servicer discovers that additional information or corrections to a previously submitted document are required to complete a Facially Complete Application and the borrower has not had a reasonable opportunity to complete the application; (2) the servicer has timely received a Complete Application but has not yet evaluated the application; (3) the time for the borrower to respond to a loss mitigation offer or to appeal a loan modification denial has not expired; or (4) the borrower is performing upon a loss mitigation agreement (*e.g.*, a trial loan modification or short-term payment forbearance program).

74.    Ocwen has failed to maintain and communicate accurate and necessary foreclosure-related information, which has ultimately caused Ocwen's failure to provide borrowers with the foreclosure protections they are entitled to under federal law.

75.     Ocwen has failed to place delinquent loans on hold where Ocwen had received a Complete Application or Facially Complete Application for loss mitigation in violation of federal law.

76.     Ocwen has failed to provide the required notices upon receipt of an application, failed to provide accurate notices regarding missing documents, failed to provide accurate reasoning for declined loan modifications, and failed to provide disclosure regarding borrowers' rights to appeal loan modification denials.

77.     Ocwen's manual entry errors, failure to maintain accurate loan data, and inaccurate controls have resulted in the initiation of wrongful foreclosure proceedings, poor loan modification decisions, the entry of premature judgments, and wrongful foreclosure sales.

78.     In 2014 and 2015, at a minimum, borrowers received deficient Evaluation Notices that did not contain the specific reason(s), as required by law, for a denial of the loss mitigation application or contained erroneous reasons for loss mitigation denial(s).  This missing information, such as the amount of borrower income and the value of the property, would be material information for a borrower deciding whether to appeal a denial.

79.     Ocwen's Evaluation Notices were also flawed because they did not notify borrowers of their legal right to an appeal as required by law.  Even if Ocwen informed the borrower of the correct reason(s) for a denial, without the required notification of the legal right to an appeal, borrowers are unaware that they have a legal right to appeal Ocwen's decision.

80.     The right to an appeal is an important borrower right as the borrower's homeownership may depend on whether he or she is able to successfully appeal the servicer's decision and secure a loan modification.

81.     Ocwen's Evaluation Notices also notify the borrower of loan modification offers. Ocwen's Evaluation Notices offered loss mitigation opportunities, but lacked details including the date by which the borrower must act to accept the offer.

82.     In numerous instances, Ocwen has inappropriately conducted foreclosure sales on the home of borrowers who had a mortgage secured by their principal residence and had timely sent Ocwen a Facially Complete Application more than 37 days before a pending foreclosure sale on or after January 10, 2014. After these borrowers submitted Facially Complete Applications, Ocwen determined it needed additional information. Ocwen sent these borrowers a letter requesting that they submit the additional information and gave the borrowers a deadline, usually 30 days, to submit that information, but then foreclosed on the borrowers before that deadline.

83.     Ocwen has inappropriately conducted foreclosure sales on the homes of borrowers before the deadline it provided these borrowers to submit missing documents. These borrowers had submitted incomplete applications for loss mitigation assistance. Ocwen sent the borrowers letters requesting that they submit the missing documents or information and gave the borrowers a deadline, but then foreclosed before that deadline.

84.     Upon information and belief, borrowers reasonably interpret Ocwen's request for additional or missing information it needs to evaluate the borrowers' loss mitigation applications to mean the Ocwen will not foreclose on them before the expiration of the deadline Ocwen provided for submitting the additional or missing information.

85.     Ocwen has also inappropriately conducted foreclosure sales on the homes of borrowers who were performing upon a loss mitigation agreement entered with Ocwen. Ocwen offered these borrowers loss mitigation options, such as loan modifications.  The borrowers accepted and were performing upon the terms of the options—for example, by making trial

payments according to the terms of a loan modification. Even though the borrower had been doing everything they were supposed to do, Ocwen unilaterally breached the terms of its loss mitigation agreements with borrowers and foreclosed on their loans.

86.     Borrowers have suffered significant harm, including the loss of their homes, financial losses, and emotional distress as a result of Ocwen's careless, inaccurate, incomplete, and misleading loss mitigation notices.

### C.     The Ocwen Defendants Have Mismanaged Borrowers' Escrow Accounts

87.     Under RESPA and Regulation X, servicers are required to  (1) perform an annual escrow analysis to determine the monthly escrow account payments for the next computation year; (2) provide an annual statement reflecting the activity in the escrow account during the escrow account computation year and a projection of the activity in the account for the next year; (3) refund to the borrower any surplus disclosed in an escrow analysis or, if the surplus is less than $50, alternatively credit such surplus against future escrow payments; and (4) potentially seek repayment for any shortage (*i.e.*, the amount by which a current escrow account balance falls short of the target balance at the time of an escrow analysis) disclosed in an escrow analysis.

88.     Ocwen has failed to perform the most basic tasks regarding the management of borrowers' escrow accounts.  In violation of federal law, Ocwen has failed to conduct annual escrow analyses, failed to conduct accurate escrow analyses, and failed to provide borrowers with annual statements that reflect escrow activity.

89.     Additionally, deficiencies with REALServicing lie at the root of various problems with Ocwen's calculation of delinquent borrowers' payoff and reinstatement quotes; that is, the amount a borrower must pay to respectively payoff or reinstate their loan to become current.  These payoff and reinstatement quotes depend upon borrowers' escrow balances.

90.     In many instances, even when Ocwen has performed escrow analyses on borrowers' accounts, Ocwen has either: (1) failed to send escrow statements to borrowers because of REALServicing system deficiencies; or (2) sent inaccurate escrow statements.

91.     When Ocwen has sent escrow statements, in many instances the escrow statements have contained inaccurate information pertaining to the borrowers' account histories, escrow balances, and escrow payments.

92.     Upon information and belief, Ocwen mailed over 7,200 misleading escrow statements to borrowers between 2013 and 2015.

93.     Upon information and belief, Ocwen has also failed to timely process escrow shortage payments, which resulted in the continued collection of escrow shortage amounts that borrowers had already paid.

94.     Moreover, Ocwen has failed to properly disburse escrow funds, and has relied on inaccurate or incomplete information to manage borrower escrow accounts.

95.     In some instances, Ocwen failed to perform or timely perform escrow analyses during the pendency of a borrower's Chapter 13 bankruptcy.  Ocwen failed to service loans in accordance with bankruptcy protections in place for borrowers by attempting to collect purported escrow shortages that should have been discharged. .

96.     Due to Ocwen's failures related to borrowers' escrow accounts, including but not limited to disbursement of inaccurate escrow amounts, reinstatement amounts and payoff amounts, Ocwen has communicated material information to borrowers that Ocwen knew or should have known was inaccurate.  The above practices employed by Ocwen caused borrowers to receive inaccurate and misleading escrow-related communications.

**D.      The Ocwen Defendants Have Mishandled Borrowers' Hazard Insurance**

97.      Ocwen has failed to make timely payments of Florida borrowers' hazard insurance premiums and used inaccurate insurance data, which has led to wrongful insurance premium charges

98.      Ocwen's failure to pay borrowers' insurance has resulted in erroneous cancellation of insurance policies, lapses in insurance coverage, and excessive and expensive improper force-placed insurance policies.

99.      Additionally, Ocwen imposed force-placed insurance on borrowers who already had insurance coverage.

100.      Under RESPA and Regulation X, if a borrower's monthly payment includes a payment for hazard insurance then the servicer must generally make disbursements in a timely manner, on or before the deadline to avoid a penalty, as long as the borrower's payment is not more than 30 days overdue.

101.      In September 2014, Ocwen transitioned insurance vendors from a company called Assurant to Southwest Business Corporation (SWBC).  Subsequently, several operational defects were identified, including rejection of disbursements, erroneously flagged and updated loans, and checks sent to incorrect payees or addresses.

102.      Ocwen discovered that due to the REALServicing errors and vendor errors, it had failed to send out insurance payments, sent payments to incorrect payees and addresses, and could not account for the payees or address to which the payment was sent.

103.      In some cases, Ocwen force-placed excessive and expensive insurance policies and adjusted the borrower's payment to collect a higher premium. Once the errors were discovered,

Ocwen scrambled to reinstate lapsed policies. Unfortunately, Ocwen was unable to reinstate or obtain insurance at the same or cheaper rate for some borrowers, resulting in a premium increase.

104.    Over 10,000 borrowers were affected nationwide by these errors, over 1,250 of whom were Floridians who suffered financial harm as a result of Ocwen's mishandling of borrowers' hazard insurance.

105.    Borrowers endured frustration, emotional distress, and confusion when Ocwen failed to properly disburse borrowers' payments to their insurance companies and financial harm to borrowers that had to obtain new and more expensive policies.

**E.    The Ocwen Defendants Have Charged Borrowers Excessive Default-Related Fees**

106.    At a minimum, during 2014 and 2015, Ocwen overcharged default-related fees to borrowers who were struggling to obtain loss mitigation options.

107.    Ocwen, through its system of record REALServicing, erroneously ordered Broker's Price Opinions ("BPO") and property inspections more frequently than allowable on loans in default.  As a result, Ocwen has overcharged borrowers excess fees for BPO's of $100 to $300 per loan.  An estimated 120,082 Florida borrowers were overcharged by over $822,000 for excess property inspection fees.  In total, millions of dollars of overpayments in default fees were assessed by Ocwen against borrowers.

108.    Ocwen's vendor, Altisource, provides services for the assessment of default related services, such as BPOs and property inspections.

**F.    The Ocwen Defendants Have Sent Misleading Communications to Borrowers**

**i.    _Borrowers Have Received Inaccurate Periodic Statements_**

109.    Ocwen is obligated to provide borrowers with a periodic statement of their mortgage account containing, among other things, information regarding the current payment,

including how the upcoming payment is to be applied to the loan balance; details of all transaction activity that has occurred since the last statement; and, if applicable, past due/delinquency information.

110. In some instances, due to inaccurate data found in REALServicing and poor operational oversight, Ocwen failed to send statements to borrowers altogether and in other instances failed to timely and accurately apply payments which resulted in borrowers receiving incomplete and inaccurate statements.

111. Upon information and belief, Ocwen's reliance on the erroneous information contained in REALServicing has led to Ocwen sending borrowers periodic statements that contain inaccurate information. This information includes but is not limited to information related to interest, late fees, escrow amounts, prepayment penalties, payment amounts, and deferred principal balance amounts

112. Upon information and belief, Ocwen has (a) failed to properly credit full periodic payments that borrowers properly made to Ocwen as of the date of receipt, wrongly resulting in late fees, negative credit reporting and inaccurate loan delinquencies; (b) failed to timely credit payments from borrowers' suspense accounts when the suspense amount has accumulated sufficient funds to cover a full periodic payment; (c) misapplied borrowers' payments and miscalculated borrowers' loan balances and amounts due; and (d) communicated material information to borrowers that Ocwen knew or should have known was inaccurate.

113. These practices employed by Ocwen have resulted in significant harm where Ocwen assessed improper late fees, erroneously reported derogatory information to credit reporting bureaus, and caused borrower frustration and emotional distress.

###### ii.  *Borrowers Have Received Requests for Information that Demand Impossible Time-Frames*

114.    Another example of Ocwen's system failures has occurred in its processing of correspondence.

115.    As a direct result of the inadequate processes and poor vendor oversight, and in combination with unreliable and incomplete data found in REALServicing, correspondence has been sent to borrowers with dates that pre-date the mailing date by days or weeks causing borrowers in some instances to miss important response deadlines.

116.    For example, for borrowers seeking a loan modification, the correspondence sent with a date by which the borrower must respond to provide additional information, accept the offer, or appeal the denial, may be impossible to meet by the time the borrower received the notice because the date had already passed or will occur without sufficient time for the borrower to respond.

117.    Ocwen knew of the back-dating issue and failed to fully investigate and appropriately address it for months after it was discovered.  According to the findings of the NY DFS, in 2014, an employee of Ocwen questioned the accuracy of Ocwen's letter dating process; however, it took over five months and a repeat escalation by that same employee to the company's Vice President of Compliance to begin to address the issue.  Once the issue was exposed, it became clear that the problem was far reaching and had impacted an unknown number of borrowers.

118.    As a result of Ocwen's backdating of letters, borrowers who are already in default and under serious financial strain have had to contend with confusing and often inaccurate information regarding their loss mitigation options and rights.

### G.    The Ocwen Defendants' Have Failed to Timely Cancel Mortgages

119.    Ocwen has failed to timely cancel mortgages and provide recorded satisfactions of mortgage to borrowers that have paid off their mortgages in full satisfaction of the loan.

120.    By law, Ocwen is required to cancel the mortgage within 45 days of the receipt of a full payoff of the loan and provide borrowers a recorded satisfaction of mortgage to the borrower within 60 days of receipt of a payment sufficient to satisfy their obligations under the loan.  Fla. Stat. §§ 701.03 & 701.04.  An open mortgage may result in the borrower's inability to transfer title free and clear of liens, obstruct of a borrower's ability to use the property as collateral to obtain new financing, and the inaccurate credit reporting of an open mortgage.  *Id.*

121.    Because Ocwen has failed to timely cancel mortgages and provide recorded satisfactions of mortgages to borrowers, in addition to violating state law, Ocwen has directly caused borrower confusion, frustration, and financial harm.

### <u>COUNT I</u>

**Escrow Account Related Violations of RESPA and Regulation X**
**(By Plaintiffs against Ocwen Defendants)**

122.    The allegations in paragraphs 1 through 121 are incorporated here by reference.

123.    Section 6(g) of RESPA, 12 U.S.C. § 2605(g) states that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due."

124.    The requirements of Section 6(g) are further explained in Regulation X, 12 C.F.R. § 1024.17(k) and 34(a), which states "[i]f the terms of any federally related mortgage loan require the consumer to make payments to an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or before the deadline to avoid a penalty."

125.    In the CFPA, Congress transferred rulemaking authority over RESPA to the Consumer Financial Protection Bureau, which recodified mortgage servicing related provisions of RESPA into 12 C.F.R. Part 1024, and designated it "Regulation X."

126.    RESPA and Regulation X apply to "federally related mortgage loans."  *See* 12 C.F.R. § 1024.2(b).

127.    RESPA and Regulation X apply to the conduct of "servicers," including the servicing of federally related mortgage loans, the administration of borrowers' escrow accounts, error resolution procedures, force-placed insurance, general servicing policies, procedures and requirements, and loss mitigation procedures.  *See* 12 C.F.R. § 1024.2(b); *see also* 12 C.F.R. §§ 1024.34, 1024.35, 1024.37, 1024.38, and 1024.41.

128.    Regulation X defines a servicer as a person "responsible for servicing of a federally related mortgage loan."  12 C.F.R. § 1024.2(b).  Under Regulation X, "servicing" means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan … and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract." 12 C.F.R. § 1024.2(b).

129.    Under RESPA and Regulation X, the Ocwen Defendants are "servicers" because they receive payments from borrowers pursuant to the terms of federally related mortgage loans

and are responsible for, among other things, distributing the payments to investors who own the borrowers' loans and, when borrowers' loans include escrow accounts, to the borrowers' taxing authorities or insurance companies.

130.    Under RESPA and Regulation X, servicers are required to timely pay disbursements from borrowers' escrow accounts for items such as hazard or homeowner's insurance premiums, pursuant to 12 C.F.R. §§ 1024.17(k) and 1024.34(a).

131.    In the course of servicing federally related mortgage loans, Ocwen has failed to make timely disbursements from borrowers' escrow accounts for items such as hazard insurance premiums.  *See* 12 U.S.C. § 2605; 12 C.F.R. §§ 1024.17(k) and 1024.34(a),

132.    The Florida Attorney General and the Florida Office of Financial Regulation have authority to enforce RESPA and its implementing regulation, Regulation X.  *See* 12 USC §2601 *et. seq*, 12 U.S.C. §§ 5536(a)(1)(A), and 5552(a)(1).

133.    Pursuant to 12 U.S.C. §§ 2605(f), 5564 and 5565, appropriate relief includes, but is not limited to:

        a.    equitable relief, including a permanent or temporary injunction;

        b.    rescission or reformation of contracts;

        c.    refund of moneys or return of real property;

        d.    restitution;

        e.    disgorgement or compensation for unjust enrichment;

        f.    payment of damages or other monetary relief;

        g.    public notification regarding the violation, including the costs of notification;

        h.    limits on the activities or functions of the person; and

       i.     civil money penalties, including but not limited to those provided under 12

U.S.C. §§ 5565 and 2609.

## COUNT II

**Violations of RESPA Regarding Escrow Violations**
**(By Florida Attorney General against the Ocwen Defendants)**

134.    The allegations in paragraphs 1 through 121 are incorporated here by reference.

135.    Section 6(g) of RESPA, 12 U.S.C. § 2605(g) states that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due."

136.    The requirements of Section 6(g) are further explained in Regulation X, 12 C.F.R. § 1024.17(k) and 34(a), which states "[i]f the terms of any federally related mortgage loan require the consumer to make payments to an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or before the deadline to avoid a penalty."

137.    In the CFPA, Congress transferred rulemaking authority over RESPA to the Consumer Financial Protection Bureau, which recodified mortgage servicing related provisions of RESPA into 12 C.F.R. Part 1024, and designated it "Regulation X."

138.    RESPA and Regulation X apply to "federally related mortgage loans." *See* 12 C.F.R. § 1024.2(b).

139.    RESPA and Regulation X apply to the conduct of "servicers," including the servicing of federally related mortgage loans, the administration of borrowers' escrow accounts, error resolution procedures, force-placed insurance, general servicing policies, procedures and

requirements, and loss mitigation procedures.  *See* 12 C.F.R. § 1024.2(b); *see also* 12 C.F.R. §§ 1024.34, 1024.35, 1024.37, 1024.38, and 1024.41.

140.    Regulation X defines a servicer as a person "responsible for servicing of a federally related mortgage loan." 12 C.F.R. § 1024.2(b).  Under Regulation X, "servicing" means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan … and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract." 12 C.F.R. § 1024.2(b).

141.    Under RESPA and Regulation X, the Ocwen Defendants are "servicers" because they receive payments from borrowers pursuant to the terms of federally related mortgage loans and are responsible for, among other things, distributing the payments to investors who own the borrowers' loans and, when borrowers' loans include escrow accounts, to the borrowers' taxing authorities or insurance companies.

142.    Under RESPA and Regulation X, servicers are required to:

a.      conduct annual escrow analyses for borrowers properly or timely notify borrowers of escrow initiation in violation of 12 C.F.R. § 1024.17(c)(3);

b.      refund escrow surpluses to borrowers within thirty (30) days from the date of the escrow account analysis to the extent the surplus is greater than or equal to $50.00, pursuant to 12 C.F.R. § 1024.17(f); and

c.      provide consumers with annual escrow account statements within 30 days of the completion of the escrow computation year, pursuant to 12 C.F.R. § 1024.17(i).

143.    Additionally, under RESPA and Regulation X, a servicer may not collect escrow shortages when a shortage does not exist, pursuant to 12 C.F.R. § 1024.17(f).

144.    In the course of servicing federally related mortgage loans, Ocwen has failed to conduct annual escrow analyses for borrowers in violation of 12 C.F.R. § 1024.17(c)(3).

145.    In the course of servicing federally related mortgage loans, Ocwen has collected escrow shortages and other escrow deficiencies that were, in fact, already paid by borrowers in violation of 12 C.F.R. § 1024.17(f).

146.    In the course of servicing federally related mortgage loans, in violation of 12 C.F.R. § 1024.17(f)(2)(1), Ocwen has failed to refund escrow surpluses to borrowers within thirty (30) days from the date of the escrow account analysis to the extent the surplus is greater than or equal to 50 dollars ($50.00).

147.    In the course of servicing federally related mortgage loans, in violation of 12 C.F.R. § 1024.17(i), Ocwen has failed to provide consumers with annual escrow account statements within 30 days of the completion of the escrow computation year.

148.    Pursuant to 12 U.S.C. §§ 2605(f), 5564 and 5565, appropriate relief includes, but is not limited to:

     a.  equitable relief, including a permanent or temporary injunction;

     b.  rescission or reformation of contracts;

     c.  refund of moneys or return of real property;

     d.  restitution;

     e.  disgorgement or compensation for unjust enrichment;

     f.  payment of damages or other monetary relief;

     g.  public notification regarding the violation, including the costs of notification;

h.  limits on the activities or functions of the person; and

i.  civil money penalties, including but not limited to those provided under 12 U.S.C. §§ 5565 and 2609.

## COUNT III

**Loss Mitigation and Foreclosure Related Violations of RESPA
(By Plaintiff Florida Attorney General against the Ocwen Defendants)**

149.  The allegations in paragraphs 1 through 121 are incorporated here by reference.

150.  In the CFPA, Congress transferred rulemaking authority over RESPA to the Consumer Financial Protection Bureau, which recodified mortgage servicing related provisions of RESPA into 12 C.F.R. Part 1024, and designated it "Regulation X."

151.  RESPA and Regulation X apply to "federally related mortgage loans."  *See* 12 C.F.R. § 1024.2(b).

152.  RESPA and Regulation X apply to the conduct of "servicers," including the servicing of federally related mortgage loans, the administration of borrowers' escrow accounts, error resolution procedures, force-placed insurance, general servicing policies, procedures and requirements, and loss mitigation procedures.  *See* 12 C.F.R. § 1024.2(b); *see also* 12 C.F.R. §§ 1024.34, 1024.35, 1024.37, 1024.38, and 1024.41.

153.  Regulation X defines a servicer as a person "responsible for servicing of a federally related mortgage loan." 12 C.F.R. § 1024.2(b).  Under Regulation X, "servicing" means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan … and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract." 12 C.F.R. § 1024.2(b).

154.    Under RESPA and Regulation X, the Ocwen Defendants are "servicers" because they receive payments from borrowers pursuant to the terms of federally related mortgage loans and are responsible for, among other things, distributing the payments to investors who own the borrowers' loans and, when borrowers' loans include escrow accounts, to the borrowers' taxing authorities or insurance companies.

155.    Under RESPA and Regulation X, servicers are required to:

a.      within five (5) days after receiving a loss mitigation application, send borrowers written notice that it acknowledges receipt of the loss mitigation application and that it has determined that the loss mitigation application is either complete or incomplete, pursuant to 12 C.F.R. § 1024.41(b)(2)(i)(B);

b.      evaluate the borrower for all loss mitigation options available and to provide the borrower with written notice of Ocwen's determination(s), pursuant to 12 C.F.R. § 1024.41(c)(1)(i);

c.      send borrowers written notice that the borrower has a right to appeal the servicer's denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal, pursuant to 12 C.F.R. § 1024.41(c)(1)(ii); and

d.      if a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to the borrower, then the servicer must include in the loss mitigation application notice the specific reason(s) for the servicer's determination for each such trial or permanent loan modification option, pursuant to 12 C.F.R. § 1024.41(d).

156.    Additionally, under RESPA and Regulation X, a servicer may not:

a.      make a first notice or filing of foreclosure without providing the borrower the required notice that the borrower is not eligible for any loss mitigation option, pursuant to 12 C.F.R. § 1024.41(f)(2); and

b.      move for a foreclosure judgment or conduct a foreclosure sale on a borrower who submitted a loss mitigation application after the initiation of a foreclosure filing, but more than 37 days before a foreclosure sale, but (i) the servicer failed to provide the notice to the borrower required under Section 1024.41(g)(1), (ii) the borrower had not rejected all loss mitigation options offered by the servicer, or (iii) the borrower did not fail to perform under an agreement on a loss mitigation option, pursuant to 12 C.F.R. 1024.41(g).

157.    In the course of servicing federally related mortgage loans, in violation 12 C.F.R. § 1024.41(b)(2)(i)(B), within five (5) days after receiving a loss mitigation application, Ocwen has failed to send borrowers written notice that it acknowledges receipt of the loss mitigation application and that it has determined that the loss mitigation application is either complete or incomplete.

158.    In the course of servicing federally related mortgage loans, in violation 12 C.F.R. § 1024.41(c)(1)(i), Ocwen has failed to evaluate the borrower for all loss mitigation options available and to provide the borrower with written notice of Ocwen's determination(s).

159.    In the course of servicing federally related mortgage loans, in violation of 12 C.F.R. §1024.41(c)(1)(ii), Ocwen has failed to send borrowers written notice that the borrower has a right

to appeal Ocwen's denial of any loan modification option as well as the amount of time the borrower has to file such an appeal and any requirements for making an appeal.

160.    In the course of servicing federally related mortgage loans, Ocwen has made the first notice or filings of foreclosure in violation of 12 C.F.R. § 1024.41(f)(2), by, including but not limited to, failing to provide the borrower the required notice that the borrower is not eligible for any loss mitigation option.

161.    In the course of servicing federally related mortgage loans, Ocwen has moved for foreclosure judgments or conducted foreclosure sales in violation of 12 C.F.R. §§1024.41(g). More specifically, Ocwen moved for foreclosure sales or conducted foreclosure sales on a borrower who submitted a loss mitigation application after the initiation of a foreclosure filing, but more than 37 days before a foreclosure sale, but (i) Ocwen failed to provide the notice to the borrower required under Section 1024.41(g)(1), (ii) the borrower had not rejected all loss mitigation options offered by Ocwen, or (iii) the borrower did not fail to perform under an agreement on a loss mitigation option.

162.    The acts and practices described herein constitute violations of Section 6 of RESPA, 12 U.S.C. § 2605(k), and Regulation X, 12 C.F.R. §§ 1024.41.

163.    Pursuant to 12 U.S.C. §§ 2605(f), 5564 and 5565, appropriate relief includes, but is not limited to:

      a.   equitable relief, including a permanent or temporary injunction;

      b.   rescission or reformation of contracts;

      c.   refund of moneys or return of real property;

      d.   restitution;

      e.   disgorgement or compensation for unjust enrichment;

f.   payment of damages or other monetary relief;

g.   public notification regarding the violation, including the costs of notification;

h.   limits on the activities or functions of the person; and

i.   civil money penalties.

## COUNT IV

**Violations of the Florida Deceptive and Unfair Trade Practices Act**
**(By Florida Attorney General against the Ocwen Defendants)**

164.   The allegations in paragraphs 1 through 121 are incorporated here by reference.

165.   Section 501.204(1), Florida Statutes, states that "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

166.   Section 501.203(8), Florida Statutes, defines "[t]rade or commerce" as:

> the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

167.   At all times relevant to this action the Ocwen Defendants engaged in trade or commerce as defined in § 501.203(8), Florida Statutes, and continues to engage in said activities.

168.   The Ocwen Defendants, at all times material hereto, provided services as defined within § 501.203(8), Florida Statutes, within the State of Florida.

169.   A person that willfully engages in a deceptive or unfair act or practice is liable for a civil penalty of Ten Thousand Dollars ($10,000.00) for each such violation, pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000.00) for each violation victimizing a senior citizen, pursuant to Section 501.2077, Florida Statutes. Willful violations of

FDUTPA occur when the person knew or should have known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to Section 501.2075, Florida Statutes.

170.    Since at least February 2014, the Ocwen Defendants have engaged in unfair acts that are likely to cause substantial injury to consumers and the substantial injury is not reasonably avoidable by consumer and is not outweighed by countervailing benefit to the consumers.  These unfair acts include, among others:

        a.    the use of incorrect data or incomplete or missing documentation to service homeowners' loans;

        b.    the imposition of force-placed insurance in excessive amounts of coverage;

        c.    the imposition of force-placed insurance where the homeowner had insurance;

        d.    charging consumers excessive property inspection fees;

        e.    charging consumers excessive BPO fees;

        f.    back-dating time-sensitive letters to homeowners;

        g.    failing to make escrow disbursements for insurance;

        h.    failing to release liens in a timely fashion;

        i.    failing to honor existing trial loan modification agreements; and

        j.    using unlicensed vendors to conduct mortgage servicing function.

171.    Since at least February 2014, the Ocwen Defendants have made material misrepresentations or omissions to borrowers, whose residential mortgage loans were serviced by Ocwen, when the borrowers were acting reasonably under the circumstances.  These misrepresentations or omissions include, but are not limited to:

a.      Misrepresenting to borrowers outstanding loan balances;

b.      Misrepresenting monthly payments due;

c.      Misrepresenting escrow amounts due;

d.      Misrepresenting the delinquency status of the loan;

e.      Misrepresenting the default fees due;

f.      Misrepresenting loan reinstatement amounts;

g.      Misrepresenting insurance amounts due;

h.      Misrepresenting the status of foreclosure;

i.      Misrepresenting the status of loan modifications;

j.      Misrepresenting due dates for borrowers' responses to letters relating to loan modification or other loss mitigation applications; and

k.      Omitting material facts in loan modification denial letters.

172.    When the Ocwen Defendants engaged in the conduct and made the representations described herein, they knew or should have known:

a.      the data and records upon which they were relying was inaccurate or missing and that they have failed to review information that is necessary to have a reasonable basis to collect on, foreclose on, or transfer borrowers' loans;

b.      their system of record contains inaccurate information about borrower payments and amounts due, including reinstatement amounts, suspense balances, default fees dues, and delinquency statuses, all of which it relies upon in demand letters, billing statements, foreclosure filings, and other communications with borrowers, and that they have failed to review

40

information that is necessary to have a reasonable basis to collect on, foreclose on, or transfer borrowers' loans; and

c.     their foreclosure, loss mitigation, and successor information was inaccurate and that they have failed to review information that is necessary to have a reasonable basis to collect on, deny loss mitigation options for borrowers, or transfer borrowers' loans.

173.    The Ocwen Defendants have willfully engaged in these unfair and deceptive acts and practices because the Ocwen Defendants knew or should have known that such acts and practices are unfair or deceptive or otherwise prohibited by law.

174.    These above-described acts and practices of the Ocwen Defendants have substantially injured and will likely continue to injure and prejudice the public.  The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.  Further, these substantial injuries are not outweighed by any countervailing benefits to consumers or competition, and are not injuries that the consumers themselves could have reasonably avoided.

175.    Unless the Ocwen Defendants are permanently enjoined from engaging further in the acts and practices complained of herein, the Ocwen Defendants' actions will result in irreparable injury to the public for which there is no adequate remedy at law.

## COUNT V

**Violations of the Florida Deceptive and Unfair Trade Practices Act
for Ocwen's Failure to Timely and Appropriately Credit Payments
(By Florida Attorney General against the Ocwen Defendants)**

176.    The allegations in paragraphs 1 through 121 are incorporated here by reference.

177.    Section 501.204(1), Florida Statutes, states that "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

178.    Section 501.203(8), Florida Statutes, defines "[t]rade or commerce" as:

>  the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

179.    At all times relevant to this action the Ocwen Defendants engaged in trade or commerce as defined in § 501.203(8), Florida Statutes, and continues to engage in said activities.

180.    The Ocwen Defendants, at all times material hereto, provided services as defined within § 501.203(8), Florida Statutes, within the State of Florida.

181.    A person that willfully engages in a deceptive or unfair act or practice is liable for a civil penalty of Ten Thousand Dollars ($10,000.00) for each such violation, pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000.00) for each violation victimizing a senior citizen, pursuant to Section 501.2077, Florida Statutes.  Willful violations of FDUTPA occur when the person knew or should have known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to Section 501.2075, Florida Statutes.

182.    In the course of servicing federally related mortgage loans, the Ocwen Defendants have regularly sent borrowers inaccurate periodic statements.

183.    In the course of servicing federally related mortgage loans, the Ocwen Defendants have failed to accurately detail on periodic statements the current amounts due by borrowers.

184.    In the course of servicing federally related mortgage loans, the Ocwen Defendants have failed to explain how borrowers' future payments will be applied.

185.    In the course of servicing federally related mortgage loans, the Ocwen Defendants have failed to account to borrowers all account activity since the prior periodic statement.

186.    In the course of servicing federally related mortgage loans, the Ocwen Defendants have, if the servicer retains a partial payment by a borrower in a suspense or unapplied funds account, failed to disclose to the borrower the total amount of funds held in such suspense or unapplied funds account.

187.    In the course of servicing federally related mortgage loans, the Ocwen Defendants have after an accumulation of funds sufficient to make a periodic payment is received in a borrower's suspense account, failed to treat such funds as a periodic payment as of the date of receipt.

188.    In the course of servicing federally related mortgage loans, the Ocwen Defendants have failed to timely and appropriately credit borrowers' full periodic payments as of the date of receipt.

189.    The Ocwen Defendants have willfully engaged in these unfair and deceptive acts and practices because the Ocwen Defendants knew or should have known that such acts and practices are unfair or deceptive or otherwise prohibited by law.

190.    The Ocwen Defendants' errors have resulted in significant harm to borrowers, including but not limited to improper late fees, inaccurate negative credit reporting, and borrower

frustration.   These harms are compounded when, in some cases, borrowers are inaccurately considered as delinquent and being threatened with collections and ultimately foreclosure.

191.   These above-described acts and practices of the Ocwen Defendants have substantially injured and will likely continue to injure and prejudice the public.  The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.  Further, these substantial injuries are not outweighed by any countervailing benefits to consumers or competition, and are not injuries that the consumers themselves could have reasonably avoided.

192.   Unless the Ocwen Defendants are permanently enjoined from engaging further in the acts and practices complained of herein, the Ocwen Defendants' actions will result in irreparable injury to the public for which there is no adequate remedy at law.

## COUNT VI

**Violations of Florida Statutes Chapter 494 Regarding Escrow Accounts**
**(By Florida Office of Financial Regulation against Ocwen Loan Servicing)**

193.   The allegations in paragraphs 1 through 121 are incorporated here by reference.

194.   Section 494.00255(1)(m), Florida Statutes, proscribes, inter alia, violation of the Real Estate Settlement Procedures Act, as amended, 12 U.S.C. § 2601 *et seq*., or any regulations adopted under such act.  Pursuant to 12 U.S.C. § 2617, the Consumer Financial Protection Bureau adopted rules, which in pertinent part are codified at 12 C.F.R. § 1024.17(k)(1), governing escrow accounts maintained in connection with consumer mortgage servicing accounts.

195.   Pursuant to Section 494.00255(1)(u), Florida Statutes, the failure to comply with any provision of Sections 494.001 – 494.0077, Florida Statutes, or related rule or order, constitutes grounds for disciplinary action.

196.    At all times material hereto, Ocwen Loan Servicing is or has been a "mortgage lender" licensee pursuant to Chapter 494, Florida Statutes, as defined in Section 494.001(23), Florida Statutes, having been issued license number MLD765.

197.    The Florida Office of Regulation may impose a penalty that includes revocation of a license, or imposition of a fine in an amount up to $25,000 for each count or separate offense. Section 494.00255(2), Florida Statutes.  Pursuant to Rule 69V-40.111, Florida Administrative Code,[2] the maximum penalty for a violation of section 494.0063 is a $5,000 fine and, or, revocation of license.

## COUNT VII

### Violations of Florida Statutes Chapter 494 Regarding Annual Financial Audit Reports (By Florida Office of Financial Regulation against Ocwen Loan Servicing)

198.    The allegations in paragraphs 1 through 121 are incorporated here by reference.

199.    Section 494.0063, Florida Statutes, requires a mortgage lender to obtain an annual financial audit report as of the date of the licensee's fiscal year end, as disclosed to the Florida Office of Regulation on its application, and to submit a copy of the report to the Florida Office of Regulation within 120 days after the end of the licensee's fiscal year.

200.    At all times material hereto, Ocwen Loan Servicing is or has been a "mortgage lender" licensee pursuant to Chapter 494, Florida Statutes, as defined in Section 494.001(23), Florida Statutes, having been issued license number MLD765.

201.    Ocwen Loan Servicing's fiscal year end as disclosed to the Florida Office of Regulation is December 31 of each year.

---

[2] Rule 69V-40-111 was amended, effective November 9, 2015.  The violation occurred prior to adoption of the amended Rule.  Consideration of the penalty for the violation, including mitigating and aggravating circumstances, are calculated pursuant to the rule in effect at the time of the violation.  The maximum penalty provided by rule is $5,000.  Violations proscribed by section 494.00255(1), F.S. are not specifically provided for by the rule.

202.     The 2014 annual financial audit report for Ocwen Loan Servicing was submitted to the Florida Office of Regulation on May 14, 2015.

203.     In violation of section 494.0063, Florida Statutes, Ocwen Loan Servicing failed to submit the annual, audited financial report for Ocwen Loan Servicing for fiscal year end 2014 within 120 days of the end of its fiscal year.

204.     The Florida Office of Regulation may impose a penalty that includes revocation of a license, or imposition of a fine in an amount up to $25,000 for each count or separate offense. Section 494.00255(2), Florida Statutes.  Pursuant to Rule 69V-40.111, Florida Administrative Code,[3] the maximum penalty for a violation of section 494.0063 is a $5,000 fine and, or, revocation of license.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, pursuant to 12 U.S.C. §§ 5552 & 5565, Sections 501.207, 501.2075, 501.2077, and 494.00255(2), Florida Statutes, and the Court's own powers to grant legal or equitable relief, request that the Court:

1.     Permanently enjoin the Ocwen Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, who receive actual notice of the injunction from committing future violations of RESPA, 12 U.S.C. § 2601 e*t seq*., and its implementing regulations, Regulation X, FDUTPA and Chapter 494, Florida Statutes, and including restrictions on the future business activities of the Ocwen Defendants to prevent violations of the law;

---

[3] Rule 69V-40-111 was amended, effective November 9, 2015.  The violation occurred prior to adoption of the amended Rule.  Consideration of the penalty for the violation, including mitigating and aggravating circumstances, are calculated pursuant to the rule in effect at the time of the violation.  The maximum penalty provided by rule is $5,000.

2.      Enter judgment as follows: (i) in favor of Plaintiffs, Florida Attorney General and Florida Office of Financial Regulation, against Ocwen Defendants, jointly and severally, on Count I; (ii) in favor of Plaintiff, Florida Attorney General, against Ocwen Defendants, jointly and severally, on Count II, Count III, Count IV and Count V; and (iii) in favor of Plaintiff, Florida Office of Financial Regulation, against Ocwen Loan Servicing on Count VI and Count VII;

3.      Award such relief as the Court finds necessary to redress harm to consumers, including, but not limited to, refund of moneys to consumers; restitution; disgorgement, and any other injunctive or equitable relief allowable under law, including, but not limited to, pursuant to 12 U.S.C. §§ 2605, 5565(a) and Section 501.207(3), Florida Statutes;

4.      Assess against Ocwen Defendants, jointly and severally, civil penalties in favor of the Florida Attorney General, the amount of Ten Thousand Dollars ($10,000.00) for each violation of FDUTPA in accordance with Section 501.2075, Florida Statutes, Fifteen Thousand Dollars ($15,000.00) for each violation that victimized or attempted to victimize, a senior citizen in accordance with Section 501.2077, Florida Statutes, and pursuant to 12 U.S.C. §§ 2609 and 5565(c);

5.      Assess against the Ocwen Defendants, jointly and severally, civil penalties in favor of the Florida Office of Financial Regulation, pursuant to 12 U.S.C. §§ 2609 and 5565(c), and assess against Ocwen Loan Servicing an administrative fine pursuant to  Section 494.00255(2), Florida Statutes;

6.      Award the Florida Attorney General reasonable attorney's fees and costs pursuant to Section 501.2105 of FDUTPA, and as otherwise allowable by applicable statutes or law;

7.      Order the Ocwen Defendants to pay costs and fees incurred in prosecuting this action; and

8.    Award additional relief as the Court may deem just and proper.


Dated: April 20, 2017                          Respectfully Submitted,

                                              Office of the Attorney General
                                              The State of Florida
                                              Department of Legal Affairs

                                              Pamela Jo Bondi
                                              Attorney General


                                              By: */s/ Jennifer Hayes*
                                              Jennifer Hayes Pinder f/k/a Jennifer Hayes
                                              Assistant Attorney General
                                              Fla. Bar No.: 17325
                                              Email: *Jennifer.Pinder@myfloridalegal.co*m

                                              Victoria Butler
                                              Director, Consumer Protection Division
                                              Fla. Bar No.: 861250
                                              Email: *Victoria.Butler@myfloridalegal.com*

                                              Sasha Funk Granai f/k/a Celine Funk
                                              Assistant Attorney General
                                              Fla. Bar No.: 96648
                                              Email: *Sasha.Granai@myfloridalegal.com*

                                              3507 East Frontage Road, Suite 325
                                              Tampa, FL 33607
                                              Phone: 813-287-7950
                                              Fax: 813-281-5515


                                              Office of Financial Regulations
                                              The State of Florida
                                              Division of Consumer Finance

                                              **By: */s/ Scott Fransen*** 
                                              Scott R. Fransen
                                              Assistant General Counsel
                                              Fla. Bar No.: 0994571
                                              Email: *Scott.Fransen@flofr.com*
                                              1313 N. Tampa St., Suite 615
                                              Tampa, FL 33602

Telephone: 813-218-5364
Facsimile: 813-272-3752

Miriam S. Wilkinson
Chief Counsel
Fla. Bar No.: 972101
Email: *Miriam.Wilkinson@flofr.com*

Anthony Cammarata
General Counsel
Fla. Bar No.: 767492
Email: *Anthony.Cammarata@flofr.com*
The Fletcher Building
200 E. Gaines Street
Tallahassee, FL 32399-0370
Telephone: 850-410-9601