# EXHIBIT 8

**Pages 1-2:**    **Gebhardt letter from Homecomings Financial dated April 25, 2005**

**Pages 3-4:**    **Gebhardt letter from MGC dated July 28, 2008**

**Pages 5-6:**    **Gebhardt letter from MGC dated June 16, 2009**

**Pages 7-8:**    **Gebhardt letter from MGC dated October 10, 2008**

**Pages 9-10:**   **Gebhardt's $6,000 paid check dated October 24, 2008**

**Pages 11-12:**  **Gebhardt's February 2009 bank statement**

**Pages 13-14:**  **Gebhardt's September 2008 GMAC Mortgage statement**

**Pages 15-16:**  **LNV attorney Kevin Hartley's "Payment Summary" for Gebhardt dated August 27, 2012**

**Pages 17-20:**  **LNV attorney Ron Steen, Jr's "Payment Summary" for Gebhardt dated February 26, 2014**

**Pages 21-24:**  **Gebhardt's Erica Thomas letter dated June 23, 2011 to Congressman Roe's office**

## Homecomings Financial

A GMAC Company

April 25, 2005

Catherine Gebhardt
3753 Thomas Cross Road
Sevierville, TN 37876

RE: Homecomings Loan Number 0435022215

Dear Catherine Gebhardt:

Thank you for choosing Speed Draft. We designed this service to provide you with
flexibility and convenience.
Below is a confirmation of your transaction:
Amount: 2713.27
Draft Date: 4/26/2005
Bank Name: TENNESSEE STATE BANK
Checking Account #: XXX5686

Did you know that you can schedule SpeedDrafts over the Internet? Just log on to
www.homecomings-loaninfo.com, choose View My Loan Info, enter our secure Web
site, and then select Payments Online. The fee for each SpeedDraft service is only
$11.99, which is much less than the cost of an overnight envelope!
In addition, if you would like to avoid the hassle of mailing your mortgage payment each
month and forever avoid late fees, then our Automated Payment Option is for you. Your
payment is withdrawn from your bank account each month on the day you specify for
less than the SpeedDraft fee! Just log on to www.homecomings-loaninfo.com, choose
View My Loan Info, enter our secure web Site, and then select Payments Online.

We appreciate you as a customer and we value your business. If you have any questions,
please write or contact our Customer Service Department at 1-800-206-2901.

Sincerely,

*Nancy Marks*

Nancy Marks
Account Manager

You can access and update your drafting information via our secure Web site at
**https://www.homecomings-loaninfo.com**

P.O. BOX 890036          DALLAS          TX          75389          1-800-206-2901

**Homecomings Financial**
*A GMAC Company*

Homecomings Financial
2711 North Haskell Avenue
Suite 900
Dallas, TX 75204

DGJJTMM 37878

# MGC Mortgage, Inc.

7195 Dallas Parkway
Plano, Texas 75024-3601
www.mgcmortgage.com
1-866-544-9820

July 28, 2008

CATHERINE GEBHARDT
3753 THOMAS CROSS ROAD
SEVIERVILLE TN 37876

RE:   *Previous Homecomings Loan Number 7435022215*
      *New MGC Mortgage, Inc. Loan Number 17101164*

Dear Borrower:

Effective July 2, 2008, the servicing of your mortgage loan, that is, the right to collect payments from you, will be transferred from Homecomings Financial, LLC to MGC Mortgage, Inc. The transfer of servicing of your mortgage loan does not affect any term or condition of your mortgage instruments, other than terms related to the servicing of your loan.  This notice should have been sent to you within 15 days of the servicing transfer date.  However, the processing of transfer information has delayed this notice. Further, MGC Mortgage, Inc. ensures that, as a result of the delayed notice, you will not be required to pay an amount in excess of any amount that you otherwise would have paid.

Homecomings Financial, LLC will continue servicing your loan, which includes the collection of payments, through July 1, 2008. Should you have any questions relating to the transfer of servicing from Homecomings Financial, LLC, please contact its Customer Service Department toll-free at 1-800 206-2901. **Beginning July 2, 2008, all payments and correspondence should be directed to MGC Mortgage, Inc. at the following addresses.** Any payments received by Homecomings Financial, LLC from you after July 2, 2008, will be forwarded directly to MGC Mortgage, Inc.

| Payments should be addressed to: | Correspondence should be addressed to: |
|---|---|
| MGC Mortgage, Inc. | MGC Mortgage, Inc. |
| 15770 N Dallas Parkway LB 62 | 7195 Dallas Parkway |
| Dallas, TX 75248-3305 | Plano, TX 75024 |
| | Attn: Borrower Relations Department |
| | Website: www.mgcmortgage.com |

All payments should be made payable to MGC Mortgage, Inc. Until you receive your first monthly billing statement from MGC Mortgage, Inc., **please note your new MGC Mortgage, Inc. loan number on your check for easy identification.**

If your payments are currently made via automatic transfer from your checking or savings account, this service will be cancelled as of the transfer date. Enclosed is information regarding ACH payments with MGC Mortgage, Inc., should you wish to continue having your payments made via automatic transfer from your checking or savings account.

This transfer may affect the terms or the continued availability of mortgage life or disability insurance or any other type of optional insurance. If you currently have life, accidental death, and/or disability

insurance, your insurance will be cancelled effective July 2, 2008. However, you may contact your carrier for arrangements to maintain your coverage through direct billing.

You should be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12U.S.C. 2605): During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old loan servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.D. 2605) gives you certain consumer rights. If you sent a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 business days of receipt of your request. A "qualified written request" is written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request.

Not later than 60 business days after receiving your request, your servicer must make any appropriate correction to your account, and must provide you with a written clarification regarding the dispute. During this 60-business day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

If you have any questions regarding the transfer of your loan, you may direct them to our Borrower Relations Department at (866) 544-9820. This telephone number is toll-free. After July 2, 2008, you can reach us Monday through Friday (excluding holidays) between 8:00 a.m. and 4:45 p.m. Central time.

We are pleased to have you as a customer of MGC Mortgage, Inc., and we look forward to servicing your loan.

Sincerely,


Borrower Relations Department
MGC Mortgage Inc.

Enclosures

# MGC Mortgage, Inc.

7195 Dallas Parkway
Plano, TX 75024-4922
1-866-973-3399

June 16, 2009

 0-762-96291-0000893-001-000-000-000-000

CATHERINE GEBHARDT
3753 THOMAS CROSS RD
SEVIERVILLE TN 37876-1243

RE:     Previous GMAC Loan Number 359526020
        New MGC Mortgage, Inc. Loan Number 0000003378

Dear Borrower:

Effective July 01, 2009, the servicing of your mortgage loan, that is, the right to collect payments from you, was transferred from GMAC to MGC Mortgage, Inc. The transfer of servicing of your mortgage loan does not affect any term or condition of your mortgage instruments, other than terms related to the servicing of your loan.

GMAC is no longer servicing your loan, which includes the collection of payments, as of July 01, 2009 Should you have any questions relating to the servicing of your loan prior to July 01, 2009please contact GMAC. Their Customer Service toll-free number is 1-800-766-4622 **Beginning  July 01, 2009, all payments and correspondence should be directed to MGC Mortgage, Inc. at the following addresses.**

| <u>Payments should be addressed to:</u> | <u>Correspondence should be addressed to:</u> |
|---|---|
| MGC Mortgage, Inc. | MGC Mortgage, Inc. |
| 75 Remittance Drive  Suite 6664 | Attn:  Borrower Relations Department |
| Chicago, IL  60675-6664 | 7195 Dallas Pkwy |
| | Plano, TX  75024 |

All payments should be made payable to MGC Mortgage, Inc. Any payments received by  GMAC from you after July 01, 2009, will be forwarded directly to MGC Mortgage, Inc.  Until you receive your first monthly billing statement from MGC Mortgage, Inc.,**please note your new MGC Mortgage, Inc. loan number on your check for easy identification.**

If you currently make your payments via automatic transfer (ACH Draft) from your checking or savings account, this service will be cancelled as of **July 01, 2009. Your mortgage payment will no longer draft from your checking or savings account unless you complete and return the enclosed form.**

You may also use the enclosed form to establish ACH Drafting of your mortgage payment even if you have not used it in the past.  Upon receipt of the ACH form, we will process your request and notify you in writing of the effective date on which we will begin to draft your mortgage payment.  MGC Mortgage will consider drafting your mortgage payment on a specific day of the month as long as that date requested is within your grace period as defined in your Note.  Until you receive this notification please continue to send your payments to the mailing address above or call MGC Mortgage, Inc at 1-866-973-3399 to make a one time phone payment with one of our customer service representatives.

This transfer may affect the terms or the continued availability of mortgage life or disability insurance or any other type of optional insurance. If you currently have life, accidental death, and/or disability insurance, your insurance will be cancelled effective July 01, 2009. However, you may contact your carrier for arrangements to maintain your coverage through direct billing.

You should be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605): During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old loan servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.D. 2605) gives you certain consumer rights. If you sent a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 business days of receipt of your request. A "qualified written request" is written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request.

Not later than 60 business days after receiving your request, your servicer must make any appropriate correction to your account, and must provide you with a written clarification regarding the dispute. During this 60-business day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

If you have any questions regarding the transfer of your loan, you may direct them to our Borrower Relations Department at 866-973-3399. This telephone number is toll-free. After July 01, 2009, you can reach us Monday through Friday (excluding holidays) between 8:00 a.m. and 5:00 p.m. Central time.

We are pleased to have you as a customer of MGC Mortgage, Inc., and we look forward to servicing your loan.

Sincerely,


Borrower Relations Department
MGC Mortgage Inc.

Enclosures



If your loan is currently in bankruptcy, this letter is being sent for informational purposes only. This letter is not intended as an attempt to collect a debt, assess, or claim against or demand payment from any person who is protected by the U.S. Bankruptcy Code.

If you have recently been discharged of your personal liability on this debt due to your Chapter 7 bankruptcy, MGC is not seeking to collect, recover or offset the debt as a personal liability.

# MGC Mortgage, Inc

7195 Dallas Parkway
Plano, Texas 75024-3601
www.mgcmortgage.com
1-866-544-9820

October 10, 2008

CATHERINE GEBHARDT
3753 THOMAS CROSS ROAD
SEVIERVILLE, TN 37876

NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS

Re:     17101164

Dear Borrower:

You are hereby notified that the servicing of the above mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from MGC Mortgage, Inc. to GMAC Mortgage Company, LLC. effective October 27, 2008.

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to your mortgage loan.  All other terms contained in your mortgage documents remain in effect.  Please note that if you have other loans serviced by MGC Mortgage, Inc.  these loans will remain with MGC Mortgage, Inc. unless you are informed otherwise.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer or at closing.  Your new servicer must also send you this notice no later than 15 days after the effective date or at closing.

Your present servicer is MGC Mortgage, Inc..  If you have any questions relating to the transfer of servicing from your present servicer, call our Borrower Relations Department between 8:00 a.m. to 5:00 p.m., CST, Monday through Friday at (866) 544-9820.  This is a toll-free number.

Your new servicer will be GMAC Mortgage Company, LLC.  Below are its contacts for correspondence and payment questions:

| **Correspondences should be addressed to:** | **Payments should be addressed to:** |
|---|---|
| GMAC Mortgage Company, LLC | GMAC Mortgage Company, LLC |
| PO Box 4622 | PO Box 780 |
| Waterloo, IA 50704-4622 | Waterloo, IA 50704-0780 |

The toll-free telephone number of your new servicer, GMAC Mortgage Company, LLC, is (866) 725-0782.  If you have any questions relating to the transfer of servicing to your new servicer, call Customer Service between 7:00 a.m. to 9:00 p.m., CST, Monday – Friday and between 9:00 a.m. to 1:00 p.m., CST, Saturday.

The date that your present servicer will stop accepting payments from you is October 26, 2008. The date that your new servicer will start accepting payments from you is October 27, 2008. Send all payments due on or after that date to your new servicer.

If you have mortgage life, disability, other type of optional insurance policies, and/or automatic payment drafting, the policies and automatic drafting will be cancelled. You may contact your new servicer to inquire about mortgage life, disability, other type of optional insurance policies, and/or automatic payment drafting.

You should also be aware of the following information which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a fee may not be imposed on you.

Section 6 of RESPA gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A "qualified written request" is written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request.

Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where services are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

We appreciate the opportunity to have been of service to you, and we are sorry for any inconvenience this has caused you.

Sincerely,

Borrower Relations Department

---

Present Servicer:      MGC Mortgage, Inc.
Future Servicer:       GMAC Mortgage Company, LLC          Effective October 27, 2008



Check: 113585 Amount: $6,000.00 Date: 10/29/2008
Run: 1, Batch: 32, Seq: 15



Check: 113585 Amount: $6,000.00 Date: 10/29/2008
Run: 1, Batch: 32, Seq: 15

**Important:** click on ⑦ symbols next to the information before using it. Dismiss

Routing Numbers | Link to Us                                                                          0

# BEAL BANK SSB Routing Number

**BEAL BANK SSB routing information**

| | |
|---|---|
| Bank Name | BEAL BANK SSB |
| Routing Number | 311993330 ⑦ |
| Address | 6000 LEGACY DRIVE ⑦ |
| City | PLANO |
| State | TX |
| Zip Code | 75024-0000 |

**Advertisement**



**BEAL BANK SSB routing information**

| | |
|---|---|
| Telephone Number | (469) 467-5000 ⑦ |
| Office Type | Main |
| Servicing Number | 111000038 |
| Record Type Code | 1 |
| Institution Status Code | 1 |
| Record Revision Date | 2010-02-11 |

**Advertisement**





**Find Routing Number of a Bank**

[                    ]  Search

http://www.routingnumbers.org/bank_routing_number_311993330.html                    9/24/2012

 **Tennessee State Bank**
"Banking at its Best"
Member FDIC



Date  1/12/09
Account Number
Enclosures

Page    8
        8

FILED
FEB 3
2014 JAN 31 P 5:48 CLS

U.S. DISTRICT COURT
EASTERN DIST. TENN.

CATHERINE LOUISE GEBHARDT
3753 THOMAS CROSS RD
SEVIERVILLE TN 37876

Family Plan Club                          (Continued)

Checks and Withdrawals
| Date | Description | Amount |
|------|-------------|--------|
|       | SEVIERVILLE   TN | |
|       | Card# 35834 | |
| 12/23 | DBT CRD 0455 12/23/08 23133582 | 15.00- |
|       | KIDS CHOICE PEDIATRICS | |
|       | SEYMOUR       TN | |
|       | Card# 35834 | |
| 12/23 | DBT CRD 1632 12/22/08 29250714 | 24.12- |
|       | DOMINOS PIZZA #6180 | |
|       | 8654288888    TN | |
|       | Card# 35834 | |
| 12/24 | POS DEB 1843 12/23/08 557740 | 13.08- |
|       | WEIGELS | |
|       | SEVIERVILLE   TN | |
|       | Card# 35834 | |
| 12/24 | POS DEB 1231 12/24/08 16456720 | 158.21- |
|       | POLO/RALPH LAUREN #38 | |
|       | SEVIERVILLE   TN | |
|       | Card# 35834 | |
| 12/24 | DBT CRD 0513 12/24/08 23123599 | 105.69- |
|       | ARIGATO JAPANESE STEAK | |
|       | SEVIERVILLE   TN | |
|       | Card# 35834 | |
| 12/26 | PHONE PAY  LOANSERVICING | 1,511.76- |
|       | TEL | |
| 12/26 | POS DEB 1711 12/24/08 00083940 | 25.09- |
|       | KROGER | |
|       | SEVIERVILLE   TN | |
|       | Card# 35834 | |
| 12/26 | POS DEB 1702 12/24/08 00085673 | 47.64- |
|       | KROGER | |
|       | SEVIERVILLE   TN | |
|       | Card# 35834 | |
| 12/26 | DBT CRD 2318 12/24/08 27000470 | 207.56- |
|       | WWW.NEWEGG.COM | |
|       | 800-390-1119 CA | |
|       | Card# 35834 | |
| 12/29 | ATM W/D 1815 12/27/08 4350 | 20.00- |
|       | 642 DOLLY PARTON PKWY | |





**Tennessee State Bank**

"Banking at its Best"

Member FDIC

Date  2/11/09
Account Number
Enclosures                    Page    6
                                      8

FILED
FEB 3
2014 JAN 31 P 5:49 CLS

U.S. DISTRICT COURT
EASTERN DIST. TN.

CATHERINE LOUISE GEBHARDT
3753 THOMAS CROSS RD
SEVIERVILLE TN 37876

Family Plan Club                              (Continued)

Checks and Withdrawals

| Date | Description | Amount |
|------|-------------|--------|
| 1/26 | DBT CRD 1057 01/25/09 22130251<br>A AND W RESTAURANT<br>SEVIERVILLE  TN<br>Card# 35834 | 5.46- |
| 1/26 | DBT CRD 0604 01/26/09 29720028<br>MCDONALD'S F14749<br>SEVIERVILLE  TN<br>Card# 35834 | 9.72- |
| 1/26 | DBT CRD 1440 01/25/09 21006009<br>TACO BELL #005681<br>SEVIERVILLE  TN<br>Card# 35834 | 19.43- |
| 1/26 | DBT CRD 1520 01/26/09 22250748<br>DOMINOS PIZZA #6180<br>8654288888    TN<br>Card# 35834 | 21.56- |
| 1/26 | DBT CRD 1547 01/23/09 26250745<br>DOMINOS PIZZA #6180<br>8654288888    TN<br>Card# 35834 | 25.54- |
| 1/26 | DBT CRD 1439 01/24/09 29140000<br>THE OLIVE GARD00016626<br>SEVIERVILLE  TN<br>Card# 35834 | 123.15- |
| 1/27 | PHONE PAY  LOANSERVICING<br>TEL | 4,080.20- |
| 1/27 | POS DEB 1611 01/26/09 941774<br>WEIGELS<br>SEVIERVILLE  TN<br>Card# 35834 | 1.08- |
| 1/27 | POS DEB 1008 01/27/09 967987<br>WEIGELS<br>SEVIERVILLE  TN<br>Card# 35834 | 8.38- |
| 1/27 | DBT CRD 0402 01/27/09 25130270<br>A AND W RESTAURANT<br>SEVIERVILLE  TN<br>Card# 35834 | 3.27- |



## GMAC Mortgage Account Statement

# GMAC Mortgage

**CUSTOMER INFORMATION**

Name:    Catherine Gebhardt

Account Number:    0359526020
Home Phone #:    (865)774-1434

**PROPERTY ADDRESS**

3753 THOMAS CROSS ROAD
SEVIERVILLE    TN 37876

Visit us at www.gmacmortgage.com for account information or to apply on-line.

#BWNHJPY
#KW04729803415#

CATHERINE GEBHARDT
3753 THOMAS CROSS ROAD
SEVIERVILLE TN 37876-1243

For information about your existing account, please call: 1-800-766-4622.

For information about refinancing or obtaining a new loan, please call: 1-866-690-8322

Please verify your mailing address, borrower and co-borrower information.   Make necessary corrections on this portion of the statement, detach and mail to address listed for inquiries on the reverse side.

### Account Information

| | |
|---|---|
| Account Number | 0359526020 |
| Current Statement Date | November 13, 2008 |
| Maturity Date | December 01, 2032 |
| Interest Rate | 12.00000 |
| Current Principal Balance* | $235,191.53 |
| Current Escrow Balance | $2,610.28 |
| Interest Paid Year-to-Date | $9,715.47 |
| Taxes Paid Year-to-Date | $0.00 |

For Customer Care inquiries call: **1-800-766-4622**
For Insurance inquiries call: **1-800-256-9962**
For Payment Arrangements call: **1-800-850-4622**

### Details of Amount Due/Paid

| | |
|---|---|
| Principal and Interest | $2,489.50 |
| Subsidy/Buydown | $0.00 |
| Escrow | $257.37 |
| Amount Past Due | $5,493.74 |
| Outstanding Late Charges | $1,313.51 |
| Other | $1,146.11 |
| Total Amount Due | $8,408.01 |
| Account Due Date | October 01, 2008 |

### Account Activity Since Last Statement

| Description | Due Date | Tran. Date | Tran. Total | Principal | Interest | Escrow | Add'l Products | Late Charge | Other |
|---|---|---|---|---|---|---|---|---|---|
| Receipt | 09/01/08 | 11/13/08 | $455.76 | | | | | | $455.76 |
| Receipt | 09/01/08 | 11/13/08 | $784.85 | | | | | | $784.85 |
| Payment | 09/01/08 | 11/13/08 | $2,746.87 | $136.22 | $2,353.28 | $257.37 | | | |
| Payment | 08/01/08 | 10/31/08 | $2,468.28 | $134.87 | $2,354.63 | $257.37 | | | |
| Receipt | 07/01/08 | 10/31/08 | $278.59 | | | | | | $278.59– |
| Payment | 07/01/08 | 10/31/08 | $2,739.37 | $133.54 | $2,355.96 | $257.37 | | | $7.50– |
| Receipt | 06/01/08 | 10/31/08 | $7.50 | | | | | | $7.50 |
| Payment | 06/01/08 | 10/31/08 | $3,010.48 | $101.51 | $2,651.60 | $257.37 | | | |
| PD PROP INSPECTION FEE | 05/01/08 | 10/29/08 | $94.50– | | | | | | $94.50– |

*This is your Principal Balance only, not the amount required to pay the loan in full. For payoff figures and mailing instructions, call the Customer Care number above or you may obtain necessary payoff figures through our automated system (24 hours a day, 7 days a week). See back for automatic payment sign-up information and other payment options.

### Important News

If you are considering a new home purchase or refinancing your existing mortgage, we are here to help.  Simply call the number above or visit our website for fast, convenient service.

Looking for a great rate on a certificate of deposit? Visit www.gmacbank.com and check out a 12-month CD from GMAC Bank. It's smart, it's simple, and best of all, it's safe. Member FDIC.

### See Reverse Side For Important Information

## Mail This Portion With Your Payment

### Mortgage Payment Coupon

# GMAC Mortgage

| Account Number | Due Date | Mortgage Payment | Total Amount Due | Amount Due With Late Fee if Received 15 Days AFTER Due Date |
|---|---|---|---|---|
| 0359526020 CATHERINE GEBHARDT | 10/01/06 | $2,746.87 | $8,408.01 | $2,746.87 |

**Please assist GMAC Mortgage in applying your payment**

| | |
|---|---|
| Full Payment(s) | $ |
| *ADDITIONAL* Principal | $ |
| *ADDITIONAL* Escrow | $ |
| Late Charge | $ |
| Other Fees (please specify) | $ |
| Total Amount Enclosed | $ |

Sign here to enroll in monthly ACH.
(See back for details.)

GMAC MORTGAGE
PO BOX 9001719
LOUISVILLE KY 40290-1719

02    1008    0359526020    00274687    00000    22222    8

## Home Equity, Refinancing, or Purchasing a New Home - 24 Hours a Day/7 Days a Week

If you are considering a new home purchase, home equity financing, or refinancing your existing mortgage, GMAC Mortgage is here to help. We are available 24 hours a day, 7 days a week. Simply call 1-800-753-4622 or visit www.gmacmortgage.com for fast, convenient service. Or, you can always make an appointment with a GMAC Mortgage representative in your local area for face-to-face personal service. Whichever method you choose, be sure to contact us today to apply, or to obtain more information on how we can help you with your home mortgage needs.

| To Apply Online | To Apply by Phone | To Reach Your Local Office |
|---|---|---|
| www.gmacmortgage.com | 1-800-753-GMAC (4622) | 1-866-806-GMAC (4622) |

## Convenient Payment Options

### Automatic Payment Plan

*By signing the box on the front of the statement, GMAC Mortgage is authorized to withdraw your scheduled payment on your due date from your bank account. Please understand that you must continue to remit monthly payments by check until written confirmation is received.*

Enrolling in GMAC Mortgage's Automatic Payment Plan is quick and easy. First, have your bank routing number and bank account number available and then call us at 1-800-766-4622.

- Listen for the prompts to access your mortgage account information

- Enter your mortgage Account Number and Social Security Number

- Follow the prompts.
  You can complete your enrollment, make changes to your existing Automatic Payment Plan information
  or request that an Automatic Payment Plan enrollment form be mailed directly to your home.

**Online Payment Services** — Pay your mortgage bills and view your mortgage account statement online! To get started simply register for Account Access at www.gmacmortgage.com, log-in, and follow the enrollment instructions.

**Mortgage Accelerator** — The bi-weekly payment option, available to qualified customers, could save you thousands of dollars on interest payments...call 1-800-335-6970 for more information (there are fees assessed with this program).

**Mail or Express Mail** — When making your mortgage payment, please detach the coupon portion and mail with your check or money order. Do not send cash. Do not send post dated checks. If paying more than the amount due, be sure to indicate on the coupon how to apply the excess money. Please write your account number on your check or money order.

**If you use a third party bill payer service or if you
do not have your mortgage payment coupon** send to:   GMAC Mortgage, Attn: Payment Processing
PO Box 79135, Phoenix, AZ 85062-9135

**For Express Mail Only** send to:   GMAC Mortgage, 6716 Grade Lane,
Building 9, Suite 910, Louisville, KY 40213-1407

**Pay by Phone** — For information and the fee to use this quick and convenient service call 1-800-766-4622. Please have your bank routing number and bank account number available when you call.

## Account Information or Questions — 1-800-766-4622 or www.gmacmortgage.com

Our automated telephone service will help you get fast and confidential answers to questions. Be sure to have your account number and social security number available for identification. You can call 24 hours a day, 7 days a week. Representatives are available from 6:00 a.m.-10:00 p.m. CT Monday-Friday, and 9:00 a.m.-1:00 p.m. CT Saturday.

Special Number for the Hearing Impaired: 1-800-395-9228

**Inquiries** — General inquiries/correspondence should be mailed separately from your account payments.

**Supplemental Tax Bills** — If you receive a supplemental or interim bill from the tax collector and would like the bill paid from escrow, promptly forward the bill to the address listed below prior to the delinquency date.

| General Inquiries | Insurance Policies/Bills | Tax Bills | Tax Bills in PA |
|---|---|---|---|
| GMAC Mortgage | GMAC Mortgage | GMAC Mortgage | GMAC Mortgage |
| Attn: Customer Care | Attn: Box 2025 | Attn: Tax Dept. | Attn: Tax Dept. |
| P.O. Box 4622 | Coraopolis, PA 15108-6942 | P.O. Box 961209 | P.O. Box 961241 |
| Waterloo, IA 50704-4622 | 1-800-256-9962 | FT. Worth, TX 76161-0219 | Ft. Worth, TX 76161-0241 |

**Qualified Written Request** — Under the Real Estate Settlement Procedures Act, a qualified written request is a written correspondence, other than notice on your payment coupon or other payment medium supplied by us, regarding the servicing of your loan which includes your name, account number, and your reasons for the request. Any qualified written request you wish to submit must be sent to: GMAC Mortgage, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-1330.

## Important Information

**Electronic Debit** — When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic funds transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic funds transfer, funds may be withdrawn from your account as soon as the same day your payment is received, and you will not receive your check back from your financial institution.

**Important Notice** — GMAC Mortgage may assess a return check fee consistent with the laws of your state and your mortgage contract on all checks returned unpaid by your financial institution. Additionally, GMAC Mortgage may be attempting to collect a debt and any information obtained will be used for that purpose. GMAC Mortgage may charge a fee for processing payoff requests.

**Important Credit Reporting Notification** — We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Your Privacy** — You will receive a copy of the GMAC Mortgage Privacy Notice annually. Should you wish to obtain an additional copy, please write to us at GMAC Mortgage, Voice of the Customer, 100 Witmer Rd., Horsham, PA 19044-1467.

**Partial Payments** — Partial payment funds, if not specified, will be posted to outstanding fees, escrow shortages or as a principal reduction in accordance with the terms of your Note.

**Optional Product Information** — Failure to pay a monthly charge for an Optional Product billed under "Add'l Products" will not cause your mortgage account to be in default. Please call 1-800-766-4622 if you have any questions or to cancel your Optional Product enrollment.



This black/white page
came to my email on
Sept 26, 2012 from
Douglas E. Taylor —
from LNV Corporation atty
Kevin Hartley, — Dated 08/27/12
Appears to be a screen
Shot — identified as a
"payment summary" —
Notice 26 payments were
allegedly made in July 2010
equaling $ 661,808,56
This black page is known as
"Reverse text" (similar to documents
in Chris/Marcia Swift case in IL
Sometimes used to HIDE information.
(compare to Second "payment summary"
                Sent two years later on 02/26/14

LN: 1423946779  ------  PAYMENT SUMMARY  08/27/12  16:51:19  PG  2

C  GEBHARDT MAX  X INV N47/001/000505504  TYPE CONT. RES, ARM  FOR_L

DUE 12/01/06  CURRENT: P&I  2,465.50  ESC.  986.04  PMT.  12,??.??

| BEGIN | RATE | P&I | ESCROW | PAYMENT | ARM | FOR_L |
|---|---|---|---|---|---|---|
| ??-06 | 12.00000 | 2,465.50 | 906.54 | 3,476.19 | 4 | 3,476.19 |
| 01-09 | 11.87500 | 2,468.06 | 906.64 | 3,454.70 | 1 | 20,723.20 |
| 07-09 | 10.37500 | 3,417.83 | 906.64 | 3,324.47 | 6 | 16,632.35 |
| 12-09 | 16.37500 | 3,217.43 | 454.25 | 2,709.56 | 5 | 2,709.58 |
| 01-10 | 9.50000 | 2,077.32 | 491.75 | 2,569.57 | 6 | 15,417.42 |
| 07-10 | 9.50000 | 2,077.01 | 491.75 | 2,569.56 | 6 | 66,208.56 |
| | | | | | 45 | 125,162.25 |

Connected to host 206.201.76.6 (7310[008])...

This letter and "Payment Summary" (compare with black paged "Payment Summary") — came to me by certified mail when attorney Ronald G. Stein interfered with a GWR (qualified written request under RESPA) sent to Lake Zurich IL in early February 2014.

Notice letter says his firm u represents MGC Mortgage though suit against me is by LNV Corporation NOT MGC Mortgage. Notice "Payment Summary" attacked which is almost identical to first "Payment Summary" sent Sept. 2012 — though No black text —

See July 2010 wherein it states I made 45 payments equaling $115,630.20.
Compare with blackened "payment summary."

# STITES & HARBISON PLLC

**ATTORNEYS**

SunTrust Plaza
401 Commerce Street
Suite 800
Nashville, TN 37219
(615) 782-2200
(615) 782-2371 Fax
www.stites.com

February 28, 2014

Ronald G. Steen, Jr.
(615) 782-2280
(615) 742-7238 FAX
ronald.steen@stites.com
Also admitted in Alabama

**BY CERTIFIED MAIL**
  **RETURN RECEIPT REQUESTED**

Ms. Catherine Gebhardt
3753 Thomas Cross Road
Sevierville, TN 37876

RE:   **Mortgagor/Grantor: Catherine Gebhardt**
      **Loan No. 1423946779 (the "Loan")**
      **Property Address: 3753 Thomas Cross Road, Sevierville, TN 37876**

Dear Ms. Gebhardt:

This firm represents MGC Mortgage, Inc. ("MGC"), with regard to Loan No. 1423946779. We are writing in response to your correspondence via letter dated February 7, 2014 (the "Letter"). Although couched as qualified written request ("QWR") under the Real Estate Settlement Procedures Act ("RESPA"), the Letter seeks production of documents and information previously supplied to you in that certain lawsuit styled as *LNV Corporation v. Catherine Gebhardt*, Case No. 3:12-cv-468, currently pending in the United States District Court for the Eastern District of Tennessee (the "Lawsuit"), and therefore MGC is not obligated to respond. *See* 12 C.F.R. § 1024.35(g).

As you may be aware, a QWR is a written correspondence which includes a statement of specific reasons why a borrower believes that his/her account is in error and which provides sufficient detail to allow the servicer of the loan to review the borrower's account to determine whether there were errors made in connection with the account, and to either make appropriate corrections where errors were made or explain to the borrower why the servicer believes the account is accurate. A QWR is *not* a vehicle for a consumer to obtain confidential information concerning the lender's business practices, trade secrets or other proprietary information, nor can it be used to support a fishing expedition for documents or as a mechanism for seeking any other information which does not relate specifically to the borrower's loan. Additionally, it cannot be used to avoid the discovery deadlines set forth by the Court in the Lawsuit.

The Letter provides no detail regarding any specific errors made by the servicer in connection with the Loan. Although the Letters are not in conformity with 12 U.S.C. § 2605, MGC reviewed its file in an attempt to obtain information responsive to your inquiries which were consistent with 12 U.S.C. § 2605. Enclosed is a copy of the payment history associated

Alexandria, VA     Atlanta, GA     Frankfort, KY     Franklin, TN     Jeffersonville, IN     Lexington, KY     Louisville, KY     Nashville, TN

**STITES & HARBISON** PLLC

**ATTORNEYS**

Ms. Catherine Gebhardt
February 28, 2014
Page 2

with this Loan.  Also enclosed is a Payoff Statement.  Furthermore, MGC finds no error with the Loan or any matters related to the Loan including the application of credits and debits thereto.

The remainder of your requests are overly broad or do not relate to any specific acts of wrongdoing related to the Loan.  Accordingly, these requests are declined, as they seek documentation and information that goes beyond that which is available through a "qualified written request" under 12 U.S.C. § 2605.

In providing the above response, MGC is not limiting or waiving any rights or remedies it may now or hereafter have, whether arising under your loan documents, at law or in equity, all of which rights and remedies are expressly reserved.  If you have any further concerns or questions regarding this matter, please contact me at (615) 782-2280 or ronald.steen@stites.com.  Thank you.

Very truly yours,

Ronald G. Steen, Jr.

RGS
Enclosures

1041326:1:NASHVILLE

```
REIN 1423946779                PAYMENT SUMMARY              02/26/14  15:03:52
C  GERHARDT MAN ' INV N47/001/0005005584  TYPE CONV. RES, ARM            FC 2
DUE 12/01/08  CURRENT: P&I    2,489.50   ESC.        986.64   INT. 12.00000
------------------------------------------------------------------------------
BEGIN     RATE          P&I        ESCROW      PAYMENT    #          TOTAL
12-08   12.00000     2,489.50      986.64     3,476.14    1        3,476.14
01-09   11.87500     2,468.06      986.64     3,454.70    6       20,728.20
07-09   10.37500     2,217.83      986.64     3,204.47    5       16,022.35
12-09   10.37500     2,217.83      491.75     2,709.58    1        2,709.58
01-10    9.50000     2,077.82      491.75     2,569.57    6       15,417.42
07-10    9.50000     2,077.81      491.75     2,569.56   45      115,630.20
                                                         64      173,983.89
```

```
3279-2   |                    |      | an |                      |0  : 6,2
```

# MGC Mortgage, Inc.

7195 Dallas Parkway
Plano, Texas 75024
www.mgcmortgage.com
Tel 866-973-3399

June 23, 2011

Ms. Sheila Houser, Administrative Assistant
Congress of the United States, House of Representatives
P.O. Box 1728
Kingsport, TN 37662

RE:     Ms. Catherine Gebhardt
        3753 Thomas Cross Road, Sevierville, TN 37876
        Loan Number 1423946779

Dear Ms. Houser:

MGC Mortgage, Inc ("MGC") is in receipt of the correspondence submitted on behalf of Ms.
Catherine Gebhardt ("Borrower") dated May 26, 2011. Thank you for your patience while
MGC researched this inquiry.

The Borrower's loan was originated with a mortgage broker employed at PrimeONE
Mortgages in Sevierville, Tennessee. The mortgage broker secured an approval for the
Borrower's loan through Sebring Capital Partners, LP who funded the loan on November 7,
2002 in the amount of $243,100.00. The Borrower signed an Adjustable Rate Note ("Note")
indicating that she agreed to the initial interest rate of 9.500% per annum which was subject
to change beginning on December 1, 2004 and every sixth month thereafter. The Note
indicates that the Note Holder (currently LNV Corporation) will calculate the Borrower's
new interest rate by adding 8.750% to the current LIBOR Index. The interest rate is limited
to increases and decreases of no more than 1.500% from the prior interest rate on any given
change date. The interest rate will never be greater than 16.500% or less than 9.500%. With
each of these terms bolded on the Note, the Borrower indicated her acceptance of said terms
by signing the Note on November 7, 2002. Certified copies of the original Note, Deed of
Trust, and applicable Riders are enclosed for your review.

We have also enclosed a copy of the Truth in Lending Disclosure Statement ("TIL") signed
by the Borrower on the date of origination. The TIL outlines the payment and finance terms
of the loan and indicates the exact amount a borrower will pay for the loan they are obtaining.
In the Borrower's case, the TIL indicates that she will finance $237,460.52, and the total
finance charge will be $549,576.73, amounting to $787,037.25 for the total sum of payments
to be made on this loan. Given this information, the Borrower was aware that the amount of
interest would surpass the principal amount of the loan she agreed to, as it does in many real
estate transactions.

As you are aware, MGC did not originate the Borrower's loan; therefore, we are unable to
address any issues that may have occurred at origination. The Borrower or her counsel may
contact the loan originator for information regarding the origination. However, per the
Borrower's request, we are enclosing a copy of the Settlement Statement that she signed at
closing.

# MGC Mortgage, Inc.

7195 Dallas Parkway
Plano, Texas 75024
www.mgcmortgage.com
Tel 866-973-3399

Ms. Sheila Houser, Administrative Assistant
Congress of the United States, House of Representatives
June 23, 2011
Page Two

As previously mentioned, the original loan amount the Borrower agreed to was $243,100.00.
Her current principal balance is $234,914.99, which indicates that $8,185.01 has been applied
to principal during the life of the loan; therefore, the allegation that no payments have been
applied to principal on this loan is false.  Additionally, Section 2 of her Deed of Trust
indicates that payments, "...shall be applied in the following order of priority: (a) interest due
under the Note; (b) principal due under the Note..."  MGC has received no payments since
we acquired servicing of the loan from GMAC Mortgage on or around July 1, 2009.
Enclosed is a copy of the payment history.  If the Borrower disputes application of a specific
payment, she may provide us that information and we will conduct further research.

While the current principal balance is $234,914.99 with the next installment due date of
December 1, 2008, this amount does not reflect the payoff of the loan.  In a letter dated
January 27, 2011 from our attorney Shapiro & Kirsch, LLP, the Borrower is informed that
the total amount of the debt is $281,373.08.  That amount includes the principal, interest,
fees, and escrow which are required to pay off the loan and make up a substantial amount of
the payoff due to the delinquency of the loan.  As of January 27, 2011, the payoff of the loan
was calculated as follows:

| | |
|---|---|
| Principal Balance: | $234,914.99 |
| Interest through 4/19/2010: | $ 37,022.99 |
| Escrow Advances: | $ 5,446.98 |
| Total Fees: | $ 12.00 |
| Accumulated Late Fees: | $ 1,313.51 |
| Recoverable Balance: | $ 2,662.61 |
| Total Balance: | $281,373.08 |

As of April 26, 2011, the payoff of the loan was calculated as follows:

| | |
|---|---|
| Principal Balance: | $234,914.99 |
| Interest through 4/26/2011: | $ 59,767.87 |
| Escrow Advances: | $ 11,764.86 |
| Total Fees: | $ 355.25 |
| Accumulated Late Fees: | $ 716.91 |
| Recoverable Balance: | $ 3,010.11 |
| Total Balance: | $310,529.99 |

Shapiro and Kirsch, LLP also provided the Borrower with a reinstatement quote which
included a foreclosure expense breakdown for this loan on April 14, 2011 (enclosed).  The
Borrower's letter mentions that she is requesting a detailed accounting of this breakdown;
therefore, we have enclosed information which only addresses the amounts due through April
14, 2011.  Please be advised that our attorneys are unable to provide reinstatement figures for
future dates due to the delinquency of the loan and the charges that may accrue as a result of
the delinquency.

# MGC Mortgage, Inc.

7195 Dallas Parkway
Plano, Texas 75024
www.mgcmortgage.com
Tel 866-973-3399

Ms. Sheila Houser, Administrative Assistant
Congress of the United States, House of Representatives
June 23, 2011
Page Three

The listed amounts within the April 14, 2011 letter are substantiated by the loan history which has previously been provided to the Borrower's counsel, and we will enclose for your review. We are providing as much loan history as we have been afforded. If the Borrower requires a current itemization of the total amounts owed on this loan, she may contact our Customer Service Department at (877) 471-7888 to order a payoff.

The letter from the Borrower's counsel suggests that this loan requires a $250,000.00 balloon payment upon maturity. Please observe that the Note indicates that the loan matures on December 1, 2032 and does not indicate that there is a balloon payment at that time, though does state that if amounts are still owed under the Note, they will be paid on that date. The Deed of Trust further supports that statement by indicating that no Balloon Rider is required for this loan in the "Definitions" section (H).

Please be advised that while the letters from the Borrower and her counsel state that the Borrower has encountered significant economic hardship and that we should review the loan prior to proceeding with foreclosure, we have received no information from the Borrower requesting a modification or loan workout. This may have been requested from prior servicers, though MGC requires current information from the Borrower to consider her loan for any loss mitigation efforts. We have placed numerous telephone calls to the Borrower for collection and workout efforts; though have been unsuccessful in reaching the Borrower. We are willing to consider the Borrower's loan for loss mitigation if she contacts our Loss Mitigation Department at (877) 609-4727 to initiate the process. We will place the foreclosure proceedings on hold for 30 days to allow the Borrower time to submit a complete loss mitigation package. For the Borrower's convenience, we are enclosing a loss mitigation package with this letter.

As previously stated, we are enclosing certified copies of the Note, Deed of Trust, and applicable Riders. Additionally, we will enclose the Assignments for this loan. Unfortunately, we are unable to provide original documents to the Borrower for her inspection as these documents must remain in our files; therefore, we are providing certified copies of the original documents. Regarding loan transfers, we have enclosed the transfer letters we have previously sent to the Borrower.

On or around April 1, 2010, MGC entered into a relationship with Dovenmuehle Mortgage, Inc. ("DMI") at which time DMI agreed to sub-service MGC's loans. The Borrower was made aware of this relationship in the Welcome Letter sent to her on or around March 16, 2010, which we have enclosed for your reference.

# MGC Mortgage, Inc.

7195 Dallas Parkway
Plano, Texas 75024
www.mgcmortgage.com
Tel 866-973-3399

Ms. Sheila Houser, Administrative Assistant
Congress of the United States, House of Representatives
June 23, 2011
Page Four

We would like to assist the Borrower in keeping her home and encourage her to contact our
Loss Mitigation or Customer Service Departments at the aforementioned telephone numbers
to discuss modification or workout options.

Sincerely,

*Erica Thomas /mc*

Erica Thomas
Vice President

cc:     Ms. Catherine Gebhardt

Enclosures

# EXHIBIT 9

**Bogus Addresses used for Beal Bank, LNV and MGC**

**Case # 3:12 – CV – 1681 MO**

**Subramaniam vs Beal, Chase, GMAC et al**                    **Exhibit J Page 3 of 9**



An MGC victim who lives in Texas drove to Plano and took these photos.

This is a sign on the Beal Bank property located at 6000 Legacy Drive, Plano Texas address.

Both MGC and LNV use the 7195 Dallas Parkway address.



In this photo the MGC customer/victim is standing at the location of the 7195 Dallas Parkway address and looking towards the Beal Bank complex. This image is consistent with the Google Map information.





File Edit View History Bookmarks Tools Help
Most Visited Latest Headlines Customize Links Getting Started Free Hotmail Windows Marketplace Windows Media Windows New Tab
+Dee Search Images Maps Play YouTube News Gmail Drive Calendar More
Google
7105 corporate drive plano texas 75024
Dee Syfert
Map
Traffic
Legacy Dr
Communications Pkwy
Dallas North Tollway (Toll road)
Dallas Pkwy
Kincaid Rd
Brockman Ct
Daniel Rd
Tennyson Pkwy
Corporate Dr
Bicycle Route 60
Beauregard Ln
Democracy Dr
500 ft
200 m
Edit in Google Map Maker
Report a problem
Find: 909
Next Previous Highlight all Match case

75 Remittance Drive Chicago, IL
Maps can't find *75 Remittance Drive Chicago, IL 60675-6664*
Make sure your search is spelled correctly. Try adding a city, state, or zip code.
Search the web instead
Should this place be on Google Maps?
Add a missing place
Apache Trail
SAHUARO PLACE
W Broadway
Satellite
Map data ©2018 Google
1000 ft

Dana Brinton
731 Price Street
West Chester, PA 19382

Case; 2010-10150 CHESTER COUNTY COURT OF COMMON PLEAS, West Chester, PA

Superior Court of Philadelphia, SOUTHEASTERN DISTRICT Case; 43 EDA 2016

### AFFIDAVIT OF MARCIA SWIFT

I, Marcia Swift, 601 Sennett Street, Batavia, IL 60510 am of sound mind and being over the legal age of 18 being first duly sworn, state and affirm the following facts:

1. That on February 5, 2016 I drove to 1501 Woodfield Road, Schaumburg, IL 60173-4982 and walked the premises and all floors of the building complex and found no evidence of Beal Bank SSB (or any other Beal Bank entity) located in the building. I photographed the building directories and there is no listing of Beal Bank SSB (or any other Beal Bank entity). (See Attached Exhibit of Photos.) *MS* (8) Eight Photos attached

2. That on February 5, 2016 I drove to the Schaumburg Corporate Center located at 1501 Woodfield Road, Schaumburg, IL 60173-4982 After walking the complex, I verified with the building security desk that there physically was no Beal Bank SSB (or any other Beal Bank entity). I verified with building security that Beal Bank is not on the list of tenants in the building.

3. Being that I have had a previous professional career as a large volume mailer and have worked very closely with many post offices and especially those in the 601 & 605 sectional areas of the post office since 1992 I knew that I could verify this information through the local post office that services zip code 60173. So, then on February 5, 2016 after my finding of the potentially bogus/counterfeit address, I drove to the Schaumburg Post Office located at 450 W. Schaumburg Road, Schaumburg, IL 60173 and spoke with supervisor Mike Reese to inquire about the 1501 Woodfield Rd, Schaumburg, IL 60173-

4982 address. I was referred to the Carrier Route Supervisor Manny Whitley who would

be in early the next morning.

4.  That early the next morning on February 6, 2016 I called the Carrier Route Supervisor,

Manny Whitley at 847-885-6502. I verified that there is no record of Beal Bank SSB at

the 1501 Woodfield Road, Schaumburg, IL 60173-4982 address and that mail does come

into the post office addressed to Beal Bank SSB and that the post office returns the mail

to the sender. Carrier Route Supervisor Manny Whitely recommended and referred me

or the party receiving documents regarding this address to contact the Postal Inspector for

an investigation of fraud.

5.  That on February 6, 2016 I also verified with United States Postal Service carrier route

supervisor Manny Whitley that the mail that is delivered to the Schaumburg Corporate

Center at 1501 Woodfield Road, Schaumburg, IL 60173-4982 must have a suite number

in the address to be a deliverable address. I verified that the mail for the building complex

is delivered to the lower level mailroom and requires a suite number to be delivered to the

proper tenant in the building.  That the use of the 1501 Woodfield Road, Schaumburg, IL

60173-4982 address alone (without a suite number) is not a deliverable address even if

Beal Bank SSB was located in the building (which it is not).

6.  If called to testify, I will testify to these facts.

WHEREFORE, affiant further sayeth naught.

Marcia Swift

Subscribed and sworn to before me
This _11_ day of _February_, 2016.

NOTARY PUBLIC

OFFICIAL SEAL
DANIEL M WEAVER
Notary Public - State of Illinois
My Commission Expires Jul 14, 2019



# RPORATE CENTER

| | | | |
|---|---|---|---|
| ABS ASSOCIATES, INC. | 202N | WAC SOLUTION PARTNERS MIDWEST 200N | |
| AMERICAN AGRICULTURAL INS. CO. | 300W | WELLMARK INTERNATIONAL | 200W |
| AMERICAN FARM BUREAU INS. SERVICES 300W | | WOODFIELD MEDIA | 200N |
| ARKADIN | 400E | XEROX CORPORATION | 200E |
| ATRIUM GIFT SHOP | 1125 | | |
| BASE ZERO PRODUCTIONS | 200N | OFFICE OF THE BUILDING 147B BUILDING 100 | |
| THE BROKERAGE GROUP | 101E | | |
| CENTRAL LIFE SCIENCES | 200W | AMENITIES/SERVICES - 1501 BUILDING | |
| CONCEPT CLEANERS | 116S | ATM MACHINE | ATRIUM SHOP |
| DELI-TIME, INC. | 116E | GIFTS, CARDS, SUNDRIES | 1125 |
| EVOQUA WATER TECHNOLOGIES LLC 200S | | CONCEPT CLEANERS | 116S |
| MICHAEL ERICKSEN, P.C. | 200N | DELI | ATRIUM |
| FAY SERVICING, LLC | 100W | FITNESS CENTER | LOWER LEVEL |
| FRESENIUS KABI USA | 900E | HAIR SALON / BARBER | 1145 |
| HAIR STUDIO 114 FOR MEN AND WOMEN 1145 | | MAIL ROOM | LOWER LEVEL |
| HAVENSIGHT CONSULTING GROUP 105E | | FEDERAL EXPRESS DROP BOX LOWER LEVEL | |
| SCHAUMBURG CENTER FOR ECONOMIC DEVELOPMENT | 115N | UPS DROP BOX | LOWER LEVEL |
| insurancelook.com LLC | 110E | SNACKS | LOWER LEVEL |
| INVESTMENT BROKERAGE GROUP | 101E | MASSAGE THERAPIST | LOWER LEVEL |
| LEARNING TREE INTERNATIONAL | 105N | | |
| LEGAL SHIELD SCHAUMBURG | 200N | | |
| M & M REPORTING WORLDWIDE | 114E | | |
| PROCEED INNOVATIVE | 200N | | |
| PROVIDENT FUNDING ASSOCIATES, LP | 204N | | |
| PUTMAN MEDIA | 400N | | |
| QUADRANT 4 SYSTEM CORPORATION 205S | | | |
| RESOURCE BROKERAGE, LLC | 110E | | |
| SAC WIRELESS | 300E | | |
| TEKSYSTEMS | 110W | | |
| THRIVENT FINANCIAL | 200N | | |
| UNDO IDENTITY THEFT | SUITE 200N | | |

# SCHAUMBURG

East
Entrance

East
Entrance

**1501 South**

To Lower Level

**1501 East**

D C B A

**Atrium**

North Courtyard

1501 North & East Elevators

1501 South & West Elevators

South Courtyard

West Entrance

**1501 North**

To Lower Level

**1501 West**

West Entrance

**N**

## Directory

① Security Console
② Conference Center
③ Dell-Time
④ Atrium Gift Shop
⑤ Hair Studio 114
⑥ Concept Cleaners
⑦ Conference Room E

**Lower Level**

Fitness Center

Mail Room

nd

nger Elevator

ht Elevator

ge Elevator

s

's Restroom

nen's Restroom

| Tenant | Location |
|---|---|
| ABS ASSOCIATES, INC. | 202N |
| AMERICAN AGRICULTURAL INS. CO. | 300W |
| AMERICAN FARM BUREAU INS. SERVICES | 300W |
| ARKADIN | 400E |
| ATRIUM GIFT SHOP | 112S |
| BASE ZERO PRODUCTIONS | 200N |
| THE BROKERAGE GROUP | 101E |
| CENTRAL LIFE SCIENCES | 200W |
| CONCEPT CLEANERS | 116S |
| DELI-TIME, INC. | 118E |
| EVOQUA WATER TECHNOLOGIES LLC | 200S |
| MICHAEL ERICKSEN, P.C. | 200N |
| FAY SERVICING, LLC | 100W |
| FRESENIUS KABI USA | 300E |
| HAIR STUDIO 114 FOR MEN AND WOMEN | 114S |

| Tenant | Location |
|---|---|
| WAC SOLUTION PARTNERS MIDWEST | 200N |
| WELLMARK INTERNATIONAL | 200W |
| WOODFIELD MEDIA | 200N |
| XEROX CORPORATION | 200E |
| OFFICE OF THE BUILDING 1475 | BUILDING 100 |

**AMENITIES/SERVICES - 1501 BUILDING**

| Amenity | Location |
|---|---|
| ATM MACHINE | ATRIUM SHOP |
| GIFTS, CARDS, SUNDRIES | 112S |
| CONCEPT CLEANERS | 116S |
| DELI | ATRIUM |
| FITNESS CENTER | LOWER LEVEL |
| HAIR SALON / BARBER | 114S |
| MAIL ROOM | LOWER LEVEL |

| Name | Suite |
|---|---|
| CONCEPT CLEANERS | 116S |
| DELI-TIME, INC. | 118E |
| EVOQUA WATER TECHNOLOGIES LLC | 200S |
| MICHAEL ERICKSEN, P.C. | 200N |
| FAY SERVICING, LLC | 100W |
| FRESENIUS KABI USA | 300E |
| HAIR STUDIO 114 FOR MEN AND WOMEN | 114S |
| HAVENSIGHT CONSULTING GROUP | 105E |
| SCHAUMBURG CENTER FOR ECONOMIC DEVELOPMENT | 115N |
| Insurancelook.com.LLC | 110E |
| INVESTMENT BROKERAGE GROUP | 101E |
| LEARNING TREE INTERNATIONAL | 105N |
| LEGAL SHIELD SCHAUMBURG | 200N |
| M & M REPORTING WORLDWIDE | 114E |
| PROCEED INNOVATIVE | 200N |
| PROVIDENT FUNDING ASSOCIATES, LP | 204N |
| PUTNAM MEDIA | 400N |

| Amenity | Location |
|---|---|
| GIFTS, CARDS, SUNDRIES | 125 |
| CONCEPT CLEANERS | 116S |
| DELI | ATRIUM |
| FITNESS CENTER | LOWER LEVEL |
| HAIR SALON / BARBER | 114S |
| NAIL ROOM | LOWER LEVEL |
| FEDERAL EXPRESS DROP BOX | LOWER LEVEL |
| UPS DROP BOX | LOWER LEVEL |
| SNACKS | LOWER LEVEL |
| MASSAGE THERAPIST | LOWER LEVEL |

| | | |
|---|---|---|
| INTERNATIONAL CENTER | | |
| INVESTMENT BROKERAGE GROUP | 101E | |
| LEARNING TREE INTERNATIONAL | 105N | |
| LEGAL SHIELD SCHAUMBURG | 200N | |
| H & M REPORTING WORLDWIDE | 114E | |
| PROCEED INNOVATIVE | 200N | |
| PROVIDENT FUNDING ASSOCIATES, LP | 200N | |
| PUTNAM MEDIA | 400N | |
| QUADRANT 4 SYSTEM CORPORATION 2055 | 110E | |
| RESOURCE BROKERAGE, LLC | 300E | |
| SAC WIRELESS | 110W | |
| TEKSYSTEMS | 200N | |
| THRIVENT FINANCIAL | 200N | |
| UNDO IDENTITY THEFT | SUITE 200N | |





KML LAW GROUP, P.C.
SUITE 5000 – BNY MELLON INDEPENDENCE CENTER
701 MARKET STREET
PHILADELPHIA, PA 19106
(866) 413-2311
WWW.KML LAWGROUP.COM

BEAL BANK S.S.B.
1501 Woodfield Road
Schaumburg, IL 60173-4982

*Plaintiff*

vs.

DANA BRINTON
Mortgagor(s) and Record Owner(s)
731 Price Street
West Chester, PA 19382

*Defendant(s)*

IN THE COURT OF COMMON PLEAS

Of Chester COUNTY

CIVIL ACTION - LAW

ACTION OF MORTGAGE FORECLOSURE

Docket Number: 2010-10150-RC

Assignment of Bid

I, the undersigned, as attorney for the successful bidder, hereby assign my bid at the Sheriff Sale dated November 19, 2015 to:

BEAL BANK S.S.B.
1501 Woodfield Road
Schaumburg, IL 60173-4982

Date: November 19, 2015

By: _____
KML LAW GROUP, P.C.
Michael McKeever Pa. ID 56129
Lisa Lee Pa. ID 78020
Kristina Murtha Pa. ID 61858
David Fein Pa. ID 82628
Thomas Pulco Pa. ID 27615
Jill P. Jenkins Pa. ID 306588
Victoria W. Chen Pa. ID 317741
Attorneys for Plaintiff

11453233  B: 9249 P: 1361  SHD
01/14/201811:50 AM     Page 6 of 6
KML LAW GROUP

COMMONWEALTH OF PENNSYLVANIA        :
                                    :        ss
COUNTY OF CHESTER                   :

On this _Bth_ day of _January_, two thousand and ~~fifteen~~ _Sixteen_
2016 (2015), personally appeared Carolyn B. Welsh, Sheriff of the County of Chester, known to me
(or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged that he/she/it executed the same for the purposes therein
contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____ deput~~y~~

Prothonotary

No. 10-10150

## Deed = Poll

Carolyn B. Welsh, Sheriff

TO

Beal Bank S.S.B.

The address of the Grantee is:

1501 Woodfield Road
Schaumburg, IL 60173

_Nicole E. Barron_

11453233  B: 9249 P: 1359  SHD
01/14/2016 11:58 AM  Page 4 of 6
KML LAW GROUP

# EXHIBIT 10

**Rhonda Hardwick's contradicting "true and accurate" copies of a Jason J. Vecchio endorsed allonge**



## ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE

POOL:         0          LOAN ID:    8754006

NOTE DATE:    9/30/2003      LOAN AMOUNT:    $87,550.00

BORROWER NAME:  RHONDA L HARDWICK

PROPERTY ADDRESS:   201 CHURCH ST, LOOGOOTEE, IN  47553

PAY TO THE ORDER OF

LNV Corporation

WITHOUT RECOURSE

Residential Funding Company, LLC

By:

Name: Jason J. Vecchio
Title: Post Funding Manager
Residential Funding Company, LLC

filed with the court (2010)
as " a true and accurate copy of
the note and it's allonges is
attatched as Exhibit A."

ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE

POOL:  0          LOAN ID:  8754006

NOTE DATE:  9/30/2003      LOAN AMOUNT:  $87,550.00

BORROWER NAME:  RHONDA L HARDWICK

PROPERTY ADDRESS:   201 CHURCH ST, LOOGOOTEE, IN  47553

PAY TO THE ORDER OF

LNV Corporation

WITHOUT RECOURSE

Residential Funding Company, LLC

By: _____

Name: Jason J. Vecchio

Title: Post Funding Manager

Residential Funding Company, LLC

filed with the court when
judge ordered original note
(2013)

.

# EXHIBIT 11

**Bret Maloney Deposition from Swift Case**

**NOTE: Representative PLAINTIFF-INTERVENORS class members cannot afford the financial burden of printing and mailing 300 plus pages for this exhibit – it's in PACER:**

**U.S. 9th Circuit _LNV v. Subramaniam_, Case 15-35963,**

**Docket Entry 7-15, filed 03/31/2016**

# EXHIBIT 12

**_In re Swift_ U.S. Bankruptcy Court**

**for the Northern District of Illinois Eastern Division**

**Case 12-35690, Doc. 104-1, filed 3/13/14**

**LNV's Discovery Responses**

**Pages 37-50**

**Showing "LPS Desktop-Invoice Management…"**

Note: This Exhibit only contains pages 1 and pages 37-50 to save printing and mailing costs. The full court document can be obtained through PACER.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Judge Carol A. Doyle |
| | ) | |
| CHRISTOPHER T. SWIFT and | ) | |
| MARCIA A. SWIFT | ) | |
| | ) | No 12-35690 |
| Debtors. | ) | |
| | ) | Chapter 13 |

**LNV'S RESPONSE TO DEBTORS FIRST INTERROGATORIES
AND REQUEST FOR PRODUCTION OF DOCUMENTS**

Now comes, Creditor, LNV Corporation, by and through its attorneys, Freedman
Anselmo Lindberg, LLC, and hereby responds to Debtors, Christopher T. Swift and Marcia A.
Swift's discovery requests.

General Objection 1: Pursuant to Federal Rule of Bankruptcy Procedure 7033, Debtors'
discovery requests exceed the limit of interrogatories permitted.

General Objection 2:  To the best of its knowledge, information and belief, formed after
reasonable inquiry, Creditor's Responses to Debtors' Requests are complete and correct as of the
time of this Response.  In the event that Creditor learns that in some material respect the
information disclosed is incomplete or incorrect and if the additional or corrective information
has not otherwise been made known to the other parties during the discovery process or in
writing, Creditor will supplement this Response as required by Rule 7026.

General Objection 3:  Creditor expressly states that (a) it is not raising all objections to Debtors'
Requests that could be raised and (b) the failure to raise such objections here is not intended to
waive the raising of such objections n the future.  Creditor also reserved the right to raise at any
hearing or trial in this matter all objections (including relevance objections) to the admission of
any (a) document produced, (b) information supplied, or (c) admission made.

General Objection 4:  Creditor objects to any directions, definitions or instructions contained in
Debtors' Requests that seek to impose upon Creditor obligations in excess of, or different from,
those required by Federal Rules of Bankruptcy Procedure or under bankruptcy law, including
any obligation to supplement answers, or any discovery orders entered by the Court.

<u>**RESPONSES TO INTERROGATORIES**</u>

1. State the name and address of all parties answering or assisting in providing answers to
their interrogatories.

LPS Desktop-Invoice Management - Invoice Detail                                    Page 1 of 1

| Vendor | LSI (Lenders Services Inc) | Regarding: | | Invoice Number: | ▆▆▆▆ |
|---|---|---|---|---|---|
| Address: | P.O. BOX 809382 | SWIFT MARCIA A | | Invoice Status: | Check Confirmed |
| | Chicago, IL 60680-9382 | 601 SENNETT ST | | Loan No.: | |
| Payee Code: | ▆▆▆▆ | BATAVIA, IL 60510 | | Loan Type: | Conventional |
| Vendor Contact: | Vera Vandiver | | | Acquistion Date: | |
| Vendor Ref #: | | | | Type: | Non-Judicial |
| Servicer: | Dovenmuehle Mortgage Inc | | | Referral Date : | 1/19/2011 |
| Inv. ID / Cat. ID | | | | Loan Location: | TT |
| Investor Name | LNV CORPORATION | | | Submitted Date: | 1/27/2011 |
| Invoice ID | ▆▆▆▆ | | | Vendor Invoice Date: | 1/19/2011 |
| | | | | Paid In Full Date: | N/A |
| | | | | Foreclosure Removal Date: | N/A |
| | | | | MS Status: | N/A |
| | | | | Relief Requested Date: | N/A |
| | | | | Protection Begin Date: | N/A |
| | | | | Protection End Date: | N/A |

### BPO - BPO Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 01/27/2011 | | | | | 01/27/2011 | 01/28/2011 | 01/29/2011 | 1 |

Dept || Comments || Line Items || Exceptions || Edit Summary || Arg. Summaries || Chronology || Queue || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| Costs | Total: | $95.00 | IM Prev. Billed: | $395.00 | Exc. Loan Allow: | | | Exc Ord Allw: | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Exc. Loan Total Fees/Costs Allow: | | | | |
| Totals | Inv Amt: | $95.00 | Prev. Billed: | $395.00 | Loan Total Fees/Costs Prev.Billed: | | $395.00 | Exc Ord Allw: | |

**Costs**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Valuation Costs | BPO with pictures - Exterior | 01/19/11 | 1 | $95.00 | $95.00 | $0.00 | $95.00 |
| Note: BP | | | | | | | |
| | | | | Total: | $95.00 | $0.00 | $95.00 |
| | | | | Invoice Total: | $95.00 | $0.00 | $95.00 |

LPS Desktop-Invoice Management - Invoice Detail                                        Page 1 of 1

| | | | | |
|---|---|---|---|---|
| Vendor | LSI (Lenders Services Inc) | Regarding: | Invoice Number: | ▬▬▬ |
| Address: | P.O. BOX 809382 | SWIFT MARCIA A | Invoice Status: | Check Confirmed (Exc) |
| | Chicago, IL 60680-9382 | 601 SENNETT ST | Loan No.: | |
| Payee Code: | | BATAVIA, IL 60510 | Loan Type: | Conventional |
| Vendor Contact: | Vera Vandiver | | Acquisition Date: | |
| Vendor Ref #: | | | Type: | Non-Judicial |
| Servicer: | Dovenmuehle Mortgage Inc | | Referral Date : | 9/1/2010 |
| Inv. ID / Cat. ID | | | Loan Location: | |
| Investor Name | BEAL BANK USA | | Submitted Date: | 9/13/2010 |
| Invoice ID | ▬▬▬ | | Vendor Invoice Date: | 9/1/2010 |
| | | | Paid In Full Date: | N/A |
| | | | Foreclosure Removal Date: | N/A |
| | | | MS Status: | N/A |
| | | | Relief Requested Date: | N/A |
| | | | Protection Begin Date: | N/A |
| | | | Protection End Date: | N/A |

### BPO - BPO Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 09/13/2010 | 09/14/2010 | 01/14/2013 | | 09/14/2010 | 09/14/2010 | 09/15/2010 | 2 |

Dept || Comments || Line Items || Exceptions || Edit Summary || Amt. Summary || Chronology || Quotes || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| Costs | Total: | $150.00 | IM Prev. Billed: | $245.00 | Exc. Loan Allow: | | Exc Ord Allw: | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Exc. Loan Total Fees/Costs Allow: | | | |
| Totals | Inv Amt: | $150.00 | Prev. Billed: | $245.00 | Loan Total Fees/Costs Prev.Billed: | $245.00 | Exc Ord Allw: | |

**Costs**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Valuation Costs | BPO with pictures – Exterior | 09/01/10 | 1 | $150.00 | $150.00 | $0.00 | $150.00 |

Note: BP

| | | | |
|---|---|---|---|
| | Total: | $150.00 | $0.00 | $150.00 |
| | Invoice Total: | $150.00 | $0.00 | $150.00 |

LPS Desktop-Invoice Management - Invoice Detail

Page 1 of 1

| | | | | |
|---|---|---|---|---|
| Vendor | LSI (Lenders Services Inc) | Regarding: | Invoice Number: | ███████ |
| Address: | P.O. BOX 809382 | SWIFT MARCIA A | Invoice Status: | Check Confirmed |
| | Chicago, IL 60680-9382 | 501 SENNETT ST | Loan No.: | |
| Payee Code: | ███████ | BATAVIA, IL 60510 | Loan Type: | Conventional |
| Vendor Contact: | Vera Vandiver | | Acquisition Date: | |
| Vendor Ref #: | | | Type: | Non-Judicial |
| Servicer: | Dovenmuehle Mortgage Inc | | Referral Date : | 8/22/2010 |
| Inv. ID / Cat. ID | ███████ | | Loan Location: | |
| Investor Name | BEAL BANK USA | | Submitted Date: | 9/2/2010 |
| Invoice ID | ███████ | | Vendor Invoice Date: | 8/22/2010 |
| | | | Paid In Full Date: | N/A |
| | | | Foreclosure Removal Date: | N/A |
| | | | MS Status: | N/A |
| | | | Relief Requested Date: | N/A |
| | | | Protection Begin Date: | N/A |
| | | | Protection End Date: | N/A |

**BPO - BPO Services**

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 09/02/2010 | | | | 09/02/2010 | 09/03/2010 | 09/04/2010 | 1 |

[ Dept ][ Comments ][ Line Items ][ Escrology ][ Edit Summary ][ Adj. Summary ][ Chronology ][ Order ][ Service Payment ][ Guideline ][ Invoice Mapping ][ History ][ Payments ][ Reconciliation ]

| Costs | Total: | $150.00 | IM Prev. Billed: | $95.00 | Exc. Loan Allow: | | Exc Ord Allw: | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Exc. Loan Total Fees/Costs Allow: | | | |
| Totals | Inv Amt: | $150.00 | Prev. Billed: | $95.00 | Loan Total Fees/Costs Prev.Billed: | $95.00 | Exc Ord Allw: | |

**Costs**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Valuation Costs | BPO with pictures - Exterior | 08/22/10 | 1 | $150.00 | $150.00 | $0.00 | $150.00 |
| Note: BP | | | | | | | |
| | | | | Total: | $150.00 | $0.00 | $150.00 |
| | | | | Invoice Total: | $150.00 | $0.00 | $150.00 |

LPS Desktop-Invoice Management - Invoice Detail                                                Page 1 of 1

| | | | | |
|---|---|---|---|---|
| **Vendor** | LSI (Lenders Services Inc) | **Regarding:** | **Invoice Number:** | ▓▓▓▓ |
| **Address:** | P.O. BOX 809382 | SWIFT MARCIA A | **Invoice Status:** | Check Confirmed |
| | Chicago, IL 60580-9382 | 601 SENNETT ST | **Loan No.:** | |
| **Payee Code:** | ▓▓▓▓ | BATAVIA, IL 60510 | **Loan Type:** | Conventional |
| **Vendor Contact:** | Vera Vandiver | | **Acquisition Date:** | |
| **Vendor Ref #:** | | | **Type:** | Non-Judicial |
| **Servicer:** | Davenmuehle Mortgage Inc | | **Referral Date :** | 7/15/2010 |
| **Inv. ID / Cat. ID** | | | **Loan Location:** | |
| **Investor Name** | BEAL BANK USA | | **Submitted Date:** | 7/27/2010 |
| **Invoice ID** | ▓▓▓▓ | | **Vendor Invoice Date:** | 7/15/2010 |
| | | | **Paid In Full Date:** | N/A |
| | | | **Foreclosure Removal Date:** | N/A |
| | | | **MS Status:** | N/A |
| | | | **Relief Requested Date:** | N/A |
| | | | **Protection Begin Date:** | N/A |
| | | | **Protection End Date:** | N/A |

**BPO - BPO Services**

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 07/27/2010 | | | | 07/27/2010 | 07/27/2010 | 07/28/2010 | 1 |

Dept || Comments || Line Items || Exceptions || Edit Summary || Adj. Summary || Chronology || Queue || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| Costs | Total: | $95.00 | IM Prev. Billed: | $0.00 | Exc. Loan Allow: | | | Exc Ord Allw: | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Exc. Loan Total Fees/Costs Allow: | | | | |
| Totals | Inv Amt: | $95.00 | Prev. Billed: | $0.00 | Loan Total Fees/Costs Prev.Billed: | | $0.00 | Exc Ord Allw: | |

**Costs**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Valuation Costs | BPO with pictures - Exterior | 07/15/10 | 1 | $95.00 | $95.00 | $0.00 | $95.00 |
| Note: BP | | | | | Total: | $95.00 | $0.00 | $95.00 |
| | | | | | Invoice Total: | $95.00 | $0.00 | $95.00 |

LPS Desktop-Invoice Management - Invoice Detail                                                    Page 1 of 1

| | | | | |
|---|---|---|---|---|
| Vendor | Freedman, Anselmo, Lindberg LLC | **Regarding:** | **Invoice Number:** | ▮▮▮ |
| Address: | P.O. Box 3228 | SWIFT MARCIA A | Invoice Status: | Check Confirmed |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | Loan No.: | ▮▮▮ |
| Payee Code: | | BATAVIA, IL 60510 | Loan Type: | Conventional |
| Vendor Contact: | Donna Koons | | Acquistion Date: | |
| Vendor Ref #: | F11050399 | | Type: | Non-Judicial |
| Servicer: | Dovenmuehle Mortgage Inc | | Referral Date : | 5/1/2011 |
| Inv. ID / Cat. ID | | | Loan Location: | TT |
| Investor Name | LNV CORPORATION | | Submitted Date: | 3/16/2012 |
| Invoice ID | ▮▮▮ | | Vendor Invoice Date: | 3/16/2012 |
| | | | Paid In Full Date: | N/A |
| | | | Foreclosure Removal Date: | N/A |
| | | | MS Status: | N/A |
| | | | Relief Requested Date: | N/A |
| | | | Protection Begin Date: | N/A |
| | | | Protection End Date: | N/A |

### Litigation - Litigation Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 03/16/2012 | 03/27/2012 | 03/27/2012 | | 03/27/2012 | 03/27/2012 | 03/28/2012 | 12 |

|| Dept || Comments || Line Items || Exceptions || Edit Summary || Adj. Summary || Chronology || Costs || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation ||

| | | | | | | |
|---|---|---|---|---|---|---|
| Fees | Total: | $67.50 | IM Prev. Billed: | $242.50 | Exc. Loan Allow: | Exc Ord Allw: |
| Costs | Total: | $0.00 | IM Prev. Billed: | $0.00 | Exc. Loan Allow: | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | |
| Totals | Inv Amt: | $67.50 | Prev. Billed: | $242.50 | Loan Total Fees/Costs Prev. Billed: | $4,315.50 | Exc Ord Allw: |

#### Fees

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 02/22/12 | 1 | $67.50 | $67.50 | $0.00 | $67.50 |
| | | | | Total: | $67.50 | $0.00 | $67.50 |
| | | | | Invoice Total: | $67.50 | $0.00 | $67.50 |

$510

https://im.lpsdesktop.com/Public/NewInvoiceWeb/NTNIInvoiceDetailService.aspx?id=6lvy...   3/4/2014

LPS Desktop-Invoice Management - Invoice Detail                                    Page 1 of 1

| | | | | | |
|---|---|---|---|---|---|
| **Vendor** | Freedman, Anselmo, Lindberg LLC | **Regarding:** | | **Invoice Number:** | ████████ |
| **Address:** | P.O. Box 3228 | SWIFT MARCIA A | | **Invoice Status:** | Check Confirmed (Exc) |
| | Naperville, Il 60566-3228 | 601 SENNETT ST | | **Loan No.:** | |
| **Payee Code:** | | BATAVIA, Il 60510 | | **Loan Type:** | Conventional |
| **Vendor Contact:** | Donna Koons | | | **Acquisition Date:** | |
| **Vendor Ref #:** | f11050399 | | | **Type:** | Non-Judicial |
| **Servicer:** | Dovenmuehle Mortgage Inc | | | **Referral Date :** | 5/1/2011 |
| **Inv. ID / Cat. ID** | ████████ | | | **Loan Location:** | TT |
| **Investor Name** | **LNV CORPORATION** | | | **Submitted Date:** | 1/26/2012 |
| **Invoice ID** | ████████ | | | **Vendor Invoice Date:** | 1/26/2012 |
| | | | | **Paid In Full Date:** | N/A |
| | | | | **Foreclosure Removal Date:** | N/A |
| | | | | **MS Status:** | N/A |
| | | | | **Relief Requested Date:** | N/A |
| | | | | **Protection Begin Date:** | N/A |
| | | | | **Protection End Date:** | N/A |

Litigation - Litigation Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 01/26/2012 | 01/30/2012 | 01/30/2012 | | 01/30/2012 | 01/30/2012 | 01/31/2012 | 5 |

Dept || Comments || Line Items || Exceptions || Edit Summary || Adj. Summary || Chronology || Dates || Service Network || Guideline || Invoice Mapping || History || Payments || Reconciliation

| | | | | | |
|---|---|---|---|---|---|
| **Fees** Total: | $67.50 | IM Prev. Billed: | $175.00 | Exc. Loan Allow: | Exc Ord Allw: |
| **Costs** Total: | $0.00 | IM Prev. Billed: | $0.00 | Exc. Loan Allow: | Exc Ord Allw: |
| | | | | Exc. Loan Total Fees/Costs Allow: | |
| **Totals** Inv Amt: | $67.50 | Prev. Billed: | $175.00 | Loan Total Fees/Costs Prev.Billed: $4,248.00 | Exc Ord Allw: |

**Fees**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 01/09/12 | 1 | $67.50 | $67.50 | $0.00 | $67.50 |
| | | | | | Total: $67.50 | $0.00 | $67.50 |
| | | | | | Invoice Total: $67.50 | $0.00 | $67.50 |

LPS Desktop-Invoice Management - Invoice Detail                               Page 1 of 1

| | | | |
|---|---|---|---|
| Vendor | Freedman, Anselmo, Lindberg LLC | Regarding: | Invoice Number: |
| Address: | P.O. Box 3228 | SWIFT MARCIA A | Invoice Status: Check Confirmed |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | Loan No.: |
| Payee Code: | | BATAVIA, IL 60510 | Loan Type: Conventional |
| Vendor Contact: | Donna Koons | | Acquistion Date: |
| Vendor Ref #: | F11050099 | | Type: Non-Judicial |
| Servicer: | Dovenmuehle Mortgage Inc | | Referral Date : 5/1/2011 |
| Inv. ID / Cat. ID | | | Loan Location: TT |
| Investor Name | LNV CORPORATION | | Submitted Date: 1/9/2012 |
| Invoice ID | | | Vendor Invoice Date: 1/9/2012 |
| | | | Paid In Full Date: N/A |
| | | | Foreclosure Removal Date: N/A |
| | | | MS Status: N/A |
| | | | Relief Requested Date: N/A |
| | | | Protection Begin Date: N/A |
| | | | Protection End Date: N/A |

Litigation - Litigation Services

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 01/09/2012 | 01/11/2012 | 01/30/2012 | | 01/11/2012 | 01/11/2012 | 01/12/2012 | 3 |

Dept | Comments | Line Items | Exceptions | Edit Summary | Adj. Summary | Chronology | Center | Service Request | Guideline | Invoice Mapping | History | Payments | Reconciliation

| | | | | | |
|---|---|---|---|---|---|
| Fees | Total: | $131.25 | IM Prev. Billed: | $43.75 | Exc. Loan Allow: | Exc Ord Allw: |
| Costs | Total: | $0.00 | IM Prev. Billed: | $0.00 | Exc. Loan Allow: | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: |
| Totals | Inv Amt: | $131.25 | Prev. Billed: | $43.75 | Loan Total Fees/Costs Prev.Billed: $4,116.75 | Exc Ord Allw: |

Fees

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 11/18/11 | 1 | $131.25 | $131.25 | $0.00 | $131.25 |
| | | | | Total: | $131.25 | $0.00 | $131.25 |
| | | | | Invoice Total: | $131.25 | $0.00 | $131.25 |

LPS Desktop-Invoice Management - Invoice Detail

Page 1 of 1

| | | | | | |
|---|---|---|---|---|---|
| Vendor | Freedman, Anselmo, Lindberg LLC | | **Regarding:** | **Invoice Number:** | ▮▮▮▮ |
| Address: | P.O. Box 3228 | | SWIFT MARCIA A | **Invoice Status:** | Check Confirmed |
| | Naperville, IL 60566-3228 | | 601 SENNETT ST | **Loan No.:** | |
| Payee Code: | | | BATAVIA, IL 60510 | **Loan Type:** | Conventional |
| Vendor Contact: | Donna Koons | | | **Acquisition Date:** | |
| Vendor Ref #: | F11050399 | | | **Type:** | Non-Judicial |
| Servicer: | Davenmuehle Mortgage Inc | | | **Referral Date :** | 5/1/2011 |
| Inv. ID / Cat. ID | | | | **Loan Location:** | TT |
| Investor Name | LNV CORPORATION | | | **Submitted Date:** | 11/30/2011 |
| Invoice ID | ▮▮▮▮ | | | **Vendor Invoice Date:** | 11/30/2011 |
| | | | | **Paid In Full Date:** | N/A |
| | | | | **Foreclosure Removal Date:** | N/A |
| | | | | **MS Status:** | N/A |
| | | | | **Relief Requested Date:** | N/A |
| | | | | **Protection Begin Date:** | N/A |
| | | | | **Protection End Date:** | N/A |

**Litigation - Litigation Services**

| Submitted | 1st Reviewed | Last Reviewed | Accepted | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|
| 11/30/2011 | 12/01/2011 | 01/30/2012 | | 12/01/2011 | 12/01/2011 | 12/02/2011 | 2 |

Detail || Comments || Line Items || Exceptions || Edit Summary || Adj. Summary || Chronology || Query || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| | | | | | | |
|---|---|---|---|---|---|---|
| Fees | Total: | $43.75 | IN Prev. Billed: | $0.00 | Exc. Loan Allow: | Exc Ord Allw: |
| Costs | Total: | $0.00 | IN Prev. Billed: | $0.00 | Exc. Loan Allow: | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | |
| Totals | Inv Amt: | $43.75 | Prev. Billed: | $0.00 | Loan Total Fees/Costs Prev.Billed: | $4,073.00 | Exc Ord Allw: |

**Fees**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 11/21/11 | 1 | $43.75 | $43.75 | $0.00 | $43.75 |
| | | | | | Total: | $43.75 | $0.00 | $43.75 |
| | | | | | Invoice Total: | $43.75 | $0.00 | $43.75 |

LPS Desktop-Invoice Management - Invoice Detail                                     Page 1 of 1

| | | | | |
|---|---|---|---|---|
| **Vendor** | Freedman, Anselmo, Lindberg LLC | **Regarding:** | **Invoice Number:** | ████ |
| **Address:** | P.O. Box 3228 | SWIFT MARCIA A | **Invoice Status:** | Check Confirmed (Exc) |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | **Loan No.:** | |
| **Payee Code:** | ████ | BATAVIA, IL 60510 | **Loan Type:** | Conventional |
| **Vendor Contact:** | Ruth Upham | | **Acquisition Date:** | |
| **Vendor Ref #:** | F11050399 | | **Type:** | Judicial |
| **Servicer:** | Dovenmuehle Mortgage Inc | | **Referral Date :** | 5/27/2011 |
| **Inv. ID / Cat. ID** | | | **Loan Location:** | TT |
| **Investor Name** | LNV CORPORATION | | **Submitted Date:** | 6/23/2011 |
| **Outsource Firm:** | LPS Default Solutions | | **Vendor Invoice Date:** | 6/23/2011 |
| **Invoice ID** | ████ | | **Paid In Full Date:** | N/A |
| | | | **Foreclosure Removal Date:** | N/A |
| | | | **MS Status:** | N/A |
| | | | **Relief Requested Date:** | N/A |
| | | | **Protection Begin Date:** | N/A |
| | | | **Protection End Date:** | N/A |

Foreclosure - Foreclosure Services - Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 06/23/2011 | 06/30/2011 | 07/15/2011 | | 06/30/2011 | 07/15/2011 | 07/15/2011 | 07/16/2011 | 23 |

Dept || Comments || Line Items || Exceptions || Edit Summary || Adj. Summary || Chronology || Claims || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| Fees | Total: | $650.00 | IM Prev. Billed: | $0.00 | Exc. Loan Allow : | | Exc Ord Allw: | |
|---|---|---|---|---|---|---|---|---|
| Costs | Total: | $1,088.00 | IM Prev. Billed: | $0.00 | Exc. Loan Allow: | | Exc Ord Allw: | |
| | | | | | Exc. Loan Total Fees/Costs Allow: | | | |
| Totals | Inv Amt: | $1,738.00 | Prev. Billed: | $0.00 | Loan Total Fees/Costs Prev. Billed: | $490.00 | Exc Ord Allw: | |

**Fees**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net | |
|---|---|---|---|---|---|---|---|---|
| Attorney Fees | Allowable | 06/15/11 | 1 | $650.00 | $650.00 | $0.00 | $650.00 | ✓ |
| | | | | | **Total:** | $650.00 | $0.00 | $650.00 |

**Costs**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net | |
|---|---|---|---|---|---|---|---|---|
| Title Costs | Title Search | 05/27/11 | 1 | $350.00 | $350.00 | $0.00 | $350.00 | ✓ |
| Note: NOT A FNMA LOAN | | | | | | | | |
| Exception: Exceeds Life of Loan Total Allowable | | | | | | | | |
| Filing Costs | Filing Fee Complaint | 06/01/11 | 1 | $286.00 | $286.00 | $0.00 | $286.00 | ✓ |
| Recording Costs | Lis Pendens/NOPA | 06/09/11 | 1 | $42.00 | $42.00 | $0.00 | $42.00 | ✓ |
| Service Costs | Service of Process | 06/15/11 | 1 | $410.00 | $410.00 | $0.00 | $410.00 | ✓ |
| | | | | | **Total:** | $1,088.00 | $0.00 | $1,088.00 |
| | | | | | **Invoice Total:** | $1,738.00 | $0.00 | $1,738.00 |

LPS Desktop-Invoice Management - Invoice Detail                                          Page 1 of 1

| | | | | |
|---|---|---|---|---|
| **Vendor** | Freedman, Anselmo, Lindberg LLC | **Regarding:** | | **Invoice Number:** | ■■■ |
| **Address:** | P.O. Box 3228 | SWIFT MARCIA A | | **Invoice Status:** | Check Confirmed (Exc) |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | | **Loan No.:** | |
| **Payee Code:** | | BATAVIA, IL 60510 | | **Loan Type:** | Conventional |
| **Vendor Contact:** | Ruth Upham | | | **Acquistion Date:** | |
| **Vendor Ref #:** | F11050399 | | | **Type:** | Judicial |
| **Servicer:** | Dovenmuehle Mortgage Inc | | | **Referral Date :** | 5/27/2011 |
| **Inv. ID / Cat. ID** | | | | **Loan Location:** | TT |
| **Investor Name** | LNV CORPORATION | | | **Submitted Date:** | 11/9/2011 |
| **Outsource Firm:** | LPS Default Solutions | | | **Vendor Invoice Date:** | 11/9/2011 |
| **Invoice ID** | ■■■ | | | **Paid In Full Date:** | N/A |
| | | | | **Foreclosure Removal Date:** | N/A |
| | | | | **NS Status:** | N/A |
| | | | | **Relief Requested Date:** | N/A |
| | | | | **Protection Begin Date:** | N/A |
| | | | | **Protection End Date:** | N/A |

Foreclosure - Foreclosure Services - Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 11/09/2011 | 11/13/2011 | 11/22/2011 | | 11/13/2011 | 11/22/2011 | 11/22/2011 | 11/23/2011 | 14 |

Dept || Comments || Line Items || Exceptions || Edit Summary || App. Summary || Chronology || Quote || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| Fees | Total: | $43.75 | IM Prev. Billed: | $2,451.25 | Exc. Loan Allow: | | $1,195.00 | Exc Ord Allw: | |
|---|---|---|---|---|---|---|---|---|---|
| Costs | Total: | $0.00 | IM Prev. Billed: | $1,088.00 | Exc. Loan Allow: | | | Exc Ord Allw: | |
| | | | | | Exc. Loan Total Fees/Costs Allow: | | | | |
| Totals | Inv Amt: | $43.75 | Prev. Billed: | $3,539.25 | Loan Total Fees/Costs Prev.Billed: | | $4,029.25 | Exc Ord Allw: | |

**Fees**

| Category | Subcategory | | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|---|
| Attorney Fees | Other | | 10/31/11 | 0.25 | $175.00 | $43.75 | $0.00 | $43.75 |
| | Note: CONTESTED SEE ATTACHED | | | | | | | |
| | | | | | **Total:** | $43.75 | $0.00 | $43.75 |
| | | | | | **Invoice Total:** | $43.75 | $0.00 | $43.75 |

Case 12-35690   Doc 104-1   Filed 03/13/14   Entered 03/13/14 09:33:30   Desc Exhibit
LNV Discovery Responses   Page 47 of 72

LPS Desktop-Invoice Management - Invoice Detail                                         Page 1 of 1

| | | | |
|---|---|---|---|
| **Vendor** | Freedman, Anselmo, Lindberg LLC | **Regarding:** | **Invoice Number:** ▮▮▮ |
| **Address:** | P.O. Box 3228 | SWIFT MARCIA A | **Invoice Status:** Check Confirmed (Exc) |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | **Loan No.:** |
| **Payee Code:** | | BATAVIA, IL 60510 | **Loan Type:** Conventional |
| **Vendor Contact:** | Daniel Contreras | | **Acquisition Date:** |
| **Vendor Ref #:** | F11050399 | | **Type:** Judicial |
| **Servicer:** | Dovenmuehle Mortgage Inc | | **Referral Date :** 5/27/2011 |
| **Inv. ID / Cat. ID** | | | **Loan Location:** TT |
| **Investor Name** | LNV CORPORATION | | **Submitted Date:** 11/3/2011 |
| **Outsource Firm:** | LPS Default Solutions | | **Vendor Invoice Date:** 11/3/2011 |
| **Invoice ID** | ▮▮▮ | | **Paid In Full Date:** N/A |
| | | | **Foreclosure Removal Date:** N/A |
| | | | **MS Status:** N/A |
| | | | **Relief Requested Date:** N/A |
| | | | **Protection Begin Date:** N/A |
| | | | **Protection End Date:** N/A |

**Foreclosure - Foreclosure Services - Judicial**

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 11/03/2011 | 11/10/2011 | 11/22/2011 | | 11/10/2011 | 11/22/2011 | 11/22/2011 | 11/23/2011 | 20 |

Dept || Comments || Line Items || Exceptions || Edit Summary || Adj. Summary || Chronology || Quote || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Fees** | Total: | $1,137.50 | IM Prev. Billed: | $1,313.75 | Exc. Loan Allow: | $1,151.25 | Exc Ord Allw: |
| **Costs** | Total: | $0.00 | IM Prev. Billed: | $1,088.00 | Exc. Loan Allow: | | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | | |
| **Totals** | Inv Amt: | $1,137.50 | Prev. Billed: | $2,401.75 | Loan Total Fees/Costs Prev. Billed: | $2,891.75 | Exc Ord Allw: |

**Fees**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 10/25/11 | 1 | $1,137.50 | $1,137.50 | $0.00 | $1,137.50 |

Note: ATTY FEE CONTESTED- ADDITIONAL LEGAL RESEARCH, REVISED MOTION TO STRIKE, RECEIVED AND REVIEWED LETTER, REVIEWED STATUS OF DISCOVERY.

|  |  | Total: | $1,137.50 | $0.00 | $1,137.50 |
|---|---|---|---|---|---|
|  |  | Invoice Total: | $1,137.50 | $0.00 | $1,137.50 |

LPS Desktop-Invoice Management - Invoice Detail                                Page 1 of 1

| | | | |
|---|---|---|---|
| **Vendor** | Freedman, Anselmo, Lindberg LLC | **Regarding:** | **Invoice Number:** ▇▇▇ |
| **Address:** | P.O. Box 3228 | SWIFT MARCIA A | **Invoice Status:** Check Confirmed (Exc) |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | **Loan No.:** |
| **Payee Code:** ▇▇▇ | | BATAVIA, IL 60510 | **Loan Type:** Conventional |
| **Vendor Contact:** | Daniel Contreras | | **Acquistion Date:** |
| **Vendor Ref #:** | F11050399 | | **Type:** Judicial |
| **Servicer:** | Dovenmuehle Mortgage Inc | | **Referral Date :** 5/27/2011 |
| **Inv. ID / Cat. ID** ▇▇▇ | | | **Loan Location:** TT |
| **Investor Name** | LNV CORPORATION | | **Submitted Date:** 10/17/2011 |
| **Outsource Firm:** | LPS Default Solutions | | **Vendor Invoice Date:** 10/17/2011 |
| **Invoice ID** ▇▇▇ | | | **Paid In Full Date:** N/A |
| | | | **Foreclosure Removal Date:** N/A |
| | | | **MS Status:** N/A |
| | | | **Relief Requested Date:** N/A |
| | | | **Protection Begin Date:** N/A |
| | | | **Protection End Date:** N/A |

Foreclosure - Foreclosure Services - Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 10/17/2011 | 10/20/2011 | 11/22/2011 | | 10/20/2011 | 11/22/2011 | 11/22/2011 | 11/23/2011 | 37 |

Dept || Comments || Line Items || Exceptions || Edit Summary || Acc. Summary || Chronology || Quote || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation

| Fees | Total: | $175.00 | IM Prev. Billed: | $1,138.75 | Exc. Loan Allow: | | $13.75 | Exc Ord Allw: |
|---|---|---|---|---|---|---|---|---|
| Costs | Total: | $0.00 | IM Prev. Billed: | $1,088.00 | Exc. Loan Allow: | | | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | | | |
| Totals | Inv Amt: | $175.00 | Prev. Billed: | $2,226.75 | Loan Total Fees/Costs Prev.Billed: | | $2,716.75 | Exc Ord Allw: |

**Fees**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 10/11/11 | 1 | $175.00 | $175.00 | $0.00 | $175.00 |

Note: ATTY FEE- CONTESTED LEGAL RESEARCH OF DEFENSES ALLEGED.

|  |  | Total: | $175.00 | $0.00 | $175.00 |
|---|---|---|---|---|---|
|  |  | **Invoice Total:** | $175.00 | $0.00 | $175.00 |

Case 12-35690    Doc 104-1    Filed 03/13/14    Entered 03/13/14 09:33:30    Desc Exhibit
LNV Discovery Responses    Page 49 of 72

LPS Desktop-Invoice Management – Invoice Detail                                    Page 1 of 1

| | | | |
|---|---|---|---|
| **Vendor** | Freedman, Anselmo, Lindberg LLC | **Regarding:** | **Invoice Number:** ▮ |
| **Address:** | P.O. Box 3228 | SWIFT MARCIA A | **Invoice Status:** Check Confirmed (Exc) |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | **Loan No.:** ▮ |
| **Payee Code:** ▮ | | BATAVIA, IL 60510 | **Loan Type:** Conventional |
| **Vendor Contact:** | Daniel Contreras | | **Acquistion Date:** |
| **Vendor Ref #:** | F11050399 | | **Type:** Judicial |
| **Services:** | Dovenmuehle Mortgage Inc | | **Referral Date :** 5/27/2011 |
| **Inv. ID / Cat. ID** | | | **Loan Location:** TT |
| **Investor Name** | **LNV CORPORATION** | | **Submitted Date:** 9/20/2011 |
| **Outsource Firm:** | LPS Default Solutions | | **Vendor Invoice Date:** 9/20/2011 |
| **Invoice ID** ▮ | | | **Paid In Full Date:** N/A |
| | | | **Foreclosure Removal Date:** N/A |
| | | | **MS Status:** N/A |
| | | | **Relief Requested Date:** N/A |
| | | | **Protection Begin Date:** N/A |
| | | | **Protection End Date:** N/A |

Foreclosure - Foreclosure Services - Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 09/20/2011 | 09/27/2011 | 10/15/2011 | | 09/27/2011 | 10/15/2011 | 10/17/2011 | 10/18/2011 | 26 |

[ Dept ][ Comments ][ Line Items ][ Exceptions ][ Edit Summary ][ Ath. Summary ][ Chronology ][ Quote ][ Service Request ][ Guideline ][ Invoice Mapping ][ History ][ Payments ][ Reconciliation ]

| | | | | | | |
|---|---|---|---|---|---|---|
| **Fees** | Total: | $222.50 | IM Prev. Billed: | $916.25 | Exc. Loan Allow: | Exc Ord Allw: |
| **Costs** | Total: | $0.00 | IM Prev. Billed: | $1,088.00 | Exc. Loan Allow: | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | |
| **Totals** | **Inv Amt:** | **$222.50** | **Prev. Billed:** | **$2,004.25** | **Loan Total Fees/Costs Prev. Billed:** $2,494.25 | Exc Ord Allw: |

**Fees**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 09/13/11 | 1 | $222.50 | $222.50 | $0.00 | $222.50 |

Note: ATTY FEE- CONTESTED- PREPARED FILE FOR COURT, COURT PREP,REVIEW EMAIL CORRESPONDENCE, REVIEW COURT RESULTS.

| | | Total: | $222.50 | $0.00 | $222.50 |
|---|---|---|---|---|---|
| | | **Invoice Total:** | **$222.50** | **$0.00** | **$222.50** |

LPS Desktop-Invoice Management - Invoice Detail                                    Page 1 of 1

| | | | |
|---|---|---|---|
| Vendor: | Freedman, Anselmo, Lindberg LLC | **Regarding:** | **Invoice Number:** ▉▉▉ |
| Address: | P.O. Box 3228 | SWIFT MARCIA A | **Invoice Status:** Check Confirmed |
| | Naperville, IL 60566-3228 | 601 SENNETT ST | **Loan No.:** |
| Payee Code: | | BATAVIA, IL 60510 | **Loan Type:** Conventional |
| Vendor Contact: | Daniel Contreras | | **Acquisition Date:** |
| Vendor Ref #: | F11050399 | | **Type:** Judicial |
| Servicer: | Dovenmuehle Mortgage Inc | | **Referral Date :** 5/27/2011 |
| Inv. ID / Cat. ID | | | **Loan Location:** YT |
| Investor Name | **LNV CORPORATION** | | **Submitted Date:** 9/8/2011 |
| Outsource Firm: | LPS Default Solutions | | **Vendor Invoice Date:** 9/8/2011 |
| Invoice ID | ▉▉▉ | | **Paid In Full Date:** N/A |
| | | | **Foreclosure Removal Date:** N/A |
| | | | **MS Status:** N/A |
| | | | **Relief Requested Date:** N/A |
| | | | **Protection Begin Date:** N/A |
| | | | **Protection End Date:** N/A |

Foreclosure - Foreclosure Services - Judicial

| Submitted | 1st Reviewed | Last Reviewed | Accepted | O/S Recommend Approval | Approved | Chk Requested | Chk Confirmed | Days To Proc |
|---|---|---|---|---|---|---|---|---|
| 09/08/2011 | 09/16/2011 | 09/21/2011 | | 09/16/2011 | 09/21/2011 | 09/21/2011 | 09/22/2011 | 14 |

| Dept || Comments || Line Items || Exceptions || Edit Summary || Auth. Summary || Chronology || Quote || Service Request || Guideline || Invoice Mapping || History || Payments || Reconciliation |

| | | | | |
|---|---|---|---|---|
| Fees | Total: | $266.25 | IM Prev. Billed: | $650.00 | Exc. Loan Allow: | | Exc Ord Allw: |
| Costs | Total: | $0.00 | IM Prev. Billed: | $1,088.00 | Exc. Loan Allow: | | Exc Ord Allw: |
| | | | | | Exc. Loan Total Fees/Costs Allow: | |
| Totals | Inv Amt: | $266.25 | Prev. Billed: | $1,738.00 | Loan Total Fees/Costs Prev.Billed: | $2,228.00 | Exc Ord Allw: |

**Fees**

| Category | Subcategory | Date | Qty | Price | Orig. Billed | Adjust | Net |
|---|---|---|---|---|---|---|---|
| Attorney Fees | Civil Litigation | 08/15/11 | 1 | $266.25 | $266.25 | $0.00 | $266.25 |

Note: ATTY FEE CONTESTED- REVIEW BORROWERS ANSWER AND AFFIRMATIVE DEFENSES, FORMATTED DISCOVERY REQUEST.

|  |  | | |
|---|---|---|---|
| | Total: | $266.25 | $0.00 | $266.25 |
| | | | |
| | Invoice Total: | $266.25 | $0.00 | $266.25 |

# EXHIBIT 13

***LNV v. Fauley***, Case 16-35593,
U.S. 9th Circuit Court of Appeals
DktEntry: 50-4 filed 08/17/2017

**Internal email chain between MGC employee Michael Barnett
and GMAC-RFC employee Diane M. Meistad
dated Friday Oct. 24, 2008 to Monday Oct. 27, 2008**

**Michael Barnett**

| | |
|---|---|
| **From:** | Michael Barnett |
| **Sent:** | Monday, October 27, 2008 1:32 PM |
| **To:** | 'Meistad, Diane' |
| **Subject:** | RE: Default Assignment Reqeust loan (Fauley, Robynne) |

**Importance:**   High

Okay Diane, I had my manager look at this file with me and we have determined that we need to following assignments to correct the chain of assignments:

**1) Corrective Assignment from WAMU TO Deutsche Bank (to correct the assignment from RFC to WAMU, which was recorded in error) & Note Allonge**
**2) Assignment from Deutsche Bank to RFC & Note Allonge**
**3) Assignment from RFC to LNV Corp (Note allonge in file already)**

The assignment from RFC to WAMU was recorded in error so it is not needed.  We also have 2 endorsements on the original Note **WAMU to RFC and from RFC to Deutsche Bank** which should be cancelled, to correct the Endorsement chain on the Note.  We will just need the okay from you via email to cancel these endorsements.  Will this work for you?
Thanks Michael.


Oct 27, 2008 01:04:45 PM

Expires: Nov 10, 2008 01:04:44 PM

From: diane.meistad@gmacrfc.com

To: mbarnett@mgcmortgage.com

Cc:

Subject: RE: Default Assignment Reqeust loan (Fauley, Robynne)

I disagree since RFC was not in position (title position) to transfer the asset.

I will need to refer your request for this assignment to our Records Services team in Iowa to begin the process.

Diane

--- Original Message ---
Diane, since the assignment from RFC to WAMU is of record we have to correct the chain of title. At this point the county recorder's office shows that WAMU is the assignee of record for this loan (which is wrong), right? RFC did assign this loan and shouldn't have but, in order to fix this one the correct chain should be from Deutsche to RFC, then from RFC to WAMU, then from WAMU to LNV Corp, which will correct the chain of title. Litton Loan Servicing LP prepared and recorded the assignment from RFC to WAMU, which should have not been recorded. We still need to get this loan from RFC to LNV to property convey this property, since we purchased it from RFC. Please call me if you still concerns about the chain of assignments. Borrower loan #7889719/17103058-Robynne Fauley. Thanks Michael.

**LNV 00144**

Received: Oct 27, 2008 08:38:36 AM
Expires: Nov 10, 2008 08:38:36 AM
From: diane.meistad@gmacrfc.com
To: mbarnett@mgcmortgage.com
Cc:
Subject: RE: Default Assignment Reqeust loan #7889719/17103058(Fauley, Robynne)
Michael,
If the assignment was recorded from WAMU to DB and another assignment f/ RFC to WAMU - Technically the second assignment in 'invalid' because RFC was not in title to record the second assignment and it should not effect title.

Because of the assignment was invalid technically it didn't transfer ownership.


--- Original Message ---
Diane, this loan was last assigned to Washington Mutual from RFC but, prior to this assignment was assigned from Washington Mutual to Deutsche Bank and recorded in Clackamas County, Oregon. We need an assignment from Deutsche Bank to RFC and from Washington Mutual to LNV Corp. I have templates for both assignments. We will be re-recording the assignment from RFC to Washington Mutual to correct the chain of title with both of these assignments. Also, please find the Note Allonge from Deutsche Bank to RFC as well. Please forward these signed assignments back to me via our federal express account #252870180. Thanks Michael.

<<OR_Non-MERS Deutsche to RFC-619513.doc>> <<OR_Non-MERS Wamu to LNV-619513.doc>> <<Allonge Deutsche Bank to RFC_BC-619513.doc>>




Michael Barnett
MGC Mortgage Inc.
(469) 229-8634 Direct
(469) 229-8604 Fax
mbarnett@mgcmortgage.com <mailto:cgolden@mgcmortgage.com>

**Michael Barnett**

| | |
|---|---|
| **From:** | Michael Barnett |
| **Sent:** | Friday, October 24, 2008 5:30 PM |
| **To:** | 'Meistad, Diane' |
| **Subject:** | Default Assignment Reqeust loan #7889719/17103058(Fauley, Robynne) |

**Importance:**   High

Diane, this loan was last assigned to Washington Mutual from RFC but, prior to this assignment was assigned from Washington Mutual to Deutsche Bank and recorded in Clackamas County, Oregon. We need an assignment from Deutsche Bank to RFC and from Washington Mutual to LNV Corp. I have templates for both assignments. We will be re-recording the assignment from RFC to Washington Mutual to correct the chain of title with both of these assignments. Also, please find the Note Allonge from Deutsche Bank to RFC as well. Please forward these signed assignments back to me via our federal express account #252870180. Thanks Michael.

      

OR_Non-MERS      OR_Non-MERS      Allonge Deutsche
)eutsche to RFC-61.amu to LNV-619513   Bank to RFC_B...

Michael Barnett
MGC Mortgage Inc.
(469) 229-8634 Direct
(469) 229-8604 Fax
mbarnett@mgcmortgage.com

LNV 00146

**Michael Barnett**

| | |
|---|---|
| **From:** | Michael Barnett |
| **Sent:** | Friday, October 17, 2008 10:01 AM |
| **To:** | Shanda Foreman |
| **Cc:** | Carissa Golden |
| **Subject:** | Intervening Assignments to Deutsche Bank |

Shanda, I have 2 RFC loans that are needing assignments from Deutsche Bank to RFC.  Please check to see if they are on the list that you sent to RFC.  See the loan numbers below:

17103058/Robynne Fauley, Oregon
17102692/Stuart Berg, New Jersey

Michael Barnett
MGC Mortgage Inc.
(469) 229-8634 Direct
(469) 229-8604 Fax
mbarnett@mgcmortgage.com

**LNV 00147**

.

# EXHIBIT 14

**Judge Feinerman's Memorandum Opinion & Order**

**Case: 16-C-10729, Doc 27, Filed 1/26/17**

**U.S. District Court Northern District of Illinois Eastern Division**

**Granting Swift's Motion to Abstain**

**Found Beal's federal suit is "vexatious" and "contrived": Pages 12**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BEAL BANK USA, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 10729 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| MARCIA SWIFT and CHRISTOPHER SWIFT, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

    Beal Bank USA brought this suit against Marcia and Christopher Swift to recover payments due on a mortgage note. Several months earlier, Beal brought a state court action against the Swifts to foreclose on the property subject to the mortgage and to recover a personal deficiency judgment. *See Beal Bank USA v. Swift*, Case 2016 CH 593 (Cir. Ct. Kane Cnty., Ill. filed June 10, 2016) (state court complaint reproduced at Doc. 7-1). The Swifts have moved to dismiss or stay this case under the doctrine set forth in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), pending resolution of the state court action. The motion is granted.

**Background**

    In 2011, an affiliate of Beal brought a foreclosure action on the Swifts' property in state court. *See LNV Corp. v. Swift*, Case 2011 CH 2069 (Cir. Ct. Kane Cnty., Ill. filed June 2, 2011) (state court complaint reproduced at Doc. 7-2). That action was dismissed without prejudice in January 2016. Doc. 7-3 at 20.

    In June 2016, Beal filed a foreclosure action in state court against the same property. Doc. 7-1. The complaint alleged that the Swifts failed to pay what they owed under the note

1

secured by the mortgage, resulting in a debt of $449,500.00 plus interest and other charges.  *Id*. at 3 ¶ 3J.  The complaint sought to foreclose on the property and also to collect a "personal deficiency judgment" against the Swifts for the total amount owed.  *Id*. at 4 ¶ 3M, 5.

In November 2016, Beal filed the present suit in this court.  Doc. 1.  The complaint alleges that the Swifts failed to make payments due on the mortgage note, resulting in their owing $449,500.00 plus interest.  *Id*. at ¶¶ 8, 11.  As relief, Beal seeks a monetary judgment of $449,500 plus interest and other charges.  *Id*. at 3.

The Swifts have moved this court to abstain in light of the pendency of the state court action.  Doc. 7.  At the presentment hearing, Beal suggested that the cases were not parallel under *Colorado River* because the state court action was an *in rem* action against the property, while this suit is an *in personam* action against the Swifts.  When the court pointed out to Beal's counsel (who does not represent Beal in state court) that the state court complaint actually sought a personal deficiency judgment against the Swifts, counsel said "we will discuss that and thanks for bringing that to our attention."  Beal then successfully moved to amend its state court complaint to remove its request for a personal deficiency judgment.  Doc. 15-1 at 3; Doc 19-4.

### Discussion

The *Colorado River* doctrine provides that "a federal court may stay or dismiss a suit in federal court when a concurrent state court case is underway, but only under exceptional circumstances and if it would promote 'wise judicial administration.'"  *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (quoting *Colorado River*, 424 U.S. at 818); *see also Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 700 (7th Cir. 1992).  The Supreme Court "has cautioned that abstention is appropriate only in 'exceptional circumstances,' and has also emphasized that federal courts have a 'virtually unflagging obligation … to exercise

2

the jurisdiction given them.'" *AXA Corporate Solutions v. Underwriters Reins. Corp.*, 347 F.3d 272, 278 (7th Cir. 2003) (alteration in original) (quoting *Colorado River*, 424 U.S. at 813, 817) (citation omitted). In determining whether to abstain, the court's task is "not to find some substantial reason for the exercise of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist exceptional circumstances, the clearest of justifications, that can suffice under *Colorado River* to justify the surrender of that jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25-26 (1983) (internal quotation marks and emphases omitted).

The *Colorado River* analysis has two steps. First, the court asks "whether the state and federal court actions are parallel." *Freed*, 756 F.3d at 1018; *see also Caminiti*, 962 F.2d at 700. If the proceedings are not parallel, *Colorado River* abstention must be denied. *Freed*, 756 F.3d at 1018. If the proceedings are parallel, the court then must weigh ten non-exclusive factors to determine whether abstention is proper. *Ibid.*

## I.      Whether the Federal and State Cases Are Parallel

State and federal suits need not be identical to be parallel. *See Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 498-99 (7th Cir. 2011) ("[F]or *Colorado River* purposes … [p]recisely formal symmetry is unnecessary."); *Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1288 (7th Cir. 1988) ("Interstate is correct in its assertion that differences exist. However, the requirement is of parallel suits, not identical suits."). Rather, suits are parallel when "substantially the same parties are contemporaneously litigating substantially the same issues in another forum." *Freed*, 756 F.3d at 1019. "The question is not whether the suits are formally symmetrical, but whether there is a substantial likelihood that the [state] litigation will dispose of all claims presented in the federal case." *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510,

518 (7th Cir. 2001) (internal quotation marks omitted); *see also Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 646 (7th Cir. 2011) (same).  "Any doubt regarding the parallel nature of the [state] suit should be resolved in favor of exercising jurisdiction." *Adkins*, 644 F.3d at 499 (alteration in original) (internal quotation marks omitted).

Here, there is no dispute that the parties in the state and federal cases are the same. Beal's argument against parallelism submits that the cases advance different claims and remedies: an *in personam* claim for a monetary judgment against the Swifts in the federal case, and an *in rem* claim for foreclosure against the property in the state case.  Doc. 19 at 5-6.  Beal's position fails for two independent reasons.

First, a party opposing abstention may not unilaterally manufacture non-parallelism.  In state court, Beal initially sought a foreclosure against the property *and* a deficiency judgment against the Swifts.  The complaint in this court was redundant, seeking a contract judgment against the Swifts on the note.  True, a deficiency judgment against the mortgagor in a foreclosure action can occur only after a foreclosure sale—with the deficiency judgment being the difference between the amount owed and the amount for which the property is sold, *see* 735 ILCS 5/15-1508(e); 735 ILCS 5/15-1508(b)(2)—while a contract claim on the note need not await a foreclosure sale.  *See LP XXVI, LLC v. Goldstein*, 811 N.E.2d 286, 290 (Ill. App. 2004) ("These remedies may be pursued consecutively or concurrently.").  That distinction, however, is immaterial.  A contract action on the note achieves the same ultimate remedy as a foreclosure suit yielding a foreclosure sale followed by a deficiency judgment—the bank recovers the amount owed on the note—and both actions ultimately turn on the same question—whether the mortgagors defaulted on the note.  So, as it originally stood, the state court action was parallel with the federal suit.  *See Freed*, 756 F.3d at 1021 ("In short, the claims in both federal cases are

premised upon the scheme that is now before the state court. … The cases rely on the same set of facts, present substantially similar legal issues, and involve substantially the same parties.  We agree … that the federal actions are parallel to … the state court proceeding.").

It was only after this court alerted Beal's federal counsel that Beal's state court action pursued personal monetary relief against the Swifts that it quickly amended its state court complaint to drop that request for relief.  Then, in its *Colorado River* response brief, Beal argued that the two actions are not parallel because the state court suit no longer seeks that monetary relief.  Beal's gambit fails, for the *Colorado River* doctrine is not so naïve as to allow a party to strategically and cynically manipulate its pleadings to destroy parallelism.  *See Freed*, 756 F.3d at 1020 ("The parallel nature of the actions cannot be destroyed by … repackaging the same issue under different causes of action."); *Clark v. Lacy*, 376 F.3d 682, 686-87 (7th Cir. 2004) (same); *Lumen Const., Inc. v. Brant Const. Co., Inc.*, 780 F.2d 691, 696 (7th Cir. 1985) (affirming abstention where the alleged lack of parallelism stemmed from the federal plaintiff's choice of which parties to bring into the state case); *Freed v. Friedman*, __ F. Supp. 3d __, 2016 WL 6070357, *6 (N.D. Ill. Oct. 17, 2016) ("[A] finding that the cases are not parallel predicated on [the plaintiff's choices of whom to join] would unjustly reward strategic behavior, because [a potential defendant's] absence from the state proceedings is entirely attributable to [the plaintiff]."); *Knight v. DJK Real Estate Grp., LLC*, 2016 WL 427614, *5 (N.D. Ill. Feb. 4, 2016) ("[A party] by its unilateral choice cannot destroy parallelism.").

Even if *Colorado River* in theory allowed parties to unilaterally and intentionally engineer non-parallelism, Beal's amendment of its state court complaint failed to destroy the parallelism between the state court action and this suit.  As noted, actions are parallel if "substantially the same parties are contemporaneously litigating substantially the same issues in

another forum." *Freed*, 756 F.3d at 1019.  And parallelism is satisfied where "there is a substantial likelihood that the [state] litigation will dispose of all claims presented in the federal case." *AAR Int'l*, 250 F.3d at 518 (internal quotation marks omitted).  Importantly, the test does not require that the relief sought be the same.  *See Clark*, 376 F.3d at 687 ("Even though an additional remedy is sought in the federal action, the liability issues (which are the central legal issues) remain the same in both cases.").

Even as currently framed, the state action concerns the same central issue, involving the same parties, as the federal suit: whether the Swifts defaulted on the mortgage note.  If they did, then Beal is entitled to a foreclosure judgment in the state action and to recover on the note in this suit.  If Beal proves a default in the state action, there is a substantial likelihood (in fact, a virtual certainty) that it will prevail in this suit; and if Beal fails to prove a default in the state action, there is a substantial likelihood (and, again, a virtual certainty) that it will lose in this suit.  Staying this case will allow that central question to be answered in the state action, which in turn will lead to a prompt resolution of this suit, as whichever party succeeds in state court may invoke preclusion principles here.  That is the essence of parallelism.  *See Rogers v. Desiderio*, 58 F.3d 299, 302 (7th Cir. 1995) ("It is sensible to stay proceedings until an earlier-filed state case has reached a conclusion, and then (but only then) to dismiss the suit outright on grounds of … preclusion.").

Beal places great weight on *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584 (7th Cir. 2005), which holds that even where compulsory joinder rules require a claim to be brought in a state action or forfeited, a federal suit bringing that claim is not necessarily parallel to the state action where it was not brought.  *Id.* at 592-93.  *TruServ* is inapposite, as the resolution of the claims there turned on the different underlying issues: the state court case concerned a misrepresentation

claim by Party A against Party B, while the federal case concerned involved a debt collection claim by Party B against Party A. *Id.* at 588. Here, by contrast, the claims turn on the same underlying issue, and thus are parallel.

## II.    The *Colorado River* Factors

The second step in the *Colorado River* analysis requires examining and balancing these ten non-exclusive factors:

1) whether the state has assumed jurisdiction over property;

2) the inconvenience of the federal forum;

3) the desirability of avoiding piecemeal litigation;

4) the order in which jurisdiction was obtained by the concurrent forums;

5) the source of governing law, state or federal;

6) the adequacy of state-court action to protect the federal plaintiff's rights;

7) the relative progress of state and federal proceedings;

8) the presence or absence of concurrent jurisdiction;

9) the availability of removal; and

10) the vexatious or contrived nature of the federal claim.

*Freed*, 756 F.3d at 1018. "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required." *Colorado River*, 424 U.S. at 818-19. The court will address each factor in turn. *See Freed*, 756 F.3d at 1022 (noting that *Colorado River* abstention requires adherence to "rigorous standards," which were met where this court "carefully addressed each of the ten factors and provided sufficient explanations for its findings").

1. *Whether the State has assumed jurisdiction over property.*  Because Beal initiated a foreclosure action in state court, the state court assumed jurisdiction over the Swifts' property. Beal is right that this suit seeks separate relief on the mortgage note, Doc. 19 at 6-9, but that relief is inexorably tied to the question whether the Swifts defaulted on the note secured by the property over which the state court has assumed jurisdiction.  This factor thus favors abstention.

2. *The inconvenience of the federal forum.*  The state court, located in Kane County, is about forty miles from the federal courthouse, and the Swifts live in Kane County.  Although the federal forum is slightly more inconvenient to the Swifts than the state forum, the difference is not significant.  So this factor is neutral.

3. *The desirability of avoiding piecemeal litigation.*  "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results."  *Day v. Union Mines Inc.*, 862 F.2d 652, 659 (7th Cir. 1988).  "Dual proceedings could involve what we have called a grand waste of efforts by both the court and parties in litigating the same issues regarding the same contract in two forums at once."  *Ibid.* (internal quotation marks omitted).  Because the federal and state suits involve the same parties and legal issues, and because both suits turn on whether the Swifts defaulted on the mortgage note, proceeding simultaneously in both forums would ensure "duplicative and wasteful litigation with the potential of inconsistent resolutions of the issue."  *Caminiti*, 962 F.2d at 701. Simultaneous proceedings also would incent one or the other party to attempt to delay proceedings in one forum should the other forum appear more favorable.  *See LaDuke v. Burlington N. R.R. Co.*, 879 F.2d 1556, 1560 (7th Cir. 1989).  This factor strongly favors abstention.

4. *The order in which jurisdiction was obtained by the concurrent forums.* This factor favors abstention, as Beal filed the state action on June 10, 2016, and did not file this suit until November 18, 2016, over five months later. *See Lumen Constr.*, 780 F.2d at 697 (holding that this factor favored abstention where the state case was filed nearly five months before the federal case).

5. *The source of governing law, state or federal.* The source of the governing law here is state law, which favors abstention. *See Day*, 862 F.2d at 660 ("[A] state court's expertise in applying its own law favors a *Colorado River* stay.").

6. *The adequacy of state court action to protect the federal plaintiff's rights.* Beal contends that the state court cannot adequately protect its rights because the state court action does not entitle it to a jury trial. Doc. 19 at 13. But that is the bed Beal made; had it brought in the state court a contract claim on the note, that claim would have been triable to a jury. *See* Ill. Const. 1970, art. I, § 13; *Catania v. Local 4250/5050 of Comm'cns Workers of Am.*, 834 N.E.2d 966, 970 (Ill. App. 2005). In any event, Beal cannot assert with a straight face that *in rem* foreclosure actions fail to adequately protect its rights; banks in Beal's position file millions of those actions annually, and Beal does not even venture to explain how those actions disadvantage the banks.

Beal also contends that because it is no longer requesting a personal deficiency judgment in the state court action, the state court "will not provide [Beal] with the separate remedy that [it is] entitled to under the Note." *Id.* at 14. Again, this is a problem of Beal's own making. Beal could have persisted in its request for a personal deficiency judgment in state court, which would have been the functional equivalent of a recovery on a contract claim on the note. And Beal does not explain why it could not have included a contact claim on the note in its state court action.

In any event, where a federal claim is stayed rather than dismissed outright, the risk that a state court proceeding will not protect the federal plaintiff's rights is lessened, because if the state proceeding proves itself inadequate, the possibility of reviving the federal proceeding remains.  Thus, even if Beal's arguments were persuasive, the risk to its rights would be mitigated because this court, in granting the Swifts' motion, will do so by way of a stay rather than outright dismissal.  *See Freed*, 756 F.3d at 1023 ("[The plaintiff]'s substantial rights are protected by granting a stay because it allows him the possibility to revive his federal litigation depending on the outcome in state court or in the unlikely event that the state court action is inadequate.").  All things considered, then, the sixth factor favors abstention.

7. *The relative progress of state and federal proceedings*.  There was an "absence of any proceedings in [this court], other than the filing of the complaint, prior to the motion to [abstain]."  *Colorado River*, 424 U.S. at 820.  But nor has there been extensive progress in the state court action.  This factor is neutral.

8. *The presence or absence of concurrent jurisdiction*.  All of Beal's claims in federal court arise under Illinois law, and the Swifts undoubtedly are susceptible to suit in Illinois court, so this factor favors abstention.  *Cf. Caminiti*, 962 F.2d at 702-03 (holding that the state court's lack of jurisdiction to hear a federal claim weighed against abstention).

9. *The availability of removal*.  This factor recognizes the policy against a federal court's hearing claims that are closely related to non-removable state proceedings.  *See Day*, 862 F.2d at 659-60.  The state court action is non-removable under the forum defendant rule because diversity jurisdiction provides the only basis for removal and the Swifts (the state court defendants) are Illinois citizens.  *See* 28 U.S.C. § 1441(b)(2) ("A civil action otherwise removable solely on the basis of jurisdiction under section 1332(a) of this title may not be

10

removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."); *Hurley v. Motor Coach Indus., Inc.*, 222 F.3d 377, 378 (7th Cir. 2000) (discussing the forum defendant rule). Thus, although abstention will delay or eliminate Beal's "opportunity to litigate in a federal forum—an opportunity to which it is entitled under 28 U.S.C. § 1332," *AXA Corporate Solutions*, 347 F.3d at 279, this factor favors abstention because this suit is bound up with claims in the non-removable state case. *See Day*, 862 F.2d at 660 ("[R]elated removable claims should be decided in state court along with the non-removable claims."). Had Beal wished to litigate this entire matter in federal court, it could brought under the diversity jurisdiction a suit seeking foreclosure on the property, a deficiency judgment against the Swifts, and a contract recovery on the note. Having elected not to do so, Beal cannot now complain of or escape the consequences of its choice.

10. *The vexatious or contrived nature of the federal claims.* Because Beal easily could have brought (and initially did bring) in state court its claim for monetary relief against the Swifts, the federal suit is "vexatious" and "contrived" within the meaning of *Colorado River*. *See Interstate Material Corp*, 847 F.2d at 1289 ("[T]he federal suit could be considered both vexatious and contrived. ... [W]e see no reason why all claims and all parties could not have been ... part of one suit."). Even if the federal suit were not vexatious or contrived at its inception, it surely became so when Beal, having been alerted by this court of its state court personal deficiency claim, amended its state court complaint in an unsuccessful attempt to avoid parallelism rather than proceed in one forum. This factor thus weighs in favor of abstention.

In sum, nearly all of the *Colorado River* factors favor abstention, providing the "exceptional circumstances" necessary to abstain. The only remaining question is whether this suit should be dismissed or stayed. The Seventh Circuit routinely holds that *Colorado River*

Case 9:17-cv-80496-KAM   Document 35-1   Entered on FLSD Docket 02/27/2018   Page 78 of
144
Case: 1:16-cv-10729 Document #: 27 Filed: 01/26/17 Page 12 of 12 PageID #:318

should be implemented through a stay, not dismissal.  *See Montano v. City of Chicago*, 375 F.3d

593, 602 (7th Cir. 2004); *CIGNA Healthcare of St. Louis, Inc. v. Kaiser*, 294 F.3d 849, 851-52

(7th Cir. 2002).  Accordingly, this suit is stayed pending resolution of the state court action.

When that action concludes, any party may move this court to lift the stay and proceed with the

federal suit in a manner consistent with the state court's rulings and any applicable preclusion

principles.  *See Rogers* 58 F.3d at 302.

## Conclusion

For the foregoing reasons, the Swifts' motion to abstain under the *Colorado River*

doctrine is granted, and this case is stayed pending resolution of *Beal Bank USA v. Swift*, Case

2016 CH 593 (Cir. Ct. Kane Cnty., Ill. filed June 10, 2016).

January 26, 2017                                   _____
                                                                    United States District Judge

# EXHIBIT 15

### _Beal Bank USA v. Swift_ Amended Complaint filed 12-27-16
### Case: 16-CH-593
### 16th Judicial Circuit Court Kane County Illinois

### Referred to by Judge Feinerman in Exhibit 14

"True copy" of "Note" differs from earlier versions: Pages 34

"True copy" of Jason J. Vecchio allonge differs from earlier versions: Page 35

"True copy" of Allison Martin allonge differs from earlier versions: Page 36

F16050217 DMI

### IN THE CIRCUIT COURT OF THE 16TH JUDICIAL CIRCUIT
### KANE COUNTY- GENEVA, ILLINOIS

Beal Bank USA              ]

    Plaintiff,         ]

vs.                    ]

Marcia A. Swift aka Marcia Swift aka Marcia A.  ]
Jewell; Christopher T. Swift aka Christopher    ]
Swift aka Chris T. Swift aka Chris R. Swift aka   ]
Chris Swift; Windemere Homeowners        ]
Association; Mortgage Electronic Registration   ]
Systems, Inc.; Ditech Financial LLC; The United  ]
States of America; State of Illinois, Department   ]
of Revenue; Unknown Owners and Non-Record  ]
Claimants                      ]

    Defendants.         ]

CASE NO. 16 CH 593
Property Address: 601 Sennett Street,
Batavia, Illinois 60510



### 1st AMENDED COMPLAINT TO FORECLOSE MORTGAGE
735 ILCS 5/15-1504(a)(1) through (3)
**Residential Property, Eligible for Mediation**

NOW COMES the Plaintiff, Beal Bank USA , by and through its attorney, ANSELMO LINDBERG OLIVER LLC and complains of the above Defendants as follows:

1. Plaintiff files this Complaint to Foreclose the Mortgage hereinafter described and joins the following persons as Defendants:

    A. Marcia A. Swift aka Marcia Swift aka Marcia A. Jewell; Christopher T. Swift aka Christopher Swift aka Chris T. Swift aka Chris R. Swift aka  Chris Swift; Windemere Homeowners Association; Mortgage Electronic Registration Systems, Inc.; Ditech Financial LLC; The United States of America; State of Illinois, Department of Revenue;

    B. Plaintiff avers that in addition to persons designated by name herein, and the unknown defendants hereinbefore referred to there are other persons who are interested in this action and who have or claim some right, title, interest or lien in, to or upon the real estate sought to be foreclosed in this Complaint; that the name of each of such other person or persons is unknown to Plaintiff, and on diligent inquiry cannot be ascertained, and all such persons are hereby made parties Defendants to this proceeding by the name and description of UNKNOWN OWNERS and NON-RECORD CLAIMANTS.

2. That attached hereto as Exhibit "A" and incorporated herein is a true copy of said Mortgage.  That attached hereto as Exhibit "B" and incorporated herein is a true copy of the Note secured thereby.

By Order of Court this case is hereby set for case management
conference before the above named Judge on _3-13-17_ at _
_9:00 AM_Failure to appear may result in the case being
dismissed or an order of default being entered.

3.  Information concerning said Mortgage attached as Exhibit "A":

A.  Nature of the Instrument:  Mortgage

B.  Date of the Mortgage:  January 26, 2007

C.  Name of the Mortgagors: Marcia A. Swift aka Marcia Swift aka Marcia A. Jewell; Christopher T. Swift aka Christopher Swift aka Chris T. Swift aka Chris R. Swift aka  Chris Swift

D.  Name of the Original Mortgagee:  Mortgage Electronic Registration Systems, Inc. as a nominee for GMAC Mortgage, LLC dba ditech.com, its successors and assigns

E.  Date and place of recording of Mortgage:  February 15, 2007 in the office of the Recorder of Deeds or Registrar of Titles

F.  Identification of recording:  2007K018917

G.  Interest subject to the mortgage: Fee Simple

H.  Amount of Original Indebtedness, including subsequent advances made under the mortgage: $449,500.00

I.  Legal Description and common address of Mortgaged Premises:

    (1)    Legal Description:  SEE ATTACHED

    (2)    Common Address:  601 Sennett Street, Batavia, Illinois 60510

    (3)    P.I.N.:  12-17-325-010;

J.  Statement as to mortgage loan default:
The mortgagor has failed to pay the monthly installments due under the note and the loan is due for the 09/01/2008 payment.  There remains an outstanding principal balance of $449,500.00 plus interest, attorney's fees, foreclosure costs, late charges, advances and expenses incurred by the plaintiff due to the mortgagor's failure to make payments.  Interest accrues at $84.67 per day.

K.  Name of present owners of said premises:  Chris T. Swift and Marcia A. Swift

L.  Names of other persons who are joined as Defendants and whose interest in or lien on the mortgage real estate is sought to be terminated:

    1)    Chris T. Swift and Marcia A. Swift, as owner(s) of the real estate foreclosed herein;

    2)    Marcia A. Swift aka Marcia Swift aka Marcia A. Jewell; Christopher T. Swift aka Christopher Swift aka Chris T. Swift aka Chris R. Swift aka Chris Swift, as mortgagor(s) of the real estate foreclosed herein;

    3)    Mortgage dated July 14, 2006 and recorded August 8, 2006 as document 2006K086049 made by Chris T. Swift and Marcia A. Swift to MERS (Mortgage Electronic Registration Systems, Inc.) as a nominee for GMAC Mortgage Corporation dba ditech.com, its

successors and assigns to secure a note for $89,000.00, being serviced by Ditech Financial LLC.

Subordination agreement recorded February 15, 2007 as document 2007K018918, purportedly subordinating the lien of the mortgage recorded as document 2006K086049 to the mortgage recorded as document 2007K018917.

4)   Federal Revenue Lien dated May 31, 2007 and recorded June 11, 2007 as document no. 2007K061752 in favor of The United States of America, Department of Treasury against Christopher T. & Marcia A. Swift in the amount of $24,770.32.

5)   State of Illinois, Department of Revenue Lien recorded February 22, 2012 as document no. 2012K011136 against Christopher Swift and Marcia Swift in an amount of $2,987.35.

6)   Federal Revenue Lien dated April 3, 2013 and recorded April 15, 2013 as document no. 2013K027822 in favor of The United States of America, Department of Treasury against Christopher T. & Marcia A. Swift in the amount of $32,070.49.

7)   State of Illinois, Department of Revenue Lien recorded October 19, 2015 as document no. 2015K056865 against Christopher Swift and Marcia Swift in an amount of $1,671.46.

8)   Windemere Homeowners Association

9)   Unknown Owners and Non-Record Claimants

M.  Names of persons claimed to be personally liable for deficiency: None

N.  Capacity in which Plaintiff brings this suit: The current mortgagee is Beal Bank USA . Plaintiff is the holder of the Indebtedness based on the attached Note, which is incorporated herein by reference.

O.  Facts in support of request for attorneys' fees and of costs and expenses, if applicable. Plaintiff has been required to retain counsel for prosecution of this foreclosure and to incur substantial attorneys' fees, court costs, title insurance and other expenses which should be added to the balance secured by said mortgage.

P.  Plaintiff seeks to terminate the right to possess the mortgaged real estate after confirmation of a foreclosure sale against all defendants who have the right to possess the property.

<u>PRAYER</u>

WHEREFORE, the Plaintiff, prays as follows:

1.   For foreclosure of such Mortgage;

2.   An Order granting a shortened redemption period, if authorized by law;

3.   For a personal deficiency judgment against none.

4.   A judgment for attorneys' fees, costs and expenses;

5.   An Order granting the right to possess the mortgaged real estate and terminating such rights of all defendants who have or claim to have a right to possess the mortgaged real estate;

6.   Such other relief as equity may require.

### ADDITIONAL REQUEST FOR RELIEF

Plaintiff also requests that the judgment for foreclosure or other orders entered herein provide for the following 735 ILCS 5/15-1506(f).

1.   A sale by public auction.

2.   A sale by open bid.

3.   A Judge of this Court or Sheriff of the County, Intercounty Judicial Sales or The Judicial Sales Corporation, shall conduct the sale.

4.   Title in the real estate may be subject, at the sale, to exceptions including general real estate taxes for the current year and for the preceding year which have not become due and payable as of the date of entry of the Judgment of Foreclosure, any special assessments upon the real estate, and easements and restrictions of record.

5.   In the event a party to the foreclosure is a successful bidder at the sale, such party shall be allowed to offset against the purchase price to be paid for such real estate amounts due such party under the Judgment of Foreclosure or Order confirming the sale.

One of its Attorneys

ANSELMO LINDBERG OLIVER LLC 1771 W. Diehl Rd., Ste 120 Naperville, IL 60563-4947
630-453-6960 | 866-402-8661 | 630-428-4620 (fax)
Attorney No.  Cook 58852, DuPage 293191, Kane 031-26104, Peoria 1794, Winnebago 3802, IL 03126232
foreclosure@ALOLawGroup.com

Douglas A. Oliver

**THIS LAW FIRM IS DEEMED TO BE A DEBT COLLECTOR.**

LEGAL DESCRIPTION:

LOT 60 IN WINDEMERE, PHASE 3 BEING A SUBDIVISION OF THE SOUTHWEST QUARTER OF
SECTION 17, TOWNSHIP 39 NORTH, RANGE 8, EAST OF THE THIRD PRINCIPAL MERIDIAN,
ACCORDING TO THE PLAT THEREOF RECORDED JANUARY 15, 2004 AS DOCUMENT NO.
2004K008420, IN KANE COUNTY, ILLINOIS.

CANIDI A

~~Return To:~~
~~GMAC Mortgage, LLC dba~~
~~ditech.com~~
~~3200 Park Center Dr. Suite~~
~~150, Costa Mesa, CA 92626~~

**2007K018917**

**SANDY WEGMAN**
RECORDER - KANE COUNTY, IL

RECORDED: 2/15/2007 2:28 PM
REC FEE: 45.00  RHSPS FEE: 10.00
PAGES: 24

Prepared By:
Vicki Davis
3200 Park Center Dr.
Suite 150.
Costa Mesa, CA 92626.

——————————— [Space Above This Line For Recording Data] ———————————

# MORTGAGE

MIN

Recording Requested by &
When Recorded Return To:
US Recordings, Inc.
2925 Country Drive
St. Paul, MN  55117

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated 01/26/2007
together with all Riders to this document.
**(B) "Borrower"** is Chris T Swift and Marcia A Swift, husband and wife as
tenants by the entirety

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS



-6A(IL) (0010).01

Page 1 of 15          Initials:

Form 3014  1/01

VMP Mortgage Solutions, Inc.

Created By: Ashley Cassese  Printed: 6/3/2016 2:07:42 PM

(D) "**Lender**" is GMAC Mortgage, LLC dba ditech.com

Lender is a Residential Mortgage Lender
organized and existing under the laws of Delaware
Lender's address is 3200 Park Center Dr. Suite 150, Costa Mesa, CA 92626

(E) "**Note**" means the promissory note signed by Borrower and dated 01/26/2007
The Note states that Borrower owes Lender Four Hundred Forty Nine Thousand Five Hundred                                                                Dollars
(U.S. $449,500.00           ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than February 1, 2037

(F) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "**Escrow Items**" means those items that are described in Section 3.

(M) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
County                                                               [Type of Recording Jurisdiction]
or Kane                                                              [Name of Recording Jurisdiction]:
The Assessor's Parcel Number (Property Tax ID#) for the Real Property is
12-17-325-010. See Attached Legal Description

Parcel ID Number: 12-17-325-010                         which currently has the address of
601 Sennett St                                                                                [Street]
Batavia                                              [City], Illinois 60510-7715   [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

-6A(IL) (0010).01                          Page 3 of 15                  Initials: MS CS    Form 3014  1/01

2007K018817    3/24
Created By: Ashley Cassese  Printed: 6/3/2016 2:07:42 PM

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

-6A(IL) (0010).01    Page 4 of 15    Form 3014   1/01

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Created By: Ashley Cassese  Printed: 6/3/2016 2:07:43 PM

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



VMP®-6A(IL) (0010).01                    Page 7 of 15                    Initials: _____   Form 3014   1/01

Created By: Ashley Cassese   Printed: 6/3/2016 2:07:43 PM

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance. Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**



-6A(IL) (0010).01     Page 8 of 15     Initials: _____ CS     Form 3014   1/01

Created by: Ashley Lessese   Printed: 6/3/2016 2:07:43 PM

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender



-6A(IL) (0010).01

Page 9 of 15

Initials: CS   Form 3014  1/01

Created By: Ashley Cassese   Printed: 6/3/2016 2:07:43 PM

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(IL) (0010).01                           Page 10 of 15                    Initials: _CS_         Form 3014  1/01

Created By: Ashley Lassese   Printed: 6/3/2016 2:07:44 PM

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.



-6A(IL) (0010).01

Page 13 of 15

Initials: SS CS

Form 3014   1/01

Created By: Ashley Cassese   Printed: 6/3/2016 2:07:44 PM

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                       Marcia A. Swift                -Borrower

_____     _____ (Seal)
                                       Chris T. Swift                 -Borrower

_____ (Seal)      _____ (Seal)
                -Borrower                              -Borrower

_____ (Seal)      _____ (Seal)
                -Borrower                              -Borrower

_____ (Seal)      _____ (Seal)
                -Borrower                              -Borrower

-6A(IL) (0010).01                     Page 14 of 15                    Form 3014   1/01

Created By: Ashley Cassese   Printed: 6/3/2016 2:07:45 PM

STATE OF ILLINOIS,

I, _Judith Ann Berlin_ _Kane_ County ss: , a Notary Public in and for said county and state do hereby certify that

_Chris T. Swift and Marcia A. Swift, Husband and wife._

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this _26th_ day of _January, 2007_

My Commission Expires:

_3/12/11_

_Judith Ann Berlin_
Notary Public

_Judith Ann Berlin._

OFFICIAL SEAL
JUDITH ANN BERLIN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/12/11

-6A(IL) (0010).01

Page 15 of 15

Initials: _CS_ _MS_

Form 3014  1/01

Created By: Ashley Cassese  Printed: 6/3/2016 2:07:45 PM

# FIXED/ADJUSTABLE RATE RIDER

**(LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)**

THIS FIXED/ADJUSTABLE RATE RIDER is made this        26th        day of January        , 2007        , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to GMAC Mortgage, LLC dba ditech.com

("Lender") of the same date and covering the property described in the Security Instrument and located at:

601 Sennett St, Batavia, IL  60510-7715

*[Property Address]*

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of  6.875            %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of  February,        2017        , and the adjustable interest rate I will pay many change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER
WSJ One-Year LIBOR Single Family - Fannie Mae
UNIFORM INSTRUMENT   Form 3187 6/01

*(Page 1 of 5)*

Initials: _YS_ _CS_

Created By: Ashley Cassese   Printed: 6/3/2016 2:07:45 PM

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding  Two & 25/100
percentage points (     2.250            %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.875            % or less than  2.250             %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.875            %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR — Single Family – Fannie Mae
UNIFORM INSTRUMENT   Form 3187   6/01

*(Page 2 of 5)*                                      Initials

Created By: Ashley Cassese   Printed: 6/3/2016 2:07:45 PM

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1.  Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.  When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR -- Single Family-- Fannie Mae
UNIFORM INSTRUMENT   Form 3187   6/01

*(Page 3 of 5)*                                    Initials: _____ CS

Created By: Ashley Cassese   Printed: 6/3/2016 2:07:45 PM

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

### THIS SPACE LEFT INTENTIONALLY BLANK

MULTISTATE FIXED/ADJUSTABLE RATE RIDER – WSJ One Year LIBOR – Single Family – Fannie Mae

*(Page 4 of 5)*

Initials ____

Created By: Ashley Cassese   Printed: 6/3/2016 2:07:46 PM

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
Mercia A. Swift                          -Borrower

_____ (Seal)
Chris T. Swift                           -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One Year LIBOR -- Single Family -- Fannie Mae
UNIFORM INSTRUMENT   Form 3187  6/01

(Page 5 of 5)

Created By: Ashley Cassese   Printed: 6/3/2015 2:07:46 PM

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this Twenty-Sixth   day of January,  2007                     , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to GMAC Mortgage, LLC dba ditech.com

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: 601 Sennett St, Batavia, IL  60510-7715

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

(the "Declaration"). The Property is a part of a planned unit development known as Windemere

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

   **PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

   **A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**MULTISTATE PUD RIDER** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
Form 3150 1/01
Wolters Kluwer Financial Services          Page 1 of 3          Initials: [signature]
VMP®-7R (0411).01

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials: CS

VMP®-7R (0411).01                 Page 2 of 3                 Form 3160 1/01

Created By: Ashley Cassese   Printed: 6/3/2016 2:07:46 PM

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)          _____ (Seal)
Marcia A. Swift          -Borrower       Chris T. Swift          -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                               -Borrower

VMP®-7R (0411).01              Page 3 of 3                Form 3150 1/01

Created By: Ashley Cassese  Printed: 6/3/2016 2:07:16 PM

ORDER #: █████████

# EXHIBIT A

ALL THAT PARCEL OF LAND IN KANE COUNTY, STATE OF ILLINOIS, AS MORE FULLY DESCRIBED IN DEED INST # 2004K101551, ID# 12-17-325-010, BEING KNOWN AND DESIGNATED AS FOLLOWS:

LOT 60 IN WINDEMERE, PHASE 3 BEING A SUBDIVISION OF THE SOUTHWEST QUARTER OF SECTION 17, TOWNSHIP 39 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JANUARY 15, 2004 AS DOCUMENT NO. 2004K008420, IN KANE COUNTY, ILLINOIS.

BY FEE SIMPLE DEED FROM DRH CAMBRIDGE HOMES, INC. AS SET FORTH IN INST # 2004K101551 DATED 07/19/2004 AND RECORDED 07/28/2004, KANE COUNTY RECORDS, STATE OF ILLINOIS.



Created By: Ashley Cassese  Printed: 6/3/2016 2:07:47 PM

EXHIBIT B

### InterestFirst℠ ADJUSTABLE RATE NOTE

### (One-Year LIBOR Index (As Published in *The Wall Street Journal*) - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| January 26, 2007 | Costa Mesa | California |
|---|---|---|
| *[Date]* | *[City]* | *[State]* |

601 Sennett St, Batavia, IL  60510-7715

*[Property Address]*

#### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 449,500.00       (this amount is called "Principal"), plus interest, to the order of Lender.  Lender is GMAC Mortgage, LLC dba ditech.com

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note.  Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

#### 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of 6.875              %.  The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

#### 3.   PAYMENTS

(A)

I                    rst day of every month, beginning on  March 1, 2007                          .
Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on  February 1, 2037             , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  P.O. Box 9001719, Louisville, KY 40290-0001
                                    or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments
My monthly payment will be in the amount of U.S. $ 2,575.26                before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date.  The Note Holder will notify me prior to the date of change in monthly payment.

(C)  Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay.  The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

#### 4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A)  Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of February        2017        , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.  The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B)  The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE -

1

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two & 25/100 percentage points (                    2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than            11.875 % or less than            2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than            11.875 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment after the first Change Date.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be            5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE - One-Year LIBOR Index - Single Family -
Fannie Mae Uniform Instrument Form 3530  11/01

*(Page 2 of 4)*                                                             Initials: ___

(D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)   Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)   When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

PAY TO THE ORDER OF

        FUNDING COMPANY,

                                                               (Seal)
                                                                -Borrower

GMAC          LLC f/k/a
GMAC MORTGAGE CORPORATION
d/b/a DITECH.COM
                              Chris T. Sy

                                                                     (Seal)
                                                                -Borrower

                                                                     (Seal)
                                                                -Borrower

ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE

POOL: ███████   LOAN ID: ███████   ████████████████

NOTE DATE:   1/26/2007   LOAN AMOUNT:   $449,500.00

BORROWER NAME:  MARCIA  SWIFT & CHRIS  SWIFT

PROPERTY ADDRESS:   601 SENNETT ST, BATAVIA, IL  60510

PAY TO THE ORDER OF

**LNV Corporation**

WITHOUT RECOURSE

Residential Funding Company, LLC

By:

Name: Jason J. Vecchio
Title: Post Funding Manager
Residential Funding Company, LLC

NOTE ALLONGE

L

Pay to the order of  BEAL BANK USA, without recourse and without representation or warranty whether express, implied or created by operation of law.

LNV CORPORATI

Allison Martin
Attorney-In-Fact

IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY, ILLINOIS

BEAL BANK USA                          )
                    Plaintiff,         )        16 CH 593
            v.                         )        Property Address: 601 Sennett St.
MARCIA A. SWIFT et al.                 )        Batavia, Illinois 60510
                    Defendants         )
                                       )        Judge Moran

### NOTICE OF FILING

To:     Christopher S. Iaria
        Anselmo Lindberg Oliver LLC
        1771 W. Diehl Road
        Suite 210
        Naperville, IL 60563-4047

Please take notice that on December 22, 2016, I filed Defendants' Objection to Motion to Amend with the Clerk of the Circuit Court for the Sixteenth Judicial Circuit, Kane County, Illinois.

### CERTIFICATE OF SERVICE

Please take notice that on December 22, 2016, I emailed a copy of the Defendants' Objection to Motion to Amend to you at foreclsure@ALOLawGroup.com pursuant to Rule 11 of the Illinois Supreme Court Rules.

_____
David P. Leibowitz
Attorney for Defendants
Marcia A. Swift and Christopher Swift

David P. Leibowitz
Attorney 1612271
53 W. Jackson Blvd.
Suite 1610
Chicago, IL 60604
847 249 9100

# EXHIBIT 16

## Gebhardt "Notes" A & B

This exhibit shows DIFFERENCES between what LNV claims to be a "true and exact copy of the Note — "Note A and Note B"

- "Note" A entered into original Breach of contract case (LNV Corporation v Catherine Geblandt 3:12-cv-00468 Eastern TN at Knoxville as document 1-1 on 09/05/2012
- Sued for breach of contract in Federal court, after two attempted unsuccessful foreclosure attempts
- Note B (doc 16-2) attached to LNV Motion for summary judgment filed by LNV almost a year later on 08/19/2013

Note A & Note B are NOT Replicas of one another
* Both of these cannot be true and exact copies of the original note
* Original Note was never produced nor was LNV required to Produce by the court despite my objections made repeatedly to the authenticity of that entered. - Both Note A + B are counterfeit.

→ "Note A"
  - has punch holes which do not align properly on all pages
  - Bears two page 3's
  - Bears darkened streaks
  - Bears my signature digitally/electronically lifted from another document (forgery)
  - Bears forgery of Texas Notary Gayna Yeager (when compared with signatures of Yeager by TX authorities)
  - Bears stamp Judy Faber (known + deposed robo signer)
  - Bears my social security # in full on last page (signature page)

Did not know for a long time that my attorney was working against me contrary to my interests - Answer he filed on my behalf in late September 2012 (document 4) attacks the appearance of the note as mentioned above of which LNV used this information to create Note B filed with their Motion for summary judgment on 08/14/2013. Note B is very clean and does not resemble Note A.

Page 1 of 2

"Note B"

· Bears No punch holes at the top of any document

· Bears only ONE Page 3

· Bears no darkened streaks on any Page

· Bears my electronically (digitally lifted (forged) signature

· Bears forgery of Texas Notary Gayna Yeager (when her signature is compared to the Notary in bond application provided by TX. authorities

· Bears stamp of known robo signer Judy Faber (known and deposed)

· Again, bears my social security # in full.

* My attorney did not make any objection to have social * security # redacted at any time despite being asked to do so from early on in year 2012 + 2013.

* LNV moved the Court to seal these two exhibits when I emphatically made objections about this after they filed motion for S.J.

* The court sealed these two exhibits "Note A" (doc 1-1) and "Note B" (doc 10-2) so the general public cannot see when viewing case on PACER what has been done to hide the fact that both of these are COUNTERFEIT.

Breach of Contract
Eastern TN Federal
Court
(LNV Corporation  V. Cathenne Gebhardt)

Counterfeit
Note  A

Filed by LNV Corporation
09/05/2012

 

Loan Number 328544

## ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY
MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

NOVEMBER 7 , 2002          SEVIERVILLE          TENNESSEE
[Date]                          [City]                [State]

3753 THOMAS CROSS ROAD, SEVIERVILLE, TENNESSEE 37876
[Property Address]

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $243,100.00 (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is SEBRING CAPITAL PARTNERS, LIMITED
PARTNERSHIP. I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and
who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a
yearly rate of 9.500%. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after
any default described in Section 7(B) of this Note.

**3. PAYMENTS**
(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the 1ST day of each month beginning on JANUARY 1, 2003. I will make
these payments every month until I have paid all of the principal and interest and any other charges described below
that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied
to interest before Principal. If, on DECEMBER 1, 2032, I still owe amounts under this Note, I will pay those amounts
in full on that date, which is called the "Maturity Date."
I will make my monthly payments at P.O. BOX 117198, CARROLLTON, TEXAS 75011-7198 or at a different
place if required by the Note Holder.
(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $2,044.12. This amount may change.
(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate
that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly
payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on the 1ST day of DECEMBER, 2004 and on that day every sixth month
thereafter. Each date on which my interest rate could change is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of
interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as
published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month
immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable
information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding EIGHT AND
THREE-QUARTERS percentage points (8.750%) to the Current Index. The Note Holder will then round the result of
this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D)
below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the
unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in
substantially equal payments. The result of this calculation will be the new amount of my monthly payment.
(D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 11.000% or less than
9.500%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than
ONE AND ONE-HALF percentage point(s) (1.500%) from the rate of interest I have been paying for the preceding six
months. My interest rate will never be greater than 16.500%.
(E) Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly
payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment
changes again.

MULTISTATE ADJUSTABLE RATE NOTE (LIBOR Index)--Single Family--Freddie Mac UNIFORM INSTRUMENT   Form 3590  1/01          (page 1 of 3 pages)



EXHIBIT
A



**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if, I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

MULTISTATE ADJUSTABLE RATE NOTE (LIBOR Index)—Single Family—Freddie Mac UNIFORM INSTRUMENT  Form 3590  1/01          (page 2 of 3 pages)

Case 3:12-cv-00468   Document 1-1   Filed 09/05/12   Page 2 of 9   PageID #: 5

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

⟨Original⟩

_____ (Seal)
CATHERINE GEBHARDT                           -Borrower

SSN: 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

_____ (Seal)
                                             -Borrower

SSN: _____

_____ (Seal)
                                             -Borrower

SSN: _____

                                    [Sign Original Only]

SECTION 5 ABOVE IS MODIFIED BY THE ADDENDUM ATTACHED HERETO.

PAY TO THE ORDER OF _____

WITHOUT RECOURSE

SEBRING CAPITAL PARTNERS, LIMITED PARTNERSHIP

BY: _____
    Gayna Yeager, Vice President

MULTISTATE ADJUSTABLE RATE NOTE (LIBOR Index)–Single Family–Freddie Mac UNIFORM INSTRUMENT   Form 3190  1/01

(page 3 of 3 pages)

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

**ORIGINAL**

_____(Seal)
CATHERINE GEBHARDT                -Borrower

SSN: 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

_____(Seal)
                                 -Borrower

SSN:

_____(Seal)
                                 -Borrower

SSN:

[Sign Original Only]

SECTION 5 ABOVE IS MODIFIED BY THE ADDENDUM ATTACHED HERETO.

PAY TO THE ORDER OF
JP MORGAN CHASE BANK, AS TRUSTEE
WITHOUT RECOURSE
Residential Funding Corporation

BY _____
Judy Faber, Vice President

PAY TO THE ORDER OF
RESIDENTIAL FUNDING CORPORATION

_____

WITHOUT RECOURSE

SEBRING CAPITAL PARTNERS, LIMITED PARTNERSHIP

BY _____
Gayna Yeager, Vice President

MULTISTATE ADJUSTABLE RATE NOTE (LIBOR Index)--Single Family--Freddie Mac UNIFORM INSTRUMENT   Form 3590  1/01

(page 3 of 3 pages)



Loan Number 328544

## FLOOR RATE
## ADDENDUM TO NOTE

THIS FLOOR RATE ADDENDUM is made this 7TH day of NOVEMBER, 2001, and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note (the "Note") of the same date made by the undersigned (the "Borrower") to SEBRING CAPITAL PARTNERS, LIMITED PARTNERSHIP (the "Lender") and to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the Borrower to secure the Note, including any Adjustable Rate Addendum attached thereto, and covering the property described in the Security Instrument and located at:

3753 THOMAS CROSS ROAD, SEVIERVILLE, TENNESSEE 37876
[Property Address]

### AMENDMENT TO NOTE AND SECURITY INSTRUMENT

1. Section 4.(D) of the Note and the corresponding Section 4.(D) under Additional Covenant A. of the Adjustable Rate Rider to the Security Instrument is amended to read and be as follows:

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.000% or less than 9.500%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND ONE-HALF ( 1.500%) from the rate of interest I have been paying for the preceding six months. My yearly interest rate will never be greater than a maximum rate of 16.500%, or a minimum, or floor, rate of 9.500%.

2. The disclosure appearing in bold type face on page 1. of the Note is amended to read and be as follows:

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE AND THE MINIMUM, OR FLOOR, RATE I MUST PAY.

3. In the event that the Note is ever sold, assigned or transferred to the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation, and the rules and regulations of the applicable agency do not permit a Floor Rate Addendum with the terms contained herein, then this Floor Rate Addendum and expressly its amended provisions with respect to establishing a minimum, or floor rate, shall thereupon terminate and shall be of no further force and effect. Any such termination of this Floor Rate Addendum shall be effective as of the first Change Date to occur after the date of any such sale, assignment or transfer, and thereupon and thereafter the Note shall be in full force and effect in accordance with its original terms as set out in Section 4.(D) of the Note as if this Floor Rate Addendum had never been incorporated into or amended the Note.



Notice the black ink streak on this alleged copy of the "original" note. Gebhardt claimed in her Answer to LNV's Complaint that this was a forgery of her signature because the white spaces (see page 1 of this Exhibit) around the signature and type are indicative of electronic copy and paste of the signature.

BY SIGNING BELOW, Borrower acknowledges and agrees to the terms contained in this Floor Rate Addendum.

CATHERINE GEBHARDT                    (Seal)
                                      -Borrower

_____              (Seal)
                                      -Borrower

_____              (Seal)
                                      -Borrower

On Doc 10-2 this page has been changed. See the altered version of this note filed by LNV with their motion for summary judgment in the following pages of this Exhibit.

The image below is an enlarged closeup of the signature from LNV's alleged "original" sumbmitted as their Exhibit A to their Complaint against Gebhardt. (Doc 1-1 page 6 of 9 page ID#9.)

It is apparent that this signature which is not actually part of the alleged note but is on a loose page that could have been (and Gebhardt claims was) added after the fact and never part of the "original" note is a forgery because the white space around the text and the signature are indicative of electronic copy and paste.

White Space



White Space

White spaces like this around the signature, the lines and the text indicate that this was created as an electronic image of the Gebhardt signature gleaned from another document then the background was removed in Photoshop or a similar software tool so the signature could then be electronically placed onto another document.

It is a logical impossibilty for these white spaces to have occurred any other way. If an ink streak already existed on the page before it was printed or if the ink streak was created by the printer when this page was printed then the black ink of the signature, the lines and the text would have blurred into the black of the ink streak; no white spaces could have been produced in a simple prining of this page. Also the fact that this page, and this page alone contians the ink streak is indicative that it was never part of the "original" note but a later addition; also an act of forgery.



• COUNTERFEIT Note B.
(Notice A and B are Not exact
replicas as they should be)

—

• CounterFeit Note B filed August 19,
2013 When LNV Corporation filed
their Motion for Summary Judgment.
Notice how clean this looks when compared to Note A.)

— • Phony Allonges → (Stamp of Amy Nelson)
Jason Vecchio allonge
exact match to Chris &
Marcia Swift in
Illinois – and other
victims (Swift
UMNI examination
of allonge)

(LNV Corporation v.
Catherine Gebhardt)

# EXHIBIT A

This is the ALTERED copy of the same alleged "original" note filed as Exhibit A to LNV's Complaint - here it is filed as Exhibit A to LNV's motion for summary judgment.  (Notice page 7 of 9 PageID# 90.) The black streak Gebhardt pointed out in her Answer to LNV's Complaint has been REMOVED.  Both these alleged copies of the "original" note cannot be genuine. This is indicative that D. Andrew Beal is himself intentionally perpetrating the conspiracy initiated by Lorraine Brown, and for which she has been criminally prosecuted and convicted by the Attorney General of the United States.

"Note" B

Case 3:12-cv-00468   Document 10-2   Filed 08/19/13   Page 1 of 9   PageID #: 84



Loan Number 328544

## ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

| NOVEMBER 7 | , 2002 | SEVIERVILLE | TENNESSEE |
|---|---|---|---|
| [Date] | | [City] | [State] |

3753 THOMAS CROSS ROAD, SEVIERVILLE, TENNESSEE  37876
[Property Address]

### 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $243,100.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is SEBRING CAPITAL PARTNERS, LIMITED PARTNERSHIP. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 9.500%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS
#### (A)  Time and Place of Payments
I will pay principal and interest by making a payment every month.

I will make my monthly payments on the 1ST day of each month beginning on JANUARY 1, 2003. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on DECEMBER 1, 2032, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 117198, CARROLLTON, TEXAS  75011-7198 or at a different place if required by the Note Holder.

#### (B)  Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $2,044.12. This amount may change.

#### (C)  Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
#### (A)  Change Dates
The interest rate I will pay may change on the 1ST day of DECEMBER, 2004 and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

#### (B)  The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

#### (C)  Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding EIGHT AND THREE-QUARTERS percentage points (8.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

#### (D)  Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 11.000% or less than 9.500%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND ONE-HALF percentage point(s) (1.500%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 16.500%.

#### (E)  Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

MULTISTATE ADJUSTABLE RATE NOTE (LIBOR Index)--Single Family--Freddie Mac UNIFORM INSTRUMENT   Form 3520 1/01
Page 1 of 3 pages

Case 3:12-cv-00468   Document 10-2   Filed 08/19/13   Page 2 of 9   PageID #: 85

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

☑ ORIGINAL

_____ (Seal)
CATHERINE GEBHARDT                        -Borrower

SSN:  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

_____ (Seal)
                                          -Borrower

SSN:

_____ (Seal)
                                          -Borrower

SSN:

*[Sign Original Only]*

SECTION 5 ABOVE IS MODIFIED BY THE ADDENDUM ATTACHED HERETO.

PAY TO THE ORDER OF
JP MORGAN CHASE BANK, AS TRUSTEE

Residential Funding Corporation

BY _____
Judy Faber, Vice President

PAY TO THE ORDER OF
RESIDENTIAL FUNDING CORPORATION

_____
WITHOUT RECOURSE

SEBRING CAPITAL PARTNERS, LIMITED PARTNERSHIP

BY _____
Gayna Yeager, Vice President

MULTISTATE ADJUSTABLE RATE NOTE

Loan Number 328544

 **ORIGINAL**   PREPAYMENT PENALTY RIDER TO NOTE

Borrower Name(s): CATHERINE GEBHARDT

Loan Number: 328544

Property Address: 3753 THOMAS CROSS ROAD
SEVIERVILLE, TENNESSEE, 37876

Note Date: NOVEMBER 7, 2002

For a valuable consideration, receipt of which is hereby acknowledged, both Borrower and Lender agree that this PREPAYMENT PENALTY RIDER TO NOTE ("Rider") amends that certain Promissory Note ("Note") of date shown above, to which this Rider is attached. Borrower and Lender agree that the Note shall be subject to the following provisions, notwithstanding any provisions to the contrary contained in said Note or the Security Instrument (Deed of Trust or Mortgage) given by Borrower to secure repayment of the Note.

**PREPAYMENT PENALTY TERM:**

☐ FIRST FIVE (5) YEARS OF LOAN

☐ FIRST FOUR (4) YEARS OF LOAN

☐ FIRST THREE (3) YEARS OF LOAN

☒ FIRST TWO (2) YEARS OF LOAN

☐ FIRST ONE (1) YEARS OF LOAN

**PREPAYMENT PENALTY:**

DURING THE PREPAYMENT PENALTY TERM INDICATED ABOVE, BORROWER MAY PREPAY THIS LOAN IN AN AMOUNT NOT EXCEEDING TWENTY PERCENT (20%) OF THE ORIGINAL PRINCIPAL AMOUNT IN ANY TWELVE (12) MONTH PERIOD WITHOUT PENALTY. HOWEVER, DURING THE PREPAYMENT PENALTY TERM INDICATED ABOVE, A PREPAYMENT CHARGE WILL BE IMPOSED ON ANY AMOUNT PREPAID IN ANY TWELVE (12) MONTH PERIOD IN EXCESS OF TWENTY PERCENT (20%) OF THE ORIGINAL PRINCIPAL AMOUNT OF THIS LOAN. THE CHARGE IMPOSED SHALL BE AN AMOUNT EQUAL TO THE PAYMENT OF SIX (6) MONTHS' ADVANCE INTEREST ON THE AMOUNT PREPAID IN EXCESS OF TWENTY PERCENT (20%) OF THE ORIGINAL PRINCIPAL AMOUNT. AFTER THE PREPAYMENT PENALTY TERM INDICATED ABOVE, THERE SHALL BE NO PREPAYMENT PENALTY.

If a law, which applies to this loan and which sets a maximum prepayment charge or prohibits prepayment charges, is finally interpreted so that the prepayment charge to be collected in connection with this loan exceeds the permitted limits, then (i) any such prepayment charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, (ii) if the prepayment charge is prohibited, no prepayment charge will be assessed or collected, or (iii) if such a charge has been paid, any funds above what is permitted by applicable law will be refunded to Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Borrower  CATHERINE GEBHARDT

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower



Loan Number 228533

## FLOOR RATE
## ADDENDUM TO NOTE

THIS FLOOR RATE ADDENDUM is made this 7TH day of NOVEMBER, 2002, and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note (the "Note") of the same date made by the undersigned (the "Borrower") to SEBRING CAPITAL PARTNERS, LIMITED PARTNERSHIP (the "Lender") and to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the Borrower to secure the Note, including any Adjustable Rate Addendum attached thereto, and covering the property described in the Security Instrument and located at:

3753 THOMAS CROSS ROAD, SEVIERVILLE, TENNESSEE 37876
[Property Address]

#### AMENDMENT TO NOTE AND SECURITY INSTRUMENT

1   Section 4.(D) of the Note and the corresponding Section 4.(D) under Additional Covenant A. of the Adjustable Rate Rider to the Security Instrument is amended to read and be as follows:

(D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 11.000% or less than 9.500%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND ONE-HALF ( 1.500%) from the rate of interest I have been paying for the preceding six months. My yearly interest rate will never be greater than a maximum rate of 16.500%, or a minimum, or floor, rate of 9.500%.

2. The disclosure appearing in bold type face on page 1. of the Note is amended to read and be as follows:

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE AND THE MINIMUM, OR FLOOR, RATE I MUST PAY.**

3. In the event that the Note is ever sold, assigned or transferred to the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation, and the rules and regulations of the applicable agency do not permit a Floor Rate Addendum with the terms contained herein, then this Floor Rate Addendum and expressly its amended provisions with respect to establishing a minimum, or floor rate, shall thereupon terminate and shall be of no further force and effect. Any such termination of this Floor Rate Addendum shall be effective as of the first Change Date to occur after the date of any such sale, assignment or transfer, and thereupon and thereafter the Note shall be in full force and effect in accordance with its original terms as set out in Section 4.(D) of the Note as if this Floor Rate Addendum had never been incorporated into or amended the Note.

BY SIGNING BELOW, Borrower acknowledges and agrees to the terms contained in this Floor Rate Addendum.

ORIGINAL

_____ (Seal)
CATHERINE GEBHARDT                    Borrower

_____ (Seal)
                                     Borrower

_____ (Seal)
                                     Borrower

Notice on this ALTERED copy of what LNV alleges is a true and accurate copy of the "original" note the black steaks have been removed.  This also was likely done in Photoshop or a similar software tool.  This version of the alleged "original" note and the alleged "original" note attached to LNV's complaint (Doc 1-1) cannot both be true and accurate copies of the "original" note - LNV committed intention fraud upon the court.

ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS
ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE

POOL:   0        LOAN ID:   8263393

NOTE DATE:   11/7/2002        LOAN AMOUNT.        $243,100.00

BORROWER NAME:  CATHERINE GEBHARDT

PROPERTY ADDRESS:   3753 THOMAS CROSS ROAD, SEVIERVILLE, TN  37876

PAY TO THE ORDER OF

*LNV Corporation*

WITHOUT RECOURSE

Residential Funding Company, LLC

By:   _(signature)_

Name: Jason J. Vecchio

Title: Post Funding Manager

Residential Funding Company, LLC

ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS
ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE

POOL:      4656          LOAN ID:      8263393

NOTE DATE:      11/7/2002      LOAN AMOUNT:        $243,100.00

BORROWER NAME.  CATHERINE  GEBHARDT

PROPERTY ADDRESS.   3753 THOMAS CROSS ROAD, SEVIERVILLE, TN  37876

PAY TO THE ORDER OF

RESIDENTIAL FUNDING COMPANY, LLC

WITHOUT RECOURSE

The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank, N.A. as
Trustee, Residential Funding Company, LLC fka Residential Funding Corporation, Attorney-In-Fact

By:      Amy Nelson

Name: Amy Nelson

Title: Assistant Vice President

The State of Texas



Notary Public Unit
P.O. Box 13375
Austin, Texas 78711-3375

Phone: 512-463-5705
Fax: 512-463-0873
Dial 7-1-1 For Relay Services
www.sos.state.tx.us

Hope Andrade
Secretary of State

October 10, 2012

David/Catherine Gebhardt R.N.
cathy@nursingoptions.com
Re: Public Information Request on:
Gayna Yeager, expiration, 4/158/2011

Dear Sir:

Attached are the notary applications as requested. Please note that the social security number has been redacted pursuant to Tex. Gov't Code §552.147(b).

For information regarding the redaction of the identification number on the application(s), please refer to the attached form from the Office of the Attorney General.

Please let us know if we can be of further assistance.

Sincerely,

Notary Public Unit
Secretary of State
PO Box 13375
Austin, TX 78711
(512) 463-5705
notary@sos.state.tx.us

Compare signature of Gayna
Yeager on Note A + B, to
this notary Application in Bond
obtained by Texas authorities.
Note A + B are Counterfeit with Gayna Yeager
Forgery. Now sealed to Public (3.12-CV-
00468)

*Compare Gayna Yeager Signature*
*to Note A.4 1.4 B*

# APPLICATION FOR APPOINTMENT AS A TEXAS NOTARY PUBLIC
Type or Print Using Black Ink Only

DO NOT STAPLE                                                                                      DO NOT STAPLE

(1) SOCIAL SECURITY #                          (FPL 11/2005) (THIS AREA FOR SEC. OF STATE USE ONLY)

**QUALIFIED**

(2) NAME TO BE USED AS A NOTARY PUBLIC:

Yeager _____ Gayna _____ _____ _____           436772        JAN 25 2007
(LAST)     (FIRST)    (MIDDLE)   (SUFFIX)
                                               **SECRETARY OF STATE**

(3) MAILING ADDRESS  [Please note that the notary public application is a public record that is subject to public access and disclosure. When providing address information, use a business or post office box address rather than a residence address if privacy concerns are an issue.]

4000 International Pkwy Suite 3000 Carrollton, TX 75007
(ADDRESS)                          (CITY)              (STATE)    (ZIP CODE)

(4) RESIDENCE COUNTY: Denton          (5) DATE OF BIRTH: 07/02/1969
                                                         (Month/Day/Year)

(6) a. TEXAS 8 DIGIT DRIVER'S LICENSE # OR TEXAS ID#: _____

   b. OR DRIVERS LICENSE # ISSUED FROM ANOTHER STATE: _____ STATE: _____

(7) [X] YES   [ ] NO  IS THIS A RENEWAL? (The commission must currently be in effect for this to apply)

   (a) IF YES, give date your current commission expires 4/15/2007
                                                          (Month/Day/Year)
   DO NOT SUBMIT IF YOU HAVE MORE THAN 90 DAYS REMAINING ON YOUR CURRENT TERM.

   (b) Name in which your present commission was issued Gayna Yeager

(8) [ ] YES  [X] NO  HAVE YOU EVER BEEN CONVICTED OF A FELONY OR A CRIME INVOLVING MORAL TURPITUDE, OR, IF THIS IS A RENEWAL, HAS THERE BEEN ANY CONVICTION SINCE YOUR LAST APPOINTMENT? IF YES, submit a copy of the final conviction and a statement of the facts, if any, regarding restoration of citizenship rights. APPLICATIONS ARE SUBJECT TO BACKGROUND INVESTIGATIONS.

(9) [X] YES  [ ] NO  ARE YOU A LEGAL RESIDENT OF TEXAS?

I hereby apply for appointment as a Notary Public in the State of Texas, and certify that the information herein provided is true and correct and that I am not disqualified by law or any other reason from holding the office of Notary Public.

_____
SIGNATURE OF APPLICANT
SIGNATURE ABOVE AND NAME (#2) MUST MATCH

**INFORMATION**

* The disclosure of your social security number is mandatory. Its solicitation is authorized by Chapter 406 of the Government Code and it is used to maintain accuracy of the notary records.

ELIGIBILITY: To hold the office of Notary Public an applicant must be at least 18 years of age and a legal resident of the State of Texas and must not have been convicted of a felony or crime involving moral turpitude.

NAME TO BE USED AS A NOTARY PUBLIC: When asked in #2 to provide the name to be used as a Notary Public, you should enter the name exactly as you intend to sign documents when acting as a Notary Public. Your commission will be issued in the name you choose. The name can be the full legal name or any variation thereof. For instance, if your full legal name is Gloria Ann Smith, you may choose to qualify as a Notary Public under the name Gloria A. Smith. There is not a statutory requirement that you use your full legal name. However, when signing as a Notary Public, you may use only the name under which you qualified. Some examples of a commonly used suffix are: Sr., Jr., III.

CRIMINAL CONVICTION: A criminal conviction does not automatically render you ineligible to hold the office of Notary Public. The application will be reviewed to make a determination on whether the applicant is eligible to become a Notary Public. You may request copies of any information this office collects about you, and are entitled to have incorrect information corrected.

SIGNATURE: For Signature of Applicant you must sign in the name you will use when acting as a Notary Public. For instance, if you print the name Gloria A. Smith in #(2), you must sign Gloria A. Smith for Signature of Applicant.

QUESTIONS: Please call the NNA at 1-800-896-6827 with any questions concerning the completion of the application.

Return this Completed Application Form (not a photocopy) and Payment to: National Notary Association, 815-A Brazos Street, #183, Austin TX 78701-2502

P27855

# EXHIBIT 17

## Letters between Texas Attorney General and MGC

**October 31, 2008 Response Letter from MGC written by Peter Weinstock**

**October 4, 2008 Letter to MGC from Texas Attorney General**

## Texas Attorney General warns MGC that perfecting foreclosures using false and robo-signed documents is illegal

ATTORNEY GENERAL OF TEXAS
GREG ABBOTT

October 4, 2010

MGC Mortgage, Inc.
7195 Dallas Parkway
Plano, TX 75024

      **RE:**   MGC Mortgage, Inc. Foreclosures in Texas

Gentlemen:

     Recent troubling developments about the veracity of claims made on documents used by Ally Financial, Inc., in its foreclosure filings have led to an inquiry by our office as to the full harm Texas homeowners have suffered.

     We are certain that you must be aware of the issues raised when Ally Financial, Inc., and later JP Morgan Chase and Bank of America, announced that they were suspending foreclosures on certain properties in 23 states. It appears that they had discovered, through testimony of their employees in private litigation, that the employees, referred to as "robosigners," had engaged in practices concerning the execution of affidavits which were used in foreclosure litigation, among which were these:

- Signing thousands of documents per month
- Signing documents without reading them
- Signing affidavits which falsely claim personal knowledge of facts
- Signing affidavits which falsely claim the affiant reviewed the attached documents
- Notarizing documents prior to signing by the signer
- Notarizing documents when the signer was not present before the notary
- Filing affidavits with records attached that do not correctly reflect loan payments, charges and advances

     We are aware that MGC Mortgage, Inc. services a significant number of mortgage loans in the State of Texas. It is likely that affidavits and other documents, such as assignments of deeds of trust and appointments of substitute trustees, with the issues described, above may have been used in connection with foreclosures in the State of Texas. Regardless of whether the foreclosure was a nonjudicial one or a judicial one in connection with a home equity loan, home equity line of credit or reverse mortgage, if any of the practices described above were utilized in establishing MGC Mortgage, Inc.'s authority to conduct the sale or obtain a court order for a sale, such use would have been a violation of Section 17.46(a) of the Texas Deceptive Trade Practices Act; Section 392.304, Texas Debt Collection Act; Section 37.02, Texas Penal Code; Section 12.001, Texas Property Code; Section 406.009, Texas Government Code; Texas Constitution Article 16, Section 50; and/or Rule 736(1), Texas Rules of Civil Procedure, and the document and therefore the foreclosure sale would have been invalid.

MGC Mortgage
October 4, 2010
Page 2

        We are also aware that after the practices described above came to light, Ally Financial, Inc., JP Morgan Chase and Bank of American voluntarily suspended all foreclosures in twenty-three states in which foreclosures are conducted solely through a judicial process, in order to determine which foreclosures may have been tainted by illegitimate affidavits. The State of Texas hereby demands that in the State of Texas, MGC Mortgage, Inc. immediately suspend all foreclosures, all sales of properties previously foreclosed upon, and all evictions of persons residing in previously foreclosed upon properties, until MGC Mortgage, Inc. has done the following:

1.      Identify all MGC Mortgage, Inc. employees or agents who "robosigned," as described above, affidavits and other documents which were recorded in the State of Texas;

2.      Identify all foreclosures in the State of Texas in connection with which an affidavit or other document with the characteristics listed above was used as part of the foreclosure process;

3.      Describe the measures taken by MGC Mortgage, Inc. to ensure that affidavits and other documents are executed in compliance with Texas law;

4.      Describe the measures taken by MGC Mortgage, Inc. to comply with the Servicemembers Civil Relief Act in connection with foreclosures;

5.      Identify all other loan servicers and/or MERS for whom the above described employees or agents signed affidavits;

6.      Provide assurances that all MGC Mortgage, Inc. foreclosures of properties in the State of Texas which relied upon affidavits with the characteristics described above will be rectified and the procedures by which they will be rectified;

7.      Provide assurances that all future MGC Mortgage, Inc. foreclosures of properties in the State of Texas will be done with legally correct documentation; and

8.      Identify all MGC Mortgage, Inc. employees or agents who are or who signed as officers of other non-related entities.

Please provide your response on or before October 15, 2010.

                                Sincerely,

                                Paul D. Carmona
                                Chief, Consumer Protection and
                                Public Health Division



HUNTON&
WILLIAMS

HUNTON & WILLIAMS LLP
FOUNTAIN PLACE
1445 ROSS AVENUE
SUITE 3700
DALLAS, TEXAS 75202-2799

TEL   214 • 979 • 3000
FAX   214 • 880 • 0011

PETER WEINSTOCK
DIRECT DIAL  214 • 468 • 3395
EMAIL  pweinstock@hunton.com

October 31, 2010

Mr. Paul D. Carmona, Chief
Consumer Protection and Public Health Division
Attorney General of Texas Office
P.O. Box 12548
Austin, Texas 78711-2548

Re:   **MGC Mortgage, Inc. ("MGC")**

Dear Paul:

I am writing this letter on behalf of MGC in response to the October 4, 2010 letter (the "Letter") from the Attorney General of Texas (the "Texas AG") and as a follow up to my October 15, 2010 letter. In our telephone conversation on October 11, 2010, you stated that it would be acceptable to the Texas AG for MGC to respond to the Letter on or before November 1, 2010. We are now providing this letter as the requested response on behalf of MGC.

MGC was established in February 2008 and, in its history, has foreclosed on 159 residential loans in Texas and has 64 residential Texas loan foreclosures in progress. In the two weeks since the date of my last letter, MGC has worked diligently to obtain the files from its subservicers and outside foreclosure counsel. Of the 223 files, MGC has obtained complete files for 184 of them. MGC has not yet received complete documentation on the other 39 files. MGC has reviewed all 184 of its completed files for every foreclosure or foreclosure in process. MGC will advise the Texas AG once it completes its review of the 39 pending files after receipt of the missing documentation.

You should also know that MGC has been proactive in working with Texas homeowners with delinquent or potentially delinquent residential mortgage loans. To do so, earlier this year, MGC engaged Dovenmuehle Mortgage, Inc. ("DMI"), which is one of the leading residential loan servicing companies in the country, to subservice MGC's loans and to assist MGC in executing on its loan modification program.

Furthermore, MGC services residential loans that were acquired from the Federal Deposit Insurance Corporation ("FDIC") as receiver for New South Federal Savings Bank, Irondale,



## HUNTON& WILLIAMS

Mr. Paul D. Carmona
October 31, 2010
Page 2

Alabama ("New South") in December 2009. The New South loans have been serviced (or subserviced) by Cenlar since 2004. Based on review of Cenlar's performance and capabilities, MGC elected to continue working with Cenlar as subservicer.

Set forth below are MGC's responses to the Letter. For your convenience, I have reproduced in bold text below the enumerated requests set forth in the Letter.

    **1.**     **Identify all MGC Mortgage, Inc. employees or agents who "robosigned," as described above, affidavits and other documents which were recorded in the State of Texas.** MGC does not use "robosigners" in its foreclosure process. MGC has reached out to virtually all of the law firms that it employs for such purposes. The vast majority have responded. They have indicated that they also do not engage in robosigning. MGC has been advised by DMI and Cenlar that they do not use such practice either. DMI has also stated that it has spoken with virtually all law firms that it retains for foreclosures, and that such firms do not engage in robosigning.

    **2.**     **Identify all foreclosures in the State of Texas in connection with which an affidavit or other document with the characteristics listed above was used as part of the foreclosure process.** No completed or in-process foreclosures in the State of Texas were identified as being conducted in connection with an affidavit or other document with the foreclosure characteristics listed in the Letter. DMI advised MGC that DMI does not conduct foreclosures with affidavits with such characteristics. Cenlar does not execute documents on behalf of MGC.

    **3.**     **Describe the measures taken by MGC Mortgage, Inc. to ensure that affidavits and other documents are executed in compliance with Texas law.** MGC has adopted written policies providing for foreclosure of residential properties. MGC also requires that information provided in foreclosure documents be verified for accuracy and that an authorized member of management reviews the documents to be executed before doing so. MGC understands that DMI and Cenlar follow similar processes.

    **4.**     **Describe the measures taken by MGC Mortgage, Inc. to comply with the Servicemembers Civil Relief Act in connection with foreclosures.** MGC has adopted written policies for compliance with the Servicemembers Civil Relief Act ("SCRA"). Upon notification from a borrower seeking SCRA relief, MGC uses reasonable means to validate



Mr. Paul D. Carmona
October 31, 2010
Page 3

the order and determine whether the obligation is a qualifying debt pursuant to the SCRA. Upon validation, the appropriate benefits afforded the borrower are instituted and the loan is coded as a loan subject to the SCRA. Before proceeding with the filing of a foreclosure action, every loan is reviewed for active military status of a borrower. If a borrower is identified as being on active military status or the loan is identified as being subject to the SCRA, the foreclosure is put on hold until expiration of the SCRA benefit or until MGC makes a determination on a case-by-case basis to seek court relief from SCRA provisions. It is MGC's understanding that DMI and Cenlar also have procedures designed to avoid foreclosures in violation of SCRA.

   5.   **Identify all other loan servicers and/or MERS for whom the above described employees or agents signed affidavits.** None.

   6.   **Provide assurances that all MGC Mortgage, Inc. foreclosures of properties in the State of Texas which relied upon affidavits with the characteristics described above will be rectified and the procedures by which they will be rectified.** As discussed above, no completed or in-process foreclosures in the State of Texas were identified as being conducted in connection with an affidavit or other document with the characteristics listed in the Letter. Accordingly, MGC does not believe that any of its foreclosures need to be rectified as a result of an affidavit or other document with the characteristics listed in the Letter.

   7.   **Provide assurances that all future MGC Mortgage, Inc. foreclosures of properties in the State of Texas will be done with legally correct documentation.** As discussed above, MGC has adopted written policies for the execution of legal documents in compliance with Texas law. MGC has systems and procedures designed to provide for the implementation of such policies by DMI and Cenlar.

   8.   **Identify all MGC Mortgage, Inc. employees or agents who are or who signed as officers of other non-related entities.** MGC does not service loans for unrelated entities.

Pursuant to the Texas Open Records Act, we hereby request confidential treatment for the information contained in this letter. The information contained herein constitutes privileged and confidential information, proprietary in nature, that is not available to the public from any



Mr. Paul D. Carmona
October 31, 2010
Page 4

other source.  Disclosure of this information to the public, including competitors of MGC, would provide such competitors and others with information about the current and future business plans of MGC.  From this information, competitors could make inferences about the operations and competitive strategies of MGC, which could potentially result in altering the competitors' own competitive strategies and relationships to the detriment of MGC.

We request that if, notwithstanding the foregoing, the Texas AG's office should determine preliminarily to make available to the public any of the information in this letter, it will inform us prior to any such release.

If you have any questions, please do not hesitate to contact Robert Ackermann at (469) 467-5342 or me at (214) 468-3395.

Sincerely,

Peter G. Weinstock

cc:    Mr. Robert Ackermann

70256.000212 EMF_US 32931125v5