IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

OFFICE OF THE ATTORNEY GENERAL,
THE STATE OF FLORIDA,
Department of Legal Affairs,

and

OFFICE OF FINANCIAL REGULATION,
THE STATE OF FLORIDA,
Division of Consumer Finance,

      Plaintiffs,

      v.                    CASE No. 9:17-cv-80496-KAM

OCWEN FINANCIAL CORPORATION,
a Florida corporation, OCWEN MORTGAGE
SERVICING, INC., a U.S. Virgin Islands
corporation, and OCWEN LOAN
SERVICING, LLC, a Delaware limited
liability company,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT

Plaintiffs, the Office of the Attorney General, The State of Florida, Department of Legal Affairs (the "Florida Attorney General"), and the Office of Financial Regulation, The State of Florida, Division of Consumer Finance (the "Florida Office of Financial Regulation") (collectively, the "Plaintiffs"), by and through their undersigned attorneys, sue defendants, Ocwen Financial Corporation, a Florida corporation ("Ocwen Financial"), Ocwen Mortgage Servicing, Inc., a U.S. Virgin Islands corporation ("Ocwen Mortgage Servicing"), and Ocwen Loan Servicing, LLC, a Delaware limited liability company ("Ocwen Loan Servicing") (Ocwen Financial, Ocwen Mortgage Servicing, and Ocwen Loan Servicing are collectively referred to herein as the "Ocwen Defendants" or "Ocwen"), and respectfully allege as follows:

## INTRODUCTION

1.     This is a civil action filed by the Florida Attorney General and the Florida Office of Financial Regulation against the Ocwen Defendants for misconduct occurring since February 27, 2014, relating to their servicing of single family residential mortgages.  The parent company Ocwen Financial is based in West Palm Beach, Florida.

2.     Despite multiple lawsuits and regulatory actions by various state attorneys general, state regulators, and federal agencies, the Ocwen Defendants continue to violate federal and state laws and industry standards.  As a result, Floridians, along with borrowers throughout the United States, have suffered financial injury, and in some instances, have lost or been placed in imminent risk of losing their homes.

3.     The deficiencies in the Ocwen Defendants' system of record are widespread and often require manual fixes and result in significant errors such as illegal foreclosures, mishandling loan modifications, misapplied mortgage payments, failure to make insurance payments from borrowers' escrow accounts, and overcharging borrowers' accounts for default fees.  The Ocwen Defendants willfully disregarded advice from regulators and retained third party auditing firms to update its technology.

4.     In addition, the Ocwen Defendants have not adequately responded to customer complaints and requests for loss mitigation.  The Ocwen Defendants have also engaged unlicensed vendors to assist in servicing functions and failed to implement adequate control over vendors.

5.     The Ocwen Defendants knew or should have known that their servicing errors were widespread and that the technology used in their systems and by their vendors was compromised and functioning below industry standard.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action because it presents a federal question, 28 U.S.C. § 1331 and is an action "brought under Federal consumer financial law," 12 U.S.C. § 5565(a).  This action is brought by the Florida Attorney General pursuant to its authority under 12 U.S.C. §§ 5536 and 5552.  This action is brought by the Florida Office of Financial Regulation pursuant to its authority under 12 U.S.C. §§ 5536 and 5552.

7.     In addition, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the subject matter of the state law claims asserted by Plaintiffs because those claims are so related to the claims brought under Federal consumer financial law that they form part of the same case or controversy, and because those claims arise out of the same transactions or occurrences as the claims brought by Plaintiffs under the Consumer Financial Protection Act of 2010 (the "CFPA").

8.     Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f) because the Ocwen Defendants are located in or do business in this district and a substantial part of the events or omissions and course of conduct giving rise to the claims set forth in this  Second Amended Complaint occurred in this district.

## PLAINTIFFS

9.     This action is brought by the Plaintiffs to seek injunctive and other statutory relief under the CFPA to enforce Section 6 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, and the regulations promulgated thereunder at Regulation X, 12 C.F.R. part 1024 ("Regulation X")., and Section 3(b) of the Homeowners Protection Act of 1998, 12 U.S.C. § 4902(b) ("HPA").   RESPA and HPA are Federal consumer financial laws.   12 U.S.C. §§ 5481(12)(M) & (14).  Violations of RESPA and HPA represent violations of the CFPA.  *See* 12

U.S.C. § 5536(a)(1)(A), 5481(12)(M) & (14); *see also* 12 U.S.C. § 4909(a)(4).  Each Plaintiff is an enforcing authority of the CFPA, and therefore they are authorized to bring this action and to enforce the CFPA.  12 U.S.C. § 5552.  The CFPA prohibits the violation of Federal consumer financial law by any covered person or service provider.  *See* 12 U.S.C. § 5536(a)(1)(A).

10.     This action is also brought by the Florida Attorney General pursuant to the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ("FDUTPA").  The Florida Attorney General is an enforcing authority of FDUTPA.  *See* FLA. STAT. § 501.203(2) (2016).  The Florida Attorney General has conducted an investigation of the matters alleged herein, and the head of the enforcing authority, Attorney General Pamela Jo Bondi, has determined that this enforcement action serves the public interest.  The FDUTPA statutory violations alleged herein affect more than one judicial circuit of the state of Florida.  As an enforcing authority under FDUTPA, the Florida Attorney General is authorized to pursue this action to enjoin FDUTPA violations and to obtain legal, equitable, or other appropriate relief, including restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, and other relief as may be appropriate pursuant to Sections 501.207, 501.2075, and 501.2077, Florida Statutes.

11.     This action is also brought by the Florida Office of Financial Regulation pursuant to Chapter 494 of the Florida Statutes.  The Office of Financial Regulation is established by Section 20.121(3)(a)2, Florida Statutes, to regulate various financial businesses in the state.  Chapter 494, Part III, of the Florida Statutes regulates various businesses and occupations involved in the financing of real estate, specifically including mortgage lenders.  According to Section 494.0011, Florida Statutes, the Florida Office of Financial Regulation is charged with administering and enforcing the provisions of Chapter 494, Florida Statutes, and pursuant to Section 494.0012,

Florida Statutes, conducting examinations and investigations to determine whether any provision of Chapter 494, Florida Statutes, has been violated.

**DEFENDANTS**

12.     Defendant Ocwen Financial is a publicly traded Florida corporation with its principal place of business in West Palm Beach, Florida.  Ocwen Financial provides residential mortgage servicing services and engages in specialty servicing and other mortgage-related services.  At all times relevant to this Second Amended Complaint, Ocwen Financial transacts or has transacted business in this district, throughout the State of Florida and the United States.

13.     Defendant Ocwen Mortgage Servicing is a United States Virgin Islands corporation.  Ocwen Mortgage Servicing's principal place of business is in the United States Virgin Islands.  At all times relevant to this Second Amended Complaint, Ocwen Mortgage Servicing transacts or has transacted business in this district, throughout the state of Florida and the United States.  Ocwen Mortgage Servicing is a direct subsidiary of Ocwen Financial.

14.     Defendant Ocwen Loan Servicing is a Delaware limited liability company and wholly-owned second-tier subsidiary servicing company of Ocwen Financial.  Ocwen Loan Servicing's principal place of business is in West Palm Beach, Florida.  At all times relevant to this Second Amended Complaint, Ocwen Loan Servicing transacts or has transacted business in this district and throughout the State of Florida and United States.  Ocwen Loan Servicing is a direct subsidiary of Ocwen Mortgage Servicing.  Ocwen Loan Servicing is licensed as a mortgage lender pursuant to Chapter 494, Florida Statutes, and holds license No. MLD765 from the Florida Office of Financial Regulation.

15.     Ocwen Financial, through its subsidiaries, originates and services loans. The Ocwen Defendants engage in servicing activities related to the loans by, among other things,

processing borrower payments, administering loss mitigation processes, and managing foreclosures. The Ocwen Defendants also acquire and collect upon borrowers' mortgage debts that are in default.

16. Ocwen Financial, the parent and publicly traded company, wholly owns all of the common stock of its primary operating subsidiary, Ocwen Mortgage Servicing. Ocwen Mortgage Servicing wholly owns the stock of another of Ocwen Financial's primary operating subsidiaries, Ocwen Loan Servicing. All three entities share and have shared key executives, including Ronald Faris, Timothy Hayes, Michael Bourque, and John Patrick Cox. Each of the three entities, through Ocwen Financial, file a consolidated financial statement with Ocwen Financial's public disclosures.

17. Ocwen Financial directs, operates, and participates in mortgage servicing activities, including the daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations, for Ocwen's loans. Ocwen Financial enters into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. Ocwen Financial has contracted for such products and services, including a system of record and related technology services, for and on behalf of Ocwen's affiliates, which include Ocwen Mortgage Servicing and Ocwen Loan Servicing.

18. Ocwen Mortgage Servicing is also engaged in servicing loans for borrowers. Upon information and belief, Ocwen Mortgage Servicing is licensed by numerous state regulators to service loans and collect mortgage debts. It has entered into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. Ocwen Mortgage Servicing has also contracted for such products and services, including a system of record and related technology services used by Ocwen Loan Servicing and Ocwen Financial.

19.     Upon information and belief, Ocwen Loan Servicing is licensed by numerous state regulators to service loans and collect borrowers' mortgage debts.

20.     Under Ocwen Financial's and Ocwen Mortgage Servicing's direction, authority, and control, Ocwen Loan Servicing has also engaged in the marketing and processing and transmitting of payments for credit monitoring products, financial advisory products, and other products that are added on to Ocwen borrowers' accounts.

21.     At all times relevant to this Second Amended Complaint, each of the Ocwen Defendants has been a "covered person," as defined by 12 U.S.C. 5481(6)(A).  Each entity offers or provides a consumer financial product or service for use by consumers primarily for personal, family, or household purposes, or that is delivered, offered, or provided in connection with such a product or service by servicing mortgage loans and collecting on consumers' mortgage debts, among other services. 12 U.S.C. § 5481(15)(A)(i), (iv), (vii) and (x).

22.     As set forth in Paragraph 16, at all times relevant to this Second Amended Complaint, Ocwen Financial has been a "related person" because, it has been the direct and indirect shareholder of all Ocwen Mortgage Servicing and Ocwen Loan Servicing stock, and is thus a "controlling shareholder" and "shareholder…or other person…who materially participates in the conduct of the affairs" of Ocwen Mortgage Servicing and Ocwen Loan Servicing, which are covered persons.  12 U.S.C. § 5481(25)(C)(i) and (ii).  Ocwen Financial is thus "deemed to [be] a covered person for all purposes of any provision of Federal consumer financial law. 12 U.S.C. § 5481(25)(B).  At all times relevant to this Second Amended Complaint, Ocwen Mortgage Servicing has been a "related person" because, as described in Paragraph 16, it owns all of Ocwen Loan Servicing's stock and is thus a "controlling shareholder" and a "shareholder…or other person…who materially participates in the conduct of the affairs" of Ocwen Loan Servicing, which

is a covered person.  12 U.S.C. § 5481(25)(C)(i) and (ii).  At all times relevant to this Second Amended Complaint, Ocwen Mortgage Servicing is thus "deemed to [be] a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

23.    At all times relevant to this Second Amended Complaint, Ocwen Financial has been a service provider, as defined in 12 U.S.C. § 5481(26)(A), to Ocwen Loan Servicing because, as described above, Ocwen Financial has provided material services to Ocwen Loan Servicing. Ocwen Financial has also controlled and participated in the design, operation, and maintenance of Ocwen Loan Servicing's mortgage servicing activities.  12 U.S.C. § 5481(26)(A)(i).

24.    At all times relevant to this Second Amended Complaint, Ocwen Financial has been a "control person" of Ocwen Mortgage Servicing, as that term as that term is defined by § 494.001(6), Florida Statutes.  At all times relevant to this Second Amended Complaint, Ocwen Mortgage Servicing has been a "control person" of Ocwen Loan Servicing, as that term as that term is defined by § 494.001(6), Florida Statutes.

25.    At all times relevant to this Second Amended Complaint, Ocwen Loan Servicing, Ocwen Mortgage Servicing, and Ocwen Financial have operated as a "common enterprise." Ocwen Loan Servicing, Ocwen Mortgage Servicing, and Ocwen Financial have conducted the business practices described below through interconnected companies that have common business functions, employees, and office locations. Ocwen Financial and Ocwen Mortgage Servicing control (either formally or informally) and operate Ocwen Loan Servicing's mortgage servicing activities.  Ocwen Financial also contracts for critical mortgage servicing operations for and on behalf of Ocwen Mortgage Servicing and Ocwen Loan Servicing. Ocwen Financial, Ocwen Mortgage Servicing, and Ocwen Loan Servicing also file consolidated financial statements and share employees and offices. Accordingly, an act by one entity constitutes an act by each entity

comprising the "common enterprise" and Ocwen Financial, Ocwen Mortgage Servicing, and Ocwen Loan Servicing are each jointly and severally liable for the acts and practices alleged below.

26.     As described in Paragraphs 16-25, at all times relevant to this Second Amended Complaint, Ocwen Financial and Ocwen Mortgage Servicing have directed and controlled Ocwen Loan Servicing's mortgage servicing activities, and authorize Ocwen Loan Servicing to service the Ocwen Defendants' loans.  Employees of Ocwen Financial and Ocwen Mortgage Servicing have knowledge of and control, or have the ability to control, the activities of Ocwen Loan Servicing, as discussed herein.  Therefore, Ocwen Financial and Ocwen Mortgage Servicing, as Ocwen Loan Servicing's principals, are liable for the actions of their agent, Ocwen Loan Servicing.

27.     The Ocwen Defendants are engaged in trade or commerce in the State of Florida and are subject to the consumer protection laws of the State of Florida in the conduct of their mortgage servicing and related activities, loss mitigation and foreclosure activities.  The consumer protection laws of the State of Florida include laws prohibiting unfair or deceptive acts or practices.

I.     **BACKGROUND**

A.     **The Mortgage Servicing Industry**

28.     The single-family mortgage servicing industry consists of financial services entities and other firms that service mortgages for residential properties designed to house one to four family dwellings.

29.     A servicer is responsible for mortgage administration activities, known as servicing activities, which generally include collecting payments from borrowers, applying payments made in an agreed-upon order to borrowers' indebtedness, pursuing collections from delinquent borrowers, and pursuing either loss mitigation or foreclosure, as appropriate, when borrowers become delinquent on mortgage payments.

30.     Servicers utilize software, known as a system of record, to input and maintain loan and borrower information.  Accurate and functioning systems of record are extremely important to a servicer's ability to comply with state and federal law.

31.     Individual loans are typically escrowed, which means that the servicer collects a budgeted escrow payment on an installment basis over the course of the year.  The servicer, rather than the borrower, is entrusted with making monetary disbursements to taxing authorities, hazard insurance providers, and other entities.  Installment payments for escrowed loans are comprised of principal, interest, and escrow payments.  Servicers are required to perform an accurate annual escrow analysis to determine the installment payment amount.  Following the escrow analysis, the servicer must provide an escrow statement to the borrower.  Borrowers are completely reliant on the servicer to timely disburse funds to the appropriate entities out of the loan's escrow account.

32.     In the event a borrower fails to provide a servicer with documentation that their home is insured, a servicer may force-place insurance on the home.  Force-placed insurance premiums are frequently two-to-three times or more the price of an insurance policy purchased by the borrower.  Generally, a servicer enters into an agreement with a force-placed insurance vendor that exclusively provides force-placed insurance policies to the servicer.

33.     A servicer who does not own a mortgage loan may become the servicer by acquiring "mortgage servicing rights" or by entering into a contract with a master servicer to act on its behalf as subservicer.  Such transfers can occur at various stages of repayment of the mortgage, including where the borrower is delinquent in payments and may seek loss mitigation assistance from the servicer to avoid foreclosure on the loan.

### B.       Background Information Regarding the Ocwen Defendants

34.       The Ocwen Defendants service and subservice home mortgage loans secured by residential properties owned by individual citizens of the State of Florida and of the United States and is currently the second largest non-bank mortgage servicer in the United States.  Ocwen's current servicing portfolio includes approximately 125,000 loans secured by property located in the State of Florida.  As of December 2016, Florida loans account for 9.14% of the Ocwen Defendants' total portfolio of single-family residential mortgage loans.

35.       Borrowers do not choose their mortgage servicer and have no control over whether and how the Ocwen Defendants service their loans.

36.       Following the onset of the mortgage crisis, the Ocwen Defendants experienced rapid growth.  Beginning in late 2012, the Ocwen Defendants began making large acquisitions of mortgage servicing rights and over a nine-month period, from December 2012 through August 2013, the Ocwen Defendants acquired the servicing rights to over 2.6 million loans with over $347 billion in unpaid principal balance (UPB) from Homeward, Residential Capital, LLC (ResCap) and Ally Bank.  By the end of 2014, the Ocwen Defendants' portfolio had nearly doubled in size, and the aggregate unpaid principal balance of the loans in their portfolio grew from nearly $204 billion at year end 2012 to over $398 billion by year end 2014.

37.       The Ocwen Defendants' rapid growth led to an increase in the complexity of its operations as Ocwen attempted to assimilate new loans into its portfolio.  Since 2014, state regulators have noted Ocwen's lack of proper risk management and found numerous operational deficiencies, including, for example, Ocwen's failure to timely date borrower correspondence, failure to timely pay borrower escrow items, and failure to ensure the accuracy of escrow accounts.

38. Ocwen specializes in "default servicing" where Ocwen's portfolio of loans consists of many loans where the borrowers are more at risk of default and often encounter hardships or difficulties in making payments.

39. In addition to collecting payments and disbursing escrows, Ocwen regularly reviews mortgage loans for potential loss mitigation or loss mitigation options, including loan modifications, and manages the foreclosure process.

40. While Ocwen Loan Servicing is the flagship mortgage loan servicer within the Ocwen family, as set forth above, each of the Ocwen Defendants perform mortgage servicing and/or debt collection activities. Additional Ocwen affiliates who perform mortgage servicing and/or debt collection on behalf of Ocwen include the following:

   a. Ocwen Financial Solutions Private Limited ("OFSPL"): OFSPL is an India entity that is licensed to conduct mortgage loan servicing and debt collection agency activities in a significant number of jurisdictions; and

   b. Homeward Residential Corporation India Private Limited ("HRCIPL"): HRCIPL is an India entity that is licensed to conduct debt collection agency activities in several jurisdictions.

41. The Ocwen Defendants rely on Altisource Portfolio Solutions ("Altisource"), an affiliated vendor, to provide technology services and perform other servicing functions.

42. In 2009, Ocwen Financial spun off its internal technology department into Altisource. As a result of this spin-off, Altisource owns and maintains the REALServicing platform, and Ocwen has contracted with Altisource for technology services.  Altisource derives a majority of its revenue from the services it provides to the Ocwen Defendants.

43.     Prior to 2015, William Erbey served as Chairman to Ocwen Financial and Altisource, at a minimum.  Mr. Erbey was forced to resign in January 2015 under the terms of a Consent Order Ocwen Financial and Ocwen Loan Servicing entered with New York Department of Financial Services ("NY DFS").  NY DFS described the conflicts of interest between Ocwen Financial, Ocwen Loan Servicing, and Altisource as wide spread.

C.     **The Ocwen Defendants' Inadequate System of Record: REALServicing**

44.     Fundamental functions of a mortgage servicer include processing and applying borrower payments, communicating accurate payment information to borrowers, managing escrow accounts, and maintaining accurate loan balance information.

45.     Servicers use systems of record to service loans and automate servicing functions.

46.     The Ocwen Defendants manage their large portfolio by relying on Altisource. Altisource provides fundamental mortgage-servicing technology functions to the Ocwen Defendants including information technology solutions for the application of payments and the preservation of loan payment and loan balance information.  Altisource uses REALServicing as the system of record.  REALServicing and its related applications consist of a patchwork of legacy systems, some of which were inherited from companies acquired by the Ocwen Defendants over the years.

47.     REALServicing suffers from fundamental architecture and design flaws, including lack of properly managed data, lack of automation, and lack of capacity.

48.     REALServicing is unable to adequately handle the volume and complexity of the Ocwen Defendants' post-2012 portfolio.  REALServicing has not been properly maintained, the system functionality has deteriorated, and the platform often malfunctions.  The system now requires the Ocwen Defendants' personnel or their vendors to input data using ill-defined codes

and manual data entry to fix failures of the automated systems, resulting in serious data integrity challenges.

49.     These flaws have adversely impacted the accuracy of information the Ocwen Defendants use to service loans.

50.     The Ocwen Defendants know that REALServicing is not an adequate system of record and is far below the industry standard, is unreliable, and cannot be trusted to accurately maintain homeowner's loan and payment information.  Nonetheless, the Ocwen Defendants still maintain REALServicing as their system of record.

51.     The Ocwen Defendants' management were frequently advised of the operational deficiencies and compliance failures of servicing functions, including continuing compliance concerns.  The Ocwen Defendants' management has been advised by employees that compliance concerns stemming from REALServicing encompassed several departments in servicing, including escrow.  Despite knowledge of widespread problems, the Ocwen Defendants were resistant to making consumer redress and failed to implement appropriate controls and take adequate actions to ensure compliance with consumer protection laws.

52.     Upon information and belief, no other mortgage servicer uses REALServicing.

53.     As a result of the patchwork of systems, duplicative and confusing comment codes, overall lack of uniformity within REALServicing, and the Ocwen Defendants' reliance upon outdated and unreliable technology, borrowers have suffered serious harm.  As set forth more fully below, the Ocwen Defendants have improperly applied borrowers' mortgage payments, mishandled loan modification payments, failed to make timely payment of insurance premiums from escrow accounts, mailed insurance payments to wrong addresses, overcharged delinquent borrowers for property inspections and maintenance, and mailed time-sensitive correspondence to

borrowers with erroneous dates. These errors have resulted in overcharges that have in some instances forced borrowers into default and even foreclosure.

> **D.     The Ocwen Defendants' History with Regulators**

54.     Since 2014, Ocwen has entered into several settlements with various regulators and state attorneys general to attempt to resolve ongoing servicing misconduct and regulatory deficiencies in Ocwen's servicing operations.

55.     Ocwen Financial and Ocwen Loan Servicing entered a Consent Judgment dated February 26, 2014, with the Florida Attorney General and 48 other states, the District of Columbia and the CFPB[1] to address and resolve servicing misconduct, including misapplying borrower payments, failing to maintain accurate account statements, charging unauthorized fees for default-related services, improperly imposing force-placed insurance, failing to provide accurate and timely information to borrowers relating to loss mitigation services and eligibility for loan modifications; among other misconduct.

56.     In December of 2014, the NY DFS restricted Ocwen's ability to acquire mortgage servicing rights ("MSR(s)") on additional New York loans and the California Division of Business Oversight ("CA DBO") placed a similar MSR ban in January of 2015. These bans were put in place due to misconduct identified by those regulators and a perception that Ocwen could not be trusted to accurately service mortgage loans. The ban imposed by CA DBO was lifted on February 17, 2017. The NY DFS ban is still in place.

57.     The Florida Office of Financial Regulation engaged in a limited examination in 2015, along with the states of Maryland, Massachusetts, Mississippi, Montana, and Washington,

---

[1] The Consent Judgment resulted in a settlement providing approximately $125 million in direct payments to foreclosed borrowers. A related Consent Order was entered between Ocwen Financial and Ocwen Loan Servicing on the one hand and the Florida Office of Financial Regulation, among other state regulators, on the other hand.

in response to concerns raised by consumer complaints about, among other things, Ocwen's handling of borrower escrow accounts and failure to make insurance payments from escrow accounts. The examination reviewed a sampling of borrower loans from January 1, 2013 through February 28, 2015.

58.     During this multi-state examination of Ocwen, the Florida Office of Regulation identified compliance violations of both federal and state law under Section 494.00255(1)(m), Florida Statutes.

59.     Additionally, several state regulators fined Ocwen for its use of unlicensed business entities in the Philippines and India to service its mortgage portfolio. Ocwen maintains an affiliate named Ocwen Business Solutions, Inc. ("OBS") in the Philippines. OBS engaged in unlicensed mortgage servicing activity during the time-period of August 26, 2013 to September 13, 2015. In 2016, Ocwen entered a Consent Order with the Florida Office of Financial Regulation to settle concerns regarding Ocwen's unlicensed business activity from the Philippines. Upon information and belief, Ocwen continues to presently conduct unlicensed business from India.

60.     In January 2017, the United States Inspector General for the Troubled Asset Relief Program released a report stating that Ocwen has one of the worst track records in foreclosure mitigation. The report includes a finding that in a sampling of loans tested Ocwen had wrongfully terminated borrowers from HAMP loan modifications in 2016. The report cited Ocwen for improperly holding borrower payments in suspense accounts, improperly reversing and reapplying payments, and mishandling rolling delinquencies.

61.     Since 2014, the Florida Attorney General has engaged Ocwen on numerous occasions to discuss grave concerns regarding the serious and troubling issues arising from

regulatory exams, various settlements, and consumer complaints.  Nonetheless, Ocwen's mortgage servicing misconduct has continued.

## II.      THE REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA) AND REGULATION X

62.     The CFPA defines RESPA as a Federal consumer financial law.  12 U.S.C. § 5481(12)(M) & (14).

63.     In the CFPA, Congress transferred rulemaking authority over RESPA to the Consumer Financial Protection Bureau, which re-codified mortgage servicing related provisions of RESPA into 12 C.F.R. Part 1024, and designated it "Regulation X."  Regulation X is the implementing regulation of RESPA.  The sections of Regulation X specifically discussed below and at issue in Counts I, II, and III in this action, Section 1024.17, Section 1024.34 and Section 1024.41, are all effective as of January 10, 2014.  *See* 12 C.F.R. §§ 1024.17, 1024.34 & 1024.41.

64.     RESPA and Regulation X apply to "federally related mortgage loans."  *See* 12 C.F.R. § 1024.5(a).  Section 1024.2(b) of Regulation X defines "federally related mortgage loans" (hereinafter "Federally Related Mortgage Loans").  *See* 12 C.F.R. § 1024.2(b).

65.     RESPA and Regulation X apply to the conduct of "servicers," including the servicing of Federally Related Mortgage Loans, the administration of borrowers' escrow accounts, error resolution procedures, force-placed insurance, general servicing policies, procedures and requirements, and loss mitigation procedures.  *See* 12 C.F.R. § 1024.2(b); *see also* 12 C.F.R. §§ 1024.34, 1024.35, 1024.37, 1024.38, and 1024.41.

66.     Regulation X defines a servicer as a person "responsible for servicing of a federally related mortgage loan."  12 C.F.R. § 1024.2(b).  Under Regulation X, "servicing" means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related

mortgage loan … and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract." 12 C.F.R. § 1024.2(b).

67.     Under RESPA and Regulation X, the Ocwen Defendants are "servicers" because they receive payments from borrowers pursuant to the terms of Federally Related Mortgage Loans and are responsible for, among other things, distributing the payments to investors who own the borrowers' loans and, when borrowers' loans include escrow accounts, to the borrowers' taxing authorities or insurance companies.

68.     Through the CFPA, the Florida Attorney General and the Florida Office of Financial Regulation have authority to enforce RESPA and its implementing regulation, Regulation X.  *See* 12 U.S.C. § 5552(a)(1).

## III.       THE HOMEOWNERS PROTECTION ACT

69.     Under the Homeowners Protection Act (HPA), servicers are required, under certain conditions, to automatically terminate a mortgagee's requirement to pay private mortgage insurance on a certain date called the "termination date." 12 U.S.C. § 4902(b).

70.     A "servicer" as defined by the HPA, 12 U.S.C. § 4901(16), means a servicer as defined in RESPA, 12 U.S.C. § 2605(i)(2).  As referenced in Paragraphs 13, 16, and 17, Ocwen is a servicer.

71.     A "mortgagor" as defined by the HPA, 12 U.S.C. § 4901(11), means the "original borrower under a residential mortgage or his or her successors or assignees."

72.     A "residential mortgage" as defined by the HPA, 12 U.S.C. § 4901(14), means a "mortgage loan, or other evidence of a security interest with respect to a single-family dwelling that is the principal residence of the mortgagor."

73.     "Private mortgage insurance" as defined by the HPA, 12 U.S.C. § 4901(13), means "mortgage insurance other than mortgage insurance made available under the National Housing Act, 12 U.S.C. § 1701, title 38, or title V of the Housing Act of 1949, 42 U.S.C. 1471 et seq."

74.     The "termination date" as defined by the HPA, 12 U.S.C. § 4901(18), means the date when:

  a.     With respect to a fixed rate mortgage, the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan; and

  b.     With respect to an adjustable rate mortgage, the date on which the principal balance of the mortgage, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan.

75.     Under the HPA, the Ocwen Defendants are "servicers" because they are servicers as defined under RESPA.

76.     Through the CFPA, the Florida Attorney General and the Florida Office of Financial Regulation have authority to enforce the HPA.  *See* 12 U.S.C. § 5552(a)(1).

## IV.     THE OCWEN DEFENDANTS HAVE ENGAGED IN MORTGAGE SERVICING MISCONDUCT

### A.     The Ocwen Defendants Often Service Loans of the Most Vulnerable Borrowers

77.    At all times material hereto, the Ocwen Defendants have serviced and subserviced home mortgage loans secured by residential properties owned by individual citizens of the State of Florida and throughout the United States.  The Ocwen Defendants' portfolio of loans consists of many loans where the borrowers are more at risk of default and often encounter hardships or difficulties in making payments.

78.    Because of the nature of the Ocwen Defendants' portfolio of distressed loans, the Ocwen Defendants' personnel frequently interact with borrowers who are delinquent, at risk of delinquency, have complaints or inquiries about their mortgages, have filed for bankruptcy, or require immediate loss mitigation assistance.

79.    Borrowers in imminent danger of losing their homes require immediate attention and accurate information from a servicer.  The Ocwen Defendants are often unable to fulfill this basic need and incapable of effectively executing its fundamental servicing functions.

80.    Borrowers continue to suffer through frustrating loss mitigation processes, errors in payment applications, poor record keeping, and a basic inability to effectively address consumer concerns.

81.    Since 2014, the Florida Attorney General and Florida Office of Financial Regulation have collectively received over 1,000 complaints raising serious concerns regarding the Ocwen Defendants' servicing practices.  More than half of the complaints are from Florida borrowers.  The complaints primarily identify mortgage-servicing-related issues by the Ocwen Defendants, including, but not limited to: (1) loss mitigation practices; (2) payment processing issues; (3) escrow account issues, including force-placed insurance; and (4) customer service.

82.    Borrowers often complain that the Ocwen Defendants' employees are unable to address borrowers' concerns, even after repeated calls. The Ocwen Defendants' employees cannot

access the required system to address borrower concerns and therefore often lack knowledge regarding the borrower's loan. Borrowers are frustrated because they are unable to reach a live person to discuss their concerns and unable to have their call escalated or transferred.

**B.** **The Ocwen Defendants Have Illegally Foreclosed on Borrowers and Engaged in Other Unlawful Foreclosure and Loss Mitigation Practices in Violation of RESPA and Regulation X**

> *a.* **i.** ***RESPA and Regulation X Loss Mitigation and Foreclosure Protections***

83.     RESPA and Regulation X provide borrowers with numerous protections during loss mitigation and foreclosure processes. More specifically, Section 1024.41 of Regulation X imposes certain loss mitigation and foreclosure requirements on servicers with respect to mortgage loans secured by property that is the borrower's principal residence. *See* 12 C.F.R. §§ 1024.30(c)(2) & 1024.41. These protections are triggered when a borrower submits an oral or written application for loss mitigation options.

84.     Regulation X, the implementing regulation of RESPA, requires that if a servicer receives a loss mitigation application forty-five (45) days or more before a foreclosure sale, the servicer shall "promptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete," 12 C.F.R. § 1024.41(b)(2)(i)(A), and within five (5) days after receiving a loss mitigation application, the servicer must send the borrower written notice that it acknowledges receipt of the loss mitigation application and that it has determined that the loss mitigation application is either complete or incomplete ("Acknowledgment Letter"). 12 C.F.R. § 1024.41(b)(2)(i)(B). If the loss mitigation application is incomplete, the Acknowledgement Letter must state the additional documents and information the borrower must submit to make the loss mitigation application complete. 12 C.F.R.

§ 1024.41(b)(2)(i)(B).  Regulation X requires that servicers "exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application."  12 C.F.R. § 1024.41(b)(1).

85.     A loss mitigation application is complete under Regulation X when the servicer has received all of the information the servicer requires from a borrower in evaluating applications for the available loss mitigation options available to the borrower" ("Complete Application").  12 C.F.R. § 1024.41(b)(1).

86.     An application is facially complete under Regulation X if a borrower submits all the missing documents and information that the servicer requests in the Acknowledgment Letter, or if no additional information is requested in the Acknowledgment Letter ("Facially Complete Application"). 12 C.F.R. § 1024.41(c)(2)(iv).

87.     Regulation X also requires that, if a servicer receives a Complete Application more than thirty-seven (37) days before a foreclosure sale, then, within thirty (30) days of receiving the application the servicer must evaluate the borrower for all available loss mitigation options, and provide the borrower with a written notice of the servicer's determination of which loss mitigation options, if any, the servicer will offer the borrower ("Evaluation Notice").  12 C.F.R. § 1024.41(c)(1)(i)-(ii).  In the Evaluation Notice, the servicer must also notify the borrower of the amount of time the borrower has to accept or reject an offer of a loss mitigation program, if applicable, and the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such appeal and any requirements for making an appeal.  12 C.F.R. § 1024.41(c)(1)(ii).

88.     Regulation X also requires that if a servicer denies a borrower's Complete Application for any trial or permanent loan modification option available to the borrower, then the

servicer must include in the Evaluation Notice the specific reason(s) for the servicer's determination for each trial or permanent loan modification option and, if applicable, that the borrower was not evaluated on other criteria.  12 C.F.R. § 1024.41(d).

89.     With respect to foreclosures, Regulation X requires that a servicer cannot make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process (collectively, a "First Filing") unless (i) the borrower is more than one hundred and twenty (120) days delinquent on its mortgage loan obligation; (ii) the foreclosure is based on the borrower's violation of a due-on-sale clause; (or) (iii) the servicer is joining a foreclosure action of a subordinate lienholder.  12 C.F.R. § 1024.41(f)(1).

90.     Regulation X also requires that if a borrower submits a Complete Application during the "pre-foreclosure review period" set forth in 12 C.F.R. § 1024.41(f)(1), or–before a servicer has made the First Filing, a servicer cannot make the First Filing unless: (i) the servicer sent the borrower the Evaluation Notice stating that the borrower is not eligible for any loss mitigation option and that the appeal process is not applicable, the borrower has not requested an appeal within the applicable time period, or the borrower's appeal has been denied; (ii) the borrower has rejected all loss mitigation options offered by the servicer; or (iii) the borrower has failed to perform under a loss mitigation agreement.   12 C.F.R. § 1024.41(f)(2).

91.     Similarly, Regulation X requires that if the borrower submits a Complete Application after a servicer has made the First Filing, but more than thirty-seven (37) days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless (i) the servicer sent the borrower the Evaluation Notice stating that the borrower is not eligible for any loss mitigation option and the appeal process is not applicable, the borrower has requested an appeal within the applicable time period, or the borrower's appeal has

been denied; (ii) the borrower has rejected all loss mitigation options offered by the servicer; or (iii) the borrower has failed to perform under a loss mitigation agreement.  12 C.F.R. § 1024.41(g).

92.     Regulation X also generally prohibits servicers from initiating a First Filing, obtaining a foreclosure judgment, or conducting a foreclosure sale if the servicer discovers that additional information or corrections to a previously submitted document are required to complete a Facially Complete Application and the borrower has not had a reasonable opportunity to complete the application.  *See* 12 C.F.R. §§ 1024.41(c)(2)(iv), (f)(2) & (g).

### ii.  The Ocwen Defendants' Loss Mitigation and Foreclosure Failures

93.     The Ocwen Defendants have failed to maintain accurate or complete foreclosure-related information, which is necessary to provide their borrowers with mandatory foreclosure protections.  In part, this has been caused by the Ocwen Defendants' errors in boarding loans acquired from other servicers into REALServicing, the Ocwen Defendants' error-prone manual processes, and REALServicing's deficiencies, all of which has caused or is likely to have caused borrowers substantial harm from wrongfully initiated foreclosure proceedings and wrongful foreclosure sales.

94.     The Ocwen Defendants have failed to maintain and communicate accurate and necessary foreclosure-related information, which has ultimately caused the Ocwen Defendants' failure to provide borrowers with the foreclosure protections to which they are entitled under federal law.

95.     After receiving a Complete Application or Facially Complete Application for loss mitigation, the Ocwen Defendants have failed to place delinquent loans on hold and proceeded with a First Filing or seeking a foreclosure judgment in violation of federal law.

96.     The Ocwen Defendants have failed to provide or timely provide the required Acknowledgement Letters upon receipt of a loss mitigation application and have failed to include in the Acknowledgement Letters the additional documents and information the borrower must submit to make the application a Complete Application.

97.     The Ocwen Defendants' manual entry errors, failure to maintain accurate loan data, and inaccurate controls have resulted in poor loan modification decisions, the initiation of wrongful foreclosure proceedings, the entry of premature judgments, and wrongful foreclosure sales.

98.     In 2014 and 2015, at a minimum, the Ocwen Defendants failed to notify borrowers in the Evaluation Notices of the specific reason(s), as required by law, for their denial of each trial or permanent loan modification option or contained erroneous reasons for loss mitigation denial(s). This missing information, such as the amount of borrower income or the value of the property, would be material information for a borrower deciding whether to appeal a loss mitigation denial.

99.     The Ocwen Defendants' Evaluation Notices were also flawed because they failed to notify borrowers of their legal right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such appeal and any requirements for making such an appeal.  Even if the Ocwen Defendants' Evaluation Notices informed borrowers of the correct reason(s) for a denial, without the required notification of the legal right to an appeal, borrowers are unaware that they have a legal right to appeal the Ocwen Defendants' decision.

100.    The right to an appeal is an important borrower right as the borrower's homeownership may depend on whether he or she is able to successfully appeal the servicer's decision and secure a loan modification.

101.    Even if the Ocwen Defendants' Evaluation Notices informed borrowers of the loss mitigation options being offered, many such notices lacked the deadline for the borrower to accept or reject the offer of a loss mitigation program.

102.    In numerous instances, the Ocwen Defendants have inappropriately conducted foreclosure sales on the home of borrowers who had a mortgage secured by their principal residence and had timely sent the Ocwen Defendants a Facially Complete Application more than thirty-seven (37) days before a pending foreclosure sale, but the Ocwen Defendants foreclosed on the borrowers before giving them a reasonable amount of time to complete their application.  After these borrowers submitted Facially Complete Applications, the Ocwen Defendants determined they needed additional information and sent these borrowers a letter requesting that they submit additional information and gave the borrowers a deadline, usually thirty (30) days, to submit that information, but then foreclosed on the borrowers before that deadline.

103.    Upon information and belief, borrowers reasonably interpret the Ocwen Defendants' request for additional or missing information they need to evaluate the borrowers' loss mitigation applications to mean the Ocwen Defendants will not foreclose on them before the expiration of the deadline the Ocwen Defendants provided for submitting the additional or missing information.

104.    The Ocwen Defendants have also inappropriately conducted foreclosure sales on the homes of borrowers who were performing upon a loss mitigation agreement entered into between the borrower and the Ocwen Defendants.  The Ocwen Defendants offered these borrowers loss mitigation options, such as loan modifications, and the borrowers accepted and were performing upon the terms of the options—for example, by making trial payments according to the terms of a loan modification.  Even though the borrowers had been doing everything they were

supposed to do, the Ocwen Defendants unilaterally breached the terms of its loss mitigation agreements with borrowers and foreclosed on their loans.

105.    Borrowers have suffered significant harm, including the loss of their homes, financial losses, and emotional distress as a result of the Ocwen Defendants' careless, inaccurate, incomplete, and misleading loss mitigation notices.

**C.    The Ocwen Defendants Have Mismanaged Borrowers' Escrow Accounts**

        *i.    RESPA and Regulation X Escrow Account Management Requirements*

106.    Regulation X require servicers to:

      a.    conduct annual escrow analyses for borrowers at the completion of the escrow account computation year to determine the borrower's monthly escrow account payments for the next computation year, pursuant to 12 C.F.R. § 1024.17(c)(3);

      b.    refund escrow surpluses to borrowers within thirty (30) days from the date of the escrow account analysis to the extent the surplus is greater than or equal to fifty dollars ($50.00), pursuant to 12 C.F.R. § 1024.17(f)(2)(i); and

      c.    provide borrowers with annual escrow account statements within thirty (30) days of the completion of the escrow account computation year, and the annual escrow account statement must include, among other things, an account history and a projection of the activity in the account for the next year, pursuant to 12 C.F.R. § 1024.17(i).

107.    Additionally, Regulation X prohibits a servicer from collecting escrow shortages or other deficiencies when a shortage or deficiency does not exist.  12 C.F.R. § 1024.17(f)(3) & (4).

### ii. The Ocwen Defendants' Escrow Account Management Violations

108.    The Ocwen Defendants have failed to perform the most basic tasks regarding the management of borrowers' escrow accounts.  In violation of RESPA and Regulation X, the Ocwen Defendants have failed to conduct annual escrow analyses, failed to conduct accurate escrow analyses, failed to provide borrowers with annual statements that reflect escrow account history, failed to properly refund escrow surpluses to borrowers, and collected escrow shortages or deficiencies from borrowers when such shortages or deficiencies did not exist.

109.    The Ocwen Defendants have relied on inaccurate or incomplete information to manage borrower escrow accounts.

110.    Additionally, deficiencies with REALServicing lie at the root of various problems with the Ocwen Defendants' calculation of delinquent borrowers' payoff and reinstatement quotes; that is, the amount a borrower must pay to respectively payoff or reinstate his/her loan to become current.  These payoff and reinstatement quotes depend upon borrowers' escrow balances.

111.    In many instances, even when the Ocwen Defendants have performed escrow analyses on borrowers' accounts, the Ocwen Defendants have either: (1) failed to send the required escrow statements to borrowers because of REALServicing system deficiencies; or (2) sent inaccurate escrow statements which included inaccurate information pertaining to the borrowers' account histories, escrow balances, and escrow payments.

112.    Upon information and belief, the Ocwen Defendants mailed over 7,200 misleading escrow statements to borrowers between 2013 and 2015.

113.    Upon information and belief, the Ocwen Defendants have also failed to timely process escrow shortage payments, which resulted in the continued collection of purported escrow

shortage amounts that borrowers had already paid, and therefore, the Ocwen Defendants had no right to collect such amounts.

114.    In some instances, the Ocwen Defendants failed to perform or timely perform escrow analyses during the pendency of a borrower's Chapter 13 bankruptcy.  The Ocwen Defendants failed to service loans in accordance with bankruptcy protections in place for borrowers by attempting to collect purported escrow shortages that should have been discharged.

115.    Due to the Ocwen Defendants' failures related to borrowers' escrow accounts, including but not limited to disbursement of inaccurate escrow amounts, reinstatement amounts and payoff amounts, the Ocwen Defendants have communicated material information to borrowers that the Ocwen Defendants knew or should have known was inaccurate.  The above practices employed by the Ocwen Defendants caused borrowers to receive inaccurate and misleading escrow-related communications.

**D.    The Ocwen Defendants Have Failed to Timely Disburse Borrowers' Hazard Insurance Premium Payments**

*i.    RESPA and Regulation X Escrow Account Disbursement Requirements*

116.    Section 6(g) of RESPA, 12 U.S.C. § 2605(g) states that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due."

117.    Under RESPA and Regulation X, servicers are required to timely pay disbursements from borrowers' escrow accounts for items such as hazard or homeowner's insurance premiums.  *See* 12 U.S.C. § 2605(g) & 12 C.F.R. §§ 1024.17(k) & 1024.34(a).

29

118.    More specifically, Section 1024.17(k)(1) of Regulation X requires that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or before the deadline to avoid a penalty, as long as the borrower's payment is not more than thirty (30) days overdue."  Similarly, Section 1024.34(a) of Regulation X requires that "[i]f the terms of a mortgage loan require the borrower to make payments to the servicer of the mortgage loan for deposit into an escrow account to pay taxes, insurance premiums, and other charges for the mortgaged property, the servicer shall make payments from the escrow account in a timely manner, that is, on or before the deadline to avoid a penalty, as governed by the requirements in § 1027.17(k)."

### ii.   The Ocwen Defendants' Escrow Account Disbursement Failures

119.    The Ocwen Defendants have failed to properly disburse escrow funds, including, but not limited to, the failure to make timely payments of borrowers' – specifically including Florida borrowers – hazard insurance premiums and used inaccurate insurance data, which has led to wrongful insurance premium charges.

120.    The Ocwen Defendants' failure to pay borrowers' insurance premiums has resulted in erroneous cancellation of insurance policies, lapses in insurance coverage, and excessive and expensive improper force-placed insurance policies.

121.    Additionally, the Ocwen Defendants imposed force-placed insurance on borrowers who already had insurance coverage.

122.    In September 2014, Ocwen transitioned insurance vendors from a company called Assurant to Southwest Business Corporation (SWBC).  After the transition, several operational defects were identified, including rejection of disbursements, erroneously flagged and updated

loans, and checks for disbursements from borrowers' escrow accounts were sent to incorrect payees or addresses.

123.    The Ocwen Defendants discovered that due to the REALServicing errors and vendor errors, they made the following errors with respect to disbursements from borrowers' escrow accounts: they failed to send out insurance payments, they sent payments to incorrect payees and addresses, and they could not account for the payees or addresses to which payment were sent.

124.    In some cases, the Ocwen Defendants force-placed excessive and expensive insurance policies and adjusted borrowers' payments to collect higher premiums.  Once the errors were discovered, the Ocwen Defendants scrambled to reinstate lapsed policies.  Unfortunately, the Ocwen Defendants were unable to reinstate or obtain insurance at the same or cheaper rate for some borrowers, resulting in a premium increase.

125.    Over 10,000 borrowers were affected nationwide by these errors, over 1,250 of whom were Floridians who suffered financial harm as a result of the Ocwen Defendants' mishandling of borrowers' hazard insurance payments.

126.    Due to the Ocwen Defendants' failure to properly disburse borrowers' payments to their insurance companies, borrowers endured frustration, emotional distress, and confusion, and many borrowers suffered financial harm if they had to obtain new and more expensive insurance policies.

**E.      The Ocwen Defendants Have Charged Borrowers Excessive Default-Related Fees**

127.    At a minimum, during 2014 and 2015, the Ocwen Defendants overcharged default-related fees to borrowers who were struggling to obtain loss mitigation options.

128.   The Ocwen Defendants, through their system of record REALServicing, erroneously ordered Broker's Price Opinions ("BPO") and property inspections more frequently than allowable on loans in default.  As a result, the Ocwen Defendants have overcharged borrowers excess fees for BPOs of $100 to $300 per loan.  An estimated 120,082 Florida borrowers were overcharged by over $822,000 (aggregate) for excess property inspection fees.  In total, the Ocwen Defendants assessed millions of dollars in default fees against borrowers.

129.   The Ocwen Defendants' vendor, Altisource, provides services for the assessment of default related services, such as BPOs and property inspections.

**F.     The Ocwen Defendants Have Sent Misleading Communications to Borrowers**

*i.     Borrowers Have Received Inaccurate Periodic Statements*

130.   The Ocwen Defendants are obligated to provide borrowers with a periodic statement of their mortgage account containing, among other things, information regarding the current payment, including how the upcoming payment is to be applied to the loan balance, details of all transaction activity that has occurred since the last statement, and, if applicable, past due/delinquency information.  *See generally* 12 C.F.R. § 1026.41.

131.   In some instances, due to inaccurate data found in REALServicing and poor operational oversight, the Ocwen Defendants failed to send statements to borrowers altogether and in other instances failed to timely and accurately apply payments which resulted in borrowers receiving incomplete and inaccurate statements.

132.   Upon information and belief, the Ocwen Defendants' reliance on the erroneous information contained in REALServicing has led to the Ocwen Defendants sending borrowers periodic statements containing inaccurate information.  This inaccurate information includes, but

is not limited to, information related to interest, late fees, escrow amounts, prepayment penalties, payment amounts, and deferred principal balance amounts.

133.    Upon information and belief, the Ocwen Defendants have (a) failed to properly credit as of the date of receipt full periodic payments that borrowers properly made to the Ocwen Defendants, wrongfully resulting in late fees, negative credit reporting and inaccurate loan delinquencies; (b) failed to timely credit payments from borrowers' suspense accounts when the suspense amount has accumulated sufficient funds to cover a full periodic payment; (c) misapplied borrowers' payments and miscalculated borrowers' loan balances and amounts due; and (d) communicated material information to borrowers that the Ocwen Defendants knew or should have known was inaccurate.

134.    These practices employed by the Ocwen Defendants have resulted in significant harm where the Ocwen Defendants assessed improper late fees to borrowers, erroneously reported derogatory information to credit reporting bureaus, and caused borrower frustration and emotional distress.

### ii.    Borrowers Have Received Requests for Information that Demand Impossible Time-Frames

135.    Another example of the Ocwen Defendants' system failures is its processing of correspondence.

136.    As a direct result of the inadequate processes and poor vendor oversight, and in combination with unreliable and incomplete data found in REALServicing, the Ocwen Defendants have sent correspondence to borrowers with dates and/or deadlines referenced therein that pre-date the mailing date by days or weeks causing borrowers in some instances to miss important response deadlines.

137.    For example, correspondence sent to borrowers seeking a loan modification includes a date by which the borrower must respond to provide additional information, accept the offer, or appeal the denial, and the deadlines included therein may be impossible for the borrower to comply with by the time the borrower received the notice because the date had already passed or will pass without sufficient time for the borrower to respond.

138.    The Ocwen Defendants knew of the back-dating issue and failed to fully investigate and appropriately address it for months after it was discovered.  According to the findings of the NY DFS, in 2014, an employee of one of the Ocwen Defendants questioned the accuracy of the Ocwen Defendants' letter dating process; however, it took over five months and a repeat escalation by that same employee to the company's Vice President of Compliance for the Ocwen Defendants to begin to address the issue.  Once the issue was exposed, it became clear that the problem was far reaching and had impacted an unknown number of borrowers.

139.    As a result of the Ocwen Defendants' backdating of correspondence, borrowers who are already in default and under serious financial strain have had to contend with confusing and often inaccurate information regarding their loss mitigation options and rights.

**G.    The Ocwen Defendants' Have Failed to Timely Cancel Mortgages**

140.    The Ocwen Defendants have failed to timely cancel mortgages and provide recorded satisfactions of mortgage to borrowers that have paid off their mortgages in full satisfaction of the loan.

141.    Under Florida law, the Ocwen Defendants are required to cancel the mortgage within forty-five (45) days of the receipt of a full payoff of the loan and provide borrowers a recorded satisfaction of mortgage within sixty (60) days of receipt of a payment sufficient to satisfy their obligations under the loan.  FLA. STAT. §§ 701.03 & 701.04.  An open mortgage may result

in a borrower's inability to transfer title free and clear of liens, obstruct a borrower's ability to use the property as collateral to obtain new financing, and cause a borrower to have inaccurate credit reporting of an open mortgage. *Id.*

142.   Because the Ocwen Defendants have failed to timely cancel mortgages and provide recorded satisfactions of mortgages to borrowers, in addition to violating state law, the Ocwen Defendants have directly caused borrower confusion, frustration, and financial harm.

**H.      Ocwen Has Mishandled Borrowers' Private Mortgage Insurance ("PMI")**

143.   Ocwen Defendants have also failed to timely cancel borrowers' PMI.

144.   Borrowers are generally required to purchase PMI when they obtain a mortgage but have a down payment of less than 20 percent, or when they refinance their mortgage but have less than 20 percent equity in their property.

145.   Under HPA, servicers are required to automatically terminate a borrower's requirement to pay PMI on the "termination date," the date when the principal balance of the mortgage is first scheduled to reach 78 percent of the original value of the property or, if the borrower is not current as of the termination date, the first day of the first month beginning after the date that the borrower becomes current on the loan.

146.   Ocwen Defendants have failed to comply with the HPA by failing to timely terminate borrowers' PMI after learning that the termination data contained in REALServicing was often unreliable or missing altogether.

**COUNT I**

**Violation of CFPA Based on Escrow Related RESPA Violations**
**(By Plaintiffs against the Ocwen Defendants)**

147.   The allegations in paragraphs 1 through 146 are incorporated here by reference.

148.     Section 6(g) of RESPA, 12 U.S.C. § 2605(g) states that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due."

149.     Under RESPA and Regulation X, at all times relevant to this action, servicers are required to timely pay disbursements from borrowers' escrow accounts for items such as hazard or homeowner's insurance premiums.  *See* 12 U.S.C. § 2605(g), 12 C.F.R. §§ 1024.17(k)(1) & 1024.34(a).

150.     More specifically, at all times relevant to this action, Section 1024.17(k)(1) of Regulation X requires that "[i]f the terms of any federally related mortgage loan require the borrower to make payments to an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or before the deadline to avoid a penalty, as long as the borrower's payment is not more than thirty (30) days overdue."  Similarly, at all times relevant to this action, Section 1024.34(a) of Regulation X requires that "[i]f the terms of a mortgage loan require the borrower to make payments to the servicer of the mortgage loan for deposit into an escrow account to pay taxes, insurance premiums, and other charges for the mortgaged property, the servicer shall make payments from the escrow account in a timely manner, that is, on or before the deadline to avoid a penalty, as governed by the requirements in § 1027.17(k)."

151.     Under RESPA and Regulation X, the Ocwen Defendants are servicers.

152.     RESPA is a Federal consumer financial law under the CFPA.

153.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, the Ocwen Defendants have failed to make timely disbursements from borrowers' escrow accounts for items such as hazard insurance premiums.

154.    The Florida Attorney General and the Florida Office of Financial Regulation have authority to enforce RESPA and its implementing regulation, Regulation X.  *See* 12 U.S.C. § 5552(a)(1).

155.    The acts and practices described in Paragraph 141 constitute violations of Section (6)(g) of RESPA, 12 U.S.C. § 2605(g), and Regulation X, 12 C.F.R. §§ 1024.17(k)(1) and 1024.34(a), and Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

156.    Pursuant to 12 U.S.C. § 5565, appropriate relief includes, but is not limited to:

        a.     equitable relief, including a permanent or temporary injunction;

        b.     rescission or reformation of contracts;

        c.     refund of moneys or return of real property;

        d.     restitution;

        e.     disgorgement or compensation for unjust enrichment;

        f.     payment of damages or other monetary relief;

        g.     public notification regarding the violation, including the costs of notification;

        h.     limits on the activities or functions of the person; and

        i.     civil money penalties, including but not limited to those provided under 12 U.S.C. §§ 5565.

## COUNT II

**Violation of CFPA Based on Escrow Related RESPA Violations**
**(By Florida Attorney General against the Ocwen Defendants)**

157.    The allegations in paragraphs 1 through 146 are incorporated here by reference.

158.    At all times relevant to this action, Regulation X, the implementing regulation of RESPA, requires servicers to:

a.    conduct annual escrow analyses for borrowers at the completion of the escrow account computation year to determine the borrower's monthly escrow account payments for the next computation year, pursuant to 12 C.F.R. § 1024.17(c)(3);

b.    refund escrow surpluses to borrowers within thirty (30) days from the date of the escrow account analysis to the extent the surplus is greater than or equal to fifty dollars ($50.00), pursuant to 12 C.F.R. § 1024.17(f)(2)(i); and

c.    provide borrowers with annual escrow account statements within thirty (30) days of the completion of the escrow account computation year, and the annual escrow account statement must include, among other things, an account history and a projection of the activity in the account for the next year, pursuant to 12 C.F.R. § 1024.17(i).

159.    Additionally, at all times relevant to this action, Regulation X, the implementing regulation of RESPA, prohibits a servicer from collecting escrow shortages or other deficiencies when a shortage or deficiency does not exist, pursuant to 12 C.F.R. § 1024.17(f)(3) and (4).

160.    Under RESPA and Regulation X, the Ocwen Defendants are servicers.

161.    RESPA is a Federal consumer financial law under the CFPA.

162.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.17(c)(3), the Ocwen Defendants have failed to conduct annual escrow analyses for borrowers.

163. In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.17(f)(3), the Ocwen Defendants have collected escrow shortages and other escrow deficiencies that did not exist, as such payments were, in fact, already paid by borrowers.

164. In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.17(f)(2)(1), the Ocwen Defendants have failed to refund escrow surpluses to borrowers within thirty (30) days from the date of the escrow account analysis to the extent the surplus is greater than or equal to fifty dollars ($50.00).

165. In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.17(i), the Ocwen Defendants have failed to provide borrowers with annual escrow account statements within thirty (30) days of the completion of the escrow account computation year.

166. The Florida Attorney General has authority to enforce RESPA and its implementing regulation, Regulation X.  *See* 12 U.S.C. § 5552(a)(1).

167. The acts and practices described in Paragraphs 150-153 constitute violations of Section 6(g) of RESPA and Regulation X, 12 C.F.R. §§ 1024.17(c)(3), 1024.17(f)(2)(i), 1024.17(f)(3) and (4), 1024.17(i), and Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

168. Pursuant to 12 U.S.C. § 5565, appropriate relief includes, but is not limited to:

   a.   equitable relief, including a permanent or temporary injunction;

   b.   rescission or reformation of contracts;

   c.   refund of moneys or return of real property;

   d.   restitution;

e.       disgorgement or compensation for unjust enrichment;

f.       payment of damages or other monetary relief;

g.       public notification regarding the violation, including the costs of notification;

h.       limits on the activities or functions of the person; and

i.       civil money penalties, including but not limited to those provided under 12 U.S.C. § 5565.

## COUNT III

**Violation of CFPA Based on Loss Mitigation and Foreclosure Related RESPA Violations
(By Plaintiff Florida Attorney General against the Ocwen Defendants)**

169.    The allegations in paragraphs 1 through 146 are incorporated here by reference.

170.    RESPA and its implementing regulation, Regulation X, provides borrowers with numerous protections during loss mitigation and foreclosure processes. More specifically, at all times relevant to this action, as further described below, Section 1024.41 of Regulation X imposes certain loss mitigation and foreclosure requirements on servicers with respect to mortgage loans secured by property that is the borrower's principal residence. *See* 12 C.F.R. §§ 1024.30(c)(2) & 1024.41.

171.    Regulation X requires that if a servicer receives a loss mitigation application forty-five (45) days or more before a foreclosure sale, the servicer shall "promptly upon receipt of a loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete," 12 C.F.R. § 1024.41(b)(2)(i)(A), and within five (5) days after receiving a loss mitigation application, the servicer must send the borrower written notice ("Acknowledgement Letter") that it acknowledges receipt of the loss mitigation application and that it has determined that the loss mitigation application is either complete or incomplete. 12

C.F.R. § 1024.41(b)(2)(i)(B). If the loss mitigation application is incomplete, the Acknowledgement Letter must state the additional documents and information the borrower must submit to make the loss mitigation application complete. 12 C.F.R. § 1024.41(b)(2)(i)(B). Regulation X requires that servicers "exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application." 12 C.F.R. § 1024.41(b)(1).

172. A loss mitigation application is complete ("Complete Application") under Regulation X, when the "servicer has received all of the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower." 12 C.F.R. § 1024.41(b)(1).

173. An application is facially complete ("Facially Complete Application") under Regulation X if a borrower submits all the missing documents and information that the servicer requests in the Acknowledgment Letter, or if no additional information is requested in the Acknowledgment Letter. 12 C.F.R. § 1024.41(c)(2)(iv).

174. Regulation X requires that if a servicer receives a Complete Application more than thirty-seven (37) days before a foreclosure sale, then, within thirty (30) days of receiving the application the servicer shall evaluate the borrower for all loss mitigation options available, and provide the borrower with, among other things, written notice of the servicer's determination ("Evaluation Notice") of which loss mitigation options, if any, the servicer will offer to the borrower. 12 C.F.R. § 1024.41(c)(1)(i)-(ii). In the Evaluation Notice, the servicer must also notify the borrower of the amount of time the borrower has to accept or reject an offer of a loss mitigation program, if applicable, and the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such appeal and any requirements for making an appeal. 12 C.F.R. § 1024.41(c)(1)(ii).

175.     Regulation X also requires that if a servicer denies a borrower's Complete Application for any trial or permanent loan modification option available to the borrower, then the servicer must include in the Evaluation Notice the specific reason(s) for the servicer's determination for each trial or permanent loan modification option and, if applicable, that the borrower was not evaluated on other criteria.  12 C.F.R. § 1024.41(d).

176.     With respect to foreclosures, Regulation X requires that a servicer cannot make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process (collectively, a "First Filing") unless (i) the borrower is more than one hundred and twenty (120) days delinquent on its mortgage loan obligation; (ii) the foreclosure is based on the borrower's violation of a due-on-sale clause; or (iii) the servicer is joining a foreclosure action of a subordinate lienholder.  12 C.F.R. § 1024.41(f)(1).

177.     Regulation X also generally requires that if a borrower submits a Complete Application during the "pre-foreclosure review period" set forth in 12 C.F.R. § 1024.41(f)(1), or before a servicer has made the First Filing, a servicer cannot make the First Filing unless: (i) the servicer sent the borrower the Evaluation Notice stating that the borrower is not eligible for any loss mitigation option and that the appeal process is not applicable, the borrower has not requested an appeal within the applicable time period, or the borrower's appeal has been denied; (ii) the borrower has rejected all loss mitigation options offered by the servicer; or (iii) the borrower has failed to perform under a loss mitigation agreement.   12 C.F.R. § 1024.41(f)(2).

178.     Similarly, Regulation X requires that if the borrower submits a Complete Application after a servicer has made the First Filing, but more than thirty-seven (37) days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless (i) the servicer sent the borrower the Evaluation Notice stating that the

borrower is not eligible for any loss mitigation option and the appeal process is not applicable, the borrower has requested an appeal within the applicable time period, or the borrower's appeal has been denied; (ii) the borrower has rejected all loss mitigation options offered by the servicer; or (iii) the borrower has failed to perform under a loss mitigation agreement.  12 C.F.R. 1024.41(g).

179.    Under RESPA and Regulation X, the Ocwen Defendants are servicers.

180.    RESPA is a Federal consumer financial law under the CFPA.

181.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.41(b)(2)(i)(B), within five (5) days after receiving a loss mitigation application, the Ocwen Defendants have failed to send borrowers whose mortgages are secured by their principal residences the required Acknowledgement Letter informing borrowers that they received the loss mitigation application and their determination whether the loss mitigation application is complete or incomplete.

182.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.41(b)(2)(i)(B), the Ocwen Defendants failed to include in Acknowledgement Letters, and failed to inform borrowers whose mortgages are secured by their principal residences, of the additional documents and information the borrower must submit to make the loss application complete.

183.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, in violation of 12 C.F.R. § 1024.41(c)(1)(i)-(ii), with respect to borrowers whose mortgages are secured by their principal residences and who submitted a loss mitigation application more than thirty-seven (37) days before a foreclosure sale, the Ocwen Defendants have failed to, within thirty (30) days of receiving a Complete Applications, evaluate such borrowers for all loss mitigation options available and provide such borrowers with the mandatory Evaluation Notice

43

including all of the required information, which includes, but is not limited to, the right to appeal the denial of any loan modification option as well as the amount of time the borrower has to file such appeal and any requirements for making an appeal.

184.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, the Ocwen Defendants have violated 12 C.F.R. § 1024.41(f)(2), by, including, but not limited to, making the First Filing without previously providing the borrowers – whose mortgages are secured by their principal residence and who submitted a Complete Application during either the pre-foreclosure review period or before the First Filing – the required Evaluation Notice stating that the borrower is not eligible for any loss mitigation option and the appeal process is not applicable, the borrower has not timely requested an appeal, or the borrower's appeal has been denied.

185.    In the course of servicing Federally Related Mortgage Loans since February 27, 2014, the Ocwen Defendants have moved for foreclosure judgments or conducted foreclosure sales in violation of 12 C.F.R. §1024.41(g).   More specifically, the Ocwen Defendants moved for foreclosure sales or conducted foreclosure sales on borrowers whose mortgages are secured by their principal residence and who submitted a Complete Application after the First Filing, but more than thirty-seven (37) days before a foreclosure sale, and (i) the Ocwen Defendants failed to provide the Evaluation Notice to the borrower prior to moving for foreclosure judgment or conducting the foreclosure sale; (ii) the borrower had not rejected all loss mitigation options offered by the Ocwen Defendants; or (iii) the borrower did not fail to perform under a loss mitigation agreement.

186.    The Florida Attorney General has authority to enforce RESPA and its implementing regulation, Regulation X.  *See* 12 U.S.C. § 5552(a)(1).

187.    The acts and practices described in Paragraphs 169-173 constitute violations of Section 6(k) of RESPA, 12 U.S.C. § 2605(k), Regulation X, 12 C.F.R. §§ 1024.41(b)(2)(i)(B), 1024.41(c)(1)(i)-(ii), 1024.41(f)(2) and 1024.41(g), and Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

188.    Pursuant to 12 U.S.C. § 5565, appropriate relief includes, but is not limited to:

   a.    equitable relief, including a permanent or temporary injunction;

   b.    rescission or reformation of contracts;

   c.    refund of moneys or return of real property;

   d.    restitution;

   e.    disgorgement or compensation for unjust enrichment;

   f.    payment of damages or other monetary relief;

   g.    public notification regarding the violation, including the costs of notification;

   h.    limits on the activities or functions of the person; and

   i.    civil money penalties.

## COUNT IV

**Violations of CFPA Based on Violations of the HPA**
**(By Florida Attorney General against the Ocwen Defendants)**

189.    The allegations in paragraphs 1 through 146 are incorporated here by reference.

190.    Ocwen Defendants are the servicer for mortgagors or the original borrowers under a residential mortgage with respect to single-family dwellings that are their principal residences.

191.   In numerous instances since February 27, 2014, Ocwen Defendants have failed to automatically terminate private mortgage insurance for borrowers who were current or became current on their mortgage as of their termination date.

192.   The acts and practices described herein, including at Paragraphs 143-146 and 191, constitute violations of Section 4902(b) of the HPA, 12 U.S.C. § 4901(b), and § 1036(a)(1)(A) of the CFPA, 12 U.S.C § 5536(a)(1)(A).

193.   Pursuant to 12 U.S.C. § 5565, appropriate relief includes, but is not limited to:

    a.   equitable relief, including a permanent or temporary injunction;

    b.   rescission or reformation of contracts;

    c.   refund of moneys or return of real property;

    d.   restitution;

    e.   disgorgement or compensation for unjust enrichment;

    f.   payment of damages or other monetary relief;

    g.   public notification regarding the violation, including the costs of notification;

    h.   limits on the activities or functions of the person; and

    i.   civil money penalties.

### COUNT V
### Violations of the Florida Deceptive and Unfair Trade Practices Act
### (By Florida Attorney General against the Ocwen Defendants)

194.   The allegations in paragraphs 1 through 146 are incorporated here by reference.

195.   Section 501.204(1), Florida Statutes, states that "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

196.    Section 501.203(8), Florida Statutes, defines "[t]rade or commerce" as:

> the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

197.    At all times relevant to this action, the Ocwen Defendants engaged in trade or commerce as defined in Section 501.203(8), Florida Statutes, and continue to engage in "trade or commerce."

198.    At all times relevant to this action, the Ocwen Defendants provided services as referenced within Section 501.203(8), Florida Statutes, within the State of Florida and throughout the United States, and continue to provide services within the State of Florida and throughout the United States.

199.    A person that willfully engages in a deceptive or unfair act or practice is liable for a civil penalty of Ten Thousand Dollars ($10,000.00) for each such violation, pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000.00) for each violation victimizing a senior citizen, pursuant to Section 501.2077, Florida Statutes. Willful violations of FDUTPA occur when the person knew or should have known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to Section 501.2075, Florida Statutes.

200.    Since February 27, 2014, the Ocwen Defendants have engaged in unfair acts that are likely to cause substantial injury to consumers and the substantial injury is not reasonably avoidable by consumer and is not outweighed by countervailing benefit to the consumers. These unfair acts include, among others:

      a.     the use of incorrect data or incomplete or missing documentation to service borrowers' loans;

      b.     the imposition of force-placed insurance in excessive amounts of coverage;

      c.     the imposition of force-placed insurance where the borrower had insurance;

      d.     charging borrowers excessive property inspection fees;

      e.     charging borrowers excessive BPO fees;

      f.     back-dating time-sensitive letters to borrowers;

      g.     failing to make escrow disbursements for insurance;

      h.     failing to release liens in a timely fashion;

      i.     failing to honor existing trial loan modification agreements; and

      j.     using unlicensed vendors to conduct mortgage servicing functions.

201.    Since February 27, 2014, the Ocwen Defendants have made material misrepresentations or omissions to borrowers, whose residential mortgage loans were serviced by the Ocwen Defendants, when the borrowers were acting reasonably under the circumstances. These misrepresentations or omissions include, but are not limited to:

      a.     misrepresenting to borrowers outstanding loan balances;

      b.     misrepresenting to borrowers monthly payments due;

      c.     misrepresenting to borrowers escrow amounts due;

      d.     misrepresenting to borrowers the delinquency status of the loan;

      e.     misrepresenting to borrowers the default fees due;

      f.     misrepresenting to borrowers loan reinstatement amounts;

      g.     misrepresenting to borrowers insurance amounts due;

      h.     misrepresenting to borrowers the status of foreclosure;

i.      misrepresenting to borrowers the status of loan modifications;

j.      misrepresenting to borrowers due dates for borrowers' responses to letters relating to loan modification or other loss mitigation applications; and

k.      omitting material facts in loan modification denial letters to borrowers.

202.    When the Ocwen Defendants engaged in the conduct and made the representations described herein, they knew or should have known:

a.      the data and records upon which they were relying was inaccurate or missing and that they have failed to review information that is necessary to have a reasonable basis to collect on, foreclose on, or transfer borrowers' loans;

b.      their system of record contains inaccurate information about borrower payments and amounts due, including reinstatement amounts, suspense balances, default fees dues, and delinquency statuses, all of which it relies upon in demand letters, billing statements, foreclosure filings, and other communications with borrowers, and that they have failed to review information that is necessary to have a reasonable basis to collect on, foreclose on, or transfer borrowers' loans; and

c.      their foreclosure, loss mitigation, and successor information was inaccurate and that they have failed to review information that is necessary to have a reasonable basis to collect on, deny loss mitigation options for borrowers, or transfer borrowers' loans.

203.    The Ocwen Defendants have willfully engaged in these unfair and deceptive acts and practices because the Ocwen Defendants knew or should have known that such acts and practices are unfair or deceptive or otherwise prohibited by law.

204.    These above-described acts and practices of the Ocwen Defendants have substantially injured and will likely continue to injure and prejudice the public.  The acts offend

established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.  Further, these substantial injuries are not outweighed by any countervailing benefits to consumers or competition, and are not injuries that the consumers themselves could have reasonably avoided.

205.   Unless the Ocwen Defendants are permanently enjoined from engaging further in the acts and practices complained of herein, the Ocwen Defendants' actions will result in irreparable injury to the public for which there is no adequate remedy at law.

## COUNT VI

**Violations of the Florida Deceptive and Unfair Trade Practices Act
for Ocwen's Failure to Timely and Appropriately Credit Payments
(By Florida Attorney General against the Ocwen Defendants)**

206.   The allegations in paragraphs 1 through 146 are incorporated here by reference.

207.   Section 501.204(1), Florida Statutes, states that "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

208.   Section 501.203(8), Florida Statutes, defines "[t]rade or commerce" as:

> the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

209.   At all times relevant to this action the Ocwen Defendants engaged in "trade or commerce" as defined in Section 501.203(8), Florida Statutes, and continue to engage in "trade or commerce."

210.     At all times relevant to this action, the Ocwen Defendants provided services, as referenced in Section 501.203(8), Florida Statutes, within the State of Florida and throughout the United States, and continue to provide services within the State of Florida and throughout the United States.

211.     A person that willfully engages in a deceptive or unfair act or practice is liable for a civil penalty of Ten Thousand Dollars ($10,000.00) for each such violation, pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000.00) for each violation victimizing a senior citizen, pursuant to Section 501.2077, Florida Statutes.  Willful violations of FDUTPA occur when the person knew or should have known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to Section 501.2075, Florida Statutes.

212.     In the course of servicing Federally Related Mortgage Loans, since February 27, 2014, the Ocwen Defendants have regularly sent borrowers inaccurate periodic statements.

213.     In the course of servicing Federally Related Mortgage Loans, since February 27, 2014, the Ocwen Defendants have failed to accurately detail on periodic statements the current amounts due by borrowers.

214.     In the course of servicing Federally Related Mortgage Loans, since February 27, 2014, the Ocwen Defendants have failed to explain how borrowers' future payments will be applied.

215.     In the course of servicing Federally Related Mortgage Loans, since February 27, 2014, the Ocwen Defendants have failed to account to borrowers all account activity since the prior periodic statement.

216.     In the course of servicing Federally Related Mortgage Loans, since February 27, 2014, the Ocwen Defendants have retained a partial payment by a borrower in a suspense or

unapplied funds account, and failed to disclose to the borrower the total amount of funds held in such suspense or unapplied funds account.

217.    In the course of servicing Federally Related Mortgage Loans, since February 27, 2014, the Ocwen Defendants have after an accumulation of funds sufficient to make a periodic payment is received in a borrower's suspense account, failed to treat such funds as a periodic payment as of the date of receipt.

218.    In the course of servicing Federally Related Mortgage Loans, since February 27, 2014, the Ocwen Defendants have failed to timely and appropriately credit borrowers' full periodic payments as of the date of receipt.

219.    The Ocwen Defendants have willfully engaged in these unfair and deceptive acts and practices because the Ocwen Defendants knew or should have known that such acts and practices are unfair or deceptive or otherwise prohibited by law.

220.    The Ocwen Defendants' errors have resulted in significant harm to borrowers, including but not limited to improper late fees, inaccurate negative credit reporting, and borrower frustration.  These harms are compounded when, in some cases, borrowers are inaccurately considered as delinquent and being threatened with collections and ultimately foreclosure.

221.    These above-described acts and practices of the Ocwen Defendants have substantially injured and will likely continue to injure and prejudice the public.  The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.  Further, these substantial injuries are not outweighed by any countervailing benefits to consumers or competition, and are not injuries that the consumers themselves could have reasonably avoided.

222.    Unless the Ocwen Defendants are permanently enjoined from engaging further in the acts and practices complained of herein, the Ocwen Defendants' actions will result in irreparable injury to the public for which there is no adequate remedy at law.

## COUNT VII

**Violations of Florida Statutes Chapter 494 Regarding Escrow Accounts**
**(By Florida Office of Financial Regulation against Ocwen Loan Servicing)**

223.    The allegations in paragraphs 1 through 146 are incorporated here by reference.

224.    Section 494.00255(1)(m), Florida Statutes, proscribes, inter alia, violation of the Real Estate Settlement Procedures Act, as amended, 12 U.S.C. § 2601 *et seq*., or any regulations adopted under such act.  Pursuant to 12 U.S.C. § 2617, the Consumer Financial Protection Bureau adopted rules, which in pertinent part are codified at 12 C.F.R. § 1024.17(k)(1), governing escrow accounts maintained in connection with consumer mortgage servicing accounts.

225.    Pursuant to Section 494.00255(1)(u), Florida Statutes, the failure to comply with any provision of Sections 494.001 – 494.0077, Florida Statutes, or related rule or order, constitutes grounds for disciplinary action.

226.    At all times material hereto, Ocwen Loan Servicing is or has been a "mortgage lender" licensee pursuant to Chapter 494, Florida Statutes, as defined in Section 494.001(23), Florida Statutes, having been issued license number MLD765.

227.    In violation of 12 C.F.R. § 1024.17(k), on multiple occasions, Ocwen Loan Servicing failed to make timely payments from escrow accounts as required.

228.    The Florida Office of Regulation may impose a penalty that includes revocation of a license, or imposition of a fine in an amount up to $25,000 for each count or separate offense. Section 494.00255(2), Florida Statutes.  Pursuant to Rule 69V-40.111, Florida Administrative

Code,[2] the maximum penalty for a violation of section 494.0063 is a $5,000 fine and, or, revocation of license.

## COUNT VIII

**Violations of Florida Statutes Chapter 494 Regarding Annual Financial Audit Reports
(By Florida Office of Financial Regulation against Ocwen Loan Servicing)**

229.    The allegations in paragraphs 1 through 146 are incorporated here by reference.

230.    Section 494.0063, Florida Statutes, requires a mortgage lender to obtain an annual financial audit report as of the date of the licensee's fiscal year end, as disclosed to the Florida Office of Regulation on its application, and to submit a copy of the report to the Florida Office of Regulation within one hundred and twenty120 days after the end of the licensee's fiscal year.

231.    At all times material hereto, Ocwen Loan Servicing is or has been a "mortgage lender" licensee pursuant to Chapter 494, Florida Statutes, as defined in Section 494.001(23), Florida Statutes, having been issued license number MLD765.

232.    Ocwen Loan Servicing's fiscal year end as disclosed to the Florida Office of Regulation is December 31 of each year.

233.    The 2014 annual financial audit report for Ocwen Loan Servicing was submitted to the Florida Office of Regulation on May 14, 2015.

234.    In violation of section 494.0063, Florida Statutes, Ocwen Loan Servicing failed to submit the annual, audited financial report for Ocwen Loan Servicing for fiscal year end 2014 within one hundred and twenty (120) days of the end of its fiscal year.

---

[2] Rule 69V-40-111 was amended, effective November 9, 2015.  The violation occurred prior to adoption of the amended Rule.  Consideration of the penalty for the violation, including mitigating and aggravating circumstances, are calculated pursuant to the rule in effect at the time of the violation.  The maximum penalty provided by rule is $5,000.  Violations proscribed by section 494.00255(1), F.S. are not specifically provided for by the rule.

235.    The Florida Office of Regulation may impose a penalty that includes revocation of a license, or imposition of a fine in an amount up to $25,000 for each count or separate offense. Section 494.00255(2), Florida Statutes.  Pursuant to Rule 69V-40.111, Florida Administrative Code,[3] the maximum penalty for a violation of section 494.0063 is a $5,000 fine and, or, revocation of license.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, pursuant to 12 U.S.C. §§ 5552 & 5565, Sections 501.207, 501.2075, 501.2077, and 494.00255(2), Florida Statutes, and the Court's own powers to grant legal or equitable relief, request that the Court:

1.    Permanently enjoin the Ocwen Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, who receive actual notice of the injunction from committing future violations of the CFPA, RESPA, 12 U.S.C. § 2601 et seq., and its implementing regulations, Regulation X, HPA, FDUTPA and Chapter 494, Florida Statutes, and including restrictions on the future business activities of the Ocwen Defendants to prevent violations of the law;

2.    Enter judgment as follows: (i) in favor of Plaintiffs, Florida Attorney General and Florida Office of Financial Regulation, against the Ocwen Defendants, jointly and severally, on Count I; (ii) in favor of Plaintiff, Florida Attorney General, against Ocwen Defendants, jointly and severally, on Count II, Count III, Count IV, Count V, and Count VI; and (iii) in favor of Plaintiff, Florida Office of Financial Regulation, against Ocwen Loan Servicing on Count VII and Count VIII;

---

[3] Rule 69V-40-111 was amended, effective November 9, 2015.  The violation occurred prior to adoption of the amended Rule.  Consideration of the penalty for the violation, including mitigating and aggravating circumstances, are calculated pursuant to the rule in effect at the time of the violation.  The maximum penalty provided by rule is $5,000.

3.     Award such relief as the Court finds necessary to redress harm to consumers, including, but not limited to, refund of moneys to consumers; restitution; disgorgement, and any other injunctive or equitable relief allowable under law, including, but not limited to, pursuant to 12 U.S.C. § 5565(a) and Section 501.207(3), Florida Statutes;

4.     Assess against Ocwen Defendants, jointly and severally, civil penalties in favor of the Florida Attorney General, the amount of Ten Thousand Dollars ($10,000.00) for each violation of FDUTPA in accordance with Section 501.2075, Florida Statutes, Fifteen Thousand Dollars ($15,000.00) for each violation that victimized or attempted to victimize, a senior citizen in accordance with Section 501.2077, Florida Statutes, and pursuant to 12 U.S.C. § 5565(c);

5.     Assess against the Ocwen Defendants, jointly and severally, civil penalties in favor of the Florida Office of Financial Regulation, pursuant to 12 U.S.C. § 5565(c), and assess against Ocwen Loan Servicing an administrative fine pursuant to Section 494.00255(2), Florida Statutes;

6.     Award the Florida Attorney General reasonable attorney's fees and costs pursuant to Sections 501.2105 and 501.2075 of FDUTPA, and as otherwise allowable by applicable statutes or law;

7.     Order the Ocwen Defendants to pay costs and fees incurred in prosecuting this action; and

8.     Award additional relief as the Court may deem just and proper.

Dated: July 11, 2018                    Respectfully Submitted,

                                        Office of the Attorney General
                                        The State of Florida
                                        Department of Legal Affairs
                                        Pamela Jo Bondi
                                        Attorney General

                                        **By: */s/ Sasha Funk Granai*__**
                                        Sasha Funk Granai
                                        Assistant Attorney General

Fla. Bar No.: 96648
Email: *Sasha.Granai@myfloridalegal.com*

Victoria Butler
Director, Consumer Protection Division
Fla. Bar No.: 861250
Email: *Victoria.Butler@myfloridalegal.com*

Jennifer Hayes Pinder
Senior Assistant Attorney General
Fla. Bar No.: 17325
Email: *Jennifer.Pinder@myfloridalegal.co*m

3507 East Frontage Road, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515


Office of Financial Regulations
The State of Florida
Division of Consumer Finance

**By: */s/ Scott Fransen*** _____
Scott R. Fransen
Assistant General Counsel
Fla. Bar No.: 0994571
Email: *Scott.Fransen@flofr.com*
1313 N. Tampa St., Suite 615
Tampa, FL 33602
Telephone: 813-218-5364
Facsimile: 813-272-3752

Miriam S. Wilkinson
Chief Counsel
Fla. Bar No.: 972101
Email: *Miriam.Wilkinson@flofr.com*

Anthony Cammarata
General Counsel
Fla. Bar No.: 767492
Email: *Anthony.Cammarata@flofr.com*
The Fletcher Building
200 E. Gaines Street
Tallahassee, FL 32399-0370

Telephone: 850-410-9601

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2018, a true and correct copy of the foregoing was served

on the following via CM/ECF:

Thomas M. Hefferon, Esq.
Goodwin Procter LLP
901 New York Avenue NW
Washington, DC 20001
Phone: 202-346-4000
Email: thefferon@goodwinlaw.com

Sabrina M. Rose-Smith, Esq.
Goodwin Procter LLP
901 New York Ave., NW
Washington, DC 20001
Phone: 202-346-4000
Fax: 202-585-6600
Email: srosesmith@goodwinlaw.com

Bridget Ann Berry, Esq.
Greenberg Traurig, P.A.
777 S. Flagler Drive, Suite 300 E
West Palm Beach, FL 33401
Phone: 561-650-7912|
Fax: 651-655-6222
Email: BerryB@gtlaw.com,
darschs@gtlaw.com, thomsonj@gtlaw.com,
whitfieldd@gtlaw.com, and
WPBLitDock@GTLAW.com

Catalina E Azuero, Esq.
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: 617-570-1000
Email: CAzuero@goodwinlaw.com

Andrew Stuart Wein, Esq.
Greenberg Traurig, PA
777 S. Flagler Dr., Suite 300E
West Palm Beach, FL 33401
Phone: 561-650-7900
Fax: 561-655-6222
Email: weina@gtlaw.com

Laura Stoll, Esq.
Goodwin Procter LLP
601 South Figueroa Street
Los Angeles, CA 90017
Phone: (213) 426-2625
Email: lstoll@goodwinlaw.com

Attorneys for Defendants Ocwen Financial, Corporation, Ocwen Mortgage Servicing, Inc., and
Ocwen Loan Servicing, LLC.

By: */s/ Sasha Funk Granai*
Sasha Funk Granai
Assistant Attorney General