**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 9:17-CV-80496-MARRA-MATTHEWMAN**

OFFICE OF THE ATTORNEY GENERAL,
THE STATE OF FLORIDA, Department of
Legal Affairs,

and

OFFICE OF FINANCIAL REGULATION,
THE STATE OF FLORIDA, Division of
Consumer Finance,

       Plaintiffs,

     v.

OCWEN FINANCIAL CORPORATION;
OCWEN MORTGAGE SERVICING, INC.;
and OCWEN LOAN SERVICING, LLC,

       Defendants.

---

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND
AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Defendants hereby move to dismiss Plaintiffs' Second Amended Complaint ("SAC") with prejudice on the grounds explained in the incorporated memorandum of law.

This lawsuit remains identical in concept—and actually identical in many places, including the only Count added in the SAC (Count IV)—to the complaint against Ocwen originally filed the same day by the Consumer Financial Protection Bureau ("CFPB") in *CFPB v. Ocwen Fin. Corp.*, No. 9:17-cv-80495-KAM (S.D. Fla.) (the "CFPB Action"). The SAC (DE 88) has three counts that essentially duplicate the CFPB's complaint, and has other counts that seek relief for Florida residents for many of the same practices for which the CFPB already seeks relief for residents of all states (including Florida). Four of the Counts in the SAC are under the same federal law as the CFPB's complaint, and while the SAC alleges the same facts from the CFPB's complaint in support of two broad claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (SAC, Counts V and VI), the Act is not applicable. The factual allegations and claims for relief that are completely new also add nothing. Each claim suffers individual infirmities, and so the SAC fails as a matter of law even apart from its overlap with the CFPB complaint.

Like the CFPB complaint, the SAC is largely an attempt to make an end-run around a 2014 consent judgment entered by the United States District Court for the District of Columbia, pursuant to a settlement (the "National Mortgage Settlement" or "NMS") between the Florida Attorney General ("Florida" or the "State"), 48 other states, the CFPB, and Ocwen. The NMS included an agreement on servicing standards to govern Ocwen for three years—the same three years, 2014–2017, that are the subject of this lawsuit. The NMS established a robust compliance and enforcement framework, with a court-appointed monitor and defined and limited remedies for any non-compliance, including specified metrics with tolerance thresholds, cure rights, and restricted opportunities for civil money penalties and consumer awards. For four of the claims for relief (Counts I, III, VI, and VII), and almost all of a fifth (Count V), the State and the Office of Financial Regulation (the "OFR")[1] may not jettison the NMS and seek to hold Ocwen liable without abiding by those defined judgment remedies. Instead, those claims must be dismissed based on *res judicata* and waiver.

The claims in this lawsuit suffer from a number of other significant flaws, independently

---

[1] Florida and the OFR brought this case together but only join in one of the eight claims for relief.

requiring dismissal. The SAC is a textbook example of exactly the type of shotgun pleading that unnecessarily complicates case management and fails to put defendants on proper notice of the claims against them. Of particular concern, several claims for relief—most notably, the newly-added HPA claim in Count IV and the FDUTPA claim in Count V—simply state broad conclusions of fact with no specificity or even consumer examples. In addition, the SAC impermissibly alleges that each Ocwen defendant is liable for most of the claims without alleging facts to support that conclusion, notwithstanding material differences in the nature of each defendant's business. All of this means that this lawsuit fails for many of the same reasons the CFPB complaint must be dismissed. *See* the "CFPB Action".

Florida and the OFR's heavy reliance on the CFPB's flawed pleading is not the only basis for dismissal, however. Counts I through III, the federal law claims under the Real Estate Settlement Procedures Act ("RESPA"), fail to allege facts that could establish liability as to two of the defendants and do not support any of the substantive allegations. The State's FDUTPA claims, Counts V and VI, fail to state a claim because loan servicing as alleged in the SAC is not "trade or commerce" under the statute. Many of the 28 loan servicing practices that the State claims are unfair or deceptive are not unfair as a matter of law, or the State fails to properly plead any actual damages, as FDUTPA requires. Finally, the OFR's state law claims, Counts VII and VIII, are completely unsupported because they seek penalties authorized by Florida Statutes Chapter 494, when such relief is available to the OFR only through an administrative action.

Each of these grounds—as well as additional arguments set forth below—is dispositive, and the Court should dismiss the SAC, with prejudice.[2]

## BACKGROUND

This case, like the CFPB Action, stems from the nation's last financial crisis, which resulted in Congress passing the Dodd-Frank Act in 2010. In addition to creating a powerful new regulator in the CFPB, Dodd-Frank also authorized State Attorneys General to enforce RESPA and the Consumer Financial Protection Act ("CFPA"). *See* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") § 1021, 12 U.S.C. § 5511 (2010); 12 U.S.C. § 5552(a)(1).

As set forth in Ocwen's motion to dismiss the CFPB Action (CFPB Action (DE 31) (the "CFPB Motion")), the CFPB and 49 states (including Florida) sued Ocwen in federal court in the

---

[2] Exhibit 1 to Ocwen's Motion to Dismiss lists the bases for dismissal of each Count.

District of Columbia ("D.C. District Court"), alleging many of the same mortgage servicing and foreclosure regulatory violations that are now in the CFPB's complaint before this Court. *See, e.g.*, *CFPB v. Ocwen Fin. Corp.*, No. 13-2025 (D.D.C. Dec. 19, 2013) (DE 1). That action resulted in the National Mortgage Settlement, which established extensive protocols as to how Ocwen was required to service loans for the following three years.

This lawsuit now purports to challenge wholesale many of Ocwen's loan servicing operations and decisions made since the NMS. But like the allegations in the CFPB Action, the State and the OFR's accusations in this action are wholly inconsistent with the reports by independent parties, including the independent monitor appointed under the NMS, which disprove the allegations of widespread error. Also like the CFPB Action, this lawsuit *claims* an urgent concern about widespread problems, but comes at the close of the three-year NMS monitoring period, during which both Florida parties served on the Monitoring Committee, and were tasked with monitoring Ocwen's compliance with the NMS and addressing non-compliance as required under the NMS.[3] And it is pled as a tangled mass of vague allegations, even though Florida has an extensive amount of information from regular monitoring reports on each operational issue raised in the SAC, and despite the broad access to details on Ocwen's operations that the OFR enjoys as Ocwen's state regulator.

As with the CFPB's claims, Florida and the OFR's assertion that Ocwen mishandles servicing duties to the detriment of borrowers is wholly inconsistent with Ocwen's proven customer-first approach and record as a corporate citizen and employer in Florida, dedicated to helping Florida homeowners. The State and the OFR's claims that Ocwen's data and systems are hopelessly inaccurate are not credible given the many ongoing, independent evaluations of those same technologies, which have found that Ocwen is fully up to the task of servicing loans consistent with detailed servicing requirements imposed by the NMS.[4]

This lawsuit is a pile-on effort, and an inconsequential one, at that. The SAC challenges

---

[3] See CFPB v. Ocwen Fin. Corp., No. 13-2025 (D.D.C. Sept. 6, 2017) (DE 45) at n. 1 ("Monitoring Committee Motion").

[4] Ocwen understands that on a motion to dismiss this Court must limit itself to the four-corners of the SAC, and its legal arguments are precisely limited to the SAC and judicially-noticeable federal court judgments. But because Florida attempts to paint such a starkly negative picture of Ocwen's servicing practices, Ocwen believes it is misleading to let that picture go unrebutted.

much of the same conduct that the CFPB asserted in its complaint.[5] Indeed, the SAC's only new claim (compared to the first amended complaint), Count IV, is copied-and-pasted from the CFPB complaint—word for word.[6] While some of the legal grounds for recovery differ, Counts I, II, III, IV, VI, and VII basically duplicate CFPB claims for relief (*see* CFPB Compl. ¶¶ 235–38 (Count III), ¶¶ 257–263 (Count VII), ¶¶ 297–308 (Count XIII)), and Count V contains a litany of alleged poor servicing conduct that almost completely overlaps with the CFPB's prolix critiques. Independently, the SAC adds few new factual allegations or substantive legal claims, and should be dismissed on the same bases as the CFPB Action (and Plaintiffs' prior first amended complaint here). Where this lawsuit differs from the CFPB Action by adding state-specific legal claims or additional allegations, those differences do not stand as a barrier to dismissal.

## ARGUMENT

**I.     THE NMS PRECLUDES FOUR CLAIMS (COUNTS I, III, VI AND VII), AND ALMOST ALL OF A FIFTH (COUNT V).**

Like the CFPB Complaint, the SAC asserts claims that are barred by the NMS court's consent judgment—a federal judgment to which the State of Florida is an expressly-bound party. For many of the same reasons that Ocwen stated in the CFPB Motion, this Court should apply *res judicata* and related principles of fundamental fairness that prevent a party like the State from suing about matters it already resolved, and dismiss Counts I, III, VI, and VII entirely, and Count V almost entirely, because each is incompatible with the NMS.

**A.     The NMS Consent Judgment Defined Certain Aspects of Ocwen's Conduct, and Limited the State and the OFR's Remedies.**

As mentioned above, in late 2013 the CFPB and 49 state plaintiffs, including the State of Florida, reached a settlement with Ocwen over allegations that certain aspects of Ocwen's loan servicing transgressed federal and state requirements. The parties submitted a consent judgment

---

[5] *Compare, e.g.*, SAC ¶¶ 44–53 *with* CFPB Compl. ¶¶ 27–72 (Ocwen's system of record); SAC ¶¶ 83–105 *with* CFPB Compl. ¶¶ 177–201 (dual-tracking loan servicing); SAC ¶¶ 108–15 *with* CFPB Compl. ¶¶ 100–28 (management of escrow accounts); SAC ¶¶ 116–26 *with* CFPB Compl. ¶¶ 129–43 (hazard insurance); *and* SAC ¶¶ 130–34 *with* CFPB Compl. ¶¶ 73–90 (accuracy of periodic statements and crediting of payments).

[6] *Compare* SAC ¶¶ 69–76 *with* CFPB Compl. ¶¶ 309–14; SAC ¶¶ 143-46 *with* CFPB Compl. ¶¶ 144-46; SAC ¶¶ 189-92 *with* CFPB Compl. ¶¶ 315-18. Plaintiffs did not even update the paragraph cross-references after copying and pasting from the CFPB complaint. For example, ¶ 70 of the SAC here cites "Paragraphs 13, 16, and 17," but those are the paragraphs regarding servicing *in the CFPB complaint*, not the paragraphs regarding servicing in the SAC. *See* SAC ¶¶ 15, 17, 18.

(with extensive attachments) laying out the settlement's terms to the D.C. District Court, which approved it on February 26, 2014. Consent Judgment, *CFPB v. Ocwen Fin. Corp.*, No. 13-2025 (D.D.C. Feb. 26, 2014) (DE 12) ("NMS Consent Judgment" or "NMS C.J."); *see* Defendant's Notice of Filing, No. 9:17-CV-80496-KAM ("Florida Action") (DE 25). Pursuant to the NMS Consent Judgment, and among other terms, Ocwen agreed to provide $2 billion in consumer relief to its mortgage servicing customers and to pay an additional $127.3 million into a borrower relief fund, and the government parties provided a near-blanket release of Ocwen for all past loan servicing conduct. NMS C.J. ¶¶ 4,5, 9,10; *id.* Ex. E (CFPB Release); *id.* Ex. F (State Release).

Relevant to this action, the NMS also was forward-looking. The agreement, embodied in the ultimate Consent Judgment, included a 46-page single-spaced stipulation of more than 300 detailed "Servicing Standards," which Ocwen agreed to adhere to in servicing loans at least through February, 2017. *Id.* ¶ 3 ("[Ocwen] shall comply with the Servicing Standards"); *id.* Ex. A (the "Servicing Standards"). To ensure compliance with the Servicing Standards and define the process and remedies if Ocwen did not perform, the State and Ocwen agreed to an enforcement framework which was also made part of the Judgment. *Id.* ¶ 6 ("The Servicing Standards . . . are incorporated herein as the judgment of the Court and shall be enforced in accordance with the authorities provided in the Enforcement Terms, attached hereto as Exhibit D."). Under this framework, the parties appointed an external "Monitor," to be funded at Ocwen's significant expense, to investigate and regularly report to the parties and the D.C. District Court on Ocwen's compliance with the Servicing Standards. *Id.* ¶ 7. Joseph A. Smith, Jr., the former North Carolina Commissioner of Banks, served as the Monitor, as he also has for similar settlements involving other mortgage servicers. *See id.* As the exclusive test of compliance, the NMS established servicing "Metrics" which measured objectively-measurable events such as whether Ocwen promptly processed payments (*id.* Ex. D at D1-7), charged allowed fees (*id.*), or provided accurate billing statements (*id.* at D1-21).

The NMS did not require perfection from Ocwen. Instead, each Metric set a defined tolerance for error—the "Threshold Error Rate"—allowing cumulative breaches of the Metrics to reach up to 10% in a reporting period before the Monitor could find a "Potential Violation" of the NMS.[7] NMS C.J., Ex. D at D-1, D-4, D-10–D-11. Any "Potential Violation" would not be

---

[7] *See United States v. Bank of Am., N.A.*, 78 F. Supp. 3d 520, 533 (D.D.C. 2015) (similar NMS "Consent Judgment does not require absolute perfection in loan servicing"); *see also Sandaler v.*

considered a settlement violation, as the settlement expressly reserved to Ocwen the "right to cure" Potential Violations by implementing and completing a corrective action plan approved by the Monitor. *Id*. at D-11; *accord United States ex rel. Schneider v. JPMorgan Chase Bank, Nat'l Assoc.*, 878 F.3d 309, 315 (D.C. Cir. 2017) (noting that "the [NMS] contains a series of steps before [a servicer] could be penalized for violating the servicing standards, including the Monitor's citation, failure to cure, failure of informal dispute resolution, and the filing of a suit in the district court").

As part of the Court's judgment, the NMS imposed a variety of other limitations on Ocwen's potential liability for failing to comply with the Servicing Standards. First, there was a "phase in" period where Ocwen was provided up to 180 days to meet certain Metrics. NMS C.J., Ex. D at D-1. Second, the NMS limited the remedies the State could seek for uncured violations, providing the State could only seek non-monetary equitable relief and civil penalties, which in most cases cannot exceed $1 million. *Id.* at D-14. Third, there were limitations built in to ensure that only "material non-compliance" needed to be addressed. *Id.* Ex. A at A-46.

For the servicing operations it expressly covers, the NMS Consent Judgment thus defines for the State and Ocwen applicable Servicing Standards, how those Standards must be implemented and monitored, and the range of available remedies for non-compliance with those Standards. It does so for Ocwen's servicing operations within the three years that nearly precisely encompass the period of time covered by this lawsuit. *Compare* NMS C.J., Ex. D at D-15 (standards "[in] effect" for three years from February 26, 2014), *with* Original Complaint (Florida Action DE 1) (case filed Apr. 20, 2017); *see also* 12 U.S.C. § 5564(g)(1) (three-year statute of limitations for CFPA); 12 U.S.C. § 2614 (three-year statute of limitations for RESPA).

### B.   Many of the State and the OFR's Claims of Improper Servicing Conduct Completely Overlap with Servicing Standards Defined in the NMS.

Even though the NMS defined standards of conduct for Ocwen's servicing practices during virtually the entire period covered by this lawsuit, the SAC acknowledges the NMS only once, with passing mention as part of Ocwen's alleged "history" with regulators. *See* SAC ¶ 55. The SAC's failure to mention the comprehensive settlement framework created by the NMS cannot hide, however, that at least four Counts of the SAC completely overlap with claims settled in the NMS and a fifth presents a nearly complete overlap:

---

*Wells Fargo Bank, N.A.*, 2017 WL 5443149, at *10 & n.8 (S.D. Fla. Nov. 14, 2017) (noting that "in fact, all parties to the litigation agreed to the [NMS]").

1. **Counts I and VII** allege Ocwen failed to timely pay hazard insurance premiums from escrow (SAC ¶¶ 153, 227), which overlaps with Servicing Standard VII.A.I (requiring Ocwen to "continue to advance payments for the homeowner's existing policy"). NMS C.J., Ex. A at A 41–42. The same claim appears in the CFPB Complaint as the first half of Count X. CFPB Compl. ¶¶ 283–85.

2. **Count III** centers on alleged "dual-tracking" violations, those situations where Ocwen proceeded to foreclosure while the borrower was on a track towards loan modification or other non-foreclosure solution. SAC ¶¶ 181–85. Yet dual-tracking rules are comprehensively set out under Servicing Standard IV.B ("Dual Track Restricted" section), and Metrics 1, 3, 6, and 30 (testing whether Ocwen initiated or foreclosed during a trial modification period or after a borrower applied for a modification). NMS C.J., Ex. A at A-17–22; *id.* Ex. D at D1-2–D1-3, D1-5–D1-6, D1-13–D1-16, and D1-18. This same claim appears in the CFPB Complaint as Counts III and IV, and as Count XIII. CFPB Compl. ¶¶ 235–43, 297–308.

3. **Count VI** alleges that Ocwen failed to credit payments, advance payment due dates when sufficient funds accumulate in suspense accounts, and provide accurate billing statements. SAC ¶¶ 212–18. The alleged conduct overlaps with Servicing Standards I.B.1 (prompt acceptance and application of payments), I.B.2–3 (post payments within two business days), I.B.3.b (advancing payment due dates when sufficient moneys accumulate in suspense accounts), I.B.5 (timely and accurate periodic statements), and I.B.10 (accurate statements), as measured by Metrics 4.B (timely payment processing) and 33 (accurate billing statements). NMS C.J., Ex. A at A-4–6, A-7–8; *id.* Ex. D at D1-7, D1-21. This claim appears in the CFPB Complaint as Count VII. CFPB Compl. ¶¶ 257–63.

4. **Count V** asserts that Ocwen engaged in a laundry list of "unfair" or "deceptive" practices. SAC ¶¶ 200(a)–(j), 201(a)–(k). Despite the SAC's kitchen-sink approach, only two allegations fall outside NMS: "failing to release liens in a timely fashion" (*id.* ¶ 200(h)) and "using unlicensed vendors" (*id.* ¶ 200(j)). The remaining alleged practices in Count V overlap with conduct addressed by the NMS Settlement:

   1. <u>Seven</u> allegations concern conduct that, as explained above as to Counts I and III, is embraced by the NMS: failure to pay insurance (SAC ¶ 200(g)) and failures in connection with loan modification applications and processing or with dual-tracking generally (*id.* ¶¶ 200(f), (i), 201(h)–(k)).

   2. <u>Eleven</u> concern Florida's assertion that Ocwen made misrepresentations about amounts due or account status. *Id.* ¶ 201(a)–(k). The SAC alleges only four routes by which Ocwen supposedly misrepresented information: account statements (*id.* ¶ 201(a)–(b), (d)–(e), (g)), loan modification and other loss mitigation communications (*id.* ¶ 201(f), (i)–(k)), foreclosure communications (*id.* ¶ 201(h)), and escrow statements (*id.* ¶ 201(c)). To the extent these allegations concern account statements, the allegations overlap with NMS Standards for the reasons Count VI also does. The alleged escrow miscommunications are part of Count II, and so are duplicative and can be addressed in that claim (for which Ocwen is not arguing that the NMS applies). To the extent these allegations concern

loan modification and foreclosure communications, they are swept up in NMS for the reasons Count III also is. Further, where the SAC contends Ocwen told borrowers applying for a loan modification that they had a period of time to submit additional documents and would not be foreclosed in the meantime (SAC ¶ 201(j)), this supposed violation is completely congruent with Servicing Standard IV.D.2 (Ocwen must disclose and provide accurate information relating to loss mitigation programs), and Metric 30 (testing whether Ocwen afforded borrowers 30 days to provide supplemental documentation before proceeding to foreclosure). NMS C.J., Ex. A at A-25; *id.* Ex. D at D1-18.

3. <u>One</u> allegation asserts that Ocwen used "incorrect data or incomplete or missing documentation to service borrowers' loans." SAC ¶ 200(a). Yet account accuracy requirements are the subject of an entire section of the NMS Consent Judgment. Servicing Standard I.B ("Requirements for Accuracy and Verification of Borrower's Account Information"). Among the Standards are ones for posting and application of payments, imposition of fees, accounting and error correction, as well as independent review of account information, and Metric testing of procedures to document key account activities. NMS C.J., Ex. A at A-4–8; *id.* Ex. D at D1-12.

4. <u>Two</u> allegations assert that Ocwen imposed "excessive" or unnecessary lender-placed insurance. SAC ¶ 200(b), (c). These overlap with Servicing Standards VII.A.1 (requiring Ocwen to obtain lender-placed insurance only if there is a reasonable basis to believe the borrower failed to obtain the necessary insurance), VII.A.5 (precluding Ocwen from placing insurance on a mortgaged property in excess of the replacement value or last known amount of coverage), and VII.A.8 (requiring Ocwen to purchase lender-placed insurance policies for a reasonable price). NMS C.J., Ex. A at A-41–42, A-43, A-44.

5. <u>Two</u> allege that Ocwen charged borrowers "excessive" property inspection and "BPO" (*i.e.*, broker's price opinions of value) fees. SAC ¶¶ 200(d), (e). These overlap with Servicing Standards VI.A.1 (requiring that all default, foreclosure, and bankruptcy-related fees be "bona fide, reasonable in amount, and disclosed in detail to the borrower"), VI.C.1 (precluding Ocwen from imposing unnecessary or duplicative property inspection, property preservation, or valuation fees), VI.C.1.c (limiting Ocwen to imposing BPO fees once every 12 months, unless requested by the borrower or required), and VI.C.2 (requiring that third parties performing default, foreclosure and bankruptcy-related services do so at reasonable market value), and. NMS C.J., Ex. A at A-39, A-41–42.

Collectively, this brief refers to the foregoing as the "Overlapping NMS State Counts."

This overlap should not be surprising, given that at the time of the NMS, the CFPB had promulgated new regulations governing servicing, which were to go into effect in January 2014. Accordingly, it built various components into the NMS that mirrored the regulatory requirements

that it was about to impose on the entire industry. The SAC effectively ignores the NMS entirely by including the Overlapping NMS State Counts. But the law does not allow the State to sue Ocwen over any of these listed matters (again) because principles of prior adjudication and fundamental fairness bar it from doing so.[8]

      **C.**     *Res Judicata* **Precludes Recovery for the Overlapping NMS State Counts.**

One of the most basic legal principles is that when parties resolve a claim, whether via a contested judgment or an agreed one, that resolution is binding and preemptive of future overlapping actions. That principle is often enforced under *res judicata* which, here, requires dismissal of the Overlapping NMS State Counts: Counts I, III, VI, and VII, and all of Count V except the lien releases (SAC ¶ 200(h)) and unlicensed vendors (*id.* ¶ 200(j)) allegations.

"The doctrine of res judicata, or claim preclusion, forecloses relitigation of matters actually or potentially litigated in an earlier lawsuit." *Richardson v. Ala. State Bd. of Educ.*, 935 F.2d 1240, 1244 (11th Cir. 1991). The doctrine applies if (1) there is a final judgment, (2) rendered by a court of competent jurisdiction, (3) the parties are identical or in privity, and (4) the claims for relief are identical. *Id.* A "consent decree, although founded on the agreement of the parties, is a judgment," so preclusion principles apply equally to such agreed judgments. *Paradise v. Prescott*, 767 F.2d 1514, 1525 (11th Cir. 1985), *aff'd*, *United States v. Paradise*, 480 U.S. 149 (1987). Thus, where a party to a prior consent decree later attempts to bring overlapping claims against another decree party that fall within that prior judgment, those claims are barred. *See Gates v. Towery*, 456 F. Supp. 2d 953, 963–65 (N.D. Ill. 2006) (dismissing plaintiff's claim for injunctive relief on *res judicata* grounds due to continuing nature of a consent decree governing plaintiff's rights), *aff'd*, 623 F.3d 389 (7th Cir. 2010); *World's Finest Chocolate, Inc. v. World Candies, Inc.*, 409 F. Supp. 840, 844–45 (N.D. Ill. 1976), *aff'd*, 559 F.2d 1226 (7th Cir. 1977) (holding terms of consent judgment were *res judicata* and rejecting attempt to sue for violation of consent judgment in another court); *Affiliated Hosp. Prod., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1185–86 (2d Cir. 1975) (holding settlement agreement controlled and limited parties to remedies provided in the agreement); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 2015 WL 5051660, at *3 (S.D.N.Y. Aug. 26, 2015) (dismissing claim for continuing violation because it was precluded by consent judgment). Most

---

[8] While the SAC effectively ignores the NMS, Plaintiffs have not done so in their discovery requests thus far, requesting documents concerning Ocwen's compliance with the NMS metrics.

pertinent here, while Ocwen's motion to dismiss the first amended complaint was pending, the D.C. Circuit affirmed dismissal of a *qui tam* action that attempted to plead around the NMS Settlement, concluding the "[r]elator's suit constituted an improper collateral attack on a judgment committed to the Monitor's discretion by the [NMS]." *Schneider*, 878 F.3d at 313.

Here, there is no reasonable dispute that the NMS meets the first three criteria for the application of *res judicata*.[9] The fourth criterion also is met. The NMS resulted in a final Consent Judgment by which the Court agreed to the parties' choice to define certain Servicing Standards and limited remedies for alleged breach of those Standards over the following three years. Among those judgment-defined requirements are the same requirements that form the basis for the State's causes of action in the Overlapping NMS State Counts.

By operation of the NMS Consent Judgment, the State and the OFR are barred from suing Ocwen about the servicing conduct that was settled in 2014, which the D.C. District Court incorporated into that Judgment, without abiding by the full contours of the Judgment.

This means that to state a claim for relief in each of the Overlapping NMS State Counts, the State and the OFR must allege more than just that Ocwen did not service loans appropriately. An actionable claim can exist, if at all, only if the SAC also alleges that the specific conditions detailed in the NMS Consent Judgment for finding and remedying violations occurred, including that (a) the Monitor found a violation of the Servicing Standard, (b) the violation exceeded the applicable Threshold Error Rate for a Metric, and (c) the violation remained uncured after Ocwen had an opportunity to address it. NMS C.J., Ex. D at D-1, D-4, D-10–D-11.[10] Even if that

---

[9] The State and Ocwen were parties to the NMS. Both the State and OFR served on the Monitoring Committee for the NMS. *See* Monitoring Committee Motion at n. 1. While the OFR was not a party to the NMS, the OFR independently agreed to abide by the terms of the settlement. *In re Ocwen Fin. Corp., et al.*, No. 3300-F-07/13 (Fla. Office of Fin. Regulation Mar. 7, 2014) (attached hereto as Exhibit 2). Even if it had not, the Consent Judgment applies with equal force to the overlapping claims brought by the OFR in Counts I and VI because the OFR is an agency of the State of Florida, which was a party to the NMS. *Johnson v. Ala. Dep't of Human Resources*, 546 F. App'x 863, 868 (11th Cir. 2013) (unpublished opinion) (finding nonparty state agency bound by prior judgment to which a different state agency and the State of Alabama were party, because it was a "state government agenc[y] or sub-agenc[y]"); *see also Griswold v. Cty. of Hillsborough*, 598 F.3d 1289, 1292 (11th Cir. 2010) (recognizing nonparty preclusion if, *inter alia*, the "nonparty was adequately represented by someone who was a party to the suit").

[10] There are other limits on the SAC claims that overlap with the NMS. The State and the OFR are barred by *res judicata* from suing Ocwen at all for alleged conduct during the permitted

is alleged, the full range of relief potentially permitted under the CFPA—all of which the State and the OFR seek in the SAC—is not available as relief for the Overlapping NMS State Counts; the parties agreed, and the NMS court ordered, that available remedies for conduct including that alleged in the Overlapping NMS State Counts here is non-monetary equitable relief and civil penalties limited in most instances to $1 million per uncured violation. *Id*. D-14. Borrower relief is also significantly limited. *Id.* Ex. D at D-1, D-4, D-10–D-11.

Any recovery against Ocwen on the Overlapping NMS State Counts is barred by *res judicata* because the State and the OFR do not allege Ocwen's alleged failures were also found by the Monitor, reported on, and uncured, and because the claims are otherwise limited as the parties agreed and the NMS Consent Judgment stipulated. Having agreed to the NMS Consent Judgment, the State and the OFR chose to define and limit Ocwen's rights and responsibilities, as well as their own, as to certain servicing conduct. They cannot now sue Ocwen for more.

**D.      By Agreeing to the NMS, the State and the OFR Waived the Ability to Bring These Claims in an Independent Action.**

The Overlapping NMS State Counts are further barred by the NMS Consent Judgment because the State waived its right to bring these claims outside the NMS enforcement framework. *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) (In a consent judgment, parties "waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation."). These waivers are judicially enforceable and binding, even where the consent judgment limits relief otherwise available by law. *See id.* at 682–83; *accord United States v. S. Fla. Water Mgmt. Dist.*, 2011 WL 4595016, at *61 (S.D. Fla. Jan. 4, 2011) ("Because the defendant has, by the decree, waived his right to litigate the issues raised . . . the conditions upon which he has given that waiver must be respected.").

In asserting the Overlapping NMS State Counts, State officials attempt to renege on their bargain and instead seek to enforce rights that were limited in the NMS. In exchange for Ocwen's agreeing to the Consent Judgment remediation and servicing terms, the State and the OFR waived the ability to litigate future actions governed by NMS Servicing Standards and Metrics except as described in the NMS's enforcement framework, which permits actions only if specific conditions have been met. *See* NMS C.J. ¶¶ 6, 12, 15; *id.* Ex. D at ¶¶ A, E, & I. Neither

---

phase-in periods. NMS C.J., Ex. D at D-1, ¶ A (variously defining April 27, May 27 and August 5, 2014 as effective dates). The State and OFR also cannot sue for immaterial violations or for borrower harm in certain circumstances. *See id*. at D-6–D-9; *id.* Ex. A at A-46.

the state of Florida, *nor any other party to the NMS*, has brought an action pursuant to the NMS terms, contending that Ocwen has failed to abide by the detailed requirements of servicing loans set forth in that document. Florida and the OFR's lawsuit, then, is both an equitable and a pleading failure because when a party sues over conduct covered by a binding agreement among parties, such as the NMS Consent Judgment, a plausible claim must plead that the plaintiff has satisfied any conditions precedent to filing a suit. *See* Fed. R. Civ. P. 9(c); *Ben Fu Li v. Tan*, 2017 WL 2464680, at *2 (S.D. Fla. June 7, 2017) (dismissing case because "Plaintiff failed to allege that he satisfied ***any*** conditions precedent") (emphasis in original). Ocwen is entitled to the benefit of the bargain it negotiated with the State. *See Reed v. United States*, 717 F. Supp. 1511, 1518 (S.D. Fla. 1988), *aff'd*, 891 F.2d 878 (11th Cir. 1990) ("The government, *more than any other party, must be held to honor its commitments*. When the government fails, United States Courts must be prepared to enforce these commitments." (emphasis added)). Thus, the NMS covers the conduct at issue in these Counts, and the State and the OFR's independent claims for additional or different recoveries have been waived. The State and OFR have not alleged any right to recover against Ocwen to the extent the NMS preserved such claims in a greatly-limited way, so the Overlapping NMS State Counts must be dismissed.[11]

## II.    THE SAC FAILS TO MEET RULE 8 PLEADING STANDARDS.

### A.    The SAC Is an Impermissible "Shotgun" Pleading.

The numerous individualized pleading deficiencies in the SAC are detailed below. But the root cause of these deficiencies independently provides grounds for dismissal of the entire SAC: the State's improper "shotgun" pleading. In typical shotgun fashion, the SAC begins with a laundry list of 146 generalized allegations, and then incorporates all 146 allegations into every one of its eight counts. *See, e.g.*, SAC ¶¶ 147, 157, 169, 189 (newly added Count IV), 194, 223, 229; *cf. Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1998) (shotgun pleadings "invariably begin with a long list of general allegations, most of which are immaterial to most of the claims for relief" that are then "incorporated by reference into each count of the complaint"). Ocwen is thus left to sift through 35 pages of allegations and guess

---

[11] Other equitable principles that cannot be decided on the face of the SAC, including estoppel, also bar the Overlapping NMS State Counts, and will be raised later in the case if necessary. Ocwen also notes for the Court that the D.C. District Court that entered the NMS Consent Judgment may be asked by one or more of the parties to address the issue of overlap between this case and NMS. If that happens, Ocwen will provide notice to this Court.

which ones support each Count. The Eleventh Circuit has "roundly, repeatedly, and consistently condemned" this pleading practice because it unnecessarily tax[es] the time and resources" of courts. *See Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1125–26 (11th Cir. 2014) (quoting *Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 979 (11th Cir. 2008)); *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1045 n.39 (11th Cir. 2014).

The State's FDUTPA claims (Counts V and VI) are two examples of the fatally deficient ways this case has been pled. Both Counts start with the assertion that the "allegations in paragraphs 1 through 146 are incorporated by reference." SAC ¶¶ 194, 206. Then, between the two Counts, the State lists 28 types of improper servicing that it alleges were "unfair" or "deceptive" under FDUTPA (*id.* ¶¶ 200–01, 212–18), with no linkage between the conclusory recitals in the Counts and the purported substantive facts that the State intends to rely on as support. Nor are such links obvious. Paragraph 200(j), for instance, alleges that Ocwen's use of "unlicensed vendors" is an unfair practice. But the only allegedly unlicensed entities the SAC identified are Ocwen "affiliates," so not vendors at all. *Id.* ¶ 59. Paragraph 200(h), regarding alleged failures to release liens in a timely fashion, is supported by only the conclusory assertion fifty paragraphs earlier that "[b]ecause the Ocwen Defendants have failed to timely cancel mortgages and provide recorded satisfactions of mortgages to borrowers, in addition to violating state law, the Ocwen Defendants have directly caused borrower confusion, frustration, and financial harm." *Id.* ¶ 142. More difficult to contend with are the unspecific assertions that there may be more than 28 types of targeted conduct, as two of the State's lists of horribles are preceded by a lawyer's favorite qualifier—"including but not limited to." *See id.* ¶¶ 200–01.

The shotgun nature of the SAC is also improper because, like the First Amended Complaint before it, the SAC hinders the parties' ability to cabin relevant discovery and renders the case unmanageable.[12] The State and the OFR's claims are based on generalized statements of misconduct—unconnected to any specific consumers or accounts—all of which are then incorporated into eight different Counts. *See Johnson Enters.*, 162 F.3d at 1332–33. For instance, paragraph 200(a) pertains to "the use of incorrect data or incomplete or missing documentation to service borrowers' loans." But that alleged violation affects nearly the entirety of the pleading,

---

[12] Plaintiffs' discovery to date has borne this out with Plaintiffs serving over 170 document requests alone (many with multiple subparts) in an attempt to, among other things, identify any borrower impacted or "potentially impacted" by any of the vague allegations of the complaint.

for all time periods, because the SAC also pleads that "*[d]ue to* the Ocwen Defendants' failures related to borrowers' escrow accounts, *including but not limited to* disbursement of inaccurate escrow amounts, reinstatement amounts and payoff amounts, the Ocwen Defendants have communicated material information to borrowers that the Ocwen Defendants knew or should have known was inaccurate." SAC ¶ 115 (emphasis added). Accordingly, were that claim to survive (and it should not), it would be impossible to decouple its scope from any more targeted issues in the case. The SAC should either be dismissed in its entirety under Rule 12(b)(6), or a more definite statement ordered pursuant to Rule 12(e). *See Paylor*, 748 F.3d at 1126–27.

> **B.**     **The SAC Relies on Improper Group Pleading.**

The SAC also must be dismissed because it lumps the three defendants together without specifying which defendants actually engaged in the specific conduct at issue in each claim for relief. The three defendants are distinct when the State identifies them, as alleged: Ocwen Loan Servicing, LLC ("OLS") is engaged in servicing loans and collects on borrowers' debts (SAC ¶ 14); Ocwen Mortgage Servicing, Inc. ("OMS") contracts for certain products and services and "is licensed . . . to service loans" (*id.* ¶¶ 13, 18); and Ocwen Financial Corporation ("OFC") allegedly controls OLS and OMS but is not itself a servicer (*see id.* ¶¶ 15–17).

But the SAC defines all three defendants collectively as "Ocwen"[13] or the "Ocwen Defendants" and refers only to the combined defendants for the entirety of the 146 "factual allegations" and the first six claims for relief. SAC p. 1; *passim*. The SAC does not specify, for example, which of the three defendants actually communicated with borrowers, actually processed payments, or actually did or failed to do any of the things that are alleged to have occurred. This failure to differentiate between the defendants is impermissible group pleading, and requires dismissal. *U.S. Bank Nat'l Ass'n v. Capparelli*, 2014 WL 2807648, at *3 (S.D. Fla. June 20, 2014) (Marra, J.) (dismissing complaint because, "[b]y comingling the factual allegations against all defendants," plaintiff improperly "placed the onus on [the defendants] to discern which, if any, of the allegations are brought against them").[14]

---

[13] Throughout this brief, defendants also refer to all three entities collectively as "Ocwen" to avoid confusion given that the SAC uses "Ocwen" to refer to all three entities. As OFC, OLS and OMS argue, however, even if the SAC allegations are true, only OLS could be liable because it is the only entity servicing loans in Florida.

[14] Plaintiffs may not retreat to the "common enterprise" doctrine based on "naked and baseless assertions" of such an enterprise. SAC ¶ 25; *Capparelli*, 2014 WL 2807648, at *3.

## C.      Many of the SAC's Claims Are Vague and Conclusory.

In the SAC, the State and the OFR have made a deliberate choice to deny Ocwen and this Court sufficient information on specific alleged violations of the statutes or regulations. This may be because, at least in some instances, the State and the OFR have not actually identified specific violations—despite the ongoing NMS monitoring and the agencies' ability to supervise Ocwen and review loan files if desired—but the ultimate reason is irrelevant. To the extent a complaint merely recites the requirements of a statute without providing any factual examples of when the defendant violated said statute, it fails to state a plausible claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1379 (S.D. Fla. 2015). This defect continuously repeats throughout the SAC. And the problem is exacerbated by the conclusory nature of the claims, which resorts to the deliberately imprecise allegations that violations occurred in "numerous" or "many" instances. *See, e.g.*, SAC ¶¶ 102 ("numerous instances"), 111 ("many instances"), 114 ("some instances"), 131 ("some instances"), 136 ("some instances"), 191 (newly added Count IV, "numerous instances").

The SAC also resorts to summarily parroting statutory language or claim elements (verbatim) without providing any meaningful additional detail. For example, the entirety of the ten paragraphs that make up Count I reduce to: one paragraph incorporating all factual allegations by reference (*id.* ¶ 145), eight paragraphs (and nine sub-paragraphs) of legal recitation (*id.* ¶¶ 148–52, 154–56(a)–(i)), and one conclusory allegation that "[i]n the course of servicing Federally Related Mortgage Loans since February 27, 2014, the Ocwen Defendants have failed to make timely disbursements from borrowers' escrow accounts for items such as hazard insurance premiums" (*id.* ¶ 153). The SAC adopts a similar content-free approach to the remaining claims for relief, including the SAC's only new claim in Count IV. *See, e.g.*, *id.* ¶¶ 157–67 (Count II alleging violations of RESPA and Regulation X, 12 C.F.R. § 1024.17, by reciting statutory text and pleading only conclusory factual statements); *id.* ¶¶ 181–84 (Count III, alleging violations of RESPA and Regulation X, 12 C.F.R. § 1024.41, by reciting statutory text and pleading only conclusory factual statements); *id.* ¶¶ 189–93 (Count IV, alleging violations of Homeowners Protection Act (HPA), 12 U.S.C. § 4902(b),[15] by merely copying the statutory language with no factual details other than baldly asserting violations "[i]n numerous

---

[15] The SAC incorrectly cites the HPA's automatic PMI-termination provision as "12 U.S.C. § 4901(b)," which does not exist. SAC ¶ 192. The relevant provision is 12 U.S.C. § 4902(b).

instances"). There is no justification for such a conclusory pleading, certainly not in light of the State's involvement with the NMS and receipt of regular monitoring reports, and the OFR's recent examinations of Ocwen and its own monitoring of Ocwen's servicing practices.

## III.    THE STATE AND THE OFR'S RESPA CLAIMS (COUNTS I, II, AND III) ALSO FAIL ON OTHER GROUNDS.

The SAC advances three RESPA claims against Ocwen, all of which are largely duplicative of the CFPB Action, and equally insufficient as a matter of law. Count I (brought by both the State and the OFR) alleges only that Ocwen failed to make timely disbursements from borrowers' escrow accounts. SAC ¶¶ 147–56; *see* CFPB Compl. ¶¶ 283–85 (Count X). Count II (brought only by the State) challenges other escrow-related conduct, including alleged failures to conduct annual escrow analyses and provide escrow statements, as well as alleged collections of escrow shortages that did not exist and failures to refund escrow surpluses. SAC ¶¶ 157–68; *see* CFPB Compl. ¶¶ 286–88 (Count X). Count III (also brought only by the State) advances dual-tracking loan servicing claims based on alleged violations of the processes and correspondence requirements concerning loss mitigation applications. SAC ¶¶ 169–88; CFPB Compl. ¶¶ 235–38 (Count III), 239–43 (Count IV), and 297–308 (Count XIII). All three RESPA Counts fail as to OFC and OMS because the SAC does not allege facts establishing that OFC and OMS are "servicers" subject to RESPA. Counts I and II also are deficient because Florida and the OFR (or both) rely on vague and conclusory allegations, rather than specific facts, regarding the alleged escrow violations. Count III fails because Florida's dual-tracking allegations are overbroad. The Court should dismiss all three Counts for the following reasons.

### A.    OFC and OMS Must Be Dismissed from All RESPA Counts Because the SAC Fails to Plausibly Allege that OFC and OMS Are "Servicers."

The State and the OFR have sued Ocwen under Section 6 of RESPA, which governs the servicing of mortgage loans. *See* 12 U.S.C. §§ 2605, 2605(i)(3). Under RESPA:

> The term "servicing" means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan.

*Id.* § 2605(i)(3).[16] Courts have thus consistently held that entities not engaged in the servicing of

---

[16] Regulation X also defines "servicing," *see* 12 C.F.R. § 1024.2, and differs from the statutory definition only in that it makes clear a servicer might make scheduled periodic payments

mortgage loans—including parents or subsidiaries to servicers—cannot violate RESPA. *See McCarley v. KPMG Int'l*, 293 F. App'x 719, 722 (11th Cir. 2008) (unpublished opinion) (plaintiff "offered no authority—and we have found none—assigning liability to parent or subsidiary companies under RESPA"); *Bernstein v. Wells Fargo Bank, N.A.*, 2016 WL 4546653, at *4 n.3 (N.D. Ga. May 13, 2016); *Reese v. JPMorgan Chase & Co.*, 2009 WL 10702443, at *4 (S.D. Fla. July 15, 2009) (dismissing RESPA claim against subsidiary under *McCarley*). Here, Plaintiffs fail to plausibly allege that OFC or OMS are engaged in the "servicing" conduct that is the subject of this suit. The SAC alleges that OFC acts "through its subsidiaries," and "directs, operates, and participates in mortgage servicing activities" by "enter[ing] into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt." *See* SAC ¶¶ 15, 17. This allegation is not enough to establish that OFC itself is a loan servicer, however, because it is nothing more than a dressed-up allegation that OFC is the parent company of a servicer. Further, RESPA is clear that servicing involves receiving borrower payments, and nothing in the allegations regarding OFC establishes that it receives borrower payments.

The SAC also alleges that OMS contracts for products and services "that are necessary for Ocwen to service mortgage loans and collect debt" and "is licensed by numerous state regulators to service loans." *See id.* ¶ 18. These allegations (in addition to failing to allege either that OMS is licensed by Florida to service loans, or that OMS actually services a single Florida loan—both facts well within Florida and the OFR's knowledge) also are insufficient to allow OMS to be sued under RESPA. Even if those allegations are true, RESPA does not define servicing by reference to which state licenses an entity holds, or by whether the company contracts for products and services incident to servicing activity conducted by a true servicer. The SAC nowhere alleges—let alone provides facts to support—that OMS receives payments from Florida borrowers (or engages in other servicing conduct on Florida loans), and is deficient without that allegation. *See* 12 U.S.C. § 2605(i)(3). For these reasons, the Court should dismiss OFC and OMS from Counts I, II, and III. *See Bernstein*, 2016 WL 4546653, at *4 n.3; *Bennett v. Nationstar Mortg., LLC*, 2015 WL 5294321, at *11 (S.D. Ala. Sept. 8, 2015).

---

pursuant to the terms of the loan either to the owner of the loan, to third parties, or, in the case of home equity conversion mortgages or reverse mortgages, directly to the borrower. The regulatory definition does not alter what constitutes fundamental servicing activity—making and receiving payments due under a loan agreement—in any way. Using either definition, the SAC contains no factual allegations establishing that OFC and OMS are loan servicers.

**B.      The SAC's Escrow Claims Under RESPA Are Deficient Because It Supplies No Factual Basis for its Allegations Concerning Escrow Accounts in Count I and Disregards the Law Applicable to Count I and Portions of Count II.**

The SAC asserts in Counts I and II (and Count VII, which is addressed separately) that Ocwen violated RESPA and its implementing regulations ("Regulation X") by failing to properly administer escrow accounts. The Court should dismiss both Counts. Count I parrots the statutory elements rather than offering facts supporting the alleged escrow misconduct. Count I and parts of Count II also fail because the regulations at issue apply only to current loans.

Count I—brought by both the State and the OFR—pertains solely to the timely disbursement of hazard insurance premiums from escrow accounts. SAC ¶ 153. It is duplicative of the CFPB's claim for the same conduct, and is even premised on the identical legal theory under RESPA. *Compare* SAC ¶¶ 148–54 *with* CFPB Compl. ¶¶ 283–85. The State and the OFR make no attempt to add anything to what the CFPB alleges. For this Count, the SAC pleads in the most conclusory terms that "[i]n the course of servicing Federally Related Mortgage Loans since February 27, 2014, the Ocwen Defendants have failed to make timely disbursements from borrowers' escrow accounts . . . ." SAC ¶ 153. To support this allegation, beginning at paragraph 119, the SAC makes a series of conclusory statements with no factual support (*e.g.*, "The Ocwen Defendants have failed to properly disburse escrow funds . . . ." (SAC ¶ 119) or "[T]he Ocwen Defendants imposed force-placed insurance on borrowers . . . ." (SAC 121)) with no factual enhancement at all. The only facts specifically alleged in this section of the SAC are in paragraph 122, where Florida and the OFR alleged Ocwen transitioned vendors in 2014, and in paragraph 125, which claims "10,000 borrowers . . . over 1,250 of whom were Floridians" have been "affected" by Ocwen's alleged "mishandling of . . . hazard insurance." But the vendor switch does not support the escrow disbursement claim, and it is not sufficient to make a blanket assertion of RESPA misconduct without facts tending to establish that any misconduct occurred. Nor is the insufficiency cured by including the number of borrowers allegedly harmed. *See Miranda v. Ocwen Loan Servicing, LLC*, 148 F. Supp. 3d 1349, 1355–56 (S.D. Fla. 2015) (dismissing RESPA claim because the "blanket assertion that Defendant violated RESPA regulations as to four other loans, without any further facts to support that claim, is too conclusory and vague"); *Rodriguez v. Seterus, Inc.*, 2015 WL 5677182, at *3 (S.D. Fla. Sept. 28, 2015); *see also Librizzi*, 120 F. Supp. 3d at 1379.

The failure to plead with specificity is highly suspect given the OFR's ongoing

18

regulations of OLS, the NMS, and the State's wide legal reach. Despite allegedly receiving "over 1,000" borrower complaints related to Ocwen's loan servicing activity (SAC ¶ 81), the SAC could not offer a single instance where a borrower's hazard premiums went unpaid. Worse, the SAC affirmatively alleges that OFR conducted an examination of "Ocwen's handling of borrower escrow accounts and failure to make insurance payments from escrow accounts" in 2015, but conspicuously does not allege that the examination resulted in any actual RESPA violations related to escrow account disbursements. *Id.* ¶ 57. Instead, the SAC is careful to note that the examination also covered "other things" and then, while the SAC claims the examination caused OFR to cite Ocwen for some underlying RESPA violation, *see* SAC ¶ 58, the SAC goes out of its way not to state that it observed escrow account disbursement violations specifically. Indeed, the lack of pleading here is worse than in *Miranda*, where at least the complainant identified four specific loans that might evidence the RESPA violation alleged. *Miranda*, 148 F. Supp. 3d at 1352, 1356. For these reasons, the Court should dismiss Count I.

Count I and portions of Count II suffer from another defect. All of the regulatory violations the State and the OFR allege in Count I, and the majority of the violations in Count II, should be dismissed because the regulations at issue apply *only* if the borrower's payment is current (*i.e.*, not more than 30 days overdue). 12 C.F.R. § 1024.17(k)(2) (requiring the servicer to make timely disbursements only "as long as the borrower's payment is not more than 30 days overdue"); *id*. § 1024.34(a) (incorporating the requirements of § 1024.17(k)(2)); *id.* § 1024.17(f)(2)(ii) (permitting the servicer to "retain the surplus" if "the servicer does not receive the borrower's payment within 30 days of the payment due date"); *id*. § 1024.17(f)(4)(iii) ("provisions regarding deficiencies" only apply "if the borrower is current"); *id.*§ 1024.17(i)(2) ("the servicer is exempt from the requirements of submitting an annual escrow account statement" if "the borrower is more than 30 days overdue"). The State and the OFR do not allege that the escrow violations occurred on current accounts, rather than delinquent ones, and so on its face the SAC fails to allege any misconduct falling outside the scope of the exception for delinquent accounts. This is not an immaterial failure to plead around an exception, for the SAC alleges that Ocwen "specializes" in "default servicing" where Ocwen's "portfolio . . . consists of many loans" in default or at risk of default. *See* SAC ¶ 38. As a result, the Court should dismiss Count I and those portions of Count II that are applicable only to delinquent accounts, because the SAC fails to plead an actual violation of RESPA.

### C.   The Dual-Tracking Claim (Count III) Is Factually and Legally Overbroad.

With allegations that mirror Counts III (CFPB Compl. ¶¶ 235–38), IV (*id.* ¶¶ 239–43), and Count XIII (*id.* ¶¶ 297–308) of the CFPB Action, the State alleges that Ocwen engaged in improper dual-tracking loan servicing, *i.e.*, that Ocwen allegedly started, and in some instances completed, foreclosures while working with the same borrower on a loan modification. SAC ¶¶ 181–85. The SAC alleges that Ocwen's conduct violated RESPA and Regulation X, which is the CFPB's comprehensive, seven-page set of rules that dictates how modification applications should be handled and processed, decided, implemented, and appealed and the defined circumstances under which foreclosures must be avoided or put on hold in light of applications or modifications. *Id.* (citing 12 C.F.R. § 1024.41 ("Section 1024.41")).

But again, the State fails to plead even a single instance of actual borrower harm, relying instead on the general statement in paragraph 105 that some aspect of the various dual-track violations alleged caused unspecified borrowers to suffer "significant harm" and offering as examples "the loss of their homes, financial losses, and emotional distress." The State's failure to plead any examples is both troubling and unexplainable. The State has broad authority to seek "return of real property," bring an action for "payment of damages," or obtain "refunds of moneys" on behalf of Florida citizens, and the SAC alleges that the State received thousands of consumer complaints about Ocwen. SAC ¶ 81. But, when given the opportunity to plead even one example of an actual Florida borrower who reached out to Plaintiffs and who is entitled to the broad relief sought, the SAC offers nothing. Instead, the State and the OFR opted to create a misimpression of widespread misconduct, broadly alleging "numerous instances" in which Ocwen allegedly committed dual-tracking violations causing "significant harm." *Id.* ¶¶ 102, 105. Florida's deliberate imprecision is insufficient. *See, e.g.*, *Librizzi*, 120 F. Supp. at 1378–79 (dismissing RESPA claim where plaintiff alleged a generalized "list of . . . errors" but no specific factual allegations). This generalized pleading underscores the State's failure to provide any "factual matter" that would "nudge[ its] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Miranda*, 148 F. Supp. 3d at 1355–56.

Apart from the absence of factual detail, Count III fails to state a claim because it is overbroad—it asserts a violation of Section 1024.41 in situations where that regulation plainly does not apply. The operative dual-tracking regulation, Section 1024.41, provides that dual-tracking protections are limited to only the *first* "complete loss mitigation application for a

20

borrower's mortgage loan account." 12 C.F.R. § 1024.41(i).[17] Numerous courts have dismissed Section 1024.41 claims for relief from alleged dual-tracking problems when the consumers challenged something other than the servicer's actions with respect to the first completed application on the account. *See, e.g.*, *Wentzell v. JPMorgan Chase Bank, N.A.*, 627 F. App'x 314, 318 n.4 (5th Cir. 2015) (unpublished opinion); *Barron v. EverBank*, 2017 WL 8186582, at *7–8 (N.D. Ga. Dec. 6, 2017). But despite this limitation, Florida alleges Ocwen violated Section 1024.41(g) by moving for or completing foreclosure in any instance a borrower timely submitted a pending application. SAC ¶ 185. This does not state a claim because the cited limitations apply only to the first completed loss mitigation application. *See Barron*, 2017 WL 8186582, at *7–8.

The State's dual-tracking claim in Count III suffers from another similar defect, in that the SAC alleges that Ocwen violated Section 1024.41 by moving for or conducting foreclosure sales on borrowers who submitted a complete application "more than thirty-seven (37) days before a foreclosure sale." SAC ¶ 185. But under the regulation, the date of the ultimate foreclosure sale is irrelevant, as CFPB guidance and case law make clear. The protections of Section 1024.41 apply only to the much smaller subset of borrowers who completed an application when at least 37 days were left before the sale was at that point scheduled. *See Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1010 (11th Cir. 2016); Amendments to the 2013 Mortgage Rules, 78 Fed. Reg. 60,382, 60,396–97 (Oct. 1, 2013). The difference matters greatly, since sales are often postponed—including as a result of Section 1024.41. So, accepting the State's allegations as true, there were no violations, as a loss mitigation application received more than 37 days before the ultimate foreclosure sale may not be entitled to protection. *See Lage*, 839 F.3d at 1010. The Court should therefore dismiss the wrongful foreclosure claim in Count III for all the same reasons that it should dismiss Count XIII of the CFPB Action.

## IV.   FLORIDA'S STATE LAW CLAIMS (COUNTS V THROUGH VIII) SHOULD BE DISMISSED FOR A VARIETY OF REASONS.

Attempting to add in some way to the CFPB Action, Plaintiffs bring four state law claims: two FDUTPA claims (Counts V and VI) that are based on the same underlying conduct

---

[17] Regulation X was amended effective October 2017 to likewise apply only to the *first* complete loss mitigation application unless the borrower also became current in the period following their first application. 12 C.F.R. § 1024.41(i). Regardless, for the time period at issue in the SAC, Ocwen was only required to comply with Regulation X's obligations under the previous version of 12 C.F.R. § 1024.41(i) to assess a borrower for a single complete loss mitigation application. *Urdaneta v. Wells Fargo Bank N.A.*, 2018 WL 2234538, at *4 (11th Cir. May 16, 2018).

alleged in the CFPB Action, and two other Florida statutory claims, one (Count VII) premised on the same escrow violations alleged in the CFPB Action and in Count I of this lawsuit, and one (Count VIII) related to an alleged failure to timely file financial statements. None of these claims add any substance to those in the CFPB Action, and each should be dismissed.

> **A.  The State Fails to State a Claim Under FDUTPA Because Loan Servicing Is Not Trade or Commerce, the State Failed to Properly Plead Unfairness, and the State Cannot Recover Certain of the Damages it Seeks.**

Counts V and VI are laundry lists of alleged unfair practices and alleged misrepresentations or omissions, each broadly stated, none supported by facts. Count V claims the Ocwen defendants' loan servicing system, REALServicing, "contains inaccurate information about borrower payments and amounts due" and relies on "inaccurate or missing" data (SAC ¶ 202),which allegedly caused numerous servicing violations and resulted in borrower deception. The State fails to specify how, or even offer a single example of, a borrower was misled or deceived, despite the State having monitored Ocwen's servicing activities over the course of three years. Both counts seemingly suggest that wholesale parts of Ocwen's servicing operation violate FDUTPA. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). To bring an FDUTPA claim, Florida must first meet the statutory trade or commerce requirement, and then must allege: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1338 n.25 (11th Cir. 2012). But a "formulaic recitation of the elements of [the] cause of action" is insufficient to plead such an FDUTPA violation. *Grosharev v. Wilson's Ltd., Inc.*, 2010 WL 2136434, at *3 (M.D. Fla. May 27, 2010) (dismissing FDUTPA claim as insufficiently pled). Further, to plead an FDUTPA violation, a plaintiff must allege "specific details" about the purported violation to "provide fair notice" of the "factual basis" for the claim. *See Guerrero v. Target Corp.*, 889 F. Supp. 2d 1348, 1355 (S.D. Fla. 2012).[18]

---

[18] Ocwen acknowledges that this Court has recognized a split of authority in this District and has declined to extend Rule 9(b) to FDUTPA claims. *Capparelli*, 2014 WL 2807648, at *5 (Marra, J.). Thus, while it certainly would be appropriate to apply heightened pleading standards to the SAC's deception-based claims, Ocwen focuses above on Rule 8 pleading deficiencies, while preserving its Rule 9(b) argument here. *See Perret v. Wyndham Vacation Resorts*, 846 F. Supp. 2d 1327, 1332–33 & n.7 (S.D. Fla. 2012) (applying 9(b)). Pursuant to Rule 9(b), a complaint alleging fraud must "state with particularity the circumstances constituting fraud or mistake," including what statements were made, the time and place of the statement, the person who made

As set forth herein, Counts V and VI fail to meet threshold requirements: the servicing conduct at issue does not qualify as "trade or commerce" covered by FDUTPA and the State either does not plead actual damages which is a necessary element of its claim for consumer relief, or seeks damages or restitution on behalf of borrowers who already obtained such relief. Further, in certain respects, the two Counts fail to allege unfairness as to certain alleged conduct.

**1.     None of the Alleged Loan Servicing Conduct Is "Trade or Commerce" Governed by FDUTPA.**

The Court should dismiss both of the State's FDUTPA claims because loan servicing is not an act or practice in trade or commerce, so FDUTPA does not apply. FDUTPA proscribes only certain "acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "Trade or commerce" is limited to "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value . . . ." *Id.* § 501.203(8). Because of this limitation, FDUTPA does not apply to every act or omission, and if the test is not met, the court must dismiss the claim. *See, e.g.*, *Williams v. Nationwide Credit, Inc.*, 890 F. Supp. 2d 1319, 1322 (S.D. Fla. 2012) (debt collector's actions were not "trade or commerce").

The "trade or commerce" threshold is not met by the conduct at issue in this lawsuit. A loan servicer such as Ocwen does not solicit, provide, offer, or distribute any product or service to the public; its role instead is to service borrower loans and it provides that service to the owners of said loans, not the public. That Ocwen may be in contact with members of the public in the course of servicing loans is not enough to implicate the statute. Nor does the State allege any facts that would show even a *prima facie* case that the law applies to Ocwen. In both Counts V and VI, the State merely parrots the statute's definition of the term and asserts that "the Ocwen Defendants provided services" as used in the definition. SAC ¶¶ 196–98, 208–10.

Indeed, courts in this District have held that a loan servicer's actions in servicing a mortgage loan do not constitute "trade or commerce" under FDUTPA. *See, e.g.*, *Benjamin v. CitiMortgage, Inc.*, 2013 WL 1891284, at *5 (S.D. Fla. May 6, 2013); *Nardolilli v. Bank of Am.*

---

them, the content of the statements, how they misled plaintiff, and what benefit the defendant obtained. *Findwhat Investor Grp. v. Findwhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). The SAC's deception-based FDUTPA claims fail to meet this standard due to the deficiencies noted above in Sections II and IV.A.1. The sprawling and imprecise nature of the claims in the SAC amply demonstrates why precision in pleading deception under FDUTPA should be required.

*Corp.*, 2013 WL 12154541, at *4 (S.D. Fla. Dec. 6, 2013) (dismissing FDUTPA claim because "Courts have held that the servicing of a mortgage do not fall within the purview of 'trade or commerce.'") (collecting cases). Loan servicing is conduct incident to the previous origination of a mortgage loan, and during the post-sale servicing phase of a loan, the servicer generally does not offer products or services, for sale or trade, to borrowers. *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 413–14 (4th Cir. 2015) (excluding "the transactions and circumstances surrounding a loan's origination" from the definition of servicer because loan origination "*precede[s]* the servicer's role in receiving the borrower's payments and making payments to the borrower's creditors." (emphasis in original)); *see* 12 U.S.C. § 2605(i)(3) (defining servicing). Servicer responsibilities fall outside the trade or commerce definition under FDUTPA. *Blake v. Seterus, Inc.*, 2017 WL 543223, at *2 (S.D. Fla. Feb. 9, 2017) (dismissing FDUTPA claim because "Defendant loan servicer was not engaged in any advertisement or solicitation when it responded to Plaintiff's request for the reinstatement amount"); *Casey v. Bank of Am., N.A.*, 2013 WL 12126306, at *4 (S.D. Fla. Nov. 7, 2013) ("notices and initiating foreclosure proceedings does not fall within that definition of trade or commerce"); *see also Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A. Inc.*, 2005 WL 975773, at *9 (S.D. Fla. Mar. 4, 2005) (report and recommendation adopted dismissing FDUTPA claim where plaintiff "fail[ed] to allege that the lending relationship . . . constituted 'trade or commerce' or the 'conduct of any trade or commerce' under Fla. Stat. § 501.203(8)"). Mortgage servicing includes the receipt and processing of payments, "informing [borrowers] of [their mortgage] default[s]," arranging "[borrowers'] foreclosure solutions," and taking "loan modification application[s] into consideration." *See, e.g.*, *Clark v. HSBC Bank USA, Nat'l Ass'n*, 664 F. App'x 810, 813 (11th Cir. 2016) (unpublished opinion).

Additionally, in contexts analogous to mortgage loan servicing, courts have routinely held certain individual loan or debt servicing activities fall outside the definition of "trade or commerce," including activities of the type Florida complains of here. For instance, the collection of data from and communication with borrowers to collect debts is not "trade or commerce" under FDUTPA. *See, e.g.*, *Williams*, 890 F. Supp. 2d at 1322 (debt collection was not trade or commerce because "[n]o goods or services were offered to [Plaintiff]" and when Nationwide called plaintiff to inquire about active debt it "only elicited information from Plaintiff"); *accord Cornette v. I.C. Sys., Inc.*, 280 F. Supp. 3d 1362, 1373–74 (S.D. Fla. 2017).

Likewise, a law firm allegedly using fabricated, false, or misleading documents "for utilization in foreclosure cases" was not engaged in trade or commerce within the statute's meaning because the conduct centered on the "processing of foreclosure cases." *State of Fla., Office of Att'y Gen. v. Shapiro & Fishman, LLP*, 59 So. 3d 353, 355–56 (Fla. 4th DCA 2011). Similarly, pursuing security rights and remedies, such as filing a lien, is not considered "trade or commerce." *Baker v. Baptist Hosp., Inc.*, 115 So. 3d 1123, 1125 (Fla. 1st DCA 2013).

The SAC's FDUTPA claims here are predicated on classic loan-servicing conduct— making escrow disbursements, honoring modifications of existing mortgage instruments, processing or applying periodic payments to borrower's accounts, corresponding with borrowers concerning payments and statements, and conducting inspections or obtaining home price information in the event of borrower default. *See* SAC ¶¶ 200(a)–(j), 201(a)–(k), 212–18. The alleged conduct falls within the ambit of loan servicing activity that is outside of the scope of the statute. *See, e.g.*, *Benjamin*, 2013 WL 1891284, at *4–5 ("[E]ven assuming the facts as pled establish that the defendant engaged in deceptive acts or unfair trade practices, the loan servicer's actions do not qualify as 'trade or commerce' under the Act."); *Trent v. Mortg. Elec. Registration Sys., Inc.*, 618 F. Supp. 2d 1356, 1365 n.12 (M.D. Fla. 2007) (pre-foreclosure suit communications by the note holder were not "trade or commerce" because they did not "advertise, solicit, provide, offer or distribute anything"), *aff'd*, 288 F. App'x 571 (11th Cir. 2008); *accord Acosta v. James A. Gustino, P.A.*, 2012 WL 4052245, at *1 (M.D. Fla. Sept. 13, 2012) ("[a]n attempt to collect a debt" is not "trade or commerce"). As this Court recently explained in dismissing with prejudice an FDUTPA claim against Ocwen in *Rodriguez v. Ocwen Fin. Corp.*:

> Consistent with . . . *Benjamin* and . . . *Trent*, the Court finds that even if Defendants denied Plaintiff's loan modification application without justification and even if Defendants' conduct in doing so constituted deceptive acts or unfair trade practices, their actions as loan servicers do not qualify as "trade or commerce" under FDUTPA. . . . As illustrated by the requirements promulgated in Regulation X, loss mitigation is part and parcel of loan servicing. . . . As with mortgage enforcement generally, a loan servicer's handling of a loss mitigation application—obligatory and reactive in nature—does not involve the loan servicer "advertising, soliciting, providing, offering, or distributing" anything to borrowers.

2017 WL 3593972, at *6 (S.D. Fla. Aug. 21, 2017).

To the extent the SAC predicates its FDUTPA claims on the imposition of lender-placed

insurance ("LPI") (SAC ¶ 200(c)), this Court's decision in *Martorella v. Deutsche Bank Nat'l Trust Co.*, 931 F. Supp. 2d 1218 (S.D. Fla. 2013); 161 F. Supp. 3d 1209 (S.D. Fla. 2015) (Marra, J.) should not bar dismissal. In *Martorella*, the Court found that "trade or commerce" encompasses lenders receiving "excessive premiums as commissions" related to LPI. 931 F. Supp. 2d at 1223–24. The facts in *Martorella* are distinguishable. Specifically, the plaintiff in *Martorella* alleged "a scheme" between a servicer not engaged in trade or commerce and its insurance vendors who were engaged in trade or commerce, to switch borrowers to LPI unnecessarily, to charge borrowers "exorbitantly high premiums" in return for "kickbacks" from their insurance vendors to "reap[] huge profits from insurance policies." *Id.* at 1221; *see also Bank of Am. v. Zaskey*, 2016 WL 2897410, at *11 (S.D. Fla. May 18, 2016) (denying motion to dismiss FDUTPA premised on LPI where plaintiffs "allege[d] that [the servicer] wrongfully demanded they purchase [LPI] [] to 'confuse and frustrate [their] efforts to resolve [servicing] errors'").[19] In contrast, the LPI allegations in the SAC raise no such claims, instead alleging ordinary servicing errors concerning escrow review and disbursement, which are attributed in the SAC to an allegedly deficient system of record, rather than any scheme to mark up prices. *See, e.g.*, SAC ¶¶ 119–26. Ocwen is *required* to place LPI so properties are insured for the benefit of the lienholder, not the borrower, and in fulfilling this obligation, has not stepped out of its role as a loan servicer and into the realm of trade or commerce. Indeed, the definition of "servicing" in Regulation X contemplates that servicers may make payments of that nature to third parties to comply with the terms of the lien, and the SAC does not allege that Ocwen did anything more.

The Court also should conclude that the SAC's FDUTPA claims based on Ocwen allegedly charging excessive fees for inspections or broker price opinions do not meet the trade or commerce standard. *Id.* ¶ 200(d)–(e). In the SAC, the "excess" inspection fees are pleaded as a derivative consequence of the SAC's claims concerning an allegedly deficient system of record. SAC ¶ 128. For that subset of alleged servicing conduct, *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302 (S.D. Fla. 2014), *aff'd*, 688 F. App'x 753 (11th Cir. 2017), also should not

---

[19] As this Court has explained, "it is *not the placement of the insurance* that constitutes the basis for the claim. Rather, it is the charging of *excessive and unreasonable amounts for LPI* that were unrelated to the provision of that insurance, while keeping a portion of those charges as commissions or other remuneration, that states a claim under the . . . FDUTPA." *Martorella v. Deutsche Bank Nat'l Tr. Co.*, 2015 WL 11347664, at *6 (S.D. Fla. Aug. 6, 2015) (Marra, J.) (first emphasis added).

prevent dismissal because again, there is no allegation that Ocwen entered the realm of trade and commerce specifically to sell or goods or services to any member of the public—instead, Ocwen's alleged failings were in conduct of its servicing function, and it is alleged to have charged improper fees due to servicing data-related failures, not some effort to manipulate the price of goods or services. *Compare*, *e.g.*, SAC ¶ 128 *with Alhassid*, 60 F. Supp. 3d at 1309, 1324 (plaintiffs alleged that servicers assessed fees for services never performed, as part of a scheme to "strip its borrowers of their homes").

In any event, *Martorella*'s application is limited solely to the SAC's LPI claims, which are subject to dismissal on additional grounds as set forth in Sections I and IV.A.3.b. Likewise, *Alhassid*'s application is limited solely to the SAC's inspection fee and BPO claims, which are subject to dismissal on additional grounds as set forth in Sections I and IV.A.3.b. Accordingly, even if the Court finds that Florida adequately pled the "trade or commerce" element as to the LPI and BPO claims, the Court should nonetheless dismiss the remainder of the FDUTPA violations.

### 2. The Court Should Limit the State's Damages Claim.

#### a. *The SAC Fails to Properly Allege Actual Damages in Support of Those FDUTPA Claims that Seek Remedies for Consumer Harm.*

Where the State seeks specific remedies for consumer redress (rather than civil penalties or injunctive relief) under FDUTPA, Fla. Stat. § 501.207(1)(c), the State also must allege actual damages, and it has not done so here.[20] *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013). To satisfy the actual damages element, the State must plead that the borrower actually paid some amount. *See, e.g.*, *Lydia Sec. Monitoring, Inc. v. Alarm One, Inc.*, 2007 WL 2446889, at *5 (S.D. Fla. Aug. 23, 2007) ("The only allegation regarding injury is the statement that the Defendant 'suffered damages.' This is insufficient.").[21] Where the State fails to specifically allege injury or harm, it cannot recover for consumers.[22] Here, the majority of the

---

[20] Although Plaintiffs conceded that they were "not seeking actual damages . . . in the Amended Complaint" in their opposition to Ocwen's motion to dismiss the FAC (Florida Action, DE 26 at 13), the SAC nevertheless does not disclaim actual damages and includes claims for "payment of damages." SAC ¶ 156(f).

[21] *See also Jones v. TT of Longwood Inc.*, 2007 WL 2298020, at *7 (M.D. Fla. Aug. 7, 2007) (no actual damages in an FDUTPA claim where Plaintiff's payment was returned in full because "[t]here can be no monetary recovery . . . where [he] has suffered no out-of-pocket losses").

[22] The actual damages element is not obviated for governmental litigants bringing an

FDUTPA claims do not even attempt to plead actual damages. The SAC's only allegations that pertain to payment of any allegedly improper amounts are the general assertions that Ocwen's actions "led to wrongful insurance premium charges," "excessive and expensive improper force-placed insurance policies," "premium increase[s]," and that borrowers "suffered financial harm," were "overcharged" and were assessed "late fees," "BPO fees," and "excessive property inspection fees." SAC ¶¶ 119–20, 124–25, 128, 133–34, 200, 220. But the SAC does not allege that any borrower actually *paid* a fee and makes no accounting for the SAC's own contrary allegations that Ocwen either did not collect fees or reinstated cheaper fees. *See id.* ¶ 114 (Ocwen "*attempt[ed]* to collect purported escrow shortages"); *id.* ¶ 124 (Ocwen was able "to reinstate or obtain insurance at the same or *cheaper* rate" for some borrowers) (emphases added).

As to the State's allegations that Ocwen "misrepresent[ed]" items such as payments, escrow amounts, and fees due (SAC ¶ 201(a)–(d)), provided inaccurate or incomplete periodic statements (*id.* ¶¶ 212–16), and misrepresented the crediting of payments (*id.* ¶¶ 216–22), the SAC fails to allege what the misrepresentations were, much less how such purported misrepresentations led reasonable customers to act "to [their] detriment," which is a requisite element of the claim. *Kelly v. Davis*, 2015 WL 12030513, at *4 (N.D. Fla. Jan. 14, 2015); *see* SAC ¶¶ 115, 130–34 (alleging inaccuracies in periodic statements but attributing no detrimental borrower action). As to the State's allegations concerning misrepresentations in foreclosure and loan modification communications (*id.* ¶ 201(h), (j), (k)), the SAC alleges no consumer detriment. The SAC alleges only that "missing information, such as the amount of borrower income or the value of the property, would be material information for a borrower deciding whether to appeal a loss mitigation denial." *Id.* ¶ 98. But this allegation does not allege an injury resulting from a violation because there is no claim that any borrower would have been successful either in obtaining a loan modification or prosecuting an appeal. Under FDUTPA, to allege substantial injury or detriment, the plaintiff must have "suffered a loss as a result of a

---

enforcement action. The statutory authority the State relies upon grants it power to bring suits only "on behalf of one or more consumers" when seeking "actual damages." Fla. Stat. § 501.207(1)(c). By contrast, the statutory authorization to pursue injunctive relief or civil penalties turns on whether an FDUTPA *violation* occurred. *Id.* §§ 501.207(1)(b), 501.2075. And courts have consistently held that "[a]ctual damages are an essential element of an FDUTPA claim" even as to governmental litigants like the State. *See, e.g.*, *Outreach Hous., LLC v. Office of the Attorney Gen., Dep't of Legal Affairs*, 221 So. 3d 691, 696 (Fla. Dist. Ct. App. 2017); *State v. Beach Blvd. Auto., Inc.*, 139 So. 3d 380, 393 (Fla. Dist. Ct. App. 2014).

violation." *Kelly*, 2015 WL 12030513, at *9. Accordingly, the SAC's conclusory allegation that consumers "suffered financial harm" is insufficient to plead actual damages as required by FDUTPA. *See Beach Blvd.*, 139 So. 3d at 393 (dismissing FDUTPA claim where the Attorney General failed to allege that the "sought-after damages" resulted from consumer costs).

> b. <u>*The State Cannot Recover Damages or Restitution on Behalf of Borrowers Who Already Obtained Such Relief.*</u>

Similarly, the State overreaches insofar as it purports to seek monetary damages on behalf of borrowers who have already obtained a remedy and released their LPI-based claims in a class action settlement in a separate litigation against Ocwen. *See Lee v. Ocwen Loan Servicing, LLC*, No. 14-60649 (S.D. Fla. 2014) (DE 111-1) (the "*Lee* Settlement") and (DE 185) (the "*Lee* Final Judgment")); *see also* SAC ¶¶ 120, 124, 200(b). The SAC claims that Ocwen violated FDUTPA by engaging in a series of unfair or deceptive acts, three of which involve LPI. Specifically, the SAC claims Ocwen (i) placed hazard insurance in excess amounts of coverage (SAC ¶ 200(b)), (ii) placed hazard insurance even in cases where the borrower had such insurance on his or her own (SAC ¶ 200(c)), and (iii) failed to make escrow disbursements for insurance (SAC ¶ 200(g)). The *Lee* action resulted in a settlement of LPI-related claims (including FDUTPA claims based on the accuracy of any communications regarding placement of LPI or the excessive LPI policies) for all U.S. borrowers from January 1, 2008 through January 23, 2015 who paid or owed payment for LPI. *See Lee* Settlement at § 10.1.

The released claims in the *Lee* Settlement included, *inter alia*, "all claims related to Ocwen's insurance requirements . . . including, but not limited to, the procuring, underwriting, placement, insurance tracking, or costs of LPI Policies; the coverage amount, duration, issue date, alleged 'backdating,' or alleged excessiveness of any LPI Policies placed or charged by Ocwen." *Id.* § 10.1.1. The release also covered claims concerning "the content, manner, or accuracy of any communications regarding the placement of any LPI Policies . . .; and to the regulatory approval or non-approval of any LPI Policy, or the premium thereon . . . ." *Id.*. The *Lee* Settlement captures all claims alleged in the SAC based on the placement of LPI through January 23, 2015. Thus, where the SAC seeks monetary payment to consumers concerning the placement of LPI, those claims must be limited by previous recoveries.

> **3.    The SAC Fails to Plead Unfairness as to Certain Alleged Conduct.**

Even if Ocwen's loan servicing conduct were considered "trade or commerce"—and it is not—or the SAC properly pled actual damages—and it does not—the State's conclusory

allegations remain insufficient to establish an "unfair practice" in violation of the statute. First, as to the claim in paragraph 200(a), Florida can point to no statute, regulation or case law that supports its claims that Ocwen's servicing system is unlawful because it is imperfect. Instead, again tagging along as the CFPB overreaches, Florida takes the unprecedented position that an imperfect servicing system is unfair under FDUTPA. But, there "is a limit to how far the FDUTPA can reach." *Hucke v. Kubra Data Transfer Ltd.*, 2015 WL 12085833, at *7 (S.D. Fla. Oct. 8, 2015), *report and recommendation adopted by Hucke v. Kubra Data Transfer Ltd.*, 160 F. Supp. 3d 1320, 1328 (S.D. Fla. 2015). The Court should draw the line here, because Florida has not.

Next, the Court should dismiss all of the alleged unfair practice claims because Florida did not and cannot allege that each one meets the FDUTPA definition of unfairness. As this Court has recognized, under FDUTPA, "[a]n unfair practice is 'one that offends established public policy' and is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009) (Marra, J.) (citation omitted).[23] Here, Florida fails to establish that any of Ocwen's alleged practices—all of which Ocwen forcefully denies—either offends established public policy or caused substantial injury to consumers, and so all unfair practices claims under the FDUTPA must be dismissed.

> a.    *The Alleged Servicing System and Data Inaccuracies on Which Count V Is Partially Based Do Not Amount to "Unfair" Practices.*

The primary theory of the State's unfairness claim is that it is an actionable "unfair business practice" for Ocwen to have used information to service mortgage loans that purportedly was sometimes inaccurate or incomplete. *See* SAC ¶ 200(a). But that theory is infirm because there is no basis for a claim resting on the assertion that a company's computer system contains some amount of "inaccurate" data or does not work perfectly. The Court should not create one under FDUTPA. The SAC asserts that, through some combination of input mistakes (*id.* ¶ 48), data with errors that were imported from prior servicers' records (*id.* ¶¶ 46, 48, 93),

---

[23] The standard in *Kertesz* is derived from a 1964 FTC policy statement, but the FTC updated its definition in 1980, and at least one Florida state court has adopted the current FTC standard. *See Porsche Cars N. Am., Inc. v. Diamond*, 140 So.3d 1090, 1097–98 (Fla. 3d DCA 2014). In any event, courts in this District appear to apply both standards, and the SAC fails to state a claim under either one. *See Martorella*, 2015 WL 11347664, at *5 (applying new standard); *Switala v. Rosenstiel*, 2017 WL 7792713, at *5 (S.D. Fla. Oct. 3, 2017) (applying former standard).

software malfunctions, and manual fixes that the State now deems inadequate (*id.* ¶¶ 3, 48, 93, 97), the REALServicing system of record used by Ocwen is not accurate to the State's liking (a claim that Ocwen denies). The SAC makes no allegations as to whether any of the alleged data inaccuracies caused injury, and, if any did, which ones. There also are no allegations of any standards of accuracy or completeness Ocwen was supposed to have met. The SAC simply asserts that it was "unfair" for Ocwen to use a system and data that were not perfect.

This is not a cognizable claim under FDUTPA. The State points to no criteria, whether requirement, rule, industry standard, or technological measurement, by which the functions, accuracy, and completeness of Ocwen's servicing system can or should be judged. The Court should not punish Ocwen for failing to meet a standard that does not exist. In the CFPB Action, Ocwen demonstrated the illogic in allowing the CFPB to bring an unfair business practices claim based on Ocwen's servicing system, and the same arguments apply here. CFPB Motion at 12–15. FDUTPA provides no basis for this Court to understand—much less apply—any standards for how accurate or complete a servicing system must be, how effective any manual servicing must be, which data is materially important and which is not, and other criteria to determine whether Ocwen's electronic systems were too off the mark to be fair to consumers. Under these circumstances, pronouncing that the system is "unfair" to consumers is not a legal claim. For related reasons, Count V and Count VI are not cognizable because Ocwen had no fair notice under the Due Process Clause as to how the technological and operational parameters of a loan servicing system or data inputs could violate the law. The Due Process Clause prohibits an agency from meting out punishment when the defendant had no way to know at the time it acted what acts were prohibited. *See Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1313 (S.D. Fla. 2006) (wage statute unconstitutionally vague where "[t]he Court is wholly at a loss as to how it would instruct any jury, let alone on what standards would apply here at the summary judgment stage, on what constitutes 'manual labor,' or what constitutes 'extra pay'"). Here, the infinitely malleable concept of "unfairness" provided no guidepost to Ocwen as to its requirements.

        b.    *The Remaining Alleged Unfair Practices in Count V and Three of the Alleged Unfair Acts in Count VI Are Deficient Because They Do Not Cause Substantial Harm or Offend Public Policy.*

All the allegations in Count V and three of those in Count VI must be dismissed because the State failed properly to plead either any borrower injury or immoral or unethical behavior that offends Florida public policy—a requirement for establishing unfairness under FDUTPA.

In particular, the State's backdating claim (SAC ¶ 200(f)) is completely bereft of any alleged cognizable injury to borrowers. It alleges only that "[a]s a result of the Ocwen Defendants' backdating of correspondence, borrowers who are already in default and under serious financial strain have had to contend with confusing and often inaccurate information regarding their loss mitigation options and rights." *Id.* ¶ 139. "But FDUTPA does not provide for the recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 873 (Fla. Dist. Ct. App. 2006).

Likewise the State's claims concerning the failure to release liens in a timely fashion (SAC ¶ 200(h)) also fails to allege any substantial injury. The State alleges only that "[b]ecause the Ocwen Defendants have failed to timely cancel mortgages and provide recorded satisfactions of mortgages to borrowers, in addition to violating state law, the Ocwen Defendants have directly caused borrower confusion, frustration, and financial harm." *Id.* ¶ 142. That allegation is impermissibly speculative and generalized to support a claim of unfairness under FDUTPA. *Rollins*, 951 So. 2d at 873; *Kertesz*, 635 F. Supp. 2d at 1348.

With regard to the State's unlicensed vendor claims (SAC ¶ 200(j)), the SAC fails to allege any substantial injury, or for that matter, anything at all. The SAC claims Ocwen's alleged use of an unlicensed lender is unfair under FDUTPA, but the most the SAC can say about this alleged practice is that "[u]pon information and belief, Ocwen continues to presently conduct unlicensed business from India." *Id.* ¶ 59. In addition to being speculative and too generalized to establish a claim of unfairness under FDUTPA, *see Rollins*, 951 So. 2d at 873; *Kertesz*, 635 F. Supp. 2d at 1348, this singular statement cannot support an FDUTPA claim because, even if true, the SAC does not allege whether or how borrowers are harmed by the alleged offshore operations, or whether or how offshore operations offend Florida public policy.

Florida also fails to allege that certain practices in Count VI are unfair. Specifically, Florida fails to plead: the alleged failure "to accurately detail on periodic statements the current amounts due by borrowers," (SAC ¶ 213); the failure "to explain how borrowers' future payments will be applied," (*id.* ¶ 214); and the failure "to account to borrowers all account activity since the prior periodic statement" (*id.* ¶ 215) harmed borrowers or otherwise was unfair. The only "harm" stemming from those practices articulated in the SAC is purported "borrower confusion," but the statement is solely speculation—the SAC does not allege even a single actual borrower was confused or otherwise harmed by an inaccuracy in the borrower's periodic

statement, and the SAC lacks any factual enhancement showing how a borrower is or was likely to be confused. Without that showing, Florida's unfairness claim fails. Moreover, even accepting as true the allegation that borrowers were "confus[ed]" by these three practices, losses stemming from such confusion are too speculative to be recovered under FDUTPA. *Rollins*, 951 So. 2d at 873.

Finally, the SAC cannot establish that the conduct listed in SAC Paragraphs 200(a) through (e), (g), or (i) is unfair because the SAC does not allege that any of these loan servicing errors exceeded the threshold rates set forth in the NMS, to which the State agreed. As a result, these allegations also fail to plead a practice that "'offends established public policy' and is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" *Kertesz*, 635 F. Supp. 2d at 1348 (citation omitted). Florida should not be permitted to allege that these practices offend public policy when Florida itself agreed to the Threshold Error Rates allowing for the realities of loan servicing. As discussed above, because perfection in servicing is not what Florida or federal law require, the NMS included certain Threshold Error Rates for many of the servicing practices at issue in the SAC, which Error Rates were applicable in the event the court-appointed monitor officially determined that a servicing violation had occurred. These Threshold Error Rates allow Ocwen a certain percentage of loans that could contain errors prior to incurring consequences under the NMS. NMS C.J., Ex. D at D-10–D-11. The NMS Consent Judgment allows a 5% error threshold for many servicing practices:

> incorrect modification denials (Metric 1.B, NMS C.J., Ex. D at D1-3); inaccurate and untimely payment applications (Metric 4.B, NMS C.J., Ex. D at D1-7); inappropriate fees (including property valuation, preservation, and late fees) (Metrics 4.A. and 4.D, *id.* at D1-7–D-8); Billing Statement Inaccuracy (Metric 33, *id.* at D1-21); improper administration of LPI (Metric 6.C.ii, *id.* at D1-16); improper processing of pending loan modification requests from prior servicer (Metric 6.D.i, *id.* at D1-17); and improper loan modification and denial notice process (Metrics 30 and 31, *id.* at D1-18–D1-19).

The SAC never alleges that Ocwen exceeded the Threshold Error Rates applicable to these practices, and if anything, the allegations in the SAC tend to support an inference that Ocwen did not exceed them. For instance, Florida alleges that Ocwen's portfolio was 2.6 million at its largest point (SAC ¶ 36), but the allegations in the SAC typically allege numbers which are far less than 5%: 1,250 borrowers suffered financial harm (*id.* ¶ 125); 1,000 complaints for "servicing practices" (*id.* ¶ 81); and 7,200 misleading escrow statements (*id.* ¶ 112). The error rates for these allegations would be well below 1%—outstanding percentages given the

allowable error rate of 5%. For this reason, the Court should dismiss the following allegations:

1. The use of incorrect, incomplete, or missing loan servicing data allegations (SAC ¶¶ 200(a)) and the loan statements allegations (*id.* ¶ 201(a)–(d), (f)–(g)) are subject to a billing statement inaccuracy Metric (33, NMS C.J., Ex. D at D1-21) with a 5% error threshold;

2. The imposition of LPI allegations (SAC ¶ 200(b)–(c), (g)) are subject to an improper administration of LPI Metric (¶ 6.C.ii, NMS C.J., Ex. D at D1-16) with a 5% error threshold;

3. The charging excessive property inspection, BPO fees, or default fees allegations (SAC ¶ 200(d)–(e), 184(e)) are subject to an inappropriate fees (including property valuation, preservation, and late fees) Metric (4.B.,4.D, NMS C.J., Ex. D at D1-7, D1-8) with a 5% error threshold;

4. The failure to honor existing trial loan modification agreement allegations (SAC ¶ 200(i)) are subject to an improper processing of pending loan modification requests from prior servicer Metric (6.D.i., NMS C.J., Ex. D at D1-17) with a 5% error threshold rate;

5. The misrepresenting foreclosure deadlines and statuses allegations (SAC ¶ 201(h)–(k)) are subject to an incorrect modification denials Metric (1.B., NMS C.J., Ex. D at D1-2) with a 5% error threshold and improper loan modification and denial notice process Metrics (30 and 31, NMS C.J., Ex. D at D1-18, D1-19) subject to a 5% error threshold; and

6. The misapplying payments allegations (SAC ¶¶ 216–18) are subject to an inaccurate and untimely payment applications Metric (4.A, NMS C.J., Ex. D at D1-7) subject to a 5% error threshold.

Florida cannot now argue that Ocwen's actions in a relatively few instances, even if true, somehow are morally objectionable and offend public policy when Florida itself expressly agreed to certain tolerances within which Ocwen remained.

### B. The Court Should Dismiss Counts VII and VIII Because the OFR Cannot Bring Suit for Monetary Penalties.

The SAC's final counts are brought solely by the OFR pursuant to Chapter 494 of the Florida Statutes asserting alleged failures to make timely payments from escrow accounts (SAC ¶ 227) and alleged violations of annual financial reporting obligations (*id.* ¶ 234). The OFR's Chapter 494 claims (Counts VII and VIII) should be dismissed because Chapter 494 does not authorize OFR to bring suit seeking monetary penalties. The OFR seeks monetary penalties for Ocwen's alleged violations of Chapter 494, but Chapter 494 authorizes the OFR to bring suit only for injunctive relief. Fla. Stat. § 494.0013. The OFR does not seek injunctive relief for the allegations in Counts VII and VIII. *See* SAC ¶¶ 228, 235. Instead, OFR purports to rely on Florida Statutes § 494.00255(2) for its demand for monetary penalties. Section 494.00255(2) provides that "[i]f the office finds a person in violation of any act specified in this section, it may enter an order imposing one or more of [certain enumerated] penalties[.]" Section 494.00255

does not authorize commencing a lawsuit in federal court seeking monetary penalties. Instead, it contemplates an administrative proceeding, and authorizes the OFR to issue an order for such penalties, which order Ocwen then would have a statutory right to challenge. "Administrative authorities are creatures of statute and have only such powers as the statute confers on them. Their powers must be exercised in accordance with the statute bestowing such powers, and they can act only in the mode prescribed by statute." *State ex rel. Greenberg v. Fla. State Bd. of Dentistry*, 297 So. 2d 628, 634 (Fla. Dist. Ct. App. 1974); *see also* Fla. Const. Art. I, § 18. Because Chapter 494 authorizes a lawsuit only for injunctive relief, and authorizes the OFR to seek monetary penalties in an administrative proceeding only, the OFR has exceeded its statutory authority in bringing Counts VII and VIII, and the Court should dismiss both Counts.

**V.    COUNTS I–III AND VII SHOULD BE DISMISSED INSOFAR AS THEY SEEK RECOVERY FOR ALLEGED VIOLATIONS BARRED BY APPLICABLE STATUTES OF LIMITATION.**

Plaintiffs' RESPA and Chapter 494 claims each are subject to a three-year statute of limitation, 12 U.S.C. § 5564(g)(1); 12 U.S.C. § 2614, and the State's claim under the HPA, newly added on July 11, 2018, is subject to a two-year statute of limitation. 12 U.S.C. § 4907(b). The original complaint was filed April 20, 2017, so Plaintiffs can recover for RESPA violations that occurred only on or after April 20, 2014. The State can recover for HPA violations that occurred only on or after July 11, 2016. But the SAC alleges that it is based on "misconduct occurring since February 27, 2014" (SAC ¶¶ 1, 191) and the SAC even references conduct and events well outside the three-year statute of limitations applicable to the RESPA and Chapter 494 claims. *See, e.g.*, *id.* ¶ 112 (RESPA escrow violation alleged to have occurred "between 2013 and 2015"). While the shotgun nature of the SAC makes it difficult to determine which dates Florida and the OFR intend to apply to which Counts, there are multiple instances where conduct arguably supporting the RESPA, Chapter 494, and HPA claims occurred well outside the allowable period. Thus, Counts I–III and VII must be dismissed insofar as they are predicated upon alleged conduct occurring prior to April 20, 2014, and Count IV must be dismissed insofar as it is predicated upon alleged conduct occurring prior to July 11, 2016.

CONCLUSION

WHEREFORE, Defendants respectfully request that the Court dismiss the SAC, and specifically dismiss Counts I, and III–VIII with prejudice.

**REQUEST FOR ORAL ARGUMENT**

Ocwen hereby requests oral argument lasting 45 minutes per side. Ocwen believes oral argument will aid the Court due to the *res judicata* issues concerning the NMS, and the far-reaching nature of the SAC and its eight Counts.

Dated:  July 25, 2018     Respectfully submitted,


        /s/ Bridget Ann Berry
        Bridget Ann Berry
        Andrew S. Wein
        **GREENBERG TRAURIG, P.A.**
        777 South Flagler Drive, Suite 300 East
        West Palm Beach, FL  33401
        Tel.: 561.650.7900
        berryb@gtlaw.com
        weina@gtlaw.com

        Thomas M. Hefferon (*pro hac vice*)
        Sabrina M. Rose-Smith (*pro hac vice*)
        **GOODWIN PROCTER LLP**
        901 New York Ave., NW
        Washington, DC 20001
        Tel.: 202.346.4000
        thefferon@goodwinlaw.com
        srosesmith@goodwinlaw.com

        Laura A. Stoll (*pro hac vice*)
        **GOODWIN PROCTER LLP**
        601 S. Figueroa Street
        Los Angeles, CA 90017
        Tel.:  213.426.2500
        lstoll@goodwinlaw.com

        Catalina E. Azuero (Fla. Bar No. 821411)
        **GOODWIN PROCTER LLP**
        100 Northern Avenue
        Boston, MA 02210
        Tel.:  617.570.1000
        cazuero@goodwinlaw.com

        *Attorneys for Defendants Ocwen Financial Corp.,*
        *Ocwen Mortgage Servicing, Inc., and Ocwen*
        *Loan Servicing, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing documents was served electronically through the CM/ECF system on July 25, 2018 on all counsel of record in this action.

/s/ Bridget Ann Berry
Bridget Ann Berry