IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE No. 9:17-cv-80496-KAM

OFFICE OF THE ATTORNEY GENERAL,
THE STATE OF FLORIDA,
Department of Legal Affairs,

and

OFFICE OF FINANCIAL REGULATION,
THE STATE OF FLORIDA,
Division of Consumer Finance,

     Plaintiffs,

     v.

OCWEN FINANCIAL CORPORATION,
a Florida corporation,
OCWEN MORTGAGE SERVICING, INC.,
a U.S. Virgin Islands corporation, and
OCWEN LOAN SERVICING, LLC,
a Delaware limited liability company,

     Defendants.
_____/

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Plaintiffs, the Office of the Attorney General, the State of Florida, Department of Legal Affairs (the "Attorney General"), and the Office of Financial Regulation, the State of Florida, Division of Consumer Finance ("OFR") (collectively, the "Plaintiffs"), by and through their undersigned attorneys, hereby file their Response to Ocwen Financial Corporation ("OFC"), Ocwen Mortgage Servicing, Inc. ("OMS") and Ocwen Loan Servicing, LLC's ("OLS") Motion to Dismiss Plaintiffs' Second Amended Complaint and Incorporated Memorandum of Law [ECF No. 96] ("Motion to Dismiss" or "Motion"), and in support thereof state as follows:

## INTRODUCTION

Defendants' Motion to Dismiss is a flawed attempt to side-step liability under state and federal law.  Defendants rely heavily on an inapplicable consent judgment that (i) is no longer in force, (ii) was limited in time to address conduct that occurred prior to the acts and practices that support this action, and (iii) in no way restricts Plaintiffs from bringing an action to hold Defendants accountable for violations of state and federal law.  In addition to its unavailing dependence on the inapplicable consent judgment, the Motion attempts to attack the sufficiency of Plaintiffs' pleading, attempts to shield corporate parents and affiliates that actively participated in the conduct alleged, and attempts to challenge the applicability of Florida law, including the Florida Deceptive and Unfair Trade Practices Act (Chapter 501, Part II, Florida Statutes) and Chapter 494, Florida Statutes.  However, Plaintiffs have sufficiently pled and supported each cause of action and entitlement to relief.  The Motion to Dismiss simply states no legally sufficient grounds for dismissal of any claim raised in the Second Amended Complaint ("SAC"), and the Motion should be denied altogether.  This action should proceed to hold Defendants accountable for their widespread servicing failures and related misconduct.

## ARGUMENT

I.      **The National Mortgage Settlement (NMS) Consent Judgment does not impact this case.**

Defendants make much ado about a prior consent judgment (discussed more fully below) despite such agreement having no bearing on Plaintiffs' authority to bring the claims asserted in the SAC.  These claims are not barred, and Defendants' assertion otherwise is completely contrary to the express language of the consent judgment.  Additionally, *res judicata* does not bar Plaintiffs from bringing the claims in the SAC because the claims are not identical to those that were subject to the consent judgment, which expressly covered claims for conduct that occurred on or before February 26, 2014.  Finally, Plaintiffs did not waive their right to enforce violations of state and

federal consumer protection laws. The Consent Judgment contains no language – and Defendants have failed to point to any language – which would compel the prosecution of future violations of state or federal consumer financial laws through the Consent Judgment's enforcement framework. The consent judgment simply has no effect on the claims brought through the SAC for alleged violations of state and federal laws occurring on or after February 27, 2014.

### A. Plaintiffs have not brought claims to enforce the Consent Judgment or brought released claims.

On December 19, 2013, forty-nine state attorneys general, including the Attorney General, and the CFPB filed an action against OFC and OLS, two Defendants here, for mortgage servicing misconduct.[1] On February 26, 2014, the United States District Court for the District of Columbia entered a Consent Judgment (the "Consent Judgment"), which ordered, among other things, OFC and OLS to pay certain monetary amounts and comply with various servicing standards. The Consent Judgment also developed an enforcement framework to assess whether OFC and OLS were complying with the mandated servicing standards set forth in the Consent Judgment.[2] Under this framework, an independent monitor tested various servicing metrics by, in most cases, compiling a "random selection of the greater of 100 loans and a statistically significant sample" and then reviewing whether OFC and OLS had satisfied the metrics within this population. *See* [ECF No. 25-1, p. 137].[3] Even if OFC and OLS failed to comply with a servicing standard for one or more loans in the sample, they would not violate the Consent Judgment unless: 1) OFC and OLS's failures were pervasive enough to exceed a threshold error rate which could be as high as 10% of the sample, and 2) OFC and OLS failed to cure the violations by implementing a "Corrective Action Plan" approved by the monitor during a defined cure period. *See* [ECF No. 25-1, p. 132]. The fact that the enforcement framework tolerated errors in as many as 10% of OFC

---

[1] *CFPB v. Ocwen Financial Corp., et. al.*, No. 13-cv-02025 (D.D.C. Dec. 19, 2013), ECF No. 1.

[2] Defendants mislead the Court regarding the purported "Overlapping NMS State Claims". [ECF No. 96, pp. 8-9]. Defendants are patently incorrect in their assertion that "at least four Counts of the [SAC] completely overlap with claims settled in the [Consent Judgment] . . . ." [ECF No. 96, p. 7]. For example, Defendants attempt to argue that a servicing standard requiring Defendants to "continue to advance payments for the homeowner's existing [insurance] policy" not only supplants state and federal law, but also was part of a "comprehensive settlement framework." [ECF No. 96, p. 8]. However, the monitor did not test whether Defendants properly disbursed payments to insurance providers. Simply put, this servicing standard, like all others that are not tested by the Monitor through Metric testing, is an injunctive term of an expired settlement.

[3] Unless otherwise specified page numbers for citations to the record correspond to the pagination assigned by the Court's CM/ECF system.

and OLS's loans illustrates that it was never intended to ensure compliance with all state and federal laws, but rather provided a mechanism to test whether OFC and OLS were making any progress implementing the servicing standards required by the Consent Judgment.

Now, all three Defendants, including OMS who was not even a party to the Consent Judgment, make the extraordinary argument that the mere existence of the enforcement framework set forth in the Consent Judgment precludes any claim based upon Defendants' wrongful conduct in the course of servicing loans.  Defendants ignore the obvious: the current action is not an enforcement action of the Consent Judgment.  Were Defendants correct, then the only way to hold them accountable would be to sue under the Consent Judgment itself; however, as Defendants are well aware, this is impossible.  The Consent Judgment sunsets by its own terms on February 26, 2017 and OFC and OLS have "no further obligations." *See* [ECF No. 25-1, p. 136].

Actions to enforce consent judgments seek to compel compliance with the judgment.  *See, e.g.*, *Thatcher v. Kohl's Dep't Stores, Inc.*, 397 F.3d 1370, 1373 (Fed. Cir. 2005) (only a party to the consent decree may "proceed with a contempt action to enforce the judgment under the terms of the consent judgment"); *Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300, 305, 308, 309 (2d Cir. 1996) (describing such an action as an "action to enforce the Consent Judgment"); *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 639-640 (1st Cir. 1989) (describing possible "action to enforce the consent judgment"); *see also, e.g., Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 271 F.3d 235, 238 (6th Cir. 2001) ("the continuing enforcement of a consent judgment is rightfully considered an extension of the original lawsuit"); *Solis v. Current Dev.* Corp., 557 F.3d 772, 775 (7th Cir. 2009) ("enforcement orders" with respect to consent decrees "are postjudgment orders").  Plaintiffs here do not seek to enforce the Consent Judgment.

By its own terms, the Consent Judgment is only applicable to: "an action to enforce the obligations of [Ocwen] and to seek remedies for an uncured Potential Violation for which [Ocwen's] time to cure has expired." [ECF No. 25-1, p. 135]. This is not an action seeking remedies for uncured "Potential Violations" as that term is defined in the Consent Judgment, but rather it is an action seeking relief for violations of state and federal consumer protection laws, many of which occurred, and are still occurring, after the Consent Judgment's sunset. There is simply nothing in the Consent Judgment which purports to bar the claims Plaintiffs have raised in this action.  Indeed, Paragraph 17 of the Consent Judgment states unequivocally, "[n]othing in this

Consent Judgment shall relieve Defendant of its obligation to comply with applicable state and federal law." [ECF No. 25-1, p. 13].

The main case cited by Defendants to support their claim that the Consent Judgment limits Plaintiffs' remedies actually supports Plaintiffs' contentions. *See United States ex rel. Schneider v. JPMorgan Chase Bank, Nat'l Ass'n*, 878 F.3d 309, 313 (D.C. Cir. 2017). There, "[t]he nub of [a]ppellant's suit, regarding the Settlement, is that the Monitor's decision that Chase had complied was incorrect because Chase falsely certified that it had complied." *Id.* Unlike in *Schneider*, this is not an action challenging any of the monitor's decisions, which would properly be brought as an action to enforce the Consent Judgment. The court in *Schneider* declined to rule on the bank's argument that the action was "nothing more than a collateral attack on the Monitor's determination" stating that such an issue "certainly is not presented by this case." *Id*. at 314. The court also agreed that the bank's argument that the plaintiff there was "obligated to exhaust his claims under the Settlement's dispute resolution procedures was misconceived." *Id*. Notably, the district court in *Schneider* also refused to dismiss the plaintiff's non-NMS Settlement related claims with prejudice, and the DC Circuit affirmed allowing plaintiff to replead and pursue separate violations of federal law which arose under the same facts. *Id.* at 315. Accordingly, Defendants' reliance on *Schneider* is misplaced.

Even if the Consent Judgment applied to the substance of Plaintiffs' claims – which it is not – it clearly does not cover acts and practices that occurred on or after February 27, 2014. The "State Release,", Exhibit F to the Consent Judgment, sets forth the terms of the release by the Attorney General (along with the other states). The State Release clearly provides that the state attorneys general only released claims "resulting from the Covered Conduct occurring on or before the effective date, except for claims and the other actions set forth in Section IV below."[4] [ECF No. 25-1, p. 164]. The effective date of the Consent Judgment is February 26, 2014. [ECF No. 25-1, p. 13]. By its express terms, the release in the Consent Judgment is limited to conduct that occurred on or before February 26, 2014. [ECF No. 25-1, p. 169]. All of the claims in the SAC clearly relate to conduct on or after February 27, 2014. *See* [ECF No. 88, ¶¶ 1, 153, 162-65, 181-85, 191, 200-01, and 212-18]. Plaintiff has not attempted to proceed under the Consent Judgment or to pursue the claims governed by that document. Defendants arguments are inapplicable.

---

[4] Section IV sets forth claims and actions that are specifically reserved and exempted from release.

**B.** *Res Judicata* **does not preclude Plaintiffs' claims.**

A party seeking to invoke *res judicata* must satisfy four factors: (1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action. *Davila v. Delta Airlines*, 326 F.3d 1183, 1187 (11th Cir. 2003); *In re Piper Aircraft*, 244 F.3d 1289, 1296 (11th Cir. 2001). *Res judicata* only bars claims that were in existence at the time the original complaint was filed, or claims actually asserted by supplemental pleadings. *See Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1357 (11th Cir. 1998) (citing *Manning v. City of Auburn*, 953 F.2d 1355, 1358 (11th Cir. 1992)). After the party proves the four requirements for *res judicata*, the court then determines whether the claim in the new suit could have been raised in the prior action, and if the answer is yes, then *res judicata* applies. *In re Piper Aircraft*, 244 F.3d at. 1296. In general, Defendants have the burden to prove the elements of *res judicata*. *Id*. Defendants have failed to meet this burden.

The claims in the instant action are not "identical" to those covered by the Consent Judgment, and Defendants' *res judicata* argument necessarily fails.[5] The claims brought in the SAC only involve violations occurring on or after February 27, 2014, and the claims covered by the Consent Judgment relate to Defendants' misconduct on or before February 26, 2014. The claims in the SAC could not have been raised in the prior action.[6] Also, many of the claims Plaintiffs brought are violations of Regulation X (Counts I, II III and VII), which was not in effect until January 10, 2014.

Defendants do not fully disclose the relevant holdings of many cases on which they rely, or the distinguishing facts. *See, e.g.*, *Gates v. Towery*, 456 F. Supp. 2d 953, 963-65 (N.D. Ill. 2006) (injunctive relief claim barred based on *res judicata* because of a prior consent decree's express limitation to equitable relief; court did not bar plaintiff's claim for damages); *In re Methyl Tertiary Butyl Prod. Liab. Litig.*, No. M21-88, 2015 WL 5051660, at *2-3 (S.D.N.Y Aug. 26, 2015)

---

[5] At this time, Plaintiffs do not address the other three requirements for *res judicata*, but Plaintiffs note that neither OFR nor Ocwen Mortgage Servicing, LLC, were parties to the Consent Judgment. OFR did bring an Administrative Proceeding, No. 3300-F-07/13, against OFC and OLS, and the parties entered into a Settlement Agreement and Consent Order which incorporated the terms of the Consent Judgment. Defendants have failed to meet their burden that this satisfies the requirement that both cases involve the same parties.

[6] The complaint filed in the prior action was filed on December 19, 2013.

(plaintiff barred from bringing a continuing nuisance action, which was expressly released). Defendants' reliance on *World's Finest Chocolate, Inc. v. World Candies, Inc.*, 409 F. Supp. 840, 844 (N.D. Ill. 1976), *aff'd,* 559 F.2d 1226 (7th Cir. 1977) is entirely misplaced, and the case in fact supports Plaintiffs' position.  In *World Candies*, the court rejected the defendant's argument that the consent judgment was void *ab initio* and concluded that "[t]he terms of the judgment or of the injunction cannot be attacked in a civil contempt proceeding as they are *res judicata*." *Id.*  Thus, *World Candies* illustrates how the doctrine of *res judicata* could properly bar a claim – that is, when the terms of the consent judgment are being attacked.  In contrast, Plaintiffs do not attack the Consent Judgment, but have alleged independent violations of state and federal law for conduct that occurred after the release date.

In another case cited by Defendants that supports Plaintiffs' argument, the court did not even reach the issue of *res judicata* and said in *dicta*: "it is nonetheless clear that a consent judgment entered without findings, although entitled to some *res judicata* effect, has no bearing upon acts between the same parties subsequent to that judgment, or upon acts outside the terms of the settlement." *Affiliated Hosp. Prod., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1188 (2d Cir. 1975).  The Consent Judgment at issue here is similarly devoid of factual findings.  Moreover, the SAC alleges facts that occurred after the effective date of the Consent Judgment and asserts claims that were not adjudicated by the Consent Judgment. Thus, there is clearly no basis to apply the doctrine of *res judicata*, even under the authority cited by Defendants.

### C.  Plaintiffs have not waived their claims.

To have waived enforcement of consumer protection state and federal laws, the Attorney General would have had to clearly express in the Consent Judgment its intent to waive enforcement, which it clearly did not do.  A consent judgment must be construed according to principles of contract interpretation. *Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007). The meaning of a consent judgment, like a contract, should be determined within its "four corners." *United States v. W. Elec. Co*., 894 F.2d 1387, 1390 (D.C. Cir. 1990).  Contracts should not be interpreted to include an implied waiver of sovereign authority.  *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 52 (1986) (sovereign authority is only waived when expressed in "unmistakable terms," and a sovereign does not have to expressly reserve a right in order to not waive such right); *see Witt v. Metro Life Ins. Co.*, 772 F.3d 1269, 1279 (11th Cir. 2014) ("[w]here a party alleges an implied waiver, 'the acts, conduct, or circumstances relied

upon to show waiver must make out a clear case.'") (citing *In re Garfinkle*, 672 F.2d 1340, 1347 (11th Cir. 1982)); s*ee also Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (a state's waiver of its constitutional protection under the Eleventh Amendment only exists when stated by express language or overwhelming implications in the text).

Defendants misleadingly cite to the Consent Judgment to support their waiver argument. *See* [ECF 25-1, p. 11-12 at ¶ 6 (stating that the servicing standards and consumer relief requirements set forth in the Consent Judgment shall be enforced through the enforcement terms set forth in the Consent Judgment), ¶ 12 (providing that the Court retains jurisdiction for the duration of the Consent Judgment to enforce its terms), ¶ 15 (providing that the Consent Judgment shall remain in force and effect for three years, after which time Defendants' obligations expire). None of these cited sections contain a waiver by the Attorney General that would foreclose claims brought under state or federal law. The enforcement terms also cited by Defendants contain no waiver of claims, except that the parties to the Consent Judgment agreed to "waive their rights to seek judicial review or otherwise challenge or contest in any court the validity or effectiveness of this Consent Judgment. " *See* [ECF 25-1, p. 134]. These cited sections merely reinforce that the enforcement terms of the Consent Judgment are limited to attacks on the Consent Judgment itself.

Defendants' arguments hinged on the Consent Judgment fail, and the Motion to Dismiss should be denied.

## II.    The SAC satisfies Rule 8(a).

Rule 8(a) of the Federal Rules of Civil Procedure requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).[7]  A complaint should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted only when the facts alleged fail to state a "plausible" claim for relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-57 (2007).  A plaintiff does not need to allege specific facts; rather, his pleading need only "give the defendant fair notice of what the … claim is and the grounds upon

---

[7] Defendants acknowledge a split of authority as to whether Rule 9(b) applies to deception-based claims.  [ECF No. 96, p. 22, n.18].  The Attorney General asserts that Rule (9)(b) should not be applied to any deception based FDUTPA claims.  See *U.S. Bank N.A. v. Capparelli,* No. 13-cv-80323, 2014 WL 2807648, *5 (S.D. Fla. June 20, 2014) (Marra, J.) (Rule 9(b) does not apply to deception based FDUTPA claims) (citing *Toback v. GNC Holdings, Inc.,* No. 13-cv-80526, 2013 WL 5206103, n. 1 (S.D. Fla. Sept. 13, 2013) (Rule 9(b) does not apply to FDUTPA)); *Galstaldi v. Sunvest Cmtys. USA*, *LLC,* 637 F. Supp. 2d 1045, 1058 (S.D. Fla. 2009) (same).

which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted).  When ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true and construe the facts in the light most favorable to the plaintiff.  *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003); *see also Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002).  As discussed below, each Count of the SAC clearly meets the requirements of Rule 8(a), as each Count states plausible claims for relief and puts Defendants on notice of the claims asserted against them.  Defendants cite no basis for dismissal, let alone dismissal with prejudice.

    **A.  The SAC is not a shotgun pleading.**

    The SAC does not incorporate each preceding count into each successive count, nor does it fit the description of other types of "shotgun pleadings."  *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1322–23 (11th Cir. 2015).[8]  The SAC is similar to the complaint in *Weiland*, which re-alleged paragraphs containing facts relevant to each claim, but the allegations of each count were not incorporated into every successive count.  *See id*. at 1324-26 (reversing the dismissal of certain counts because the counts sufficiently stated claims for relief and the pleading was not a shotgun pleading).  The SAC incorporates by reference the factual paragraphs 1-146 at the start of each Count; however, the allegations of each Count are *not* incorporated into each successive Count.  Each Count in the SAC includes factual allegations that are distinct and relate to that specific Count.[9]  Defendants fail to identify how the SAC could fit the description of any of the four types of shotgun pleadings described in *Weiland*.

    Also, the cases to which Defendants cite are distinguishable and do not support Defendants' argument for dismissal.  In *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1332 (11th Cir. 1998), the court found that the pleading contained irrelevant

---

[8] The Eleventh Circuit identified four types of shotgun pleadings: (i) a complaint with multiple counts where each count adopts the allegations of all preceding counts; (ii) a complaint that includes conclusory, vague, and immaterial facts that are not clearly related to any particular cause of action; (iii) a complaint that fails to separate into a different count each cause of action; and (iv) a complaint with multiple claims against multiple defendants which fails to specify which of defendants are responsible for which acts or omissions, or which defendants against whom the claim is brought.  *Weiland*, 792 F.3d at 1322–23.

[9] Counts I and VII are based on similar factual allegations – generally, the failure to disburse payments from escrow accounts as required – but these facts support distinct causes of action under the Consumer Financial Protection Act of 2010 (the "CFPA") as well as Chapter 494, Florida Statutes.

allegations of "greenmail" and fraud. Here, Plaintiffs' allegations are not irrelevant, but rather are confined to the facts which give rise to each Count. Further, allegations are grouped according to descriptive subheadings, which often reference the specific statutes and regulations violated, signaling to Defendants that the allegations are relevant to counts for violation of those statutes and regulations. *See e.g.* [ECF No. 88, p. 21] (subheading B: "The Ocwen Defendants Have Illegally Foreclosed on Borrowers and Engaged in Other Unlawful Foreclosure and Loss Mitigation Practices in Violation of [the Real Estate Settlement Procedures Act] RESPA and Regulation X." The other authorities Defendants rely on fall into *Weiland's* first category of shotgun pleading – those which incorporate the preceding counts into each successive count. *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1126 (11th Cir. 2014) (noting that each count adopted the allegations of all preceding counts); *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1045 n.39 (11th Cir. 2015) (noting in a footnote that the complaint was a shotgun pleading because it incorporated into successive counts all preceding allegations and counts). The SAC does not incorporate preceding counts into each successive count. Simply put, Defendants' assertions lack merit. Even if the SAC was a shotgun pleading, which it is not, the appropriate remedy is a more definite statement pursuant to Rule 12(e) and not dismissal. *Your Baby Can, LLC v. Planet Kids, Inc.*, No. 10-cv-81266, 2011 WL 197421, at *1 (S.D. Fla. 2011) (Marra, J.) (the alternative relief of a more definite statement under Rule 12(e) is the proper remedy for a shotgun pleading, not dismissal).

**B.  Plaintiffs' allegations are appropriate for a common enterprise.**

Plaintiffs are required to provide enough details to put Defendants on fair notice of the claims against them,[10] and "at a minimum, [p]laintiffs should allege sufficient facts specific to each [d]efendant, or *at least each corporate family of [d]efendants*, to tie that [d]efendant to the wrongdoing alleged." *In re Auto Body Shop Antitrust Litig.*, No. 14-cv-6006, 2015 WL 4887882, at *6 (M.D. Fla. June 3, 2015) (emphasis added). Yet, without citing any authorities to support their argument, Defendants incorrectly assert that Plaintiffs engaged in improper group pleading. Plaintiffs properly allege: (1) sufficient facts against each Defendant, either through group

---

[10] *See Sanders v. JGWPT Holdings, Inc.*, No. 14-cv-9188, 2016 WL 4009941, at *10 (N.D. Ill. July 26, 2016) (group allegations specific enough to put defendants on notice of claims against them); *Harris v. Kruger*, No. 13-cv-8584, 2015 WL 4971888, at *3 (N.D. Ill. Aug. 19, 2015) (same).

allegations or otherwise, to put Defendants on notice of the claims against them; and (2) the existence of a common enterprise involving Defendants.

The Eleventh Circuit has endorsed the use of group pleading stating that "[w]hen multiple defendants are named in a complaint, the allegations can be and usually are to be read in such a way that each defendant is having the allegation made about him individually." *Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997). Furthermore, the entities comprising a common enterprise are jointly and severally liable – i.e., the acts of one are attributable to all. *See FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014) (the Florida Attorney General was a co-plaintiff; group pleading allowed where common enterprise alleged). Accordingly, "grouping" Defendants and applying all of the allegations of the complaint to all defendants is permissible. *See FTC v. Consumer Health Benefits Ass'n*, No. 10-cv-3551, 2012 WL 1890242, at *8 (E.D.N.Y. May 23, 2012) (denying defendants' motion to dismiss and finding that defendants operated as a common enterprise). Courts look to a variety of factors when determining the existence of a common enterprise, including: (1) common officers and employees; (2) common control; (3) shared offices; (4) commingling of funds; and (5) shared advertising and marketing. *See FTC v. Wyndham Worldwide Corp.*, No. 13-cv-1887, 2014 WL 2812049, at *5 (D.N.J. June 23, 2014) (denying defendants' motion to dismiss where the Federal Trade Commission ("FTC") pled "specific facts relating to common control, sharing of office space, and lack of distinction between [d]efendants").

Throughout the SAC, Plaintiffs allege the following specific facts about each of Defendants and the Ocwen corporate family, providing fair notice of the claims brought against Defendants operating as a "common enterprise:"

- each Ocwen Defendant is liable for Counts I-VI (*see* SAC [ECF No. 88 at ¶¶ 147-222);
- each Ocwen Defendant is engaged in servicing activities, including "processing borrower payments, administering loss mitigation processes, and managing foreclosures" [ECF No. 88, ¶¶ 15, 17-19]);
- each Ocwen Defendant acquires and collects upon borrowers' mortgage debts that are in default [ECF No. 88, ¶ 15];
- Ocwen Financial, the parent and publicly traded company, wholly owns all of the common stock of Ocwen Mortgage Servicing, and that Ocwen Mortgage Servicing owns the stock of Ocwen Loan Servicing [ECF No. 88, ¶ 16];
- Ocwen Financial Corporation, Ocwen Loan Servicing and Ocwen Mortgage Servicing have operated as a "common enterprise" and that an act of one entity constitutes an act by each entity comprising the "common enterprise" [ECF No. 88, ¶ 25];
- Ocwen Financial, Ocwen Mortgage Servicing and Ocwen Loan Servicing are each jointly and severally liable for the acts and practices alleged in the SAC [ECF No. 88, ¶ 25];

- Defendants file consolidated financial statements and share employees and offices [ECF No. 88, at ¶ 25];
- Ocwen Financial and Ocwen Mortgage Servicing have directed and controlled Ocwen Loan Servicing's mortgage servicing activities and authorize Ocwen Loan Servicing to service the Ocwen Defendants' loans; that employees of Ocwen Financial and Ocwen Mortgage Servicing have knowledge of and control, or have the ability to control, the activities of Ocwen Loan Servicing; and that Ocwen Financial and Ocwen Mortgage Servicing, as Ocwen Loan Servicing's principals, are liable for the actions of their agent Ocwen Loan Servicing [ECF No. 88, ¶ 26];
- that the Ocwen Defendants share and have shared key executives, including Ronald Faris, Timothy Hayes, Michael Bourque, and John Patrick Cox [ECF No. 88, ¶ 16]
- each of the Ocwen Defendants has been a "covered person" as defined by 12 U.S.C. 5481(6)(A) [ECF No. 88, ¶ 21];[11] and
- that Ocwen Financial and Ocwen Mortgage Servicing are "related persons" under the CFPA [ECF No. 88, ¶ 22], and that Ocwen Financial is a service provider under the CFPA [ECF No. 88, ¶ 23].

Given that Plaintiffs allege numerous specific facts supporting the allegation that Defendants operate as a "common enterprise," Plaintiffs do not have to differentiate between the three entities in their allegations. *See Tax Club, Inc.*, 994 F. Supp. 2d at 469. Defendants' reliance on *U.S. Bank Nat'l Ass'n v. Capparelli*, No. 13-cv-80323, 2014 WL 2807648 (S.D. Fla. June 20, 2014) (Marra, J.), is misplaced. In *Capparelli*, the opposition to the motion to dismiss stated that certain defendants had an agency relationship and were a common enterprise; however, the complaint failed to allege anything to suggest that the entities were agents or instrumentalities of one another. *Id.* at *3. Therefore, this Court ruled that such allegations were "naked and baseless." *Id.* Unlike the complaint in *Capparelli*, Plaintiffs allege that Defendants are affiliate entities with a parent-subsidiary relationship, an agency relationship, and numerous other facts supporting an allegation of a "common enterprise," including their filing consolidated financial statements and sharing employees and offices.

### C. Plaintiffs' allegations in support of Count I is specific and plausible.

Plaintiffs bring Count I under the CFPA for RESPA and Regulation X violations, specifically, Defendants' failure to make timely disbursements from borrowers' escrow accounts for items such as hazard insurance premiums in violation of Section 6(g) of RESPA and Sections 1024.17(k)(1) and 1024.34(a) of Regulation X. Plaintiffs are not required to set forth specific facts regarding specific borrowers where Defendants failed to make such escrow disbursements. *See*

---

[11] This relates to Counts I-III, which are claims under the CFPA.

*Erickson*, 551 U.S. at 93. Plaintiffs allege more than legal conclusions. *See, e.g.*, [ECF No. 88, ¶¶ 119-26]. For example, Plaintiffs include specific allegations detailing Defendants' transition of insurance vendors from Assurant to Southwest Business Corporation in September 2014, and how such transition caused Defendants to fail to timely disburse insurance payments and caused Defendants to disburse insurance payments to the incorrect payees and incorrect addresses. *See* [ECF No. 88, ¶¶ 122-26].

Defendants' reliance upon *Miranda v. Ocwen Loan Servicing, LLC*, 148 F. Supp. 3d 1349 (S.D. Fla. 2015), *Rodriguez v. Seterus, Inc.*, No. 15-cv-61253, 2015 WL 5677182 (S.D. Fla. Sept. 28, 2015) and *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368 (S.D. Fla. 2015), is misplaced, and Defendants' description of the holdings in those cases is also misleading. These cases all involve individual borrowers who brought RESPA claims for actual damages under 12 U.S.C. § 2605(f)(1)(A), and in two of the cases the plaintiff sought statutory damages pursuant to 12 USC § 2605(f)(1)(B). Let it be clear that Plaintiffs are not seeking actual damages in any Count in the SAC. Counts I-III allege violations under the CFPA for RESPA and Regulation X violations brought by enforcement authorities; these do not represent individual borrowers' claims under RESPA. Therefore, the requirements for an individual borrower to state a claim under 12 U.S.C. § 2605, as discussed in *Miranda*, *Rodriguez*, and *Librizzi*, are not applicable to Plaintiffs' CFPA claims in Counts I-III.

In *Miranda*, the Court did not dismiss all of the RESPA claims; rather, the Court *denied* Ocwen's request to dismiss the borrowers' claim for actual damages brought under 12 U.S.C. § 2605(f)(1)(A), but did dismiss, without prejudice, the claim for statutory damages under 12 U.S.C. § 2605(f)(1)(B), which is based on a pattern or practice of noncompliance. *Miranda*, 148 F. Supp. 3d at 1355-56. Similarly, in *Rodriguez*, the Court denied dismissal of the RESPA claim for actual damages, but dismissed the claim for statutory damages because the allegations regarding a pattern or practice of noncompliance with RESPA were insufficient.[12] *Rodriguez*, 2015 WL 5677182, at

---

[12] In *Rodriguez*, the plaintiff's allegation regarding the pattern or practice of non-compliance did not even attempt to track the language of the statute, failing to allege, for example, that the other harmed borrowers sent a "qualified written request" to the mortgage servicer -- a requirement to state a claim for the relief sought. *Complaint, Rodriguez v. Seterus, Inc.*, No. 15-cv-61253, ECF 1, ¶ 66 (June 12, 2015).

*3 & *5.  In *Librizzi*,[13] the Court held that the plaintiff failed to allege any facts relating to a "private right of action under RESPA, such as the submissions of Qualified Written Requests and Defendant Ocwen's failure to respond."  *Librizzi,* 120 F. Supp. 3d at 1379.

Unlike in Defendants' cited cases, Plaintiffs here sufficiently pled facts alleging that Defendants violated Section 6(g) of RESPA and Sections 1024.17(k)(1) and 1024.34(a) of Regulation X based on the failure to make timely disbursements from borrowers' escrow accounts. Defendants offer no authority to impose a heightened pleading standard.  The SAC meets the pleading requirement of Rule 8(a), the Court should deny Defendants' Motion to Dismiss.

### D.  Individual consumer complaints need not be pled.

Defendants complain on one hand that Plaintiffs' allegations are conclusory because Plaintiffs do not provide "factual examples" of violations, while on the other hand argue that Plaintiffs' allegations are "deliberately imprecise" because specific violations are introduced with qualifiers such as "in 'numerous' or 'many' instances." [ECF No. 96, p. 16]. The irony of arguing in the same paragraph both that examples of specific violations have not been pled and that the examples pled are not specific enough appears lost on Defendants and shows that their arguments are devoid of merit.  Furthermore, Plaintiffs' allegations that Defendants' misconduct occurred numerous times are entirely appropriate. As Defendants well know, Plaintiffs are continually receiving complaints from the public regarding Defendants' illegal servicing practices. It would not be feasible to name each individual complainant who was a victim of Defendants' illegal conduct, nor would alleging a running total of the number of complaints Plaintiffs have received for each violation contribute anything of substance to Plaintiffs' pleadings. Moreover, Plaintiffs are not required to set forth, in a Complaint, every known incident that supports a violation of state or federal law.  Courts have rejected similarly frivolous demands for such an accounting.  *See State v. Beach Blvd Auto. Inc.*, 139 So. 3d 380, 393–94 (Fla. 1st DCA 2014) ("we have previously rejected the argument that Appellant, as the enforcing authority under FDUTPA, is required to name those consumers on whose behalf it is litigating a FDUTPA action.") (*Citing Taubert v. State, Office of the Attorney Gen.,* 79 So.3d 77, 79 (Fla. 1st DCA 2011)).

---

[13] Regarding the RESPA claim, the plaintiff in *Librizzi* only alleged that "Plaintiff brought a list of accounting errors to Ocwen's attention including the aforementioned for nearly two years but Ocwen did not correct those errors.  Therefore, Ocwen violated said law." *Librizzi,* 120 F. Supp. 3d at 1379.

### III.   Ocwen Financial Corporation and Ocwen Mortgage Servicing are "Servicers."

Counts I-III in the SAC are claims brought under the CFPA for RESPA and Regulation X violations.  Defendants incorrectly assert that Plaintiffs have failed to plausibly allege that OFC and OMS are "servicers" under RESPA.[14]  Plaintiffs clearly allege that all Defendants are servicers under RESPA and Regulation X and that Defendants "receive payments from borrowers pursuant to the terms of Federally Related Mortgage Loans."  [ECF No. 88, ¶ 67].  Plaintiffs also alleged the following:

- "Ocwen Financial, through its subsidiaries, originates and services loans."  [ECF No. 88, ¶ 15].
- "The Ocwen Defendants engage in servicing activities related to the loans by, among other things, processing borrower payments, administering loss mitigation processes, and managing foreclosures."  [ECF No. 88, ¶ 15]
- "The Ocwen Defendants service and subservice home mortgage loans secured by residential properties owned by individual citizens of the State of Florida and of the United States and is currently the second largest non-bank servicer in the United States.  Ocwen's current servicing portfolio includes approximately 125,000 loans secured by property located in the State of Florida.  As of December 2016, Florida loans account for 9.14% of the Ocwen Defendants' total portfolio single-family residential mortgage loans."  [ECF No. 88, ¶ 34].
- "In addition to collecting payments and disbursing escrows, Ocwen regularly reviews mortgage loans for potential loss mitigation or loss mitigation options, including loan modifications, and manages the foreclosure process."  [ECF No. 88, ¶ 39].
- "At all times material hereto, the Ocwen Defendants have serviced and subserviced home mortgage loans secured by residential properties owned by individual citizens of the State of Florida and throughout the United States."  [ECF No. 88, ¶ 77].

Defendants' reliance on *McCarley v. KPMG Int'l*, 293 F. App'x 719 (11th Cir. 2008) is unavailing.  The allegations in the SAC are distinguishable and *McCarley* addresses the summary judgment standard, not dismissal under Rule 12(b)(6).  *Id.*  In *McCarley*, the borrower attempted to attribute RESPA liability to an affiliate of the servicer who was not servicing the loan, so that liability would be solely based on either a parent or subsidiary relationship to the servicer.[15]  *Id.* at

---

[14] In the absence of any argument to the contrary, Defendants concede that that OLS is a servicer under RESPA.

[15] The borrower in *McCarley* alleged that the HFC III was "essentially the same entity as [the servicer] for purposes of RESPA," with nothing further to support this allegation.  *McCarley,* 293 F. App'x at 722.  As the procedural posture was summary judgment, Defendants provided affidavits stating that HFC III was not servicing the loan; the borrower offered nothing to rebut the evidence so the court affirmed the summary judgment against the borrower.  *Id.*

722.  Therefore, the Court held that a parent or subsidiary company that *is not a servicer* is not liable under RESPA.  *See id*.  Defendants attempt to make an illogical parallel argument—because OLS *is* a servicer under RESPA, the purported parent companies, OFC and OMS, *are not* servicers under RESPA.  [ECF No. 96, p. 18].  Plaintiffs do not allege liability for RESPA violations solely because OFC and OMS are parent entities to OLS; rather, as discussed above, Plaintiffs clearly and plausibly allege that OFC and OMS are servicers under RESPA.  The other cases to which Defendants cite are also distinguishable because in those cases the plaintiff either failed to allege the defendant was a servicer, or it was factually clear that the defendant was not a servicer.[16]

Additionally, Plaintiffs allege that Ocwen Financial and Ocwen Mortgage Servicing are jointly liable under theories of a "common enterprise" and principal-agent liability.  As further discussed above, group pleading is appropriate where a common enterprise exists and the group allegations are specific enough to put defendants on notice of claims against them.  *See Crowe*, 113 F.3d at 1539; *Tax Club, Inc.*, 994 F. Supp. 2d at 469.  Defendants failed to challenge, or even acknowledge, these theories in the Motion to Dismiss, and any such argument has therefore been waived.  With respect to OMS, Defendants also incorrectly assert that Plaintiffs failed to allege that it receives payments from "Florida borrowers."  Plaintiffs have no obligation to specifically allege that OMS receives payments from Florida borrowers given that OMS transacts business in Florida.[17]  As discussed above, Plaintiffs clearly allege that OMS, as a subsidiary of OFC, receives payments from borrowers.  *See* [ECF No. 88, ¶¶ 15 & 39].

Plaintiffs allege sufficient facts that each of Defendants, including OFC and OMS, is a servicer under RESPA, and Plaintiffs' allegations in Count I-III are sufficient to put Defendants

---

[16] *Bernstein v. Wells Fargo*, No. 15-cv-2520, 2016 WL 4546653, at *4, n. 3 (N.D. Ga. May 13, 2016) (rather than being alleged to be a servicer, "Freddie Mac is alleged to be the owner and holder of the Note and Security Deed."); *Bennett v. Nationstar*, No. 15-cv-165, 2015 WL 5294321, at *11 (S.D. Ala. Sept. 8, 2015) ("it is also undisputed that [defendant] did not act as a servicer").

[17] Plaintiffs on numerous occasions allege that OMS received payments from borrowers, and did allege that "at all times relevant to this Second Amended Complaint, Ocwen Mortgage Servicing transacts or has transacted business in this district, throughout the state of Florida and the United States." [ECF No. 88, ¶ 13].  Notably, it is well settled that the Attorney General may bring actions on behalf of consumers residing outside of Florida.  *See Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General, Dept. of Legal Affairs, State of Fla.,* 761 So.2d 1256, 1260-62 (Fla. 3d DCA 2000) (holding that FDUTPA's plain language makes clear the Act is "applicab[le] to the commercial transactions between Florida corporations and non-resident consumers").

on notice as to the claims asserted against them.  Therefore, Defendants' Motion to Dismiss should be denied on this basis.

**IV.    Plaintiffs have properly pled the FDUTPA Counts.**

Counts V and VI are claims brought by the Attorney General against Defendants for violations of FDUTPA.  Count V alleges that Defendants engaged in various unfair acts and practices and made various material misrepresentations or omissions to borrowers.  Count VI alleges that Defendants engaged in unfair acts and practices related to Defendants' failure to timely and appropriately credit borrower payments.  Defendants make four arguments in support of dismissal regarding Counts V and VI: (i) loan servicing is not "trade or commerce" under FDUTPA; (ii) the Attorney General failed to sufficiently plead that Defendants' conduct was unfair and Defendants lacked notice that their conduct was unfair; (iii) the Attorney General cannot recover "consumer redress" for borrowers because the Attorney General did not plead actual damages; and (iv) the Attorney General cannot recover monetary damages on behalf of borrowers who already obtained a remedy in a class action settlement.  For the reasons set forth below, all these arguments fail and the Motion to Dismiss regarding Counts V and VI should be denied.

**A.  Defendants are engaged in "trade or commerce."**

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  Fla. Stat. § 501.204(1).  The text of the statute suggests that the term "trade or commerce" should be applied broadly given that trade or commerce is expressly defined as, "the advertising, soliciting, *providing*, *offering*, or distributing, whether by sale, rental, or *otherwise*, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated."  Fla. Stat. § 501.203(8) (emphasis added).  Under FDUTPA, the term "thing of value" includes "*any moneys*, donation, membership, credential, certificate, prize, award, *benefit*, license, interest, professional opportunity, or chance of winning."  Fla. Stat. § 501.203(9) (emphasis added).  Additionally, FDUTPA clearly states that "the provisions of [FDUTPA] shall be construed liberally . . . [t]o protect the consuming public . . .  from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices . . . ."  Fla. Stat. § 501.202.  Furthermore, this Court has also stated that FDUTPA should be construed liberally: "[b]ecause the FDUTPA is a consumer and business protection statute that is remedial in nature, this Court is inclined to align with the courts that construe the FDUTPA liberally in favor of

consumers." *Capparelli*, 2014 WL 2807648, at *4 (footnote omitted) (citing *Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. 4th DCA 2005)). A review of case law regarding "trade or commerce" and Defendants' actions shows that they are clearly within FDUTPA's broad scope.

   i.  **Case Law Interpreting "Trade or Commerce."**

   With respect to mortgage servicing, courts have held that a putative mortgage servicer is engaged in "trade or commerce" to the extent it offers or provides services or products that are beyond the scope of mere debt collection or the pursuit of legal or contractual remedies. *See Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1323-24 (S.D. Fla. 2014). In *Alhassid*, the court denied defendant's motion to dismiss claims alleging that a mortgage servicer violated FDUTPA by charging unauthorized, excessive property inspection and appraisal fees. *Id*. The defendant, a mortgage servicer, maintained that these activities do not involve trade or commerce because they are related to debt collection. *Id*. However, the court held that "[w]hile appurtenant to the pursuit of [the servicer's] mortgage servicing rights, those activities can be construed as the separate offer or provision of services within the meaning of FDUTPA." *Id*. at 1324. Similarly, in *Martorella v. Deutsche Bank Nat'l Trust Co.*, 931 F. Supp. 2d 1218, 1224 (S.D. Fla. 2013) (Marra, J.), this Court denied a mortgage servicer's motion to dismiss claims alleging that the servicer violated FDUTPA by charging grossly excessive rates for force–placed insurance. The court stated that the "transactions at issue fall comfortably within the definition of trade or commerce" because the consumer, in effect, purchased insurance that the defendant "provided, offered, or distributed." *Id*; *see also Martorella v. Deutsche Bank Nat'l Trust Co.*, 161 F. Supp. 3d 1209, 1220 (S.D. Fla. 2015) (Marra, J.) (finding transactions related to force–placed insurance to be trade or commerce at the summary judgment stage and finding that the servicer had a "direct financial relationship" with the borrower due to it placing hazard insurance); *Bank of Am., N.A. v. Zaskey*, No. 15-cv-81325, 2016 WL 2897410 at * 11 (S.D Fla. May 18, 2016) (denying motion to dismiss counterclaim on grounds that force–placed insurance is trade or commerce within the scope of FDUTPA).

   Defendants argue that the acts or practices alleged in Counts V and VI are just "classic loan servicing conduct," and therefore such conduct is not "trade or commerce." [ECF No. 96, p. 26]. Defendants fail to cite to any legal authority in support of this argument. The cases cited by Defendants involve narrow rulings, which collectively stand for the proposition that certain actions

taken merely to recover amounts owed on a mortgage or loan in default, i.e., debt collection—whether these might be debt collection calls, foreclosure actions, or the filing of a lien—are not considered to be trade or commerce under FDUTPA because they do not involve advertising, soliciting, offering, providing, or distributing anything to consumers.  *See e.g.*, *Williams v. Nationwide Credit, Inc.*, 890 F. Supp. 2d 1319, 1321 (S.D. Fla. 2012) (excluding debt collection calls from trade or commerce); *Benjamin v. CitiMortgage, Inc.*, 2013 WL 1891284, at *5 (S.D. Fla. May 6, 2013) (holding servicer obtaining interest in mortgage note and proceeding to enforce mortgage terms is not trade or commerce); *Blake v. Seterus, Inc.*, 2017 WL 543223, at *2 (S.D. Fla. Feb. 9, 2017) (holding that providing reinstatement letters in response to borrower request is not trade or commerce because it does not involve advertising or solicitation); *State of Fla., Office of Att'y Gen. v. Shapiro & Fishman, LLP*, 59 So. 3d 353, 355–56 (Fla. 4th DCA 2011) (upholding quash of investigative subpoena on basis that law firm's processing of foreclosure cases is merely the pursuit of legal or contractual remedies not in trade or commerce); *Trent v. Mortg. Elec. Registration Sys., Inc.*, 618 F. Supp. 2d 1356, 1365 n.12 (M.D. Fla. 2007) (holding foreclosure actions and pre-suit notices are not trade or commerce); *Casey v. Bank of Am., N.A.*, No. 13-cv-60983, 2013 WL 12126306 at *4 (S.D. Fla. Nov. 7, 2013) (stating sending of notices and initiating foreclosure proceedings does not fall within definition of trade or commerce); *Baker v. Baptist Hosp., Inc.*, 115 So. 3d 1123, 1124 (Fla. 1st DCA 2013) (finding filing of hospital lien is pursuit of legal remedy not within definition of trade or commerce).  These cases fail to support Defendants' request for dismissal because the facts alleged by the Attorney General in Counts V and VI are not, unlike the cases cited by Defendants, actions taken merely to recover amounts owed on a mortgage or a loan in default.

It is misleading to contend—as does Defendants' Motion to Dismiss—that "courts in this District have held that a loan servicer's actions in servicing a mortgage loan do not constitute 'trade or commerce' under FDUTPA."  [ECF No. 96, p. 24].  There is no such rule that would effectively exempt mortgage servicers from FDUTPA.  This overbroad statement appears to be derived from *Nardolilli v. Bank of Am. Corp.*, No. 12-cv-81312, 2013 WL 12154541 at *4 (S.D. Fla. Dec. 6, 2013) (citing *Benjamin,* 2013 WL 1891284 at *4-5; *Trent,* 618 F. Supp. 2d at 1365, n.12), which stated in dicta that "[c]ourts have held that the servicing of a mortgage do not fall within the purview of 'trade or commerce.'"  Although the Court in *Nardolilli* did not discuss the underlying allegations in the complaint, the dismissed FDUTPA count in *Nardolilli* only alleged that the

Mortgage Electronic Registration System ("MERS") (engaged in unconscionable collection practices which eventually caused a wrongful foreclosure. *See Amended Complaint, Nardolilli v. Bank of Am. Corp.*, No. 12-cv-81312 (S.D. Fla. May 31, 2013), ECF No. 14 (p. 22, ¶ a). In dismissing the plaintiff's FDUTPA claim, the court stated, "it is unclear how exactly MERS violated FDUTPA. Plaintiff only alleges that MERS's actions qualify as 'trade or commerce' under FDUTPA. Even if MERS engaged in deceptive acts or unfair trade practices, its actions as a servicer of the mortgage do not qualify as 'trade or commerce.'" *Nardolilli*, 2013 WL 12154541 at *4 (internal citation omitted). The holding in *Nardolilli* is consistent with other cases ruling that "[a]n attempt to collect a debt by exercising one's legal remedies does not constitute 'advertising, soliciting, providing, offering or distributing' as those terms are used in Fla. Stat. § 501.203(8)." *Acosta v. Gustino*, No. 11-cv-1266, 2012 WL 4052245 at *1 (M.D. Fla. Sept. 13, 2012).

However, debt collection efforts may be considered "trade or commerce" if those efforts are carried out by the party that originated the loan. *See Beach Blvd*, 139 So. 3d at 392; *Baker* 115 So. 3d at 1125; *Schauer v. Gen. Motors Acceptance Corp.,* 819 So. 2d 809, 812 (Fla. 4th DCA 2002). According to these cases, the original provision of credit by a lender establishes a trade or commerce relationship with a consumer; thus, the original extension of credit, as well as subsequent efforts to collect the debt, are considered to be in trade or commerce. *See id.* Therefore, there is no question that a mortgage servicer is engaged in trade or commerce with respect to mortgages it has originated, including related debt collection actions. *See Shapiro & Fishman*, 59 So. 3d at 356 (stating initial applications for mortgages and initial lending relationships akin to trade or commerce). This Court has also held that an intermediary accepting money on behalf of another entity is engaged in trade or commerce. *Pincus v. Speedpay, Inc.*, 161 F. Supp. 3d 1150, 1157 (S.D. Fla. 2015) (Marra. J.).

Finally, the unfair and deceptive acts and practices Plaintiffs have alleged go far beyond the "obligatory and reactive" conduct alleged in *Rodriguez v. Ocwen Fin. Corp.*, No. 17-CV-60574, 2017 WL 3593972, at *6 (S.D. Fla. Aug. 21, 2017). As further detailed below, Defendants have affirmatively misled borrowers and failed to provide basic services including, but not limited to, managing escrow accounts, purchasing insurance, applying payments correctly and communicating accurate information to borrowers.

ii.      **Defendants' Acts and Practices are "Trade or Commerce."**

A careful review of the nature and extent of the services or benefits provided or offered to borrowers by Defendants, and the interaction between Defendants and the borrowers related to the same, is necessary and relevant in the analysis of trade or commerce.   As set forth below, Defendants have a substantial relationship with borrowers, which Defendants attempt to benefit from while avoiding accountability for their servicing misconduct.  The conduct alleged in Counts V and VI falls comfortably within the definition of trade or commerce because it constitutes the providing or offering of a service, property, or thing of value – a benefit – and is separate from straight-forward debt collection or the pursuit of legal or contractual remedies.

The SAC alleges that because Defendants service distressed loans, their personnel frequently interact with borrowers, many of whom require immediate attention and accurate information from Defendants.  [ECF No. 88, ¶¶ 78-79].  Borrowers contact Defendants repeatedly for help, but Defendants' employees are unable to help because they cannot access information in their own system, and lack necessary information regarding the borrowers' loans.  [ECF No. 88, ¶ 82].  The SAC also enumerates Defendants' various material misrepresentations and omissions made to borrowers.  [*See, e.g.* ECF No. 88 ¶ 201].

Without a doubt, the proper administration of a borrower's escrow account – for example – is a benefit to the borrower.  To illustrate, some of the specific conduct alleged regarding Defendants' mismanagement of borrowers' escrow accounts includes the following: sending inaccurate payoff or reinstatement quotes because such quotes are impacted by the borrowers' escrow balances, [ECF No. 88, ¶¶ 110, 201(a)]; failing to send borrowers escrow statements at all or sending escrow statements with inaccurate information, [ECF No. 88, ¶ 111]; failing to timely process escrow shortage payments resulting in continued collection of purported escrow shortage amounts that Defendants had no right to collect, [ECF No. 88, ¶ 113]; attempting to collect purported escrow shortages that have been discharged in bankruptcy [ECF No. 88, at ¶ 114]; communicating material information to borrowers regarding their escrow accounts that Defendants knew or should have known was inaccurate, [ECF No. 88, ¶ 115]; failing to pay insurance premiums from borrowers' escrow accounts, which in turn caused erroneously cancelled insurance policies, lapses in insurance coverage and excessive and improper force-placed insurance policies, [ECF No. 88,, ¶¶ 119-20, 200(b), 200(g)]; imposing force–placed insurance on borrowers who already had insurance, [ECF No. 88, ¶¶ 121, 200(c)]; increasing borrowers' monthly payments to

collect higher insurance premiums that should never have been imposed, [ECF No. 88, ¶ 124]; and more specifically, over 10,000 borrowers were affected nationwide and over 1,250 in Florida suffered financial harm resulting from the mishandling of borrowers' hazard insurance payments, [ECF No. 88, ¶¶ 125-26]. Defendants also charged borrowers excessive property inspection fees and maintenance fees, which in some instances forced borrowers into default and foreclosure, [ECF No. 88, ¶¶ 128, 200(d)]; charged borrowers excessive fees for broker's price opinions, [ECF No. 88, ¶¶ 128 & 200(e)]; and misrepresented the amounts due for force-placed insurance, [ECF No. 88, ¶ 201(g)], property inspection and appraisal fees, which are default fees, [ECF No. 88, ¶ 127-28, 201(e)]. More specifically, the SAC alleges that Defendants overcharged an estimated 120,082 Florida borrowers at least $822,000 for excess property inspection fees and overcharged $100 to $300 per loan for excessive fees for broker's price opinions; therefore, Defendants assessed millions of dollars in default fees against borrowers. [ECF No. 88, ¶ 128].

Similarly, the accurate and timely application of borrowers' payments is a benefit to borrowers. The SAC includes numerous allegations regarding the misapplication of borrowers' payments, including the failure to credit payments to borrowers' accounts, and misrepresentations regarding the application of payments. *See* [ECF No. 88, ¶¶ 214-15]. Defendants failed to disclose to borrowers the treatment of partial payments and failed to apply funds held in suspense account to the borrowers' accounts as periodic payments. [ECF No. 88, ¶¶ 216-17]. This conduct harms borrowers, especially when Defendants treat these borrowers as delinquent due to their own payment application failures and threaten collection activity or pursue foreclosure remedies. [ECF No. 88, ¶ 220].

The SAC also includes numerous allegations regarding Defendants' offering and providing loss mitigation services to borrowers, which is clearly a benefit to the borrowers who are afforded the protections provided by law. Allegations regarding Defendants' loss mitigation abuses include: back-dating time sensitive letters related to mortgage modifications, [ECF No. 88, ¶¶ 136-39, 200(f)]; failing to honor existing loan modification agreements, including initiating a foreclosure or foreclosing on borrowers performing on a loan modification agreement, [ECF No. 88, ¶¶ 95, 104, 200(i)]; misrepresenting to borrowers the status of loan modifications, [ECF No. 88, ¶ 201(i)]; misrepresenting to borrowers the status of foreclosure, [ECF No. 88, ¶ 201(h)]; misrepresenting to borrowers the due dates for responses to communications regarding loss mitigation applications, [ECF No. 88, ¶ 102-03, 201(j)]; foreclosing on borrowers before the stated

deadline for the borrower to submit additional information regarding a loan modification application, [ECF No. 88, ¶ 102]; and omitting material facts in loan modification denial letters to borrowers, [ECF No. 88, ¶ 98-99, 201(k)].  Defendants also fail to timely release liens on borrowers' property, and releasing liens is clearly a benefit to the borrowers.  [ECF No. 88, ¶¶ 141-42, 200(h)].  Additionally, OLS, under the direction and control of OFC and OMS, markets, processes and transmits payments for credit monitoring products, financial advisory products, and other products that are added on to borrowers' accounts."  [ECF No. 88, at ¶ 20].

Defendants' Motion to Dismiss fails to capture the breadth of the definition of "trade or commerce" as it is apparent from the text of the statute.  *See* Fla. Stat. §§ 501.202, 501.203(8)-(9).  According to the plain meaning of the statutory text and construing the text liberally, Defendants are engaged in trade or commerce–and subject to FDUTPA–to the extent they advertise, solicit, provide, offer or distribute any activity which benefits borrowers.  Defendants have a direct financial relationship with borrowers as Defendants provide or offer services or benefits to borrowers, including but not limited to force-placed insurance, escrow administration, and loss mitigation.  *See generally Martorella,* 161 F. Supp. 3d at 1220.  The case law cited by Defendants merely carves out from "trade or commerce" the use of legal and contractual remedies to recover amounts due from mortgages in default; it does not wholesale exempt a mortgage servicer from the primary consumer protection statute in Florida.  Furthermore, Defendants' actions that resulted in illegal foreclosures and unauthorized fees charged to borrowers should not be cloaked as merely the pursuit of collection activities.  Defendants' conduct relevant to Counts V and VI is "trade or commerce" under FDUTPA, and Defendants' Motion to Dismiss should be denied.[18]

**B.  The Allegations in Counts V and VI Satisfy the Unfairness Standard.**

FDUTPA states that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Fla. Stat. § 501.204(1).  FDUTPA provides that when construing Section 501.204(1), Florida Statutes, "due consideration and great weight shall be given to the

---

[18] Notably, in the action that led to the Consent Judgment, OFC and OLS never contested the Attorney General's allegation that their servicing conduct–or misconduct–was "trade or commerce" under FDUTPA with respect to the underlying complaint to the Consent Judgment.  *See Complaint, CFPB vs. Ocwen Financial Corp., et al,* No. 13-cv-02025, ECF No. 1, ¶ 16 (D.C. Dec. 19, 2013) (alleging that these entities engaged in trade or commerce).  Given that Defendants claim most of the allegations in the SAC were covered by the Consent Judgment, it is illogical and inconsistent for Defendants to now argue that such conduct is not "trade or commerce."

interpretations of the FTC and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2013." Fla. Stat. § 501.204(2).  Therefore, based on the Federal Trade Commission's ("FTC") standard for unfairness, to bring an "unfairness" claim under FDUTPA, one must allege that an injury to the consumer (i) is substantial; (ii) is not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (iii) is an injury that consumers themselves could not reasonably have avoided.[19]  *Martorella v. Deutsche Bank Nat'l Trust Co.*, No. 12-cv-80372, 2015 WL 11347664,*5 (S.D. Fla. Aug. 6, 2015) (citing the FTC Act, § 5(n), 15 U.S.C. § 45(n); *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. 3d DCA 2014) (citations omitted)).[20]

Defendants rely upon the FTC's former "unfairness" standard, [ECF No. 96, p. 31], which is derived from a 1964 FTC policy statement.  However, the FTC updated its definition of an "unfair" trade practice in 1980, and the new standard is that set forth in the *Martorella* decision.  *See* FTC Policy Statement on Unfairness (Dec. 17, 1980); *see also Porsche*, 140 So. 3d at 1096.  The *Porsche* Court held that Florida law adopted the FTC's updated definition of unfairness because "[t]he Legislature provided that violations of FDUTPA include violations of '[t]he standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts.  Included are standards of unfairness issued 'as of July 1, 2013.'"  *Porsche*, 140 So. 3d at 1096-97 (citing Fla. Stat. § 501.203(3)(b)).[21]  The Attorney General acknowledges that courts are split as to whether the current or former FTC unfairness standard applies.  *See Napa Overseas, S.A. v. Nextran Corp.*, No. 16-cv-20862, 2016 WL 3841677, *6 (S.D. Fla. July 12, 2016) (using the former standard for unfairness) (citing *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (Fla. 2003)); *Omni Healthcare Inc. v. Health First, Inc.*, No. 13-cv-1509, 2016 WL

_____

[19] The Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 41, *et seq.*, states that an act or practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  15 U.S.C. § 45(n).

[20] In *Martorella*, this Court denied the motion to dismiss; where defendants were alleged to have charged excessive and unreasonable amounts for  lender placed insurance while retaining a portion as commissions or other remuneration.  *Martorella*, 2015 WL 11347664, at *6.

[21] The *Porsche* Court further noted that "the reference to 'standards of unfairness' 'as of July 1, 2013' is the product of a long legislative history in which the Florida Legislature amended FDUTPA in 1983, 2001, 2006, and 2013, for the specific purpose of adding to Florida Law interpretations by the Federal Trade Commission or federal courts that occurred since the last statutory amendment."  *Porsche,* 140 So. 3d at 1097.

4272164, *23 (M.D. Fla. Aug. 13, 2016) (using the former standard for unfairness) (citing *Suris v. Gilmore Liquidating, Inc.*, 651 So. 2d 1282, 1283 (Fla. 3d DCA 1995)).

Regardless, the allegations in Counts V and VI meet both standards of unfairness, state plausible claims for relief, and provide fair notice of the claims asserted against Defendants.  For example, Count V alleges that the unfair practices set forth in Paragraph 200(a)-(j) caused "substantial injury to consumers and the substantial injury is not reasonably avoidable by [the] consumer and is not outweighed by countervailing benefit to the consumers."  [ECF No. 88, ¶ 200; *see also* ECF No. 88 ¶ 204 (alleging that Defendants' acts and practice have substantially injured and will likely continue to injure and prejudice the public, and noting that such injuries could not have been reasonably avoided by consumers)].  Similarly, as stated above, Count VI alleges seven types of unfair and/or deceptive acts or practices.  [ECF No. 88 at ¶ 212-218; *see also* ECF No. 88, at ¶ 220 (alleging that Defendants' errors have resulted in significant harm to borrowers and describing such harm; ECF No. 88 ¶ 221 (alleging that Defendants' acts and practices have substantially injured and will likely continue to injure and prejudice the public and offend established public policy)].

Defendants incorrectly, and in a misleading manner, assert that the unfairness claims in Counts V and VI[22] are really claims for data inaccuracies.  Defendants intentionally mischaracterize the allegations in Counts V and VI, and incorrectly state that these counts merely assert unfairness claims for using an imperfect system and data.  [ECF No. 96, p. 31].  Defendants also assert that "[t]he State points to no criteria . . . by which the functions, accuracy, and completeness of Ocwen's servicing system can or should be judged."  [ECF No. 96, p. 32].  Counts V and VI are not claims for using a "system and data that were not perfect."  [ECF No. 96, p. 32]  Rather, Count V specifically alleges ten distinct types of unfair conduct in Paragraphs 200(a)-(j) of the SAC and Count VI specifically alleges seven distinct types of unfair (or deceptive) conduct in Paragraphs 212-218 of the SAC.  Defendants completely fail to address or even acknowledge these allegations in their Motion to Dismiss.  Defendants confuse a contribution to their unfair practices – the data inaccuracies caused by Defendants' servicing platform – with the *actual* unfair

[22] The Motion to Dismiss is confusing as to whether Defendants' argument only applies to Count V, or both Counts V and VI. Therefore, the Attorney General addresses both Counts.

practices alleged in Counts V and VI.  Because Defendants' arguments are not applicable to the actual allegations in Counts V and Count VI, the Court should deny dismissal on these grounds.[23]

Defendants erroneously assert that the Attorney General failed to point to a "requirement, rule, industry standard, or technological measurement by which the functions, accuracy, and completeness of Ocwen's servicing system can or should be judged."  [ECF No. 96, p. 32].  First, Count V and VI are not simply based on Defendants' substandard servicing system.  Furthermore, the Attorney General does not have to rely on a specific rule or regulation to determine what is deceptive or unfair under Section 504.204(1), Florida Statutes.  *See Dep't of Legal Affairs v. Father & Son Moving & Storage, Inc.*, 643 So. 2d 22, 24 (Fla. 4th DCA 1994) (reversed dismissal on the basis that a specific rule or regulation is not needed to find conduct to be unfair or deceptive); *see also State of Fla., Office of the Att'y Gen., Dep't of Legal Affairs v. Tenet Healthcare Corp.,* 420 F. Supp. 2d 1288, 1310 (S.D. Fla. 2005) (an act does not need to violate a specific rule or regulation to be considered deceptive and violate FDUTPA; court denied the motion to dismiss FDUTPA claim).

Nor does Count V or VI violate Defendants' due process rights.  Defendants incorrectly and illogically assert that "Ocwen had no fair notice under the Due Process Clause as to how the technological and operational parameters of a loan servicing system or data inputs could violate the law."  [ECF No. 96, p. 32].  The Attorney General's claims are not based on the technological and operational parameters of the servicing system.  Rather, Counts V and VI allege specific unfair or deceptive practices by Defendants, which may have been exacerbated, in part, by insufficiencies or failures of their servicing platform. [24]  Section 501.204, Florida Statutes, does not have to spell out every act that is considered deceptive or unfair in order to pass muster with due process rights.

---

[23] Defendants also have apparently confused the standard for a motion to dismiss as they state that "Florida fails to *establish* that any of Ocwen's alleged practices … either offends established public policy or caused substantial injury to consumers.  [ECF No. 96, p. 31].  At the pleading stage, the Attorney General does not have to prove any of the allegations; rather, it must only state a plausible claim, which it has.

[24] Count V alleges, for example: improper imposition of force-placed insurance, including excessive amounts of coverage, the use of incorrect data or incomplete or missing documentation to service borrowers' loans; charging borrowers excessive property inspection fees; charging borrowers excessive BPO fees; back-dating time sensitive letters to borrowers; failing to make escrow disbursements for insurance; failing to release liens in a timely fashion; failing to honor existing trial loan modification agreements; and using unlicensed vendors to conduct mortgage servicing functions. *See* [ECF No. 88, ¶ 200(a) & (c)-(j)].

When interpreting the constitutionality of Sections 501.204 and 501.205, Florida Statutes, the Florida Supreme Court held that such sections are constitutional as they are "not vague and indefinite and do not constitute an unconstitutional delegation of legislative authority." *Dep't of Legal Affairs v. Rogers*, 329 So. 2d 257, 267 (Fla. 1976) (reversing lower court's holding that such statutes were unconstitutionally vague and indefinite); *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 256 (3d Cir. 2015) (interpreting § 45(a) of the FTC Act and holding that the defendant is only entitled to notice of the meaning of § 45(a) and not the FTC's interpretation of the statute). Because Counts V and VI are not actions based on the "technological and operational parameters of a loan servicing systems or data inputs," [ECF No. 96, p. 31], Defendants' due process arguments premised on the same must fail. The Attorney General also maintains that Defendants were on notice that mortgage servicing misconduct could be subject to enforcement under FDUTPA.[25]

---

[25] FDUTPA provides that due consideration shall be given to interpretations of Section 5 of the FTC Act. *See* Fla. Stat. 501.201(2). Therefore, actions by the FTC, the CFPB and other Attorneys General, along with private litigation, provide Defendants sufficient notice that mortgage servicing conduct is subject to liability for unfair or deceptive practices under FDUTPA. *See generally* Compl., *FTC v. EMC Mortg. Co.*, No. 08-cv-338 (E.D. Tex. Sept. 8, 2008) (action based in part on defendants' use of inaccurate or unverified loan data to make inaccurate representations to borrowers and unwarranted collection practices); Compl., *CFPB v. Green Tree Servicing*, No. 15-2064 (D. Minn. Apr. 15, 2015), (allegations regarding violations of FTC, FDCPA, and FCRA by loan servicer; the alleged unfair or deceptive conduct includes servicer's mishandling of loss mitigation, failure to verify information from prior servicers, and knowledge that certain loan portfolios included unreliable or missing data about the borrowers' loans); Compl., *U.S., et al. v. Bank of Am. Corp., et al.*, 2012 WL 798776 (D.D.C. March 12, 2012) (allegations against financial institutions for loan servicing and foreclosure processing misconduct). State regulators have filed enforcement actions against Defendants for servicing and foreclosure misconduct, including specific allegations of gaps in the servicing records for loans in Defendants' portfolio. *See, e.g.,* Consent Order, *In the Matter of Ocwen Financial Corp., et al.*, 2014 WL 7899416 (N.Y. Bnk. Dept. Dec. 22, 2014); Consent Order, *In the Matter of Ocwen Loan Servicing, LLC*, 2015 WL 11109398 (Cal. Dept. Corp. Jan. 23, 2015). In January 2017, the United States Inspector General for the Troubled Asset Relief Program ("SIGTARP") released a report stating that Ocwen has one of the worst track records in foreclosure mitigation. *See* SIGTARP, Quarterly Report to Congress, January 27, 2017, www.sigtarp.gov (last visited July 29, 2017). The report includes a finding that Ocwen wrongfully terminated borrowers from HAMP loan modifications in 2014 through 2016. *Id.* at p. 76. The report cited Ocwen for improperly holding borrower payments in suspense accounts, improperly reversing and reapplying payments, and mishandling rolling delinquencies. *Id.*

### C.  An enforcement authority need not plead actual damages.

Counts V and VI are statutory enforcement actions brought by the Attorney General, an enforcing authority of FDUTPA, to enjoin FDUTPA violations and to obtain "refund of moneys to consumers; restitution; disgorgement, and any other injunctive or equitable relief allowable under law." [ECF No. 88, p. 56].  FDUTPA creates three distinct causes of action that the Attorney General may bring: an action for a declaratory judgment, an action for an injunction, and an action for actual damages. § 501.207(1), Fla. Stat. In a separate subsection, FDUTPA also lists the various *remedies* the Attorney General may seek upon motion in any of those causes of action. § 501.207(3), Fla. Stat. One such remedy is "equitable" relief: "Upon motion of [the Attorney General] . . . in any action . . . the court may . . . grant legal, *equitable*, or other appropriate relief." (emphasis added). *Id.* In other words, the court can grant *equitable relief* in *any action* brought by the Attorney General, regardless of the cause of action pled, including an action seeking an injunction.

Consumer restitution is equitable relief available to the enforcing authority and is distinct from the legal relief of actual damages.  *Outreach Housing, LLC v. Office of the Att'y Gen.*, 221 So. 3d 691, 697 (Fla. 4th DCA). Specifically, actual damages require proof of the "difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. 3d DCA 1984). In other words, damages make a victim whole. Conversely, restitution (or disgorgement) is a form of *equitable* relief meant "*not* to compensate the victims of fraud, but to deprive the wrongdoer of his ill-gotten gain." *F.T.C. v. Gem Merch. Corp.,* 87 F.3d 466, 470 (11th Cir. 1996)  (emphasis added); *see F.T.C. v. Verity Int'l, Ltd.*, 443 F.3d 48, 67 (2d Cir. 2006) ("The appropriate measure for restitution is the benefit unjustly received by the defendants.").[26] "In an equitable enforcement action seeking to freeze the defendants' assets, the defendants are liable to the extent of their ill-gotten gains, that being

---

[26] A stated purpose of FDUTPA is "[t]o make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection," § 501.202(3), Fla. Stat., and Florida courts must give "due consideration and great weight . . . to the interpretations of the [FTC] and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act," *id.* § 501.204(2). Thus, this Court should consider jurisprudence construing federal consumer-protection statutes such as section 13(b) of the FTC Act, 15 U.S.C. § 53(b), which is materially similar to 501.207(1)(b) and (3), Fla. Stat.

revenue and not net profit." *E-Racer Tech, LLC v. Office of Att'y Gen. Dep't of Legal Affairs,* 198 So. 3d 1107, 1110 (Fla. 4th DCA 2016).

The difference in pleading requirements between cases seeking equitable relief and cases seeking actual damages is well settled. Florida's district courts of appeal have uniformly recognized that pleading actual damages is not required when the Attorney General does not seek them. *See Beach Blvd*, 139 So. 3d 380 at 394 ("Appellees' premise that [the Attorney General] had to plead and prove actual damages in order to bring a FDUTPA claim is flawed."); *Himes v. Brown & Co. Securities Corp.*, 518 So. 2d 937, 938 n.1 (Fla. 3d DCA 1987) ("[T]he legislature . . . has decided to leave the enforcement of [FDUTPA] in the hands of state agencies in cases where the victims have not suffered actual damages."); *Chicken Unlimited, Inc. v. Bockover*, 374 So. 2d 96, 97 (Fla. 2d DCA 1979) ("*As contrasted to an action brought by an enforcing authority under Section 501.207(1)(a) or (b)*, this statute makes it clear that a plaintiff seeking damages must show not only that a defendant engaged in unfair or deceptive trade practices but also that those practices caused injury to the plaintiff." (emphasis added)); *see also Philip Morris USA Inc. v. Hines*, 883 So. 2d 292, 295 (Fla. 4th DCA 2003) (the "legislature left enforcement of FDUTPA 'in the hands of state agencies in cases where the victims have not suffered actual damages'" (quoting *Himes*, 518 So. 2d at 938 n.1)). Florida courts have recognized the "advantage over private remedies" that the enforcing authority has in seeking restitution: "state agencies need not prove that victims suffered actual damages." *Rollins, Inc. v. Butland,* 951 So. 2d 860, 880 (Fla. 2d DCA 2006). Florida courts have also upheld an asset freeze to ensure the availability of funds for consumer restitution where the Attorney General did not plead actual damages. *See E-Racer Tech*, 198 So. 3d at 1110.

This accords with FDUTPA's text. Sections 501.207(1)(a) and (b), providing for actions seeking equitable relief, make no mention of—much less require the Attorney General to plead— actual damages. Instead, they provide an avenue for the Attorney General to obtain either a declaratory judgment that someone is violating FDUTPA or an injunction against someone who has violated, is violating, or *likely will violate* FDUTPA. In authorizing the Attorney General to seek injunctive relief, the Legislature did not intend for it to wait until consumers suffer actual damages before it could halt an unfair or deceptive trade practice. *See Davis v. Powertel, Inc.*, 776 So. 2d 971, 975 (Fla. 1st DCA 2000) ("[A]n aggrieved party may pursue a claim for declaratory

or injunctive relief under the Act, even if the effect of those remedies would be limited to the protection of consumers who have not yet been harmed by the unlawful trade practice.").

Defendants suggest that *dicta* in *Outreach Housing, LLC v Office of the Att'y Gen., Dep't of Legal Affairs,* 2017 WL 2983990 (Fla. 4th DCA, July 12, 2017), stating that "[a]ctual damages are an essential element of an FDUTPA claim" applies to governmental litigants seeking only equitable remedies as well as private litigants seeking actual damages; however, there is no basis for this interpretation in the opinion itself or in common sense. Plaintiffs request "refund of moneys to consumers; restitution; disgorgement, and any other injunctive or equitable relief allowable under law, including, but not limited to, pursuant to 12 U.S.C. § 5565(a) and Section 501.207(3), Florida Statutes." [ECF No. 88, p. 56]. The Attorney General does not seek actual damages. In the light most favorable to Defendants, *Outreach Housing* (at most) stands for the proposition that actual damages are an essential element of a FDUTPA claim seeking actual damages. *See Outreach Housing,* 2017 WL 2983990 at *2 & 4.[27]

Defendants also mischaracterize *Tenet,* 420 F. Supp. 2d at 1309 and *Beach Blvd,* 139 So. 3d at 394, both Attorney General actions, as requiring actual damages to be pled regardless of whether the action is brought for actual damages. In *Tenet*, unlike the instant case, the Attorney General did seek to recover actual damages; therefore, the pleading of damages was required. *See Complaint, Office of the Att'y Gen. v. Tenet Healthcare Corp.*, No. 05-cv-20591, ECF 1, ¶133 (S.D. Fla. March 3, 2005). Any argument regarding the requirement to plead actual damages based on *Tenet* is irrelevant. Defendants' reliance on *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243 (11th Cir. 2013) and *Lydia Sec. Monitoring, Inc. v. Alarm One, Inc.*, No. 07-cv-80145, 2007 WL 2446889 (S.D. Fla. Aug. 23, 2007), is also misplaced as these cases deal with individual claims under FDUTPA and not enforcement actions.

The Attorney General does not need to allege actual damages in this action, and Defendants' inappropriate attempts to hold the Attorney General – the enforcing authority – to the pleading standards for an individual claimant must fail.

### D. Coverage by a Prior Class Action is Only a Potential Defense to the Scope of Recovery on Behalf of Consumers.

Defendants argue that any "monetary payment to consumers concerning the placement of [lender placed insurance] . . . must be limited by recoveries" because of the settlement of a class

---

[27] In *Outreach Housing*, the Attorney General sought actual damages in its complaint.

action through *Lee v. Ocwen Loan Servicing, LLC.* [ECF No. 96, p. 30]. This argument asserts a potential defense to liability; therefore, it is premature at this time. Defendants even admit that the class period in *Lee* is of January 1, 2008 through January 23, 2015 while the SAC covers claims accruing from February 27, 2014 forward. *See id.* Thus, the claims asserted in the SAC cannot be the same as those covered by *Lee*.

Moreover, it is well-established that the government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests. *Herman v. South Carolina Nat'l Bank,* 140 F.3d 1413, 1423-25 (11th Cir.1998); *Commodity Futures Trading Comm'n v. Commercial Hedge Serv., Inc.*, 422 F. Supp. 2d 1057, 1061 (D. Neb. 2006) (a private settlement cannot preclude the Commission from seeking additional restitution or any other remedy because "the Commission seeks to protect a public interest that far exceeds the interest of individual citizens."). While class actions seek private remedies for a limited, defined class of persons, the Attorney General is charged with the duty to protect the public at large from unscrupulous business practices by Defendants, and in this case from conduct that occurred after February 27, 2014; a task which could not be undertaken by the private litigant in the *Lee* class action. *See Secretary U.S. Dept. of Labor v. Kwasny*, 853 F.3d 87, 95 (3d. Cir. 2017) (private plaintiffs do not adequately represent the broader national public interest that the Secretary is charged with in the context of ERISA suits). Therefore, this argument should be rejected as a basis for dismissal.

## V.  Plaintiffs do not need to negate Defendants' Affirmative Defenses in the Complaint.

"[P]laintiffs are not required to negate an affirmative defense in [their] complaint." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (quoting *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993)). Generally, ruling on affirmative defenses at the motion to dismiss stage is procedurally premature unless there are sufficient facts alleged in the complaint to rule on the affirmative defense. *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984). The allegations in the Counts provide no facts in support of any potential defense by Defendants. Yet, Defendants prematurely raise several affirmative defenses in their Motion to Dismiss. Specifically, Defendants' arguments regarding whether borrowers were current in their loans, whether borrowers filed an application for loss mitigation less than 37 days

prior to a foreclosure sale, and whether the applicable statutes of limitations have run, are each affirmative defenses which need not be negated in the SAC.[28]

**A. Borrowers' Loan Status.**

Counts I and II are claims brought under the CFPA for RESPA and Regulation X violations. As discussed above, Count I is a claim brought by Plaintiffs for Defendants' failure to make timely disbursements from borrowers' escrow accounts. Count II is a claim brought by the Attorney General and it alleges various additional violations of Regulation X related to borrowers' escrow accounts.[29] Defendants claim that Counts I and II should be dismissed because the servicer only has to comply with the regulations at issue if the borrower is current (i.e., not more than 30 days overdue). [ECF No. 96, p. 20]. However, whether the borrower was "current" under the mortgage is a potential affirmative defense, and not a basis for dismissal. *See Quiller*, 727 F.2d at 1068; *Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1013 (11th Cir. 1982) (requiring the statutory exemption to a "[Title VII] claim to be pled as an affirmative defense promotes fairness."); *Rachbach v. Cogswell*, 547 F.2d 502, 505 (10th Cir. 1976) (a statutory exemption to TILA must be pled as an affirmative defense) (citations omitted).

**B. Dual Tracking Claims.**

Defendants assert that the dual tracking claim in Count III should be dismissed because the Attorney General failed to allege (i) that the violations relate to a borrower's first complete loss mitigation application, and (ii) that the violations relate to "borrowers who completed an application when at least 37 days were left before the sale was at that point scheduled." [ECF No. 96, p. 22]. "A servicer is only required to comply with the requirements of this section for a single complete loss mitigation application for a borrower's mortgage loan account." 12 C.F.R. § 1024.41(i). Therefore, whether a borrower submitted more than one complete loss mitigation application is a potential factual defense which is only available to Defendants once they have

---

[28] The borrower-specific affirmative defenses also ignore that this is not a private action brought by an individual borrower, but rather an action brought by enforcing authorities of state and federal law. Defendants appear to wholly ignore, for example, that a violation of RESPA includes "*any* act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law." 12 U.S.C. § 5561(5) (emphasis added). *Any* violation exposes Defendants to, at a minimum, penalties. 12 U.S.C. § 5565(c)(1)).

[29] More specifically, Count II asserts a claim for violations of the following sections of Regulation X: 12 C.F.R. §§ 1024.17(c)(3), 1024.17(f)(2)(i), 1024.17(f)(3) & (4) & 1024.17(i).

shown that the loss mitigation application is a duplicate request and that the servicer already complied with the requirements of Section 41 for the first complete application. *See Quiller*, 727 F.2d at 1068; *see also Jackson*, 678 F.2d at 1013; *Rachbach*, 547 F.2d at 505. The cases on which Defendants rely are inapplicable as follows: *Wentzell v. JPMorgan Chase Bank, N.A.*, 627 F. App'x 314, 318 (5th Cir. 2015) (unpublished decision)[30] did not even involve a RESPA violation, but rather a borrower who brought an action under Mississippi law for wrongful foreclosure prior to Regulation X's effective date; and in *Trionfo v. Bank of Am., N.A*, No. 15-cv-925, 2015 WL 5165415, at *4 (D. Md. Sept. 2, 2015), the court found that the borrower admitted that the loss mitigation application at issue was not the first application.

Similarly, the assertion that 12 C.F.R. § 1024.41(g) only relates to complete applications submitted at least 37 days before the sale was scheduled at that point is also a factual defense. 12 C.F.R. § 1024.41(g). The Attorney General clearly pled the requirements of Section 1024.41(g) – that "[i]f a borrower submits a complete loss mitigation application … more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale" unless certain exceptions apply. *Id.* Defendants cite to *Lage v. Ocwen Loan Servicing*, 839 F.3d 1003 (11th Cir. 2016), in support of dismissal, but the *Lage* decision had nothing to do with a motion to dismiss of a dual tracking claim. Rather, the Eleventh Circuit affirmed summary judgment against the borrower because the borrower submitted a complete application two days prior to the scheduled foreclosure sale, and therefore the Court held that the servicer had no duty to evaluate the borrower's application. *Id.* at 1009-11. Therefore, *Lage* deals with a defense to liability and not pleading requirements. Defendants failed to alert this Court to the fact that in *Lage*, the Court *denied* Ocwen's motion to dismiss. *Lage v. Ocwen Loan Servicing*, No. 14-cv-81522, ECF No. 21 (S.D. Fla. Feb. 21, 2015). While Defendants also repeatedly reference the date of the "ultimate foreclosure sale," [ECF No. 96, p. 22], Count III as pled, makes no reference to "ultimate foreclosure sale" date. Again, this is the type of fact that must be proven by Defendants as an affirmative defense, and is not a basis for dismissal.

---

[30] *Wentzell* did not involve RESPA or Regulation X, but rather a wrongful foreclosure action under Mississippi law, which took place prior to the effective date of Regulation X. In a footnote, the court noted because the borrower' "claims relate to later alleged loan modifications, they have not stated a claim even under the federal regulation." *Wentzell,* 627 F. App'x at 318, n.4.

### C.  Statute of Limitations.

Defendants argue that portions of Counts I-IV and VI, are barred by 12 U.S.C. §§ 5564(g)(1), 4907(b)[31] & 2614.[32]   Statute of limitations is only an affirmative defense and "plaintiffs are not required to negate an affirmative defense in [their] complaint." *La Grasta,* 358 F.3d at 845 (citing *Tregenza,* 12 F.3d at 718); *see also* Fed. R. Civ. P. 8(c) (listing statute of limitations as an affirmative defense). "[D]ismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred." *LaGrasta,* 358 F.3d at 845 (citing *Omar v. Lindsey,* 334 F.3d 1246, 1251 (11th Cir. 2003) (stating that it is proper to grant a Rule 12(b)(6) motion if it is apparent on the face of the complaint that the statute of limitations has run); *Carmichael v. Nissan Motor Acceptance Corp.,* 291 F.3d 1278, 1279 (11th Cir. 2002)).

The applicable statute of limitations for the claims in Counts I, II and III is three years.  *See* 12 U.S.C. §§ 5564(g)(1) & 2614.   Counts I, II and III clearly allege violations occurring since February 27, 2014, through the Original Complaint's filing date of April 20, 2017.  It is apparent from the face of the SAC that Counts I, II and III are not time barred given that such Counts allege violations occurring since February 27, 2014.   Even if certain violations occurring between February 27, 2014 and April 20, 2014 are time barred, this is a potential affirmative defense to the SAC and not a basis for dismissal of these Counts.  The same logic applies for Count IV, which is subject to a 2-year limitations period.

OFR brought Count VII under Chapter 494, Florida Statutes, for RESPA and Regulation X violations.[33]  The statute of limitations for the enforcement by OFR of RESPA for conduct in Florida is that set by Florida law.  In administrative proceedings, there is no statute of limitations. *Farzad v. Dep't of Prof'l Regulation, Fla. Bd. of Med. Exam'rs*, 443 So. 2d 373, 375 (Fla. 1st DCA

---

[31] 12 U.S.C. § 5364(g) and 12 U.S.C. § 4907(b) provide a limitation of three years from the date of discovery.

[32] 12 U.S.C. § 2614 provides for a limitation of three years from the date of the violation.

[33] OFR regulates loan originators, mortgage brokers, and mortgage lenders pursuant to Chapter 494, Florida Statutes.  The authority to enforce chapter 494, Florida Statutes, is vested in OFR. Fla. Stat. §§ 494.011 & 494.012.  The Florida Legislature included section 494.00255(m), Florida Statutes, which specifically authorizes enforcement of RESPA provisions and regulations adopted under RESPA.  By authorizing enforcement of RESPA in state law, RESPA requirements and provisions become the law of the state.  The State of Florida, as a sovereign state, sets its own terms and conditions for regulating business activities, such as mortgage servicing, within its borders, including limitations on state enforcement of adopted provisions, such as RESPA.

1983) (in the absence of specific legislative authority, civil or criminal statutes of limitation are inapplicable to administrative license revocation proceedings).   However, by filing suit in court, Section 95.011, Florida Statutes, becomes applicable, and imposes a limit on civil actions and proceedings by the state, including this case.   Florida's general statute of limitations, Section 95.11(3)(f), Florida Statutes, provides a limitation on civil actions and proceedings of four years. Clearly, all events for which relief is sought in Count VI occurred within four years of the filing date of this complaint.

### VI.   OFR is authorized to bring Counts VII and VIII.

Defendants argue that OFR is not authorized to bring suit for monetary penalties as alleged in Counts VII and VIII, but may only seek monetary penalties in an administrative proceeding. However, Defendants fail to provide any authority to support their argument.   Section 494.002, Florida Statutes, provides "[t]his chapter does not limit any statutory or common-law right of any person to bring any action in any court for any act involved in the mortgage loan business or the right of the state to punish any person for any violation of any law."

Count VII alleges violations of Florida regulatory law that incorporates RESPA provisions. Pursuant to Sections 494.00255(l), (m) and (u), Florida Statutes, the RESPA violations may be punished by disciplinary action that may include a fine.   Similarly, Count VII alleges violation of Florida regulatory law that requires a mortgage lender – which is the license held by OLS[34] with the State of Florida – to submit an annual financial audit prepared by an independent licensed certified public accountant as of the licensee's fiscal year end.   The licensee has 120 days after the end of the licensee's fiscal year to comply.   Fla. Stat. § 494.0063.   Ocwen Loan Servicing failed to comply with the regulatory requirement.   The penalty for failure to comply may include an administrative fine.   Fla. Stat. § 494.00255(2).[35]

Pursuant to Rule 69V-40-111, Florida Administrative Code, which was in effect until November 9, 2015, OFR is limited to an administrative fine in the sum of $5,000 for each violation. The OFR seeks $5,000 for each category of violation, therefore, a total administrative penalty of $10,000, is due to OFR.

---

[34] OMS also holds a mortgage lender license with OFR.
[35] Pursuant to applicable Disciplinary Guidelines applicable to events from November, 2015, the penalty may include a fine of $1,000 to $3,500 per violation, suspension of license for 3 to 10 days, or revocation of license.  Form OFR-494-14.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order denying Defendants' Motion to Dismiss in its entirety.  In the alternative, to the extent the Court finds the Second Amended Complaint has any pleading deficiencies, Plaintiffs request the Court enter an order for a more definite statement.  Plaintiffs also request that this Court enter an order denying Defendants' request for oral argument (45 minutes per side), as the issues do not merit an oral argument.

Dated: August 22, 2018

Respectfully Submitted,

Office of the Attorney General
The State of Florida
Department of Legal Affairs

Pamela Jo Bondi
Attorney General

*/s/ Sasha Funk Granai*
Sasha Funk Granai
Assistant Attorney General
Fla. Bar No.: 96648
Email: *Sasha.Granai@myfloridalegal.com*

Jennifer Hayes Pinder
Senior Assistant Attorney General
Fla. Bar No.: 17325
Email: *Jennifer.Pinder@myfloridalegal.co*m

Victoria Butler
Director, Consumer Protection Division
Fla. Bar No.: 861250
Email: *Victoria.Butler@myfloridalegal.com*

3507 East Frontage Road, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515

Office of Financial Regulations
The State of Florida
Division of Consumer Finance

/s/ *Scott Fransen*
Scott R. Fransen
Assistant General Counsel
Fla. Bar No.: 0994571
Email: *Scott.Fransen@flofr.com*
1313 N. Tampa St., Suite 615
Tampa, FL 33602
Telephone: 813-218-5364
Facsimile: 813-272-3752

Miriam S. Wilkinson
Chief Counsel
Fla. Bar No.: 972101
Email: *Miriam.Wilkinson@flofr.com*

Anthony Cammarata
General Counsel
Fla. Bar No.: 767492
Email: *Anthony.Cammarata@flofr.com*
The Fletcher Building
200 E. Gaines Street
Tallahassee, FL 32399-0370
Telephone: 850-410-9601

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2018, a true and correct copy of the foregoing was served on the following via CM/ECF:

Thomas M. Hefferon, Esq.
Goodwin Procter LLP
901 New York Avenue NW
Washington, DC 20001
Phone: 202-346-4000
Email: thefferon@goodwinlaw.com

Sabrina M. Rose-Smith, Esq.
Goodwin Procter LLP
901 New York Ave., NW
Washington, DC 20001
Phone: 202-346-4000
Fax: 202-585-6600
Email: srosesmith@goodwinlaw.com

Bridget Ann Berry, Esq.
Greenberg Traurig, P.A.
777 S. Flagler Drive, Suite 300 E
West Palm Beach, FL 33401
Phone: 561-650-7912|
Fax: 651-655-6222
Email: BerryB@gtlaw.com,
darschs@gtlaw.com, thomsonj@gtlaw.com,
whitfieldd@gtlaw.com, and
WPBLitDock@GTLAW.com

Catalina E Azuero, Esq.
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Phone: 617-570-1000
Email: CAzuero@goodwinlaw.com

Andrew Stuart Wein, Esq.
Greenberg Traurig, PA
777 S. Flagler Dr., Suite 300E
West Palm Beach, FL 33401
Phone: 561-650-7900
Fax: 561-655-6222
Email: weina@gtlaw.com

Laura Stoll, Esq.
Goodwin Procter LLP
601 South Figueroa Street
Los Angeles, CA 90017
Phone: (213) 426-2625
Email: lstoll@goodwinlaw.com

Attorneys for Defendants Ocwen Financial Corporation, Ocwen Mortgage Servicing, Inc., and Ocwen Loan Servicing, LLC.

_/s/ Sasha Funk Granai_____
Sasha Funk Granai f/k/a Celine Funk
Assistant Attorney General